UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-1580 (RCL) |
| | ) | |
| JOHN R. BOLTON, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**EMERGENCY APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff, the United States of America, by and through its attorneys, respectfully files this Emergency Application for Temporary Restraining Order and Motion for Preliminary Injunction ("Application") against Defendant John R. Bolton seeking to enjoin publication of a book containing classified information.  Prior to filing this Application, and consistent with Local Civil Rule 65.1(a), the United States contacted counsel for Mr. Bolton, provided him notice that the United States would be filing this Application today, and sent him copies of all papers submitted with the United States' complaint in this action and the materials submitted herewith (except for the classified declarations noted below).   The United States understands the Mr. Bolton opposes the relief sought by this Application.

The United States respectfully requests that the Court schedule a hearing on this Application at the Court's earliest convenience on Friday, June 19, 2020, because Mr. Bolton's book is scheduled to be released on Tuesday, June 23, 2020.

In support of this Application, Plaintiff refers the Court to (1) the Complaint and relevant attachments thereto; (2) Plaintiff's Memorandum of Law In Support of Its Application for Temporary Restraining Order and Preliminary Injunction, attached to this Application; (3) the

unclassified declarations attached to this Application; and (4) the classified declarations of Michael

Ellis and William R. Evanina, which have been lodged with the Court *ex parte* for purposes of *in*

*camera* review.  A proposed order is attached for the Court's consideration.

Dated:  June 17, 2020                              Respectfully submitted,

                                                   JOSEPH H. HUNT
                                                   Assistant Attorney General

                                                   MICHAEL SHERWIN
                                                   Acting United States Attorney

                                                   ETHAN P. DAVIS
                                                   Principal Deputy Assistant Attorney General

                                                   DAVID M. MORRELL
                                                   Deputy Assistant Attorney General

                                                   ALEXANDER K. HAAS
                                                   Director
                                                   Federal Programs Branch

                                                   _____*/s/ Daniel F. Van Horn*_____
                                                   Daniel F. Van Horn (D.C. Bar. No. 924092)
                                                   Assistant United States Attorney
                                                   555 Fourth Street N.W., Room E4226,
                                                   Washington, D.C. 20530
                                                   Tel: 202-252-2506
                                                   Email: daniel.vanhorn@usdoj.gov

                                                   _____*/s/ Michael J. Gerardi*_____
                                                   Michael J. Gerardi (D.C. Bar No. 1017949)
                                                   Trial Attorney
                                                   United States Department of Justice
                                                   Civil Division, Federal Programs Branch
                                                   1100 L Street NW, Room 11514
                                                   Washington, D.C. 20005
                                                   Tel: (202) 616-0680
                                                   Fax: (202) 616-8460
                                                   E-mail: michael.j.gerardi@usdoj.gov

                                                   *Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-1580 (RCL) |
| | ) | |
| JOHN R. BOLTON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES' APPLICATION
FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION…………………………………………………….…...……………1

FACTUAL BACKGROUND…………….…………………………………...…..……….1

    A. Defendant Assumed Statutory and Contractual Obligations Not to Disclose
       Classified Information, to Submit Manuscripts for Prepublication Review,
       and to Abide by the Results of Such Review……………………………….….……2

    B. Defendant Wrote a Book Subject to Prepublication Review, Submitted it for
       Prepublication Review, and Did Not Receive Written Authorization to Publish
       the Book, which Continues to Contain Classified Information……………………….4

    C. Without Written Authorization and Without Notice, Defendant Submitted His
       Book to Simon & Schuster For Publication Containing Classified Material……...….6

LEGAL STANDARD…………….……………………………………...…..………..8

ARGUMENT………………..…………………………………………...…..………9

  I. The Government Is Likely to Succeed on the Merits…………………………9

    A. By Publishing Classification Information Without Written Approval After
       Completion Of Prepublication Review, Defendant Has Breached His Secrecy
       Obligations To the Federal Government……………………………………. 10

       **1.** Defendant Breached His SF 4414 Agreement by Walking
          Away From the Pre-Publication Process Before It Was Complete..….12

       **2.** Defendant Breached His SF 312 Agreement by Disclosing
          Classified Information Without Prior Approval……………………..14

    B. Courts Consistently Have Upheld, Over First Amendment Objections,
       the Government's Right to Enforce Secrecy Agreements Like Those
       Defendant Signed…………………………………...……………………15

    C. Defendant Lacks Any Valid Defenses, Contractual or Otherwise, to
       Enforcement of His Secrecy Obligations……………………………...….19

  II. The United States Will Be Irreparably Harmed Without an Injunction…….....…….23

  III. The Balance of the Equities and the Public Interest Factors Also Weigh in
     Favor of an Injunction…………………………………………………………25

  IV. The Injunction Should Provide Full Relief to the United States………...………..27

CONCLUSION……………………………………………………………………..30

# TABLE OF AUTHORITIES

**Cases**

*Aevoe Corp. v. AE Tech Co.*, 727 F.3d 1375 (Fed. Cir. 2013) ................................................. 28, 29

*Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362 (4th Cir. 1975 ....................................................... 18

*Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986) ................................................................. 28

*Armenian Assembly of America v. Cafesjian*, 692 F. Supp. 2d 20 (D.D.C. 2010) ...................... 10

*Bartnicki v. Vopper*, 532 U.S. 514  (2001 ...................................................................................... 28

*Branzburg v. Hayes*, 408 U.S. 665 (1972) ..................................................................................... 28

*Davis v. PBGC*, 571 F.3d 1288 (D.C. Cir. 2009) ............................................................................ 8

*Dep't of Health & Human Servs. v. Alley*, 556 U.S. 1149 (2009) ................................................ 24

*Dep't of Navy v. Egan*, 484 U.S. 518 (1988) ................................................................................. 12

*Edgar v. Coats*, No. GJH-19-985, 2020 WL 1890509 (D. Md. Apr. 16, 2020) ........................... 22

*Elec. Privacy Info. Ctr. v. FTC*, 844 F. Supp. 2d 98 (D.D.C. 2012) .............................................. 8

*Fox TV Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30 (D.D.C. 2013) ................................. 8

*In re Navy Chaplaincy*, 738 F.3d 425 (D.C. Cir. 2013) ................................................................... 8

*In re Papandreou*, 139 F.3d 247 (D.C. Cir. 1998) ......................................................................... 23

*John Doe Agency v. John Doe Corp.*, 488 U.S. 1306 (1989) ......................................................... 23

*Johnson v. Zerbst*, 304 U.S. 458 (1938). ....................................................................................... 21

*Marshak v. Treadwell*, 595 F.3d 478 (3d Cir. 2009) ..................................................................... 28

*\*McGehee v. Casey*,718 F.2d 1137 (D.C. Cir. 1983). ........................................................ 18, 20, 22

*Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67 (D.D.C. 2001)) ......................................... 8

*New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam) ............................ 18

*Nken v. Holder*, 556 U.S. 418 (2009). ........................................................................................... 25

*People for the Am. Way Found. v. U.S. Dep't of Educ.*, 518 F. Supp. 2d 174 (D.D.C. 2007) ..... 24

*Providence Journal v. FBI*, 595 F.2d 889 (1st Cir. 1979) ....................................................... 23, 24

*Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945) .................................................................. 28

*Savarese v. Agriss*, 883 F.2d 1194 (3d Cir. 1989) ....................................................................... 27

*Singh v. Carter*, 185 F. Supp. 3d 11 (D.D.C. 2016) ..................................................................... 8

*\*Snepp v. United States*, 444 U.S. 507 (1980) ..................................................................... passim

*Stillman v. CIA*, 319 F.3d 546 (D.C. Cir. 2003) ............................................................. 15, 18, 21

*Stillman v. CIA*, 517 F. Supp. 2d 32 (D.D.C. 2007) ................................................................... 17

*U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133 (D.D.C. 2015)..................... 25

*United States v. Aguilar*, 515 U.S. 593 (1995) ......................................................................... 16

*United States v. Bin Laden*, 58 F. Supp. 2d 113, 122 (S.D.N.Y. 1999)...................................... 25

*United States v. Hashmi*, 621 F. Supp. 2d 76 (S.D.N.Y. 2008).................................................. 25

*\*United States v. Marchetti*, 466 F.2d 1309 (4th Cir. 1972), ............................................... passim

*United States v. Pappas*, 94 F.3d 795 (2d Cir.1996) .................................................................. 15

*United States v. Ring*, 628 F. Supp. 2d 195 (D.D.C. 2009) ........................................................ 10

*United States v. Silvano*, 812 F.2d 754 (1st Cir.1987)................................................................ 10

*United States v. Snepp*, 897 F.2d 138 (4th Cir. 1990) .......................................................... 17, 22

*Veit & Co. v. United* States, 46 Fed. Cl. 30, (2003)................................................................... 22

*Wilson v. C.I.A.*, 586 F.3d 171 (2d Cir. 2009) .................................................................. 15, 20, 21

*Winter v. NRDC*, Inc., 555 U.S. 7 (2008). .............................................................................. 8, 26

## Constitutional Provisions

U.S. Const., Art. II, § 2 ............................................................................................................ 12

**Rules**

Federal Rule of Civil Procedure 65(d)(2), ......................................................................... 27

**Other Authorities**

Executive Order 13526 ............................................................................................................ 4

Intelligence Community Directive 703 (June 21, 2013),
   https://www.dni.gov/files/documents/ICD/ICD%20703.pdf...................................................... 2

John Bolton, "Edward Snowden's leaks are a grave threat to US national security," The
   Guardian, https://www.theguardian.com/commentisfree/2013/jun/18/edward-snowden-leaks-
   grave-threat (June 18, 2013). ................................................................................................. 25

## INTRODUCTION

A National Security Advisor to a sitting President possesses national security information like few others.  Were such a person to offer such information for sale to foreign governments, all would readily acknowledge the wrongdoing involved.  That is why, when similar risks occur from the proposed dissemination of books, such individuals are required by contractual and fiduciary obligations to submit their manuscripts for prepublication review and not to publish them without having received written approval to do so.  In this case, defendant John Bolton has not received any such approval, but unilaterally has decided to abandon the prepublication review process that he agreed to and instead plans to disseminate classified information as he sees fit in order to profit from his book.  To be clear: Defendant's manuscript still contains classified information, as confirmed by some of the Government's most senior national-security and intelligence officials— the Director of National Intelligence, the Director of the National Security Agency ("NSA"), the Director of the National Counterintelligence and Security Center, and the National Security Counsel's ("NSC's") Senior Director for Intelligence Programs.  Disclosure of the manuscript will damage the national security of the United States.  The United States asks this Court to hold Defendant to the legal obligations he freely assumed as a condition of receiving access to classified information and prevent the harm to national security that will result if his manuscript is published to the world.

## FACTUAL BACKGROUND

Defendant is an experienced public official, with nearly four decades of service in positions of public trust in the United States Government.  He is an attorney, having graduated from Yale Law School, who previously served as, among other things, General Counsel and Assistant Administrator for the U.S. Agency for International Development; Assistant Attorney General at

the Department of Justice; Assistant Secretary and Under Secretary at the Department of State; and as U.S. Ambassador to the United Nations. This case arises out of Defendant's most recent service—his appointment by the President as National Security Advisor on April 9, 2018, and his voluntary acceptance of that appointment. Compl. ¶ 9. As National Security Advisor, Defendant directed and supervised the work of the National Security Council staff on behalf of the President. Defendant knew he would be privy to and responsible for safeguarding the Nation's most sensitive national-security matters, and that his responsibilities would entail access to sensitive classified materials of the highest order. Compl. ¶ 21. The President entrusted this position to Defendant and gave him access to classified information so that he could serve the Nation and carry out his responsibilities as National Security Advisor.

A.     **Defendant Assumed Statutory and Contractual Obligations Not to Disclose Classified Information, to Submit Manuscripts for Prepublication Review, and to Abide by the Results of Such Review.**

When he assumed the role of National Security Advisor, and in consideration for his appointment and access to classified information, Defendant entered into a series of agreements setting forth binding nondisclosure and prepublication review obligations. In particular, he executed a Classified Information Nondisclosure Agreement, titled Standard Form 312 ("SF 312"), and two Sensitive Compartmented Information ("SCI") Nondisclosure Agreements,[1] each titled Standard Form 4414 ("Form 4414").[2] By signing the SF 312, Defendant acknowledged that "the unauthorized disclosure . . . of classified information by me could cause damage or irreparable

---

[1]     SCI is "[a] subset of [Classified National Intelligence] concerning or derived from intelligence sources, methods or analytical processes that is required to be protected within formal access control systems established by the [Director of National Intelligence]." Intelligence Community Directive 703 (June 21, 2013), https://www.dni.gov/files/documents/ICD/ICD%20703.pdf

[2]     These agreements between Defendant and the United States are included in Exhibit A to the Declaration of Matthias Mitman ("Mitman Decl.").

injury to the United States" and agreed "never [to] divulge classified information" without "prior written notice of authorization from" the relevant government agency.  SF 312 ¶ 3.  By signing the Form 4414, he similarly promised "never [to] divulge anything marked as SCI or that I know to be SCI to anyone who is not authorized to receive it without prior written authorization."  Form 4414 ¶ 3.  In both agreements, Defendant acknowledged the disclosure of classified information "may constitute a violation, or violations, of United States criminal laws."  SF 312 ¶ 4; Form 4414 ¶ 6.  He further agreed that he would "submit for security review . . . any writing or other preparation in any form . . . that contains or purports to contain any SCI or description of activities that produce or relate to SCI or that I have reason to believe are derived from SCI, that I contemplate disclosing to any person not authorized to have access to SCI or that I have prepared for public disclosure."  Form 4414 ¶ 4.  Defendant also committed "to make any required submissions prior to discussing the preparation with, or showing it to, anyone who is not authorized to have access to SCI," and "not [to] disclose the contents of such preparation with, or show it to, anyone who is not authorized to have access to SCI until I have received written authorization[.]" *Id.*  In the event Defendant was "uncertain about the classification status of information," Defendant agreed that he would be "required to confirm from an authorized official that the information is unclassified before [he could] disclose it" to an unauthorized recipient.  SF 312 ¶ 3.  These obligations were reinforced in multiple post-employment memoranda.  Mitman Decl., Exh. B, Memo. From S. Gast to J. Bolton, Sept. 13, 2019; Exh. C, Letter from J. Eisenberg to J. Bolton, Sept. 10, 2019.

When a former NSC employee, like Defendant, submits a manuscript for prepublication review pursuant to these obligations, the proposed publication is reviewed by the Records Access and Information Security Management Directorate at NSC.  Compl. ¶ 25.  NSC staff reviews the

submitted written work, requests removal of any classified information (or suggests edits to make otherwise classified language unclassified), and concludes the process by providing written authorization for the former employee to disseminate the revised materials once all classified information has been removed.  Compl. ¶¶ 26-28.  NSC staff may also work with the former employee on an iterative basis to ensure the final product is free of classified information.  Compl. ¶ 27.  The duration of the review can depend on many factors, such as the length of the written work, the amount of classified information, the sensitivity of classified information included, and how recent the information might be.  Compl. ¶ 26.

**B.    Defendant Wrote a Book Subject to Prepublication Review, Submitted it for Prepublication Review, and Did Not Receive Written Authorization to Publish the Book, which Continues to Contain Classified Information.**

Defendant's service as National Security Advisor concluded on September 10, 2019.  Compl. ¶ 9.  By November 9, 2019, Defendant had a book deal with publisher Simon & Schuster for the rights to a memoir of his time in the White House.  Compl. ¶ 23.  Public reports suggest that Defendant received approximately $2 million in the deal.  *Id.*  By late January 2020, Defendant's book was being marketed for pre-sale under the title *The Room Where It Happened*, Compl. ¶ 34—in apparent reference to the song, "The Room Where It Happens," from the hit Broadway musical *Hamilton*.  At the same time, the *New York Times* published an article that purported to describe the contents of Defendant's manuscript.  *See* Compl. ¶ 35.

Four weeks before this media surge, on December 30, 2019, counsel for Defendant initiated the prepublication review process by submitting a hard copy of Defendant's manuscript to Ellen Knight, the Senior Director for Records Access and Information Security Management Directorate at the NSC. Mitman Decl., Exh. D, Letter from C. Cooper to E. Knight, Dec. 30, 2019.  Ms. Knight is an Original Classification Authority, meaning she is "authorized to classify information in the first instance."  Executive Order 13,526, § 6.1(gg).  After conducting an initial review of the

manuscript, on January 23, 2020, Ms. Knight informed Defendant, through his counsel, that the manuscript "appears to contain significant amounts of classified information," including information classified at the Top Secret level.  Mitman Decl., Exh. E, Letter from E. Knight to C. Cooper, Jan. 23, 2020.  Ms. Knight thus instructed Defendant that his manuscript "may not be published or otherwise disclosed without the deletion of this classified information."  *Id.*

Over the next few months, Ms. Knight worked with Defendant to review his manuscript and to excise classified information.  *See* Compl. ¶¶ 32-46.  On multiple occasions, Defendant was told that he would need final written approval before he could proceed with publication.[3]  By April 27, Ms. Knight had completed her review and was of the view that the manuscript draft did not contain classified information.  Compl. ¶ 46; Unclassified Declaration of Michael Ellis ("Ellis Decl.") ¶ 9.  Ms. Knight did not, however, provide Defendant with written authorization to proceed with publishing the manuscript.  *See* Ellis Decl. ¶ 13.  To the contrary, on May 7, 2020, Ms. Knight informed Defendant that "[t]he process remains ongoing" and that her staff would "reach out as soon as there is an update to provide."  Mitman Decl., Exh. I, E-mail from E. Knight to J. Bolton, May 7, 2020.  This was Ms. Knight's last communication with Defendant.

In the meantime, after Ms. Knight's review of the draft manuscript, the Assistant to the President for National Security Affairs ("APNSA") reviewed the manuscript and concluded that it still appeared to contain classified information.  Ellis Decl. ¶ 10.  The APNSA asked the NSC's

---

[3]      Mitman Decl., Exh. F, Letter from K. Knight to C. Cooper, Feb. 7, 2020, at 1 ("In the meantime, your client has a duty not to publish or otherwise disclose the manuscript or any of its underlying information until he has addressed our concerns and received authorization to do so from our office."); Mitman Decl., Exh. G, Letter from K. Knight to C. Cooper, Feb. 24, 2020, at 2 ("Please note that the prepublication review remains in process, and your client may not publish or further disseminate the manuscript or any of its contents until authorized."); *Id.*, Exh. H, E-Mail from K. Knight to J. Bolton, Mar. 27, 2020 ("I must reiterate that the prepublication review remains in process.  Even after making the edits, you are not authorized to publish or further disseminate the manuscript or its contents until expressly given clearance by me to do so.").

Senior Director for Intelligence Programs, Michael Ellis, to conduct a further review of the manuscript and on May 2, 2020, Mr. Ellis commenced that review. Ellis Decl. ¶¶ 10-11. Like Ms. Knight, Mr. Ellis is an Original Classification Authority. Ellis Decl. ¶ 8. Mr. Ellis completed his initial review of the manuscript on June 9. Ellis Decl. ¶ 12. Mr. Ellis concluded that the manuscript contains information subject to both the Standard Form 312 and the Form 4414 signed by Defendant, and that the revisions already made to the manuscript had not removed all classified information, including information classified at the Confidential, Secret, Top Secret, and Top Secret/SCI levels. Ellis Decl. ¶¶ 19, 20. In Mr. Ellis's judgment, disclosure of certain passages in the manuscript "will damage the national security of the United States." Ellis Decl. ¶ 22. A description of examples of classified information that remains in the manuscript—and the basis for Mr. Ellis's determination that their disclosure reasonably could be expected to cause damage to national security—appears in the classified Declaration of Michael Ellis, which will be made available to the Court solely for *in camera*, *ex parte* review. *See* Classified Decl. of Michael Ellis (lodged *ex parte* with the Court).

Mr. Ellis's conclusion is shared by other senior intelligence officials. John L. Ratcliff, the Director of National Intelligence, has concluded "that the[] passages of the manuscript" reviewed by Mr. Ellis "contain classified national security information" and "if made public, will damage national security." Decl. of John L. Ratcliff ("Ratcliff Decl.") ¶¶ 6-7. William R. Evanina, the Director of the National Counterintelligence and Security Center, concluded "that the information contained in the passages I have reviewed is precisely what foreign adversaries' intelligence services seek to target and collect," and "unauthorized disclosure of this information could reasonably be expected to enable foreign threat actors to cause serious, and sometimes grave, damage to our national and economic security." Decl. of William R. Evanina ¶ 6; *see also*

Classified Decl. of William R. Evanina (lodged *ex parte* with the Court).  And Paul M. Nakasone, the Director of the National Security Agency and a general in the U.S. Army, concluded that disclosure of some of the classified information contained in the manuscript "could result in the permanent loss of a valuable [signal intelligence] source and cause irreparable damage to the U.S. [singal intelligence] system."  Decl. of Paul M. Nakasone ("Nakasone Decl.") ¶ 8.

Neither Ms. Knight, nor Mr. Ellis, nor any other NSC official provided written authorization for Defendant to proceed with publication of his manuscript.  *See* Ellis Decl. ¶ 13.

**C.    Without Written Authorization and Without Notice, Defendant Submitted His Book to Simon & Schuster For Publication Containing Classified Material.**

The Government learned through June 7, 2020 press reports that Defendant already had submitted his manuscript for publication and that he and Simon & Schuster were "planning to publish even if the White House does not give publication approval."  Compl. ¶ 53; Mitman Decl., Exh. J, Letter from J. Eisenberg to C. Cooper, June 8, 2020.  On June 8, 2020, the NSC Legal Adviser wrote to Defendant, through Defendant's counsel, reminding him that he was not authorized to publish his book because it contained classified material and because he had not yet completed prepublication review.  Mitman Decl., Exh. J.  The NSC Legal Adviser further indicated that the NSC would provide Defendant with a copy of Defendant's manuscript, with redactions for classified information, on or before June 19, 2020.  *Id.*  Two days later, on June 10, Defendant's counsel informed the Government that Defendant "and his publisher, Simon & Schuster, moved forward with publication" scheduled for June 23, 2020, and that the book had already been "printed, bound, and shipped to distributors across the country."  Compl. ¶ 55; Mitman Decl., Exh. K, Letter from C. Cooper to J. Eisenberg, June 10, 2020.

On June 11, 2020, the NSC Legal Advisor wrote to Defendant's counsel, emphasizing that "the manuscript still contains classified information, because, among other things, it includes

information that he himself classified and designed for declassification only after the lapse of twenty-five years."  Mitman Decl., Exh. L, Letter from J. Eisenberg to C. Cooper, June 11, 2020. The Legal Advisor further reminded Defendant that he "remains under an obligation to stop the dissemination of the manuscript, which still contains classified information that belongs to the United States Government, the unauthorized disclosure of which could reasonably be expected to cause serious damage to national security."  *Id.*  This suit followed.

On June 16, 2020 —three days in advance of the June 19 date Mr. Eisenberg had indicated in his June 8 letter—Mr. Ellis sent Defendant a complete marked copy of the current version of the manuscript identifying passages that he had determined, based on his initial review, appeared to contain classified information.  He offered to meet with Defendant "to discuss the removal of classified information from the manuscript."

## LEGAL STANDARD

"To obtain a preliminary injunction, the movant must establish that: (a) it is likely to succeed on the merits; (b) it is likely to suffer irreparable harm in the absence of preliminary relief; (c) the balance of equities tips in its favor; and (d) an injunction is in the public interest."  *Fox TV Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30, 37 (D.D.C. 2013) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).  "The D.C. Circuit has further instructed that 'the movant has the burden to show that all four factors . . . weigh in favor of the injunction.'"  *Id.* (quoting *Davis v. PBGC*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)).[4]  "The court considers the same factors in ruling on a motion for a temporary restraining order and a motion for preliminary injunction."  *Elec.*

---

[4]     The D.C. Circuit "has, in the past, followed the 'sliding scale' approach to evaluating preliminary injunctions . . . . The continued viability of the sliding scale approach is highly questionable, however, in light of the Supreme Court's holding in *Winter*[.]"  *Singh v. Carter*, 185 F. Supp. 3d 11, 16 (D.D.C. 2016) (citing *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013)); *see also Davis v. PBGC*, 571 F.3d 1288, 1295-96 (D.C. Cir. 2009) (Kavanaugh, J., concurring).

*Privacy Info. Ctr. v. FTC*, 844 F. Supp. 2d 98, 101 (D.D.C. 2012) (quoting *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001)).

**ARGUMENT**

**I.      The Government Is Likely to Succeed on the Merits.**

The basis for preliminary relief in this matter is straightforward: Defendant, who as National Security Advisor enjoyed access to the most sensitive information in the Government's possession, has decided to publish a work containing classified information without completing prepublication review and without receiving written authorization to publish.  This action is contrary to Defendant's fiduciary duties toward the Government, and puts Defendant in breach of his non-disclosure agreements.  Defendant assumed the obligations in these agreements as a condition of both obtaining his employment in one of the most sensitive and important national security positions in the United States Government and of gaining access to the highly classified information necessary to perform his job.  These obligations are not mere bureaucratic contrivances; indeed, Defendant acknowledged that the "unauthorized disclosure of classified information by me may constitute a violation, or violations, of United States criminal laws." SF 312 ¶ 4; *see also* Form 4414 ¶ 6.  The criminal penalties associated with unauthorized disclosure of classified information underscore the seriousness of the Defendant's commitments. *See, e.g.*, 18 U.S.C. §§ 641, 793, 794, 798, 952, 1924.  Courts routinely enforce secrecy agreements between the United States and former Government personnel who, like Defendant, have been given access to classified information as a necessary part of their employment.  The United States is therefore likely to succeed on its request for specific performance of his contractual and fiduciary obligations not to publish classified information without completing prepublication review and receiving written authorization to publish.

9

**A.**     **By Publishing Classification Information Without Written Approval After Completion Of Prepublication Review, Defendant Has Breached His Secrecy Obligations To the Federal Government.**

As one of the most senior national security officials of the United States, Compl. ¶ 7, Defendant has a fiduciary relationship with the United States Government based on his placement in a position of trust and special confidence.  *See United States v. Ring*, 628 F. Supp. 2d 195, 207 (D.D.C. 2009) (recognizing that a public official acts as 'trustee for the citizens and the State . . . and thus owes the normal fiduciary duties of a trustee, e.g., honesty and loyalty' to them") (quoting *United States v. Silvano*, 812 F.2d 754, 759 (1st Cir.1987)); *Armenian Assembly of Am. v. Cafesjian*, 692 F. Supp. 2d 20, 43 (D.D.C. 2010) (recognizing protection of proprietary information as among fiduciary duties).  The National Security Advisor to the President has unique access to classified information based on his position atop the NSC hierarchy, his responsibility to make recommendations to the President regarding national security and foreign policy, and his representation of the United States in its relations with other countries.  Compl. ¶ 8.  In this capacity, Defendant was entrusted with classified and SCI information that related to some of the most sensitive matters of national security, and Defendant owes to the United States a fiduciary duty of loyalty to protect from unauthorized disclosure classified information.  This duty of loyalty includes his duty to submit to the United States Government for review any materials subject to his prepublication review obligations and to refrain from the dissemination of those materials or information unless and until the United States Government completes its prepublication review processes and affirmatively and expressly approves disclosure.  *See Snepp*, 544 U.S. 515 n. 11.

At the heart of this case are the three confidentiality agreements Defendant executed to protect the classified information to which he gained access as the National Security Advisor to the President.  While "the law would probably imply a secrecy agreement" where the information involved is "highly sensitive to the conduct of foreign affairs and the national defense," *United*

10

*States v. Marchetti*, 466 F.2d 1309, 1316 (4th Cir. 1972), the duty of confidentiality undoubtedly arises where there is an express agreement. The three agreements entered into by Defendant included Classified Information Nondisclosure Agreement (a Standard Form 312 or SF 312), and two SCI Nondisclosure Agreements (titled a Standard Form 4414 or Form 4414). *See* Compl. at Exh. A (hereafter "NDAs"). Each of these NDAs was signed by Defendant at the White House in connection with his duties as National Security Advisor to the President. Compl. ¶ 11. Defendant reaffirmed his obligations when his employment as National Security Advisor ended, acknowledging that he understood that he continued to be "prohibited from disclosing any classified or confidential information," and that he "may not use or disclose nonpublic information," including information that is "confidential or classified." Mitman Decl., Exh. B; *see also* Exh. C. Before Defendant signed this acknowledgment, the NSC Legal Advisor reminded Defendant that his obligations included the submission for "security review [of] . . . any writing or other material in any form that could contain classified information before" sharing that information with anyone. Mitman Decl., Exh. B.

As Defendant's own conduct tacitly conceded, he was obligated to undertake the prepublication review process, and the contents of Defendant's manuscript fall within the scope of the NDAs. *See* Ellis Decl. ¶¶ 19-20. The premise of Defendant's book is that it is a "White House Memoir" recounting information from "The Room Where it Happened," *i.e.*, material obtained by Defendant in the course of his employment as National Security Advisor, where he gained access to highly classified national security information. Compl. ¶ 34. Defendant apparently recognized that nothing about his position, his manuscript, his contract, or his separation from Government service exempted him from the routine obligation imposed on Government personnel to complete pre-publication review prior to disclosures like those Defendant seeks to make, and he initiated

11

the prepublication review process.  Mitman Decl., Exh. D.  Initial review of Defendant's manuscript identified numerous instances of classified information in various categories—so many instances, in fact, that a single four-hour meeting proved adequate to cover only three chapters in detail.  Mitman Decl., Exh. G.  In recognition of the need to revise his manuscript to protect classified information, Defendant then made edits and submitted revised manuscripts and pages in both March, 2020 and April, 2020.  Compl. ¶ 45; Mitman Decl., Exh. H.  Even after that, however, the draft manuscript still contains classified information, including information classified at the Secret and Top Secret/SCI levels.  Ellis Decl. ¶ 19.

All of this demonstrates that the requirement of pre-publication review applies, and in that review, the authority to determine when review is complete rests with the Executive Branch, not with a self-serving, unilateral judgment by Defendant to withdraw from the review process.  *See Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) (the protection of classified information "is committed by law to the appropriate agency of the Executive Branch," and "flows primarily from [a] constitutional investment of power in the President") (citing U.S. Const., Art. II, § 2); *Marchetti*, 466 F.2d at 1317 (noting that burden is on the author, not the Government, to seek judicial review of prepublication process).  As explained below, Defendant's decision to proceed with publication of classified material before completion of this process violated his ongoing contractual obligations to the Government.

### 1.    Defendant Breached His Form 4414 Agreement by Walking Away From the Pre-Publication Process Before It Was Complete

Defendant's actions to date, including his unilateral decision to proceed with publication before receiving official authorization to do so, cannot be reconciled with the obligations imposed by his Form 4414.  Indeed, as the unclassified Ellis Declaration explains, even after making changes to the manuscript, the latest manuscript contains information classified at the Top Secret/

SCI level and is subject to the Form 4414 signed by Defendant.  *See* Ellis Decl. ¶¶ 19-20.  Under that agreement, Defendant was required to "submit for security review" to the United States Government "any writing or other preparation in any form, including a work of fiction, that contains or purports to contain any SCI or description of activities that produce or relate to SCI or that [he has] reason to believe are derived from SCI."  Form 4414 ¶ 4.  He further agreed he "will not disclose the contents of such preparation with, or show it to, anyone who is not authorized to have access to SCI until [he had] received written authorization . . . that such disclosure is permitted."  *Id.*

Defendant is proceeding, and already has advanced substantially, on a course that defies his obligations to complete pre-publication review of, and obtain written approval to publish, his manuscript.  As noted, Defendant tacitly acknowledged that his manuscript must be submitted for such review by commencing and participating in an iterative process to finalize a manuscript that did not disclose classified information.  Mitman Decl., Exh. D.  Defendant then decided to walk away from that process prior to completion, and to move forward with the printing and distribution of his book based only on edits provided to that point by the Government but without further edits that would be required to complete the pre-publication review, including a final, written authorization to proceed. Mitman Decl., Exh. K.  This unilateral decision to disregard the final steps in the pre-publication review process and to publish without the required approval cannot be reconciled with Defendant's contractual and fiduciary duties.

Defendant's disregard for his obligations is underscored by how abruptly he shifted from participating in the pre-publication review process to deciding unilaterally—and without any notice to the Government—to defy that process and to publish his book before the process was complete.  Defendant was participating in the pre-publication review process by submitting

changes to the manuscript based on feedback from the NSC's review.  Mitman Decl., Exh. L.  On May 6, 2020—just ten days after his last submission—Defendant dispatched a follow-up inquiry to Ms. Knight, who responded that "[t]he process remains ongoing."  Mitman Decl., Exh. I. Defendant did not communicate further with the Government until after it had already been reported in the press that he had decided to release the book on June 23, without completing the review process.  After the NSC Legal Advisor wrote to defendant's counsel on June 8, Defendant informed the NSC, through counsel, that his book had already been "printed, bound, and shipped to distributors across the country."  Mitman Decl., Exh. K.  By sharing his manuscript with his publisher—and preparing to share it with the world—before completing prepublication review, Defendant breached his contractual obligations to complete prepublication review.

### 2. Defendant Breached His SF 312 Agreement By Disclosing Classified Information Without Prior Approval.

Defendant has also violated his SF 312 agreement by proceeding with publication of his book without receiving appropriate authorization.  Defendant acknowledged in that agreement that "the unauthorized disclosure . . . of classified information by me could cause damage or irreparable injury to the United States" and agreed "never [to] divulge classified information" without "prior written notice of authorization from" the relevant government agency.  SF 312 ¶ 3.  Defendant has violated that contractual duty by proceeding with publication of his book containing classified material without receiving written authorization.  Moreover, Defendant was required "to confirm from an authorized official that [any other] information is unclassified" before disclosing such information whenever "[he is] uncertain about the classification status."  *Id*., SF 312 ¶ 3.

Defendant has disregarded these requirements.  As early as January 2020, it was reported that he had disseminated copies of his manuscript to members of the press—a manuscript Ms. Knight later concluded was rife with classified information, and that Defendant removed from the

manuscript at her request.  Compl. ¶¶ 35-36.  And even after Defendant made changes to the manuscript, it still contains classified information, including information classified at the Confidential, Secret, Top Secret, and Top Secret/SCI levels.  *See* Ellis Decl. ¶ 19.  This means that in some instances disclosure reasonably could be expected to cause serious damage, or exceptionally grave damage, to the national security of the United States.  *Id.*  Defendant nevertheless decided, on his own accord, not only again to share the manuscript with his publisher but to authorize its printing and distribution to the public.  By so doing, Defendant has violated the obligations he accepted by signing the SF 312.  Publication of the book in its current state would constitute additional unauthorized disclosures of classified information in violation of Defendant's SF 312 obligations.

### B.    Courts Consistently Have Upheld, Over First Amendment Objections, the Government's Right To Enforce Secrecy Agreements Like Those Defendant Signed

Nothing in the First Amendment prevents the United States from securing an injunction requiring a former high-ranking official with unique access to sensitive information, such as Defendant, to abide by the agreements he signed.  It is settled law that restrictions on the publication of classified information are judicially enforceable.  Where "a government employee signs an agreement not to disclose information properly classified pursuant to executive order, that employee 'simply has no first amendment right to publish' such information."  *Wilson v. CIA*, 586 F.3d 171, 183 (2d Cir. 2009) (quoting *Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003)).  The Government is thus "entitled to enforce its agreements to maintain the confidentiality of classified information," *United States v. Pappas*, 94 F.3d 795, 801 (2d Cir.1996), without needing to comply with "the same stringent standards that would apply to efforts to impose restrictions on unwilling members of the public," *United States v. Aguilar*, 515 U.S. 593, 606 (1995).

15

The seminal case in this area is *Snepp v. United States*, 444 U.S. 507 (1980), which involved a former CIA agent who, in violation of his secrecy agreement, published a book about CIA activities without first obtaining the Agency's approval.  After the book had been published, the United States sued Snepp for breach of contract and breach of fiduciary duties.  The government secured not only the imposition of a constructive trust over all of Snepp's profits from the book, but also a forward-looking injunction against future unauthorized disclosures by Snepp.  *See id.* at 508.  The Supreme Court affirmed both remedies.  *See id.* at 514-16.

The Supreme Court explained that a prepublication review requirement imposed on a government employee with access to classified information is not an unconstitutional prior restraint.  *See id.* at 510-11.  The Court found the secrecy agreement to be a "reasonable means" for vindicating the Government's "compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service."  *Id.* at 509 n.3.  The Court also concluded that "[w]hether Snepp violated his trust does not depend upon whether his book actually contained classified information."  *Id.* at 511.  Rather, Snepp violated that trust when he published his book without first obtaining authorization from the CIA to do so, as required by his secrecy agreement.  "When a former agent relies on his own judgment about what information is detrimental, he may reveal information that the CIA—with its broader understanding of what may expose classified information and confidential sources—could have identified as harmful."  *Id.* at 512.  The Court held that, because Snepp "deliberately and surreptitiously violated his obligation to submit all material for prepublication review," *id.* at 511, a constructive trust over his book's proceeds would appropriately "require[] him to disgorge the benefits of his faithlessness."  *Id.* at 515.

Even before *Snepp*, the Fourth Circuit upheld the validity and enforceability of secrecy agreements in *United States v. Marchetti*, 466 F.2d 1309 (4th Cir. 1972). In *Marchetti*, as in *Snepp* and the instant case, the United States sued a former employee to enforce a secrecy agreement; the United States sought to prevent Marchetti from publishing a book about his intelligence experiences in the CIA. *Id.* at 1311. The court held that the United States could properly require Marchetti to submit all intelligence-related materials intended for publication for prepublication review to protect classified information. *Id.* at 1313-17. The court further held that there was no First Amendment problem with the secrecy agreements, because Marchetti could seek judicial review of any action by the CIA disapproving publication of the material. *Id.*; *see also United States v. Snepp*, 897 F.2d 138, 143 (4th Cir. 1990) (confirming that the burden is on the author to seek judicial review of any agency decision not to approve publication).

Consistent with these authorities, courts regularly have upheld the validity of secrecy agreements in the face of First Amendment challenges. In *Stillman v. CIA*, for example, a former employee of the Los Alamos National Laboratories sought to publish a book about China's nuclear weapons program and challenged the delay on publication imposed by pre-publication review, as well as determinations by various agencies that portions of his manuscript were classified. *See* 517 F. Supp. 2d 32, 34 (D.D.C. 2007) ("*Stillman II*"). In rejecting Stillman's First Amendment challenge, this Court explained that "[c]ourts have uniformly held that current and former government employees have no First Amendment right to publish properly classified information to which they gain access by virtue of their employment." *Id.* at 38. The D.C. Circuit, in earlier proceedings in *Stillman*, had reached the same conclusion: "If the Government classified the information properly, then Stillman simply has no first amendment right to publish

it." *Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003) ("*Stillman I*") (reversing district court's preliminary order granting Stillman's counsel access to the manuscript and remanding for further proceedings).  Relying on *Snepp*, this Court granted judgment to the Government, emphasizing that "the government's ability to maintain secrecy is essential and [recognizing] that the government is in the best position to judge the harm that would result from disclosure." *Stillman II*, 517 F. Supp. 2d at 39.

Likewise, in *McGehee v. Casey*, a former CIA officer brought a declaratory judgment action, before publication, challenging "an agreement that on its face bar[red] him from revealing classified information without prior . . . approval."  This Court denied relief, and the D.C. Circuit affirmed.  718 F.2d 1137, 1139 (D.C. Cir. 1983).  The D.C. Circuit reasoned that the "classification and censorship scheme," including the requirement of pre-publication review, "protects critical national interests" and "satisf[ies] the applicable constitutional tests." *Id.*  The court further added that, even though the CIA officer had "adhered to his secrecy agreement[,] submitted his manuscript for prepublication review, and deleted portions" of it in accordance with Government instructions, he was not entitled to declassification of portions of a magazine article he published that the CIA had determined to be classified, because affidavits gave the court "reason to believe that disclosure of the censored portions of McGehee's article could reasonably be expected to cause serious damage to the national security." *Id.* at 1149-50.[5]

---

[5]       In dicta, the court noted that the CIA had "not sought an injunction against publication of the censored items" and stated that if the CIA had sought "judicial action to restrain publication, it would [have borne] a much heavier burden." *McGehee*, 718 F.2d at 1147 n. 22 (citing, e.g., *Snepp*, 444 U.S. at 513 n. 8, and *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam)).  But the cited language in *Snepp* does not support this assertion.  Indeed, the cited portion of *Snepp* cited to two cases, which include language that, if anything, undermines the notion that the government would bear a heavier burden where it—rather than the author—sought relief. *See Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362 (4th Cir. 1975) ("We decline to modify our previous holding that the First Amendment is no[] bar against an injunction forbidding the disclosure of

It follows from these decisions that there is no First Amendment bar to enforcement of Defendant's secrecy agreements here.  The Government is seeking, as it has done in the past, to enforce the terms of its NDAs regarding classified information executed by Defendant when he joined the Government as National Security Advisor.  Defendant willingly accepted the terms of these NDAs in consideration for his access to this information, and there is no valid constitutional objection to the Government seeking relief under their terms.

### C.    Defendant Lacks Any Valid Defenses, Contractual or Otherwise, to Enforcement of His Secrecy Obligations.

To date, Defendant has refused to accept that he is in breach of his obligations to the Government.  In a June 10, 2020 letter from his counsel, he asserts that he has substantially complied with the prepublication review requirement and that, in light of his purported "substantial compliance" and supposed assurances from Ms. Knight, he should be excused from the remainder of his fiduciary and contractual obligations.  Mitman Decl., Exh. K.  Neither this argument, nor any other effort to defend his about-face on pre-publication review, can justify his unilateral decision to print and distribute copies of his book without prior written authorization.

At the outset, the express terms of the NDAs make clear that Defendant has not "substantially compl[ied]" with his obligations by submitting his manuscript and engaging with the Government for a time; rather, the NDAs required *full* compliance.  Defendant is expressly required to obtain express and "written notice of authorization" before making a disclosure of

---

classifiable information within the guidelines of the Executive Orders when (1) the classified information was acquired, during the course of his employment, by an employee of a United States agency or department in which such information is handled and (2) its disclosure would violate a solemn agreement made by the employee at the commencement of his employment. With respect to such information, by his execution of the secrecy agreement and his entry into the confidential employment relationship, he effectively relinquished his First Amendment rights."); *United States v. Marchetti*, 466 F.2d 1309 (4th Cir. 1972) (granting the United States' request for injunction against future publication in violation of secrecy agreement).

classified information.  SF 312 ¶ 3; *see also* Form 4414 ¶ 4.  He never received such notice.  Even though Ms. Knight had completed her review in April and was of the view that the manuscript did not contain classified information, Compl. ¶ 46; Ellis Decl. ¶ 9, Ms. Knight did not authorize Mr. Bolton to proceed with publication, and instead informed him that "[t]he process remain[ed] ongoing," Mitman Decl., Exh. I.  That process involved an additional classification review by Mr. Ellis, who concluded that the manuscript, even as revised, contained classified material, including information classified at the Confidential, Secret, Top Secret, and Top Secret/SCI levels.  In other words, as Mr. Ellis explains, the manuscript, even as revised, contains instances of information that, if disclosed, reasonably could be expected to cause serious damage, or exceptionally grave damage, to the national security of the United States—and, indeed, Mr. Ellis concluded that disclosure of "certain passages in the draft manuscript … will damage the national security of the United States."  *See* Ellis Decl. ¶¶ 19, 22.  The conclusion that the draft still contains classified information is shared by Mr. Ratcliffe, Mr. Evanina, and Gen. Nakasone.  Ratcliffe Decl. ¶ 7; Evanina Decl. ¶¶ 6-7; Nakasone Decl. ¶ 8.  Mr. Bolton's decision nevertheless to proceed with the publication of a book containing such material is a breach of his contractual and fiduciary duties.

Nor does Mr. Bolton have a First Amendment right to publish classified information that would allow him to sidestep the breach of his contractual duties.  As previously discussed, the legal obligations he freely assumed—namely, his obligation to obtain authorization before publishing classified information—is fully in accord with constitutional requirements, as the Supreme Court and the D.C. Circuit have confirmed.  *See Snepp*, 444 U.S. at 509 n.3; *McGehee*, 718 F.2d at 1139.  Where "a government employee signs an agreement not to disclose information properly classified pursuant to executive order, that employee 'simply has no first amendment right to publish' such information."  *Wilson v. CIA*, 586 F.3d 171, 183 (2d Cir. 2009) (quoting

*Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003)).  Defendant signed *three* such agreements in this case.  He affirmatively agreed that he "will never divulge classified information to anyone unless: (a) [he has] officially verified that the recipient has been properly authorized by the United States Government to receive it; or (b) [he has] been given prior written notice of authorization from the United States Government Department . . . that such disclosure is permitted."  SF 312 ¶ 3.  And he twice agreed to "submit for security review" "any writing . . . that contains or purports to contain any SCI or description of activities that produce or relate to SCI or that I have reason to believe are derived from SCI . . . that I have prepared for public disclosure" and "further agree[d] that I will not disclose the contents of such preparation with, or show it to, anyone who is not authorized to have access to SCI until I have received written authorization from the Department or Agency that last authorized my access to SCI until I have received written authorization . . . that such disclosure is permitted."  Form 4414 ¶ 4.  Defendant further attested his understanding that "the United States Government may seek any remedy available to it to enforce this Agreement, including, but not limited to, application for a court order prohibiting disclosure of information in breach of this Agreement."  SF 312 ¶ 6; *see also* Form 4414 ¶ 7 (same).

Accordingly, even assuming that the First Amendment applies in the context of a former high-ranking government employee disclosing classified information without authorization after completion of prepublication review, any such rights would be waived by the agreements that Defendant entered into.  Waiver of a constitutional right must be knowing and voluntary.  *Cf. Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).  There can be no suggestion that Defendant, a Yale-trained attorney and sophisticated public official with decades of experience in positions of trust within the Federal Government, did not know and understand these obligations.  Indeed, the text of Defendant's security agreements make clear that he could not release such material absent

written confirmation at the end of the prepublication review process.  These provisions also provide that the United States would and could seek to enforce these agreements via a court order preventing disclosure, *see* SF 312 ¶ 6; Form 4414 ¶ 7, contract terms that would be superfluous if they did not constitute an acknowledgement that those very proceedings were proper.  *See Veit & Co. v. United* States, 46 Fed. Cl. 30, 35 (2003) ("The Court is to attempt to avoid an interpretation that leaves a portion of the contract useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical results.") (citation and internal quotation marks omitted).  Nor can Defendant claim that such provisions constitute a prior restraint, as courts have recognized that such prepublication review, as here, "is not . . . a 'system of prior restraints' in the classic sense." *Edgar v. Coats*, No. GJH-19-985, 2020 WL 1890509, at *19 (D. Md. Apr. 16, 2020) (quoting *Wilson v. CIA*, 586 F.3d 171, 183 (2d Cir. 2009), and additionally citing *McGehee v. Casey*, 718 F.2d 1137, 1147-48 (D.C. Cir. 1983)) *appeal docketed* No. 20-1568 (4th Cir.).  Defendant should be held to the obligations of his bargain.

Moreover, to the extent Defendant contends he has a constitutional right to publish his book in its current form, the proper course would have been to complete the prepublication review or to seek judicial review of any alleged denial or undue delay of permission to publish.  Indeed, case law makes clear that it is the *author's* burden to seek judicial review of the Government's denial or delay of permission to publish.  *See Snepp*, 897 F.2d at 143; *Marchetti*, 466 F.2d at 1317. What is not Defendant's right is to decide for the Executive Branch—indeed, for the entire nation—that sufficient edits have been made and thereby usurp the Government's proper role in determining whether a manuscript contains classified information.

## II.   The United States Will Be Irreparably Harmed Without an Injunction.

The United States will be irreparably injured absent preliminary relief.  The book Defendant intends to publish on June 23 contains classified information, including information

classified at the Confidential, Secret, Top Secret, and Top Secret/SCI levels.  This means it contains instances of information that, if disclosed, reasonably could be expected to cause serious damage, or exceptionally grave damage, to the national security of the United States.  *See* Ellis Decl. ¶ 19.  And Mr. Ellis specifically concluded, moreover, that "certain passages in the draft manuscript . . ., if disclosed, will damage the national security of the United States."  Ellis Decl. ¶ 22; *see also* Ratcliffe Decl. ¶¶ 6-7; Evanina Decl. ¶ 6; Nakasone Decl. ¶ 8.  The rights that the United States contracted for to protect national security—including the right to prepublication review of writings that Defendant might disseminate with sensitive information—will be severely undermined, if not entirely lost, if Defendant is not enjoined from further disseminating this information.  *See Snepp*, 444 U.S. at 513 ("both the District Court and the Court of Appeals recognized that Snepp's breach of his explicit obligation to submit his material—classified or not—for prepublication clearance has irreparably harmed the United States Government."); *cf. Providence Journal v. FBI*, 595 F.2d 889, 890 (1st Cir. 1979) ("Once the documents are surrendered pursuant to the lower court's order, confidentiality will be lost for all time.  The status quo could never be restored."); *In re Papandreou*, 139 F.3d 247, 251 (D.C. Cir. 1998) ("Disclosure followed by appeal after final judgment is obviously not adequate in such cases [where privilege is claimed over information] – the cat is out of the bag."); *John Doe Agency v. John Doe Corp.*, 488 U.S. 1306, 1309 (1989) (Marshall, J., in chambers) (disclosure of materials pending a stay would create an irreparable injury).  Only by completing the review process can the Government ensure that any personal benefits Defendant hopes to reap from this writing will not come at the expense of the national security.

Courts routinely grant equitable relief to prevent the public release of confidential information of all sorts on the ground that such public disclosure necessarily constitutes irreparable

harm given that the confidentiality of information, once lost, can never be restored.  For example, courts will stay pending appeal orders to the Government to release documents, on the ground that the public disclosure of information constitutes irreparable harm.  *See Providence Journal*, 595 F.2d at 890 (granting stay of disclosure pending final appeal, as "denial of a stay will utterly destroy the status quo"); *Dep't of Health & Human Servs. v. Alley*, 556 U.S. 1149 (2009) (ordering stay of district court's order that directed agency to disclose records to plaintiff pending final disposition of appeal); *People for the Am. Way Found. v. U.S. Dep't of Educ.*, 518 F. Supp. 2d 174, 177 (D.D.C. 2007) (stay necessary "to avoid irreparable injury [to the government] by having to release documents prior to having the opportunity to seek meaningful appellate review").  While the forced disclosure of non-public information alone may constitute irreparable harm, that harm is heightened where classified information is involved.  Unlike ordinary confidential information the Government holds, the information at stake here is classified, including in some instances at the Secret or Top Secret/SCI levels, which means by definition that its disclosure reasonably could be expected to cause serious damage, or exceptionally grave damage, to the national security of the United States.  Ellis Decl. ¶ 19.  And, in Mr. Ellis's judgment, certain passages, if disclosed, "will damage the national security of the United States."  Ellis Decl. ¶ 22; *see also* Ratcliffe Decl. ¶¶ 6–7; Evanina Decl. ¶ 6; Nakasone Decl. ¶ 8.

This is not surprising.  When an official leaks classified information to the world it can cause serious damage to the United States' relationships with foreign powers or endanger future military and intelligence activities by revealing U.S. intelligence capabilities or gaps in those capabilities.  And, as common sense suggests, "it is practically impossible to remedy the damage of an unauthorized disclosure [of classified information] *ex post*."  *United States v. Bin Laden*, 58 F. Supp. 2d 113, 122 (S.D.N.Y. 1999); *see also Snepp*, 444 U.S. at 514; *United States v. Hashmi*,

621 F. Supp. 2d 76, 83 (S.D.N.Y. 2008) ("The Government has a strong interest in preventing the irreparable harm of disclosing classified information, which might jeopardize national security."). Defendant knows well the threat posed by disclosing classified information that might benefit the Nation's adversaries.  *See* John Bolton, "Edward Snowden's leaks are a grave threat to US national security,"  *The Guardian*,  https://www.theguardian.com/commentisfree/2013/jun/18/edward-snowden-leaks-grave-threat (June 18, 2013).  Congress does as well, as reflected in its decision to criminalize the unauthorized disclosure of classified information.  *See, e.g.*, 18 U.S.C. §§ 641, 793, 794, 798, 952, 1924.

## III.  The Balance of Equities and Public Interest Factors Also Weigh In Favor of an Injunction

"The final two factors in the Court's analysis of a request for preliminary relief [are] the balance of equities and the public interest."  *U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133, 163 (D.D.C. 2015).  These two factors "merge" in cases where one of the parties is the Government.  *Cf. Nken v. Holder*, 556 U.S. 418, 435 (2009).  This is particularly true in the context of the possible disclosure of classified information, where the public interest is served by ensuring that classified information vital to our nation's security is protected from either intentional or inadvertent disclosure.

In evaluating the equities, the Court is to "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24 (internal quotation marks omitted). Here, the effect on the national security, the responsibility for which is entrusted to the Government, is immense: the manuscript—even as revised—contains instances of information that, if disclosed, reasonably could be expected to cause serious damage, or exceptionally grave damage, to the national security of the United States—and Mr. Ellis concluded that release of certain passages "will damage the national security

of the United States." *See* Ellis Decl. ¶¶ 19, 22; *see also* Ratcliffe Decl. ¶¶ 6-7; Evanina Decl. ¶ 6; Nakasone Decl. ¶ 8.  As discussed above, *see supra* Part II, this kind of harm is not reversible or remediable once it occurs.  In balancing the equities, the Court must "pay particular regard for the[se] public consequences" *Winter*, 555 U.S. at 7.  In contrast, any harm to Defendant is merely a delay of the publication of his book for the duration of the preliminary injunction (*i.e.*, until the Court can render a decision on the merits of the claims raised by the United States), or until Defendants removes the remaining classified information from the manuscript.  In fact, that delay need only encompass the time required to complete the very pre-publication review process that Defendant voluntarily commenced.  And any concern Defendant raises about the effect of an injunction on his ability to speak is diminished, if not altogether eliminated, by the fact that Defendant voluntarily agreed to condition his right to speak on securing a determination from the Government that what he wanted to say would not reveal the classified information he was sworn to protect.  Defendant's interest in disregarding that agreement does not outweigh the government's substantial interest in adhering to it.  At bottom, any delay is simply the consequence of Defendant's voluntary decision to accept a position of confidence and trust as National Security Advisor to the President and to agree to the contractual obligations attendant to that position.

Permitting the final resolution of the instant dispute will further the Government's interest and the broader public interest in the observance of proper procedures to control national security information and reduce the possibility of serious damage to the national security.  As against an interim delay in Defendant's ability to reap the financial rewards from trading on the confidential information he learned in his position of public trust, the merged public-interest and balance-of-equities prongs overwhelmingly favor the requested injunction.

**IV.    The Injunction Should Provide Full Relief to the United States**

For the reasons discussed above, the United States is entitled to an injunction barring Defendant from publishing the book.  To ensure that the injunction cannot be circumvented, the injunction should also prohibit the Defendant from proceeding with the publication of his book in any form or media; require Defendant to notify his publisher that the book contains classified information that he was not authorized to disclose; instruct his publisher to delay the release date of the book; and to instruct his publisher to take any and all available steps to retrieve and destroy any copies of the book that may be in the possession of any third party.  The Court should further enjoin Defendant from taking any additional steps towards publicly disclosing classified information without first obtaining authorization from the United States through the prepublication review process.

Furthermore, if this Court enjoins Defendant from distributing his book until he receives written authorization after the conclusion of the government's prepublication review, then that injunction should also bind his publisher, Simon & Schuster.

Under Federal Rule of Civil Procedure 65(d)(2), an injunction binds not only "the parties" but also their "officers, agents, servants, employees, and attorneys," and all "other persons who are in active concert or participation with" them and who have "actual notice" of the injunction. This rule "is derived from the common law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control."  *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945).  It provides, "[i]n essence[,] . . . that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding."  *Id.*; *see also Marshak v. Treadwell*, 595 F.3d 478, 486 (3d Cir. 2009) ("non-parties 'guilty of aiding or

abetting or acting in concert with a named defendant or his privy in violating the injunction ....

may be held in contempt.'" " (quoting *Savarese v. Agriss*, 883 F.2d 1194, 1209 (3d Cir. 1989))).

Under these principles, when the producer of a product is enjoined from distributing it,

courts have subjected the product's distributors to the same injunction.  For example, in *Aevoe*

*Corp. v. AE Tech Co.*, 727 F.3d 1375 (Fed. Cir. 2013), the Federal Circuit explained that the

distributor of an infringing product—which obtained the product from the infringing producer and

sold it in the marketplace—was "'acting in concert' with [the producer] in connection with the

resale of" the product and thus was bound by an injunction against the sale of the product.  *Id.* at

1384.  "Failure to enjoin" the distributor's conduct, the court explained, "would thwart the

purposes of that injunction."  *Id.*; *see also, e.g.*, *CBS, Inc. v. PrimeTime 24 Joint Venture*, 9 F.

Supp. 2d 1333, 1325 (S.D. Fla. 1998) (distributors were bound by an injunction because, "[i]f the

injunction did not apply to [them], the injunction would be effectively nullified").  That basic

principle of federal remedies applies equally where the product at issue is a book, because the Free

Speech Clause does not entitle book sellers to special exemptions from the application of general,

speech-neutral laws such as Rule 65.  *See Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986)

("[T]he First Amendment is not implicated by the enforcement of a public health regulation of

general application against the physical premises in which respondents happen to sell books.");

*see also Branzburg v. Hayes*, 408 U.S. 665, 682-83 (1972) ("[O]therwise valid laws serving

substantial public interests may be enforced against the press as against others, despite the possible

burden that may be imposed."); *cf. Bartnicki v. Vopper*, 532 U.S. 514, 526-27 (2001) (applying

First Amendment scrutiny to suit against recipient of unlawfully obtained information under a

statute that specifically regulated the disclosure and use of such information and thus was not

speech-neutral, although it was content-neutral in certain applications).

These principles subject Simon & Schuster to any injunction against Defendant's distribution of his book.  As in *Aevoe*, Simon & Schuster is the exclusive commercial distributor of Defendant's book and obtained the book exclusively from him.  Defendant can properly be enjoined from unlawfully disseminating the book to the public, *see supra* pp. 23–26, and he therefore cannot be permitted to circumvent that injunction by unlawfully delivering the manuscript to Simon & Schuster before an injunction is entered—indeed, before press reports even revealed that he and Simon & Schuster intended to release the book prior to the completion of the prepublication review process.[6]

\*   \*   \*

---

[6]    Commercial resellers further down the distribution chain, such as booksellers, likewise would be subject to the injunction under Rule 65(d) once they have actual notice of it, as Simon & Schuster does.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion for a temporary restraining order and preliminary injunction.  A proposed order accompanies this motion.

Dated:  June 17, 2020                      Respectfully submitted,

                                           JOSEPH H. HUNT
                                           Assistant Attorney General

                                           MICHAEL SHERWIN
                                           Acting United States Attorney

                                           ETHAN P. DAVIS
                                           Principal Deputy Assistant Attorney General

                                           DAVID M. MORRELL
                                           Deputy Assistant Attorney General

                                           ALEXANDER K. HAAS
                                           Director
                                           Federal Programs Branch

                                           _*/s/ Daniel F. Van Horn*_____
                                           Daniel F. Van Horn (D.C. Bar. No. 924092)
                                           Assistant United States Attorney
                                           555 Fourth Street N.W., Room E4226,
                                           Washington, D.C. 20530
                                           Tel: 202-252-2506
                                           Email: daniel.vanhorn@usdoj.gov

                                           _*/s/ Michael J. Gerardi*_____
                                           Michael J. Gerardi (D.C. Bar No. 1017949)
                                           Trial Attorney
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           1100 L Street NW, Room 11514
                                           Washington, D.C. 20005
                                           Tel: (202) 616-0680
                                           Fax: (202) 616-8460
                                           E-mail: michael.j.gerardi@usdoj.gov

                                           *Counsel for Plaintiff*