# Exhibit K

# Cooper & Kirk

Lawyers
A Professional Limited Liability Company

Charles J. Cooper
(202) 220-9660
ccooper@cooperkirk.com

1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036

(202) 220-9600
Fax (202) 220-9601

June 10, 2020

**Via Electronic Mail**

John A. Eisenberg
Assistant to the President,
Deputy Counsel to the President, and
Legal Advisor to the National Security Council
1600 Pennsylvania Ave., NW,
Washington, DC 20500

Re:   **Prepublication review of Ambassador John Bolton's manuscript**

Dear Mr. Eisenberg:

I write in response to your letter of June 8, 2020. Ambassador Bolton has fully discharged all duties that the Federal Government may lawfully require of him under the nondisclosure agreements that he signed upon assuming the office of National Security Advisor. As described below, Ambassador Bolton undertook, in good faith, an exhaustive and lengthy prepublication review process of his book, *The Room Where It Happened: A White House Memoir*, and the senior career professional at the National Security Council (NSC) tasked with performing such a review, Ms. Ellen Knight, assured Ambassador Bolton that there were no remaining issues of classified information in his manuscript. His own independent judgment, based on decades of experience handling classified information, confirms that his manuscript contains no classified information. It is readily apparent that the White House seeks to block publication of Ambassador Bolton's book for purely political reasons, in violation of the First and Fifth Amendments to the United States Constitution, the covenant of good faith and fair dealing implicit in the nondisclosure agreements, and the executive order and regulations governing the classification of information.

Ambassador Bolton's long and distinguished service to the government of the United States, in senior positions both in national security and law enforcement, testifies to his close familiarity with classified information at the highest levels and his extensive experience in handling it properly. And his well-deserved reputation as a fierce defender of American interests in dealing with foreign powers, both allies and enemies, establish that he would never—*never*—take an action that would compromise the national security of the United States. In drafting the manuscript for his book, Ambassador Bolton was careful to avoid including any

John A. Eisenberg
June 10, 2020
Page **2** of **5**

classified information. Nonetheless, to ensure that there could be no question of his good-faith compliance with the nondisclosure agreements he signed in April 2018, Ambassador Bolton instructed me, as his lawyer, to submit the draft of his manuscript to the National Security Council for a prepublication review. As you know, the purpose of this review, as stated in one of the agreements, is "to give the United States a reasonable opportunity to determine whether the [manuscript] . . . sets forth any" classified information, and it gives the NSC 30 business days to review the material and provide its response.

I submitted the manuscript on December 30, 2019, to Ms. Knight, Senior Director for Records, Access, and Information Security Management at the National Security Council, the office responsible for conducting the prepublication review process for the NSC. In doing so, I emphasized to Ms. Knight that Ambassador Bolton was relying on regulations restricting the scope of prepublication reviews to "identifying and preventing the disclosure of . . . classified information," and limiting disclosure of the material under review to those government officials necessary for carrying out that responsibility. These regulations are in line with Executive Order 13526's prohibition on classifying information "in order to prevent embarrassment to a person" or to "prevent or delay the release of information that does not require protection in the interest of national security." Ms. Knight assured me that the sole purpose of the NSC's review would be to ensure that Ambassador Bolton's manuscript did not disclose classified information.

Over the course of four months, Ambassador Bolton and Ms. Knight, who personally conducted the review with the assistance of a senior member of Ms. Knight's staff, painstakingly reviewed the nearly 500-page manuscript *four times*, page by page and often line by line. During that period, the book's announced publication date had to be pushed back twice.

Round one of the process began on January 23, as the President's impeachment trial was getting underway on the Senate floor. Ms. Knight wrote to say that Ambassador Bolton's manuscript contained "significant amounts of classified information" and that she would provide "detailed guidance regarding next steps that should enable [Bolton] to revise the manuscript and move forward as expeditiously as possible." A few days later, *Vanity Fair* reported that "the president is out for revenge against his adversaries." The article stated that the President "has an enemies list," that "Bolton is at the top of the list," and that the "campaign against Bolton" included Ms. Knight's January 23 letter asserting that the manuscript contained classified information. It also reported that the President "wants Bolton to be criminally investigated." Six days later, the President tweeted that the Ambassador had written "a nasty & untrue book"—an assessment of the book's content that he could only have made if the manuscript had been shared with those outside the normal prepublication-review process—and he described the book as "All Classified National Security." Notwithstanding these alarming

John A. Eisenberg
June 10, 2020
Page **3** of **5**

indications that the prepublication-review process had already been corrupted, Ambassador Bolton pressed onward and continued to cooperate in good faith with the review.

On February 7 (after the White House acknowledged that NSC staff had provided a briefing about the book to White House Counsel Pat Cipollone, then leading President Trump's impeachment defense), Ms. Knight advised that "to further the iterative process, it would be most efficient for me to meet with [Ambassador Bolton] to review each instance of classified information in detail." Their first meeting took place on February 21, the same day on which the *Washington Post* reported that "President Trump has directly weighed in on the White House [prepublication] review of a forthcoming book by his former national security adviser, telling his staff that he views John Bolton as 'a traitor,' that everything he uttered to the departed aide about national security is classified and that he will seek to block the book's publication." The story also reported that the President vowed to a group of television news anchors that "we're going to try and block publication of [his] book. After I leave office, he can do this."

In the February 21 meeting, which lasted four hours, Ms. Knight, as she described it, "reviewed the preliminary results of three chapters in the draft manuscript in detail with" Ambassador Bolton. The Ambassador took five pages of handwritten notes, as he and Ms. Knight discussed her specific concerns page by page, line by line, and sometimes word by word. Three days later, Ms. Knight wrote that the meeting had been "most productive," and she suggested that "it would be most helpful to the process if we hold one or more following meetings . . . to discuss the remaining portions of the draft manuscript." Ambassador Bolton and Ms. Knight met again three times, on March 2 (approximately four hours), March 3 (over four hours), and March 4 (approximately three hours). In these meetings, they reviewed in meticulous detail each of Ms. Knight's concerns in the remaining 11 chapters, producing 34 pages of handwritten notes. Following his notes and the guidance provided by Ms. Knight, Ambassador Bolton revised his manuscript, and by March 9 he had resubmitted all 14 chapters to begin the second round of the iterative review process.

Ambassador Bolton did not hear from Ms. Knight again until March 27, when she wrote: "I appreciate your efforts to address the classification concerns in the latest draft version you submitted. Many of the changes are satisfactory. However, additional edits are required to ensure the protection of national security information. To assist in making the additional required changes, I will provide a list of required edits and language substitutions to guide you in this next stage of revising the draft." Her list amounted to 17 typed, single-spaced pages of comments, questions, suggestions of specific alternative language, and citations to publicly available source material. Working through the weekend, Ambassador Bolton responded to all

John A. Eisenberg
June 10, 2020
Page **4** of **5**

17 pages on Monday, March 30, accepting the vast majority of Ms. Knight's suggestions and proposing alternative solutions to others.

The third round in the iterative review process occurred on April 13, in a telephone conversation in which Ms. Knight provided her much shorter list of remaining concerns after reviewing Ambassador Bolton's March 30 revisions. Their conversation resulted in entirely agreed-upon language changes, which were delivered to Ms. Knight the next day, April 14.

During the April 13 call, Ms. Knight also said she would review the entire manuscript one more time, to recheck the issues previously resolved and ensure that she had not overlooked any. That final review resulted in two further telephone calls, on April 21 and 24, in which she conveyed her final round of edits and some additional citations to publicly available sources. Ambassador Bolton promptly responded with the requested revisions, and on April 27, Ms. Knight, after clarifying one previously discussed edit, confirmed "that's the last edit I really have to provide for you." Thus, the lengthy, laborious process finally came to an end.

When Ambassador Bolton asked when he could expect to receive the pro-forma closing letter confirming that the prepublication review process had been concluded, Ms. Knight cryptically replied that her "interaction" with unnamed others in the White House about the book had "been very delicate," and that there were "some internal process considerations to work through." She nonetheless thought the letter might be ready that afternoon but would "know more by the end of the day." They even discussed whether the letter should be transmitted by electronic transmission or by him physically picking up the hard copy. It has now been more than six weeks since the final revisions to the book, and Ambassador Bolton has not received the letter to which Ms. Knight thought he was entitled. His inquiries of Ms. Knight as to when he would receive the letter documenting her agreement that the book contains no classified information have been answered with stiff and formal replies that she had nothing new to report. He had not heard from her, or anyone else at the NSC, since May 7, until I received your letter two days ago.

In light of the foregoing, there can be no serious dispute that Ambassador Bolton discharged in good faith any duty, contractual or otherwise, he had to undertake the prepublication-review process. The process was exhaustive, involving innumerable, often picayune changes to his manuscript. It required multiple delays in the publication date for the book, which Ambassador Bolton accommodated to allow the prepublication-review process to continue. It ended with the career professional in charge of the prepublication-review process at NSC determining that the manuscript contained no classified information and that no further changes to the manuscript were required. And it continued for four months — with Ambassador

John A. Eisenberg
June 10, 2020
Page **5** of **5**

Bolton's full cooperation—even though the President repeatedly made clear throughout the review that he would seek to block the book's publication. Ambassador Bolton has fulfilled any lawful obligations he had under his nondisclosure agreements or otherwise.

Again, your June 8 letter was the first communication we have received from the White House (including from Ms. Knight) concerning the Ambassador's manuscript since May 7, and it is the first time anyone from the White House has suggested that any remaining information in the book is classified since Ms. Knight signed off on the manuscript on April 27. This last-minute allegation of classified information, coming as it does after weeks of silence from the NSC despite Ambassador Bolton's urgent inquiries, after the conclusion of an intensive four-months-long review, and—as you acknowledge—only after press reports alerted you that the Ambassador's book would be published on June 23, is a transparent attempt on the part of the White House to use national security concerns as a pretext to censor, or at least indefinitely delay, Ambassador Bolton's constitutional right to speak on matters of the utmost public import. The attempt to suppress Ambassador Bolton's book is a clear violation of the First and Fifth Amendments and the covenant of good faith and fair dealing governing the nondisclosure agreements.

It also, as a practical matter, comes too late. In reliance on Ms. Knight's assurances that his manuscript contained no classified information, that she had no further changes to his manuscript, and that she would attempt to deliver promptly the pro-forma closing letter, and after hearing *nothing* for weeks in response to his urgent requests for the closing letter, Ambassador Bolton and his publisher, Simon & Schuster, moved forward with publication of his book. The book has now been printed, bound, and shipped to distributers across the country. Ambassador Bolton has no authority to stop the book from being made available to the public on June 23.

I trust that this will conclude the matter.

Sincerely,

Charles J. Cooper