**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE UNITED STATES OF AMERICA,

                        Plaintiff,

v.

JOHN R. BOLTON,

                    Defendant.

Civil Action No. 20-1580-RCL

**DEFENDANT'S COMBINED MEMORANDUM IN SUPPORT OF HIS
MOTION TO DISMISS AND IN OPPOSITION TO THE UNITED STATES'
EMERGENCY APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

June 18, 2020

Charles J. Cooper, Bar No. 248070
Michael W. Kirk, Bar No. 424648
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC  20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
Email: ccooper@cooperkirk.com

*Counsel for Defendant John R. Bolton*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ......................................................................................................... 1

STATEMENT .................................................................................................................. 4

ARGUMENT ................................................................................................................. 20

MOTION TO DISMISS UNDER RULE 12(b)(6) ...................................................... 20

OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINTING ORDER
AND MOTION FOR PRELIMINARY INJUNCTION ............................................... 28

I.    The Government Is Not Likely To Succeed On The Merits.............................. 28

    A.    The Government Lacks Standing To Seek A Prior Restraint
        Against Publication Of Ambassador Bolton's Book Because
        Its Alleged Injury Is Not Redressable. ................................................. 28

    B.    Ambassador Bolton Has Not Violated The Nondisclosure Agreements. .............. 34

    C.    The Government Has Not Overcome The Heavy Presumption
        Against The Constitutionality Of The Prior Restraint It Seeks. ............................ 38

    D.    Ambassador Bolton's Contract Does Not Entitle
        The Government To A Prior Restraint.................................................. 43

II.    The Remaining Factors Favor Denial of Preliminary Injunctive Relief. ........................... 47

CONCLUSION............................................................................................................... 49

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                                       **<u>Page</u>**

*Aevoe Corp. v. AE Tech Co.*, 727 F.3d 1375 (Fed. Cir. 2013) ....................................34

*Agee v. CIA*, 500 F. Supp. 506 (D.D.C. 1980)...............................................................42

*Alexander v. United States*, 509 U.S. 544 (1993) .........................................................38

*Archdiocese of Washington v. Washington Metro. Area Transit Auth.*,
    897 F.3d 314 (D.C. Cir. 2018).................................................................................48

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002)....................................................37

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................20

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963).....................................................38

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .........................................................20

*Berntsen v. CIA*, 618 F. Supp. 2d 27 (D.D.C. 2009)......................................................41

*Bronson v. Swensen*, 500 F.3d 1099 (10th Cir. 2007) ..................................................31

*Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175 (1968)...............2, 28

*Centex Corp. v. United States*, 395 F.3d 1283 (Fed. Cir. 2005) ...................................44

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ........................................................29

*Concrete Specialties v. H.C. Smith Constr. Co.*, 423 F.2d 670 (10th Cir. 1970) .........44

*DeGeer v. Gillis*, 707 F.Supp.2d 784 (N.D. Ill. 2010)..................................................26

*Duit Const. Co. Inc. v. Bennett*, 796 F.3d 938 (8th Cir. 2015) ..................................... 31

*E.M. v. New York City Dep't of Educ.*, 758 F.3d 442 (2d Cir. 2014) .....................29, 33

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
    878 F.3d 371 (D.C. Cir. 2017)................................................................................29

*Elrod v. Burns*, 427 U.S. 347 (1976) ...........................................................................48

*Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283 (Fed. Cir. 2000) ........................44

*Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123 (1992)........................................27

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) .......................................................48

*Hewitt v. Helms*, 482 U.S. 755 (1987) ....................................................................29, 30

*Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013)........................................................23

*Hometown Fin., Inc. v. United States*, 409 F.3d 1360 (Fed. Cir. 2005) .......................22

*In re APA Assessment Fee Litigation*, 766 F.3d 39 (D.C. Cir. 2014)...........................26

*Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193 (11th Cir. 2020) ...........................33, 34

*\*Lowe v. SEC*, 472 U.S. 181 (1985) .......................................................................23, 37

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .....................................................28, 31

*M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134 (2d Cir. 1990) .................................................44

*Malone v. United States*, 849 F.2d 1441 (Fed. Cir. 1988) ....................................................44

*Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995) .....................................22

*\*McGehee v. Casey*, 718 F.2d 1137 (D.C. Cir. 1983) .................................................39, 40, 42, 43

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ........................................................2

*Metcalf Const. Co. v. United States*, 742 F.3d 984 (Fed. Cir. 2014) ..........................................47

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) ........................................37, 38, 48, 49

*New York Coastal P'ship, Inc. v. U.S. Dep't of Interior*,
    341 F.3d 112 (2d Cir. 2003) ....................................................................................32

*\*New York Times Co. v. United States*, 403 U.S. 713 (1971) ..........................2, 23, 34, 38, 39, 48

*Newdow v. Roberts*, 603 F.3d 1002 (D.C. Cir. 2010) ..............................................................31

*Niemotko v. Maryland*, 340 U.S. 268 (1951) ..........................................................................27

*Nken v. Holder*, 556 U.S. 418 (2009) ....................................................................................48

*Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) ..................................................................31

*Parsons v. U.S. Dep't of Justice*, 801 F.3d 701 (6th Cir. 2015) ..............................................31

*Penguin Books USA Inc. v. Walsh*, 756 F. Supp. 770 (S.D.N.Y.) .............................................40

*Perry v. Sindermann*, 408 U.S. 593 (1972) ............................................................................43

*Polito v. Continental Cas. Co.*, 689 F.2d 457 (3d Cir. 1982) ..................................................44

*Pulphus v. Ayers*, 909 F.3d 1148 (D.C. Cir. 2018) ................................................................34

*Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320 (Fed. Cir. 2003) ..............................................44

*Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975) ............................................................27

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) .........................................................................27

*Shaffer v. Def. Intelligence Agency*, 102 F. Supp. 3d 1 (D.D.C. 2015) ............................7, 40, 41

*Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969) ...........................................26, 27

*Snepp v. United States*, 444 U.S. 507 (1980) ....................................................................6, 39

*Speiser v. Randall*, 357 U.S. 513 (1958) ...............................................................................43

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ............................................29, 30

*Stillman v. CIA*, 319 F.3d 546 (D.C. Cir. 2003) .....................................................................40

*T. Brown Constructors, Inc. v. Pena*, 132 F.3d 724 (Fed. Cir. 1997) .................................22, 37

*Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645 (2017) .............................................29

*United States v. Marchetti*, 466 F.2d 1309 (4th Cir. 1972) ...................................................38

*United States v. Raymond*, 228 F.3d 804 (7th Cir. 2000) ......................................................23

*US Airways, Inc. v. McCutchen*, 569 U.S. 88 (2013) .............................................................26

*Utah v. Evans*, 536 U.S. 452 (2002) ................................................................................31, 32

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982).....................27

*Warth v. Seldin,* 422 U.S. 490 (1975) ..............................................................................30

*Washington All. of Tech. Workers v. United States Dep't of Homeland Sec.*,
    892 F.3d 332 (D.C. Cir. 2018) .................................................................................20

*Weaver v. U.S. Info. Agency*, 87 F.3d 1429 (D.C. Cir. 1996).......................................................38

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943)....................................................33

*William Kaufman Org., Ltd. v. Graham & James LLP*, 703 N.Y.S.2d 439 (N.Y. 2000)..............26

*Wilson v. CIA*, 586 F.3d 171 (2d Cir. 2009) ................................................................39, 40

*Winter v. NRDC*, 555 U.S. 7 (2008) ..............................................................................28

*Wright v. FBI*, 613 F. Supp. 2d 13 (D.D.C. 2009).......................................................40, 41, 42

## Constitutions, Statutes, and Rules

U.S. CONST., art. III, § 2 ........................................................................................28

FED. R. CIV. P. 65(d)(2) .........................................................................................33

## Legislative Materials

166 CONG. REC. S645, S660 (daily ed. Jan. 29, 2020) (statement of Sen. Heinrich)...................12

## Other Authorities

Peter Baker, *Bolton Says Trump Impeachment Inquiry Missed Other Troubling Actions*,
N.Y. TIMES (June 17, 2020), https://nyti.ms/2UWziLU .......................................................18, 32

Kevin Casey, *Till Death Do Us Part: Prepublication Review in the Intelligence Community*,
115 COLUM. L. REV. 417 (2015) .................................................................................21

CENTRAL INTELLIGENCE AGENCY, FORM 368, SECRECY AGREEMENT,
https://bit.ly/2NamBc6.............................................................................................24

Josh Dawsey, *Trump asked China's Xi to help him win reelection, according to Bolton book*,
THE WASH. POST (June 17, 2020), https://wapo.st/2BeET9E.............................................18, 32, 42

Josh Dawsey, Tom Hamburger, and Carol D. Leonnig, *Trump wants to block Bolton's
book, claiming most conversations are classified*, THE WASH. POST
(Feb. 21, 2020), https://wapo.st/2AuWEBs ...................................................................14, 45

Donald J. Trump (@realDonaldTrump), TWITTER (Jan. 29, 2020, 7:28 AM),
https://bit.ly/30QPvWW ..........................................................................................13, 45

Executive Order 13526, published at 75 Fed. Reg. 707 (Dec. 29, 2009) ...................7, 8, 9, 44, 45

FEDERAL BUREAU OF INVESTIGATION, FBI EMPLOYMENT AGREEMENT,
https://bit.ly/2NamBc6.............................................................................................23

FEDERAL BUREAU OF INVESTIGATION RECORDS MANAGEMENT DIVISION, PREPUBLICATION
REVIEW POLICY GUIDE (2015), https://bit.ly/2NamBc6. ...................................................23

Maggie Haberman and Michael S. Schmidt, *Trump Tied Ukraine Aid to Inquiries He Sought, Bolton Book Says*, N.Y. TIMES (Jan. 26, 2020), https://nyti.ms/2S71JVd .................12

Press Conference, President Donald J. Trump, (Jun. 15, 2020) https://politi.co/2Y2Vo1i .....19, 47

Paula Reid (@PaulaReidCBS), TWITTER (Jun. 18, 2020, 8:29 AM), https://bit.ly/37NU9q3 ........4

RESTATEMENT (SECOND) OF CONTRACTS (1981)

    § 202(4)....................................................................................................................34

    § 203(a) ..........................................................................................................22, 37

    § 205........................................................................................................................44

    § 206........................................................................................................................22

    § 207........................................................................................................................37

    § 223........................................................................................................................34

RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 2(2), p. 15 (2010) ...........26

Gabriel Sherman, *"It's Payback Time": With Acquittal Certain, Trump Plots Revenge on Bolton, Impeachment Enemies*, VANITY FAIR (Feb. 3, 2020), https://bit.ly/2C2irkp .........13, 45

11 WILLISTON ON CONTRACTS (4th ed.)

    § 32:5 ...............................................................................................................22, 37

    § 77:10 ....................................................................................................................44

13A CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. § 3531.6 (3d ed. 2008)..29

## INTRODUCTION

If the First Amendment stands for anything, it is that the Government does not have the power to clasp its hand over the mouth of a citizen attempting to speak on a matter of great public import. "Prior restraint upon speech suppresses the precise freedom which the First Amendment sought to protect against abridgment," *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 181 (1968), and political speech "is the essence of First Amendment expression," *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). Prior restraints on political speech strike at the heart of the American constitutional tradition, and for that reason, the Supreme Court has refused to countenance them even where the Government has asserted that "the information to be revealed threatens 'grave and irreparable' injury to the public interest." *New York Times Co. v. United States*, 403 U.S. 713, 732 (1971) (White, J., concurring).

Heedless of this tradition, the Government, at the behest of the White House, asks this Court to issue a prior restraint order suppressing the speech of his former National Security Advisor, Ambassador John R. Bolton, for the transparent purpose of preventing Ambassador Bolton from revealing embarrassing facts about the President's conduct in office. It is difficult to conceive of speech that is closer to the core of the First Amendment than speech concerning presidential actions in office, including actions at the heart of the President's impeachment, and it is difficult to conceive of a greater attack on the First Amendment than the suppression of that speech in the service of a reelection campaign. But that, we respectfully submit, is precisely what is happening in this case.

Ambassador Bolton has written a memoir, *The Room Where It Happened*, describing his interactions with President Trump during the eighteen-month period in which he served as National Security Advisor to the President. Ambassador Bolton, who has decades of experience

properly dealing with classified information, diligently and conscientiously attempted to avoid including anything in the book that would reveal classified information.[1] Out of an abundance of caution, he submitted the manuscript to the National Security Council (NSC) for prepublication security review. The career professionals regularly charged with conducting such reviews, Ellen Knight, the NSC's Senior Director for Records, Access, and Information Security Management, and a member of her staff, personally undertook a painstaking, iterative prepublication examination that lasted almost four months, going through the nearly 500-page manuscript in four waves, page by page and often line by line, and directing Ambassador Bolton to make a host of revisions.[2] At the end of that review, on April 27, Ms. Knight informed Ambassador Bolton "that's the last edit I really have to provide for you,"[3] confirming her agreement that there was no classified information in the revised manuscript, and that he should receive the pro-forma customary letter confirming that he was authorized to publish it. Indeed, the Government concedes in its complaint that at the conclusion of her exhaustive prepublication review, Ms. Knight "was of the judgment that the manuscript draft did not contain classified information." Compl., Doc. 1 ¶ 46. At that moment, Ambassador Bolton fulfilled any obligation he had under the express terms of his non-disclosure agreement with the Government.

Nevertheless, the President, and those acting at his direction, have sought to delay publication of the book until after the election by withholding the customary pro-forma letter confirming that the book was cleared for publication. When it became obvious that the prepublication review process had been abused in an effort to suppress Ambassador Bolton's

---

[1] Bolton Decl., Ex. A ¶ 3. All exhibits refer to those attached to this brief unless otherwise specified.

[2] *Id.* ¶ 6.

[3] *Id.* ¶ 16.

speech, Ambassador Bolton and his publisher, Simon & Schuster, set the book for release (after two postponements of the release date to accommodate the prepublication review) on June 23, 2020. While the Government seeks to dispute Ms. Knight's considered judgment, its claim is, quite simply, a regrettable pretext designed to cover up what is in fact a determined political effort to suppress Ambassador Bolton's speech.

But the Court need not, and indeed cannot, reach the First Amendment issues raised by the Government's request for a prior restraint. For the Government is asking the Court to order Ambassador Bolton to do something he is powerless to do. The practical reality is that neither Ambassador Bolton nor his publisher, Simon & Schuster, has any ability to stop copies from being sold to the general public on June 23. Indeed, the surreal nature of the Government's request to enjoin publication and distribution of the book was driven home earlier today when a CBS News reporter, holding a copy of the book in her hand, questioned the President's press secretary about passages in the book on the White House lawn.[4] The Government's motion for a temporary restraining order and preliminary injunction should be denied, and all claims against Ambassador Bolton should be dismissed.

## STATEMENT

Ambassador Bolton has had a long and distinguished career serving his country as a senior official in multiple presidential administrations. Prior to his time as National Security Advisor for President Trump, Ambassador Bolton served in numerous capacities under Presidents Ronald Reagan, George H.W. Bush, and George W. Bush.[5] For example, he served as Assistant Attorney General for the Civil Division under President Reagan, Assistant Secretary for International

---

[4] Paula Reid (@PaulaReidCBS), TWITTER (Jun. 18, 2020, 8:29 AM), https://bit.ly/37NU9q3.

[5] Bolton Decl., Ex. A ¶ 1.

Organization Affairs at the Department of State under President George H. W. Bush, and as Ambassador to the United Nations under President George W. Bush.[6]

When he became National Security Advisor, Ambassador Bolton was required to sign two form nondisclosure agreements: the Classified Information Nondisclosure Agreement (the "Classified Information NDA")[7] and the Sensitive Compartmented Information Nondisclosure Agreement (the "SCI NDA").[8] As indicated by the "Unclassified" marking at the top of each agreement, the contents of these agreements are not classified.[9]

The Classified Information NDA does not impose an obligation on the signatory to submit to a prepublication review process in all cases. If the signatory knows that information is classified, the signatory may disclose the information only if he or she has either "officially verified that the recipient has been properly authorized by the United States Government to receive it" or "been given prior written notice of authorization from the United States Government Department or Agency (hereinafter Department or Agency) responsible for the classification of information or last granting [the signatory] a security clearance that such disclosure is permitted."[10] By contrast, "if [the signatory is] uncertain about the classification status of information, [the signatory is]

_____

[6] *Id.*

[7] Classified Information NDA, Ex. D.

[8] SCI NDA, Ex. C.

[9] Because the agreements are not classified, only the signatories' social security numbers have been redacted.

[10] Classified Information NDA, Ex. D ¶ 3. The agreement, in Paragraph 1, defines "classified information" as follows: "marked or unmarked classified information, including oral communications, that is classified under the standards of Executive Order 13526, or under any other Executive order or statute that prohibits the unauthorized disclosure of information in the interest of national security; and unclassified information that meets the standards for classification and is in the process of a classification determination as provided in sections 1.1, 1.2, 1.3 and 1.4(e) of Executive Order 13526, or under any other Executive order or statute that requires protection for such information in the interest of national security." *Id.* ¶ 1.

required to confirm from an authorized official that the information is unclassified before [the signatory] may disclose it . . . ."[11]

Paragraphs 4 through 6 of the Classified Information NDA lay out the potential consequences for violation of the agreement. Paragraph 4 warns that failure to comply with the procedures established in Paragraph 3 "may result," *inter alia*, in "termination of any security clearances [the signatory] hold[s]."[12] It also warns that "any unauthorized disclosure of classified information by [the signatory] may constitute a violation, or violations, of United States criminal laws."[13] In addition, Paragraph 6 warns that "the United States Government may seek any remedy available to it to enforce this Agreement including, but not limited to, application for a court order prohibiting disclosure of information in breach of this Agreement."[14] Finally, Paragraph 5 "assign[s] to the United States Government all royalties, remunerations, and emoluments that have resulted, will result or may result from any disclosure, publication, or revelation of classified information not consistent with the terms of this Agreement."[15] This provision purports to authorize the Government "to impose a constructive trust on" any profits the signatory might derive from the publication of any information in violation of the Classified Information NDA. *Snepp v. United States*, 444 U.S. 507, 516 (1980).

In contrast with the Classified Information NDA, the SCI NDA establishes a mandatory prepublication review process for those granted access to SCI, which the agreement defines as

---

[11] *Id.* ¶ 3.

[12] *Id.* ¶ 4.

[13] *Id.*

[14] *Id.* ¶ 6.

[15] *Id.* ¶ 5.

information that "involves or derives from intelligence sources or methods and is classified or is in the process of classification."[16] Paragraph 4 of the SCI NDA required Ambassador Bolton to

> submit for security review . . . any writing or other preparation in any form . . . that contains or purports to contain any SCI or description of activities that produce or relate to SCI or that [he] ha[s] reason to believe are derived from SCI, that [he] contemplate[s] disclosing to any person not authorized to have access to SCI or that [he] ha[s] prepared for public disclosure.[17]

Paragraph 5 of the SCI NDA states that "the purpose of the [prepublication] review described in paragraph 4 is to give the United States a reasonable opportunity to determine whether the preparation submitted pursuant to paragraph 4 sets forth any SCI."[18] Paragraph 5 also imposes a time limit of "30 working days from date of receipt" of the material to "act upon it . . . and make a response."[19] The SCI NDA forbids Ambassador Bolton from disclosing any writing subject to prepublication review "until [he] ha[s] received written authorization from the Department or Agency that last authorized [his] access to SCI that such disclosure is permitted."[20] Paragraphs 6, 7, and 12 of the SCI NDA provide for materially similar potential consequences for violation of the agreement as for violation of the Classified Information NDA.[21]

The criteria used by the Executive Branch to determine whether information is classified is found in Executive Order No. 13526, 75 Fed. Reg. 707, 708 (Dec. 29, 2009). *See Shaffer v. Def. Intelligence Agency*, 102 F. Supp. 3d 1, 8 (D.D.C. 2015). Section 1.2(a) of Executive Order 13526

---

[16] SCI NDA, Ex. C ¶ 1.

[17] *Id.* ¶ 4.

[18] *Id.* ¶ 5.

[19] *Id.*

[20] *Id.* ¶ 4.

[21] *See id.* ¶¶ 6–7, 12.

describes the type of harm that must reasonably be expected to result from the disclosure of information for such information to be classified:

> Information may be classified at one of the following three levels:
>
> > (1) ''Top Secret'' shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to the national security that the original classification authority is able to identify or describe.
> >
> > (2) ''Secret'' shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security that the original classification authority is able to identify or describe.
> >
> > (3) ''Confidential'' shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause damage to the national security that the original classification authority is able to identify or describe.

75 Fed. Reg. 707–08. Section 1.4 of Executive Order 13526 describes the type of information that is subject to potential classification:

> Information shall not be considered for classification unless its unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security in accordance with section 1.2 of this order, and it pertains to one or more of the following:
>
> > (a) military plans, weapons systems, or operations;
> >
> > (b) foreign government information;
> >
> > (c) intelligence activities (including covert action), intelligence sources or methods, or cryptology;
> >
> > (d) foreign relations or foreign activities of the United States, including confidential sources;
> >
> > (e) scientific, technological, or economic matters relating to the national security;
> >
> > (f) United States Government programs for safeguarding nuclear materials or facilities;

(g) vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security; or

(h) the development, production, or use of weapons of mass destruction.

*Id.* at 709.

Section 1.7(a) of Executive Order 13526 warns that "[i]n no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to," *inter alia*, "conceal violations of law," "prevent embarrassment to a person, organization, or agency," or "prevent or delay the release of information that does not require protection in the interest of the national security." *Id.* at 710.

Given his extensive government career in matters relating to national security and foreign policy, Ambassador Bolton was and is an expert on what constitutes classified information and the proper handling of such information.[22] He therefore took care to ensure that the manuscript of his book did not contain or reveal classified information.[23] Nonetheless, so that there could be no question of his compliance with his obligations, Ambassador Bolton directed his counsel, Charles J. Cooper, to submit the manuscript to the NSC for prepublication review.[24] Mr. Cooper emailed Defendant Ellen J. Knight on December 30, 2019, asking to "discuss with [her] the process for securely submitting for prepublication review a hard copy of the manuscript of a book that Mr. Bolton [was] preparing for publication."[25] As noted above, Ms. Knight is the Senior Director who supervises the office responsible for overseeing the prepublication review process at the NSC. The

---

[22] Bolton Decl., Ex. A ¶ 2.

[23] *Id.* ¶ 3.

[24] *Id.* ¶ 4.

[25] *See* Email from Charles J. Cooper to Ellen Knight, Senior Director for Records, Access, and Information Security Management, National Security Council (Dec. 30, 2019, 11:34 AM), Ex. E; *see also* Doc. 1 ¶ 31.

Government concedes that Ms. Knight is the senior career official responsible for reviewing proposed written works to ensure that they do not include classified information.[26] Mr. Cooper and Ms. Knight spoke by phone later that same day. During the call, Mr. Cooper noted that Ambassador Bolton's manuscript contained information relating to the Ukraine controversy giving rise to the then-pending impeachment proceedings, and that Ambassador Bolton was relying on regulations restricting the scope of prepublication review to identifying and preventing the disclosure of classified information and limiting the review process to those career government officials regularly charged with that responsibility. Ms. Knight assured Mr. Cooper that "the sole purpose of prepublication security review is to ensure that SCI or other classified information is not publicly disclosed."[27]

Immediately following the phone call, on December 30, 2019, specifically relying on this understanding of the limited purpose of the prepublication review process, Ambassador Bolton (via Mr. Cooper) hand-delivered a hard copy of his manuscript to Ms. Knight's office.[28] Mr. Cooper included a cover letter reiterating that Ambassador Bolton "carefully sought to avoid any discussion in the manuscript of sensitive compartmented information ('SCI') or other classified information, and [he] accordingly do[es] not believe that prepublication review is required."[29] Ambassador Bolton "nonetheless submitt[ed] [h]is manuscript out of an abundance of caution.[30] Mr. Cooper emphasized that Ambassador Bolton was relying upon his understanding that the

---

[26] *See* Doc. 1 ¶¶ 25–27, 30.

[27] *See* Letter from Charles J. Cooper to Ellen Knight, Senior Director for Records, Access, and Information Security Management, National Security Council (Dec. 30, 2019), Ex. F at 1.

[28] *Id.* at 1; Doc. 1 ¶ 31.

[29] Ex. F at 1; Doc. 1 ¶ 31.

[30] Ex. F at 1; Doc. 1 ¶ 31.

contents of the manuscript would not be shared with anyone other than the career officials regularly

involved in conducting such reviews. Ex. F at 1. While the Government now alleges that this

understanding was "erroneous," Doc. 1 ¶ 31, at no point did Ms. Knight or anyone else at the

White House correct his understanding. Ms. Knight confirmed receipt of the manuscript at 2:50

p.m. on December 30, 2019, and stated "we will begin the review process. I will be in-touch."[31]

On January 23, at 3:33 p.m., as the impeachment trial of the President was underway in the

United States Senate, Ms. Knight emailed Mr. Cooper and attached a letter stating:

> Based on our preliminary review, the manuscript appears to contain significant
> amounts of classified information. It also appears that some of this classified
> information is at the TOP SECRET level, which is defined by Executive Order
> 13526 as information that "reasonably could be expected to cause exceptionally
> grave harm to the national security" of the United States if disclosed without
> authorization. Under federal law and the nondisclosure agreements your client
> signed as a condition for gaining access to classified information, the manuscript
> may not be published or otherwise disclosed without the deletion of this classified
> information.[32]

Ms. Knight's letter closed by promising to provide "additional, more detailed guidance regarding

next steps that should enable you to revise the manuscript and move forward as expeditiously as

possible."[33]

On January 26, the *New York Times* published an article purporting to describe passages

from Ambassador Bolton's manuscript that bore on the ongoing impeachment trial. The *Times*

stated that "President Trump told his national security adviser in August that he wanted to continue

freezing $391 million in security assistance to Ukraine until officials there helped with

---

[31] Email from Ellen Knight, Senior Director for Records, Access, and Information Security Management, National Security Council, to Charles J. Cooper, (Dec. 30, 2019, 2:50 PM), Ex. G.

[32] Letter from Ellen Knight, Senior Director for Records, Access, and Information Security Management, National Security Council, to Charles J. Cooper (Jan. 23, 2020), Ex. H; *see* Doc. 1 ¶ 33.

[33] Ex. H; Doc. 1 ¶ 33.

investigations into Democrats including the Bidens, according to an unpublished manuscript by the former adviser, John R. Bolton."[34] Mr. Cooper issued a statement quoted in the *Times* article: "It is clear, regrettably, from the *New York Times* article published today that the pre-publication review process has been corrupted and that information has been disclosed by persons other than those properly involved in reviewing the manuscript."[35]

On January 29, Senator Martin Heinrich of New Mexico asked the following question of the President's lawyers during the impeachment trial:

> When did the President's Counsel first learn that the Bolton manuscript had been submitted to the White House for review, and has the President's counsel or anyone else in the White House attempted in any way to prohibit, block, disapprove, or discourage John Bolton, or his publisher, from publishing his book?

166 CONG. REC. S645, S660 (daily ed. Jan. 29, 2020) (statement of Sen. Heinrich). In response, Patrick F. Philbin, Deputy Counsel to the President and one of the President's defense lawyers during the impeachment trial, read into the Senate record Ms. Knight's January 23 letter to Mr. Cooper. *Id.* at S660–61 (statement of Mr. Counsel Philbin). Mr. Philbin also stated that, sometime after Ambassador Bolton's manuscript was submitted to the NSC, "[t]he White House Counsel's Office was notified that it was there. The NSC has released a statement explaining that it has not been reviewed by anyone outside NSC staff." *Id.* at S660.

Later that day, the President asserted on Twitter that after he fired Ambassador Bolton, he had "go[ne] out and IMMEDIATELY writ[ten] a nasty & untrue book. All Classified National

---

[34] Maggie Haberman and Michael S. Schmidt, *Trump Tied Ukraine Aid to Inquiries He Sought, Bolton Book Says*, N.Y. TIMES (Jan. 26, 2020), https://nyti.ms/2S71JVd.

[35] *Id.* The Government's baseless insinuation that Ambassador Bolton was the source of the disclosure to the press is completely and categorically false. Bolton Decl., Ex. A ¶ 8.

Security."[36] Of course, the President could not have offered this assessment of the content of the Ambassador's book unless he had read the manuscript or been briefed on its contents, and the President's tweet expressly linked his assertion that "All" the material in the manuscript is "Classified National Security" with his personal hostility toward Ambassador Bolton and the content of the Ambassador's book.

On February 3, *Vanity Fair* reported that "the president is out for revenge against his adversaries."[37] The article stated that the President "has an enemies list," "Bolton is at the top of the list," and the "campaign against Bolton" included Ms. Knight's January 23 letter asserting that the manuscript contained classified information.[38] It also reported that the President "wants Bolton to be criminally investigated."[39]

On February 7, Ms. Knight sent Mr. Cooper a letter asserting that the manuscript "contains classified discussions between the President and foreign heads of state, classified foreign government information, details about classified military plans and operations, and classified details about intelligence sharing and activities."[40] Ms. Knight offered to meet with Ambassador Bolton "to review each instance of classified information in detail and, as necessary, assist in the prioritization of any particular portions."[41] She asserted that her February 7 letter, along with her

---

[36] Donald J. Trump (@realDonaldTrump), TWITTER (Jan. 29, 2020, 7:28 AM), https://bit.ly/30QPvWW.

[37] *See* Gabriel Sherman, *"It's Payback Time": With Acquittal Certain, Trump Plots Revenge on Bolton, Impeachment Enemies*, VANITY FAIR (Feb. 3, 2020), https://bit.ly/2C2irkp.

[38] *Id.*

[39] *Id.*

[40] Letter from Ellen Knight, Senior Director for Records, Access, and Information Security Management, National Security Council, to Charles J. Cooper (Feb. 7, 2020), Ex. I at 1; *see* Doc. 1 ¶ 40.

[41] Ex. I at 1; *see* Doc. 1 ¶ 40.

January 23 letter, "constitute NSC's initial response for the purposes of the nondisclosure agreements signed by [Ambassador Bolton]."[42]

On February 21, the *Washington Post* reported that

President Trump has directly weighed in on the White House [prepublication] review of a forthcoming book by his former national security adviser, telling his staff that he views John Bolton as 'a traitor,' that everything he uttered to the departed aide about national security is classified and that he will seek to block the book's publication.[43]

The story also reported that the President vowed to a group of television news anchors that "we're going to try and block the publication of [his] book. After I leave office, he can do this."[44]

Ambassador Bolton's first meeting with Ms. Knight also took place on February 21.[45] In the meeting, which lasted four hours, Ms. Knight, as she described it, "reviewed the preliminary results of three chapters in the draft manuscript in detail with" Ambassador Bolton.[46] Ambassador Bolton took five pages of handwritten notes, as he and Ms. Knight discussed her specific concerns page by page, line by line, and sometimes word by word.[47] Three days later, on February 24, Ms. Knight wrote that the meeting had been "most productive," and she suggested that "it would be most helpful to the process if we hold one or more following meetings . . . to discuss the remaining portions of the draft manuscript."[48]

---

[42] Ex. I at 2.

[43] *See* Josh Dawsey, Tom Hamburger, and Carol D. Leonnig, *Trump wants to block Bolton's book, claiming most conversations are classified*, THE WASHINGTON POST (Feb. 21, 2020), https://wapo.st/2AuWEBs.

[44] *Id.*

[45] *See* Letter from Ellen Knight, Senior Director for Records, Access, and Information Security Management, National Security Council, to Charles J. Cooper (Feb. 24, 2020), Ex. J; Doc. 1 ¶ 41.

[46] Ex. J; *see* Doc. 1 ¶ 41.

[47] Bolton Decl., Ex. A ¶ 10.

[48] *See* Ex. J at 1; Doc. 1 ¶ 41.

Ambassador Bolton met with Ms. Knight three more times, on March 2 (approximately four hours), March 3 (over four hours), and March 4 (approximately three hours).[49] In these meetings, Ambassador Bolton and Ms. Knight reviewed in meticulous detail each of her concerns in the remaining 11 chapters and produced 34 pages of handwritten notes.[50] Following his notes and the guidance provided by Ms. Knight, Ambassador Bolton revised his manuscript, and by March 9 had resubmitted all 14 chapters to begin the second round of the iterative review process.[51]

Ambassador Bolton did not hear from Ms. Knight again until March 27, when she wrote:

> I appreciate your efforts to address the classification concerns in the latest draft version you submitted. Many of the changes are satisfactory. However, additional edits are required to ensure the protection of national security information. To assist in making the additional required changes, I will provide a list of required edits and language substitutions to guide you in this next stage of revising the draft.[52]

Her list amounted to 17 typed, single-spaced pages of comments, questions, suggestions of specific alternative language, and citations to publicly available source material.[53] Working through the weekend, Ambassador Bolton responded to all 17 pages on Monday, March 30, accepting the vast majority of Ms. Knight's suggestions and proposing alternative solutions to others.[54]

In a telephone conversation on April 13, Ms. Knight provided Ambassador Bolton her much shorter list of remaining concerns after reviewing his March 30 revisions.[55] Their conversation resulted in entirely agreed-upon language changes, which Ambassador Bolton

---

[49] *See* Bolton Decl., Ex. A ¶ 12; Doc. 1 ¶ 42.

[50] Bolton Decl., Ex. A ¶ 12.

[51] *Id.*

[52] *See* Email from Ellen Knight, Senior Director for Records, Access, and Information Security Management, National Security Council, to John Bolton, Former National Security Advisor, National Security Council (Mar. 27, 2020, 3:52 PM), Ex. K; Doc. 1 ¶ 44.

[53] Ex. P; Doc. 1 ¶ 44.

[54] Bolton Decl., Ex. A ¶¶ 13–14; Doc. 1 ¶¶ 44–45.

[55] Bolton Decl., Ex. A ¶ 15; Doc. 1 ¶ 45.

delivered to Ms. Knight the next day, April 14.[56] During the April 13 call, Ms. Knight also said she would review the entire manuscript one more time, to recheck the issues previously resolved and ensure that she had not overlooked any.[57]

That final review resulted in two further telephone calls, on April 21 and 24, in which Ms. Knight conveyed her final round of edits and some additional citations to publicly available sources.[58] Ambassador Bolton promptly responded with the requested revisions, and on April 27, Ms. Knight, after clarifying one previously discussed edit, confirmed "that's the last edit I really have to provide for [Ambassador Bolton]."[59] All told, over the course of four months, Ambassador Bolton and Ms. Knight made four passes through the manuscript, and at the end of this painstaking process, Ms. Knight confirmed that the manuscript contained no classified information. Again, the Government concedes that the senior NSC official responsible for determining whether proposed publications contain classified information concluded that Ambassador Bolton's book, as revised, contained none. Doc. 1 ¶ 46

When Ambassador Bolton asked on April 27 when he could expect to receive the pro-forma closing letter confirming her agreement that the book contained no classified information, Ms. Knight cryptically replied that her "interaction" with unnamed others in the White House about the book had "been very delicate," and that there were "some internal process considerations to work through."[60] She nonetheless thought the letter might be ready that afternoon but would

---

[56] Bolton Decl., Ex. A ¶ 15; Doc. 1 ¶ 45.

[57] Bolton Decl., Ex. A ¶ 15.

[58] *Id.* ¶ 16; *see* Doc. 1 ¶ 45.

[59] Bolton Decl., Ex. A ¶ 16; Doc. 1 ¶ 46.

[60] Bolton Decl., Ex. A ¶ 17.

"know more by the end of the day."[61] Ambassador Bolton and Ms. Knight also discussed whether the letter should be transmitted by electronic transmission or whether Ambassador Bolton should pick up a hard copy from Ms. Knight's office.[62]

Ambassador Bolton's subsequent inquiries of Ms. Knight as to when he would receive the letter clearing the book for publication were answered with formal replies that the process was ongoing and that she had nothing new to report.[63] It soon became obvious that the White House had no intention of permitting Ms. Knight to issue the clearance letter, but instead was attempting to run out the clock before the election by simply refusing to respond to Ambassador Bolton's requests. In light of Ms. Knight's approval of the manuscript on April 27, Ambassador Bolton notified his publisher, Simon & Schuster, which thereafter scheduled the book for release on June 23, 2020.[64]

Six weeks of silence from the NSC had passed when, on June 8, following press reports that Ambassador Bolton intended to publish his book on June 23, John Eisenberg, Deputy White House Counsel and the NSC's counsel, wrote to Ambassador Bolton's counsel claiming that manuscript still contained classified information.[65] Mr. Eisenberg said he would "provide [Ambassador Bolton's counsel], no later than June 19, 2020, a copy of your client's draft manuscript with redactions for the information that has been identified as classified."[66]

---

[61] *Id.*

[62] *Id.*

[63] *Id.* ¶ 18.

[64] *Id.* ¶ 19.

[65] *See* Letter from John Eisenberg, Legal Advisor, National Security Council, to Charles J. Cooper (Jun. 8, 2020), Ex. L; Doc. 1 ¶ 54.

[66] Ex. L.

On June 10, Ambassador Bolton's counsel wrote to Mr. Eisenberg, explaining that the White House was clearly attempting to suppress Ambassador Bolton's book, that Ambassador Bolton had fulfilled all of his contractual and any other obligations to the Federal Government, and that the exhaustive prepublication review conducted by Ambassador Bolton and Ms. Knight confirmed that, the book, as revised, contained no classified information.[67] In any event, counsel explained, Simon & Schuster had already printed, bound, and shipped the book to booksellers across the country, and Ambassador Bolton has no authority to stop the book from being made available to the public on June 23.[68] In fact, thousands of copies of the book have also been printed in Australia and the United Kingdom, and thousands of books have been shipped to Canada and India for sales in those countries beginning on June 23.[69] A significant number of advance "review" copies of the book have also been provided to a select group of major newspapers and other mass audience outlets.[70] Indeed, both the *New York Times* and the *Washington Post* have obtained copies of the book and have published stories recounting incidents that Ambassador Bolton described in the book.[71] There is nothing that Ambassador Bolton can do to stop the book from becoming public on June 23; indeed, it is already public.

On June 15, in response to a question about why his administration was planning to file this lawsuit, the President openly admitted that his classification decisions are not based on specific

---

[67] *See* Letter from Charles J. Cooper to John Eisenberg, Legal Advisor, National Security Council (Jun. 10, 2020), Ex. M.

[68] *Id.*; Doc. 1 ¶ 55.

[69] Bolton Decl., Ex. A ¶ 21.

[70] *Id.*

[71] Peter Baker, *Bolton Says Trump Impeachment Inquiry Missed Other Troubling Actions*, N.Y. TIMES (June 17, 2020), https://nyti.ms/2UWziLU; Josh Dawsey, *Trump asked China's Xi to help him win reelection, according to Bolton book*, WASH. POST. (June 17, 2020), https://wapo.st/2BeET9E.

national-security concerns but instead encompass *anything* he says while in office: "I told that to the attorney general before; *I will consider every conversation with me as president highly classified*. So that would mean that if he wrote a book, and if the book gets out, he's broken the law." *See* Press Conference, President Donald J. Trump at 0:54–1:05, (Jun. 15, 2020) (emphasis added), https://politi.co/2Y2Vo1i. The President reiterated: "Any conversation with me is classified." *Id.* at 4:18–21. The President added that "a lot of people are very angry with [Bolton] for writing a book" and that he "hope[d]" that Ambassador Bolton "would have criminal problems" for publishing the book. *Id.* at 1:05–08, 1:30–36.

On June 16, the Government delivered to Ambassador Bolton a copy of the book with wholesale redactions indicating the passages that it purportedly believes contain classified information.[72] The Government's redactions are extensive and sweeping, apparently eliminating passages describing or recounting a significant majority of the President's conversations with his advisors and with foreign leaders.[73] The Government also deleted numerous passages portraying President Trump in an unflattering light.[74] Along with the redacted copy, the Government sent a cover letter from Deputy Assistant to the President Michael J. Ellis, who asserted that the redactions were "based on [his] initial review."[75] The Government filed this lawsuit hours later, and it moved for a temporary restraining order or preliminary injunction on June 17.

---

[72] Bolton Decl., Ex. A ¶ 23.

[73] *Id.*

[74] *Id*.

[75] Letter from Michael J. Ellis, Deputy Assistant to the President, to John R. Bolton (Jun. 16, 2020), Ex. N.

In the pages that follow, we first explain why the Government's complaint must be dismissed in toto for failure to state a claim. We then turn to our opposition to the Government's motion for preliminary-injunctive relief.

## ARGUMENT

### MOTION TO DISMISS UNDER RULE 12(b)(6)

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted). The complaint meets this standard "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A complaint must provide 'more than labels and conclusions'; although it 'does not need detailed factual allegations,' the factual allegations 'must be enough to raise a right to relief above the speculative level.' " *Washington All. of Tech. Workers v. United States Dep't of Homeland Sec.*, 892 F.3d 332, 343 (D.C. Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

The Government's complaint fails to state a claim for relief and should be dismissed. As noted above, Ambassador Bolton signed two separate NDAs: the SCI NDA and the Classified Information NDA. The SCI NDA expressly states that it only governs SCI: "This Agreement concerns SCI and does not set forth such other conditions and obligations not related to SCI as may now or hereafter pertain to my employment by or assignment or relationship with the Department or Agency."[76] While the Government points out that Ambassador Bolton had *access* to SCI during his time as National Security Advisor, *see* Doc. 1 ¶¶ 7, 21, nowhere in its complaint does the Government assert that Ambassador Bolton's manuscript *contains* SCI. To the contrary,

---

[76] Compl., Ex. A (SCI NDA), Doc. 1-1 ¶ 10; *see also id.* ¶ 4.

the complaint alleges that the manuscript still contains information "classified at the Confidential, Secret and Top Secret levels." *See id.* ¶ 58.[77] Thus, the SCI NDA does not apply, and the complaint must be dismissed insofar as its claims purport to be based on violation of the SCI NDA. (We acknowledge that the Government's brief now asserts—for the first time in all the oral communications, correspondence, and papers exchanged by the parties—that his book contains SCI. That assertion—which this Court must ignore for purposes of adjudicating Defendant's Rule 12(b)(6) motion—does not change the analysis, for reasons discussed on pages 34–37, *infra*).

Unlike the SCI NDA, the Classified Information NDA (also known as Standard Form ("SF") 312) imposes an obligation on the signatory to submit to a prepublication review process only if he either knows that the information is classified or is "uncertain about the classification status" of the information.[78] Paragraph 4 of the agreement provides:

> I hereby agree that I will never divulge classified information to anyone unless: (a) I have officially verified that the recipient has been properly authorized by the United States Government to receive it; or (b) I have been given prior written notice of authorization from the United States Government Department or Agency (hereinafter Department or Agency) responsible for the classification of information or last granting me a security clearance that such disclosure is permitted. I understand that if I am uncertain about the classification status of information, I am required to confirm from an authorized official that the information is unclassified before I may disclose it . . . .[79]

---

[77] Again, the SCI NDA makes clear that SCI is a special category of "information or material protected within Special Access Programs," specifically defining it as information that "involves or derives from Intelligence sources or methods and is classified or is in process of a classification determination under the standards of Executive Order 13526 or other Executive order or statute." *Id.* ¶ 1. As the Government admits in is complaint, "Sensitive Compartmented Information is *a subset* of Classified National Intelligence concerning or derived from intelligence sources, methods or analytical processes that is required to be protected within formal access control systems established by the Director of National Intelligence." Doc. 1 ¶ 7 n.1 (emphasis added).

[78] "SF 312 itself does not mandate prepublication review . . . ." Kevin Casey, *Till Death Do Us Part: Prepublication Review in the Intelligence Community*, 115 COLUM. L. REV. 417, 431 (2015).

[79] Compl, Ex. A (Classified Information NDA), Doc. 1-1 ¶ 3.

The Government relies on this language as requiring authors to obtain *written* confirmation that the information to be disclosed is not classified. It clearly does not. To the contrary, it is clear from its plain language that the obligation to obtain "prior written notice of authorization" from the Government applies only to information that the employee is *certain* is classified. Indeed, if an employee was required to obtain such written authorization even for information about whose classification status the employee is *uncertain*, the Classified Information NDA's instruction that "if I am uncertain about the classification status of information, I am required to confirm from an authorized official that the information is unclassified before I may disclose it" would be superfluous, violating one of the most basic principles of contract interpretation. *See T. Brown Constructors, Inc. v. Pena*, 132 F.3d 724, 730–31 (Fed. Cir. 1997) ("A contract should be interpreted, if possible, to give effect to all provisions. An interpretation which renders portions of the contract meaningless, useless, ineffective, or superfluous should be eschewed." (citation omitted)); *see also* 11 WILLISTON ON CONTRACTS § 32:5 (4th ed.); RESTATEMENT (SECOND) OF CONTRACTS § 203(a) (1981).

Interpreting the "written notice of authorization" requirement according to its plain language—as applying only to information that the author knows to be classified—is also consistent with the principle that specific contract terms—those governing the precise situation at hand—prevail over more general contract terms, and the contract contains a specific term governing the situation where the author is "uncertain" if information is classified. *See Hometown Fin., Inc. v. United States*, 409 F.3d 1360, 1369 (Fed. Cir. 2005); 11 WILLISTON ON CONTRACTS § 32:5. It is also consistent with the principle that any ambiguity in a contract is to be construed against its drafter. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995); RESTATEMENT (SECOND) OF CONTRACTS § 206.

Finally, this interpretation of the Classified Information NDA is required by the principle that prior restraints must be interpreted narrowly to avoid doubts about their constitutionality. *See Lowe v. SEC*, 472 U.S. 181, 203–11 (1985); *United States v. Raymond*, 228 F.3d 804, 815 (7th Cir. 2000), *overruled in part on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). This constitutional-avoidance principle is even stronger in the context of prior restraints, since normally a prior restraint would "bear[ ] a heavy presumption against its constitutional validity." *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam).[80]

The NSC (setting aside constitutionality concerns) could have customized its own NDA form and required Ambassador Bolton to sign its NSC-specific NDA *in addition to* the two standard NDAs he signed and that are used across the Government. Such a hypothetical NSC-specific NDA could have required prepublication review for non-classified materials, and it could have required the author to obtain *written* authorization before the author could publish. That is what other agencies have done. For example, the FBI requires its employees to sign the standard SCI NDA and Classified Information NDA insofar as those employees have access to such information,[81] but it *also* requires employees to sign its own NDA that broadly requires prepublication review for "any information or material from or related to FBI files or any other information acquired by virtue of [the employee's] official employment."[82] And it specifically

---

[80] In its brief, the Government collapses the distinction between when a "written notice of authorization" is required and when the author need only "confirm from an authorized official that the information [was] unclassified," *see* Doc. 3 at 14–15, but as this analysis shows, those requirements must be analyzed separately.

[81] FEDERAL BUREAU OF INVESTIGATION RECORDS MANAGEMENT DIVISION, PREPUBLICATION REVIEW POLICY GUIDE § 6 (2015). FBI and CIA documents discussed herein may be found at KNIGHT FIRST AMENDMENT INSTITUTE, INTERACTIVE CHART: PREPUBLICATION REVIEW BY AGENCY AND SECRECY AGREEMENT (Aug. 27, 2019), https://bit.ly/2NamBc6.

[82] FEDERAL BUREAU OF INVESTIGATION, FBI EMPLOYMENT AGREEMENT ¶ 3.

forbids disclosure of such information "without prior official *written authorization* by the FBI."[83] There is a reason why the FBI imposes broad prepublication review and a specific written-authorization requirement: such requirements are *not* imposed by the standard SCI NDA or the Classified Information NDA that FBI employees—just like NSC employees—must sign. Similarly, the CIA requires its employees to sign a "Secrecy Agreement" that mandates prepublication review of any material that "contains any mention of intelligence data or activities" and specifies that the employee "will not take any steps towards public disclosure until [he or she] ha[s] received *written permission* to do so from the Central Intelligence Agency."[84] In stark contrast, both of the standard NDAs that Ambassador Bolton signed apply to a much narrower class of information, and the Classified Information NDA does not require *written*, as opposed to oral, authorization "from an authorized official" prior to publication. This contrast further reinforces the interpretation of the NDAs described above.

It is undisputed that, when Ambassador Bolton submitted his manuscript to the NSC on December 30, 2019, he believed that he had "carefully . . . avoid[ed] any discussion in the manuscript of sensitive compartmented information ('SCI') or other classified information" and that he only "submit[ed] [h]is manuscript out of an abundance of caution."[85] Because he was confident that the manuscript did not contain classified information, he had no obligation under the Classified Information NDA either to seek "written notice of authorization" or to "confirm

---

[83] *Id.* (emphasis added).

[84] CENTRAL INTELLIGENCE AGENCY, FORM 368, SECRECY AGREEMENT ¶ 5. (emphasis added).

[85] Compl., Ex. D, Doc. 1-4, at 1. The Government's assertion that Ambassador Bolton "tacitly conceded" that the NDAs applied to his manuscript by submitting it for review is baseless. Doc. 3 at 11. Ambassador Bolton made it crystal-clear that he "d[id] not believe that prepublication review [was] required." Compl., Ex. D, Doc. 1-4, at 1.

from an authorized official that the information [was] unclassified" before publishing the manuscript.[86] He submitted the manuscript for prepublication review, again, only out of an abundance of caution.

*At most*, then, the provision applying to situations in which the author "is uncertain about the classification status of information" would apply, and under that provision, Ambassador Bolton was required only to "confirm from an authorized official that the information is unclassified before [he] [could] disclose it."[87] As the Government admits, that is precisely what he did. Ambassador Bolton submitted his manuscript to the NSC's Records Access and Information Security Management Directorate, which "bears primary responsibility for the classification review of written works submitted to the NSC for the prepublication review process," and he engaged in a four-month, exhaustive review of his manuscript with Ms. Knight, "who holds original classification authority under operative Executive Order" and, as "the Senior Director for Records Access and Information Security Management at the NSC," is the "head[ ]" of that office, Doc. 1 ¶¶ 25–26, 30. The Government concedes that "[o]n or around April 27, 2020, Ms. Knight had completed her review and was of the judgment that the manuscript draft did not contain classified information." *Id.* ¶ 46. Thus, on April 27, Ambassador Bolton "confirm[ed] from an authorized official that the information [in his book] is unclassified," and that pursuant to the Classified Information NDA, he "may disclose it."[88] Because Ambassador Bolton has not violated the Classified Information NDA, any claims based on violation of that agreement must be dismissed.

---

[86] *Id.*, Ex. A (Classified Information NDA), Doc. 1-1 ¶ 3.

[87] *Id.*

[88] *Id.*

The Government asserts that Ambassador Bolton has violated the common law doctrines of unjust enrichment and fiduciary duty. *See* Doc. 1 ¶¶ 80–85; Doc. 3 at 10. But these claims are based on the same conduct underlying the Government's breach-of-contract claims, and if the contract claim fails, so also must these claims. *See US Airways, Inc. v. McCutchen*, 569 U.S. 88, 98 (2013) ("A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment" (quoting RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 2(2), p. 15 (2010))); *DeGeer v. Gillis*, 707 F.Supp.2d 784, 795 (N.D. Ill. 2010) ("Courts have frequently found that claims for breach of contract and claims for breach of fiduciary duty are duplicative of one another and must be dismissed." (citation omitted)); *William Kaufman Org., Ltd. v. Graham & James LLP*, 703 N.Y.S.2d 439, 442 (N.Y. 2000) The rationale for this rule is that "court[s] will not displace the terms of [a] contract and impose some other duties not chosen by the parties." *In re APA Assessment Fee Litig.*, 766 F.3d 39, 46 (D.C. Cir. 2014) (quotation marks and citation omitted). If a contract says that a party must perform a duty within two years, it cannot be that the party has a fiduciary duty to perform within one year. In the same way, because the NDAs did not require Ambassador Bolton to obtain written authorization to publish his book, such a requirement cannot be imposed by fiduciary or unjust-enrichment principles.

More importantly, even if the common law permitted such duplicative claims, they would certainly be barred by the First and Fifth Amendments. In the NDAs, the Government set out in precise detail the steps that Ambassador Bolton needed to take to remove the prior restraint on his speech and to avoid civil and criminal penalties. A governmental action "subjecting the exercise of First Amendment freedoms to [a] prior restraint . . . without narrow, objective, and definite standards to guide the [governmental] authority, is unconstitutional." *Shuttlesworth v. City of*

*Birmingham*, 394 U.S. 147, 150–51 (1969); *see also Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). It would be a clear violation of the First Amendment to allow the Government to prolong its censorship of Ambassador Bolton  or to punish him for his speech based on an alleged violation of unwritten obligations going beyond the duties expressly set forth in the contracts. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975); *see also Niemotko v. Maryland*, 340 U.S. 268, 271–73 (1951).

In the same way, it would violate the Due Process Clause of the Fifth Amendment to subject Ambassador Bolton to the forfeiture of any remuneration for his book and to threaten him with potential criminal liability based on unwritten procedures or duties *even though* he complied with the contracts specifying how he could avoid such penalties. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) ("If . . . the law interferes with the right of free speech or of association, a more stringent vagueness test should apply."); *see also Sessions v. Dimaya*, 138 S. Ct. 1204, 1212–13 (2018) (plurality opinion); *see also id.* at 1228–29 (Gorsuch, J., concurring in part and concurring in the judgment).[89] Accordingly, the allegations of the complaint fail to state a claim, and this case must be dismissed.

---

[89] The Due Process violation is compounded by the Government's arbitrary and irregular deviation from the normal NSC prepublication review process. As the Government admits, the normal prepublication-review process would entail "a first-level review" by "a staff employee of the Records Access and Information Security Management Directorate," followed by a "second-level review" "by a more senior member" of the Directorate." Doc. 1 ¶ 27. Once the iterative process with the Directorate is completed, "the staff of" the Directorate issues the pro-forma letter memorializing that the manuscript does not contain classified information. *Id.* ¶¶ 28–29. At *no point* does the process normally involve a *third* round of review by the National Security Advisor himself and his hand-picked political appointee, as it did here. *See id.* ¶ 51. The procedure defended by the Government would allow it to add review-upon-review atop the normal process and delay the publication of Ambassador Bolton's book indefinitely. This arbitrary, additional layer of review—upon which the Government's entire lawsuit depends—does not comport with due process. *See Vill. of Hoffman Estates*, 455 U.S. at 499.

**OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINTING ORDER
AND MOTION FOR PRELIMINARY INJUNCTION**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). A preliminary injunction is an "extraordinary remedy," *id.* at 24, and the injunction that the Government has sought here—a prior restraint on core First Amendment political speech—is uniquely disfavored in American law, *see Carroll*, 393 U.S. at 181. Because the Government does not have standing to seek injunctive relief preventing publication of Ambassador Bolton's book, its motion for a temporary restraining order and preliminary injunction should be denied. Alternatively, because the Government cannot carry its burden of showing that it is entitled to its requested prior restraint of Ambassador Bolton's political speech, its motion must be denied.

**I.      The Government Is Not Likely To Succeed On The Merits.**

**A.      The Government Lacks Standing To Seek A Prior Restraint
Against Publication Of Ambassador Bolton's Book Because
Its Alleged Injury Is Not Redressable.**

Article III of the Constitution limits federal court jurisdiction to "Cases" or "Controversies." U.S. CONST., art. III, § 2. To demonstrate standing, a plaintiff must show (1) "injury in fact" in the form of "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation marks and citations omitted). The Government's request for a temporary restraining order and preliminary injunction compelling Ambassador

Bolton to prevent his book from being released to the public—an order that he is powerless to perform—would do nothing to redress the Government's alleged injury. The Government thus lacks standing to seek this form of relief, and its motion must be denied.

"[A] plaintiff must demonstrate standing for each claim he seeks to press *and for each form of relief that is sought*." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (emphasis added). Thus, quite apart from whether the Government has standing to seek monetary relief against Ambassador Bolton, it must separately demonstrate standing to seek a preliminary injunction restraining publication of his book. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (plaintiff "presumably" had standing to seek damages but lacked standing to seek preliminary injunctive relief). And because standing is "a threshold matter [that] spring[s] from the nature and limits of the judicial power," it must be addressed before the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) (second alteration in original) (quotation marks omitted). The Government must demonstrate standing "under the heightened standard for evaluating a motion for summary judgment . . . Thus, the plaintiff cannot rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts that, if taken to be true, demonstrate a substantial likelihood of standing." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017) (quotation marks omitted).

The redressability requirement "lies at the core of the standing doctrine" because "[a]n abstract decision without remedial consequence seems merely advisory, an unnecessary expenditure of judicial resources that burdens the adversary and carries all the traditional risks of making bad law and trespassing on the provinces of the executive and legislature." *E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 450 (2d Cir. 2014) (quoting 13A CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. § 3531.6 (3d ed. 2008)); *see also Hewitt v. Helms*, 482

29

U.S. 755, 761 (1987). Where, as here, a plaintiff requests prospective relief in the form of a declaratory judgment or injunction, the plaintiff must show that "prospective relief will remove the harm" and the plaintiff "personally would benefit in a tangible way from the court's intervention." *Warth v. Seldin,* 422 U.S. 490, 505, 508 (1975). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co.*, 523 U.S. at 107.

Here, the injury for which the Government seeks preliminary relief is the disclosure of allegedly classified information through the publication of Ambassador Bolton's book. But over 200,000 copies of the book have already been printed, bound, and distributed to booksellers throughout the country, and thousands more have shipped internationally.[90] "This includes shipments to retail booksellers large and small, from large national chains and online entities to a host of small, independent, booksellers."[91] And notwithstanding the Government's erroneous allegation "on information and belief" that Ambassador Bolton "possess[es] the authority to continue to delay the release date" of his book, both Ambassador Bolton and his publisher, Simon & Schuster, have now testified that Ambassador Bolton has no authority to prevent the book from being released to the public.[92] As the CEO of Simon & Schuster states in his declaration:

> Shortly after the NSC's conclusion was communicated to it [on April 27, 2020], Simon & Schuster took the necessary steps to formally accept the final version of the manuscript that Ambassador Bolton submitted, as provided under the terms of their publication agreement. Once Simon & Schuster formally accepted the manuscript for publication, and initiated the publication process, Ambassador Bolton lost any authority/ability he otherwise may have had to prevent or delay the Book's publication.[93]

---

[90] Bolton Decl., Ex. A ¶ 21; Karp Decl., Ex. Q ¶ 27.

[91] Karp Decl., Ex. Q ¶ 19.

[92] Bolton Decl., Ex. A ¶ 21; Karp Decl., Ex. Q ¶ 17.

[93] Karp Decl., Ex. Q ¶ 17.

Indeed, *even the Government* doubts that Ambassador Bolton has such authority, hedging its requested order as requiring Ambassador Bolton "to instruct or request his publisher, *insofar as he has the authority to do so*, to further delay the release date of *The Room Where it Happened* until completion of the prepublication review process" and "to instruct or request his publisher, *insofar as he has the authority to do so*, to take any and all available steps to retrieve and dispose of any copies of *The Room Where it Happened* that may be in the possession of any third party in a manner acceptable to the United States." Doc. 1 at p. 25 (emphases added). Far from shouldering its burden to establish the redressability of its alleged injury, the Government's own complaint effectively admits that it cannot.

Because declaratory and injunctive relief against Ambassador Bolton "would not prevent the claimed injury," *Newdow v. Roberts*, 603 F.3d 1002, 1011 (D.C. Cir. 2010), such relief would be "utterly meaningless," *Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc); *see also Lujan*, 504 U.S. at 569–70 (plurality opinion). "The redressability prong is not met when a plaintiff seeks relief against a defendant with no power to [stop the injury from occurring]." *Bronson v. Swensen*, 500 F.3d 1099, 1111 (10th Cir. 2007); *see also Duit Const. Co. Inc. v. Bennett*, 796 F.3d 938, 941 (8th Cir. 2015). The Government therefore cannot obtain redress from Ambassador Bolton. *See Okpalobi*, 244 F.3d at 427 ("Because these defendants have no powers to redress the injuries alleged, the plaintiffs have no case or controversy with these defendants that will permit them to maintain this action in federal court."); *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 715 (6th Cir. 2015) ("Redressability is typically more difficult to establish where the prospective benefit to the plaintiff depends on the actions of independent actors.").

Nor would "the *practical* consequence of" an injunction or declaratory judgment against Ambassador Bolton "amount to a significant increase in the likelihood that the plaintiff would

obtain relief that directly redresses the injury suffered." *Utah v. Evans*, 536 U.S. 452, 464 (2002) (emphasis added). Again, Ambassador Bolton's book has been shipped to booksellers across the country and around the world.[94] Advance "review" copies have been provided to a number of newspapers and other media,[95] and "virtually every major media organization in the United States possesses at least one copy of the Book."[96] The *New York Times*, the *Washington Post*, and other mass audience media outlets have copies of the book, and stories disclosing excerpts of its contents have already been published.[97]

The Government cannot plausibly argue that Ambassador Bolton has power to stop the Amazon delivery trucks in America, unshelve the copies in Europe, commandeer the copies in Canada, and repossess the copies sent to reviewers or in the possession of major newspapers. *See New York Coastal P'ship, Inc. v. U.S. Dep't of Interior*, 341 F.3d 112, 116 (2d Cir. 2003) ("Plaintiffs-appellants have no standing in this case, because we can only speculate whether the remedy they seek would redress their purported injuries."). Nor has the Government provided any evidence or given any reason to expect that hundreds of booksellers and reviewers with copies of the book have any legal obligation to return their copies of the book or that they would voluntarily do so if Ambassador Bolton or Simon & Schuster asked them to do so.[98] As Simon & Schuster's

---

[94] Bolton Decl., Ex. A ¶ 21; Karp Decl., Ex. Q ¶ 17.

[95] Bolton Decl., Ex. A ¶ 21;

[96] Karp Decl., Ex. Q ¶ 22.

[97] *See* Baker, *supra*; Dawsey, *supra*; Karp Decl., Ex. Q ¶ 22.

[98] For this reason, the Government's request that this Court order Ambassador Bolton "to notify his publisher that he was not authorized to disclose *The Room Where It Happened* because he has not completed prepublication review and because it contains classified information" would do nothing to redress the Government's alleged injury. Doc. 1 at p. 25. Moreover, this requested relief—which cannot plausibly be said to follow from any duty that Ambassador Bolton has under the nondisclosure agreements—would not only be an unconstitutional attempted prior restraint (though an ineffectual one); it would *separately* violate the First Amendment by compelling

CEO has testified:

> Simon & Schuster no longer maintains control of the copies of the Book that have been shipped to the large national chains, online retailers, and small independent booksellers referenced in the previous paragraph of this Declaration. Once Simon & Schuster shipped them in response to a purchase order, title to the physical copies passed to the retailer or wholesaler.[99]

The costs already expended in printing and shipping the book (not to mention the income that would be foregone) strongly suggest that none, let alone all, of those independent third parties will refrain from selling the book—if they could even do so. Again, as Simon & Schuster's CEO has observed:

> [T]he practice of many online booksellers is to ship preordered copies in advance of the publication date so that the books arrive on, or very shortly after, the day they first become available for purchase at brick-and-mortar stores. As a result, I have been advised that certain online retailers have already shipped preordered copies of the Book to some of their customers.[100]

While "[a] plaintiff need not demonstrate with certainty that her injury will be cured by a favorable decision," "she must at least make a showing that there is *a substantial likelihood* that the relief requested will redress the injury claimed." *E.M.*, 758 F.3d at 450 (emphasis added) (quotation marks omitted). The Government has fallen far short of that standard here.

Finally, the Government's tacked-on request for Rule 65(d)(2) relief against Simon & Schuster does not affect the standing analysis. Rule 65(d)(2) "applies only when a plaintiff validly invokes federal jurisdiction by satisfying the traceability and redressability requirements of standing against a defendant. If a plaintiff sues the wrong defendant, an order enjoining the correct official who has not been joined as a defendant cannot suddenly make the plaintiff's injury

---

Ambassador Bolton to speak a message with which he vehemently disagrees. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 640–42 (1943).

[99] Karp Decl., Ex. Q ¶ 20.

[100] *Id.* ¶ 21.

redressable." *Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193, 1209 (11th Cir. 2020) (citation omitted). "The Federal Rules of Civil Procedure do not create federal jurisdiction." *Id.* And an injunction under Rule 65(d)(2) would not bind the newspapers, independent booksellers, and retailers to whom the book has already been sent, since Ambassador Bolton and Simon & Schuster "do[] not control" those "independent third part[ies] that [are] not before the court." *Pulphus v. Ayers*, 909 F.3d 1148, 1153 (D.C. Cir. 2018).[101] In any event, such an injunction would be a clear violation of the Supreme Court's holding in *New York Times Co.*, 403 U.S. at 714.

In short, the Government's alleged injury cannot be redressed by Ambassador Bolton, and its motion for a temporary restraining order and preliminary injunction must therefore be denied for lack of standing.

### B.    Ambassador Bolton Has Not Violated The Nondisclosure Agreements.

For the reasons described above in support of Defendant's motion to dismiss, Ambassador Bolton has not violated the NDAs. However, in its brief, the Government asserts for the first time that Ambassador Bolton's book contains SCI and, therefore, that the SCI NDA applied to his manuscript and required that he receive written authorization from the NSC to publish it. *See* Doc. 3 at 12–14. This surprise assertion that the book contains SCI, even if true, would not alter the conclusion that the SCI NDA is inapplicable to this case.

The Government is not painting on a blank canvas when it asserts that Ambassador Bolton's book contains SCI. Rather, the Government's assertion comes after a six-month course of dealing between the parties that informs whether and how the NDAs apply. *See* RESTATEMENT (SECOND) OF CONTRACTS § 202(4) (1981); *see also id.* § 223. Ambassador Bolton submitted his

---

[101] *Aevoe Corp. v. AE Tech Co.*, 727 F.3d 1375, 1384 (Fed. Cir. 2013), is distinguishable because Aevoe had standing to sue AE Tech and because the S&F Defendants were the *sole* distributors of AE Tech's infringing product, giving AE Tech some control over S& Defendants.

manuscript for prepublication review on December 30, 2019. Over the next four months, he (or his counsel) and Ms. Knight exchanged more than a dozen emails and letters, participated in numerous phone calls, and sat through more than a dozen hours of face-to-face meetings, painstakingly reviewing Ambassador Bolton's manuscript. Yet, in all that time, Ms. Knight never asserted—or even hinted—that the manuscript contained SCI, even as she asserted that earlier drafts contained classified information.[102] After conducting an exhaustive process in which she reviewed the manuscript through *least four waves of changes*, Ms. Knight concluded that it contains no classified information—let alone *SCI*—as the Government concedes. Doc. 1 ¶ 46.

Nor did Mr. Eisenberg assert in either his June 8 or June 11 letters that the manuscript contains SCI. Nor did Mr. Ellis assert in his June 16 letter that the manuscript contains SCI. Indeed, *not even the Government's complaint* asserted that the manuscript contains SCI, even as it specifically alleges that it contains "Confidential, Secret, and Top Secret" information. Doc. 1 ¶ 58. The first time that *anyone* in the Government so much as *whispered* that the manuscript contains SCI to either Ambassador Bolton or the public was yesterday, when the Government filed its motion. For nearly six months, it has been common ground between the NSC and Ambassador Bolton that his manuscript does *not* contain SCI. Only now, on the eve of the book's publication and in service of seeking a prior restraint, has the Government brought forth this allegation.

And here is the key point: Ambassador Bolton authorized Simon & Schuster to publish his manuscript *weeks ago*, not long after receiving Ms. Knight's confirmation that the book did not contain classified information and long before the Government's first assertion yesterday that the book contained SCI. [103] Thus, at the time Ambassador Bolton proceeded with publishing his

---

[102] Bolton Decl., Ex. A. ¶ 24.

[103] Bolton Decl., Ex. A ¶ 22; Karp Decl., Ex. Q ¶ 17.

book—a decision that has long-since become irrevocable—he had *absolutely no reason to believe* that the book contained SCI. Indeed, quite the opposite: the Government had given him *every reason to believe* that it agreed with him that the book did *not* contain SCI. And if the book did not contain SCI, the SCI NDA did not apply when Ambassador Bolton authorized the book's publication.

Yet the Government now argues that the SCI NDA *did* apply based on its discovery of alleged SCI six months after the prepublication-review process began. If that argument is sustained—if, that is, an author may be held liable under the SCI NDA even though neither the author nor the Government believed that the author's writing contained SCI through four months of exhaustive prepublication review—it would mean that any federal employee who signs the SCI NDA would have no choice but to submit *any* writing, and certainly any writing that could even *theoretically* contain SCI, and then await written authorization before publishing that writing. The risk of liability would simply be too great for any author to proceed with publishing even a writing that both he *and the official in charge of prepublication review* believe, in good faith, is not subject to the SCI NDA.

Such a regime is flatly inconsistent both with the text of the SCI NDA and the First Amendment. The SCI NDA lays out specific criteria for determining whether material must be submitted for prepublication review and must await written authorization from the Government before being published. Only a work that "contains or purports to contain any SCI or description of activities that produce or relate to SCI or that [the author] ha[s] reason to believe are derived from SCI" must be submitted;[104] otherwise, the SCI NDA's prepublication-review process does not apply. Yet, the Government's interpretation of the SCI NDA would render these criteria

---

[104] SCI NDA, Ex. C ¶ 4.

completely superfluous, since it would effectively compel authors to submit *all* their materials to the prepublication-review process. *See T. Brown Constructors*, 132 F.3d at 730–31; 11 WILLISTON ON CONTRACTS § 32:5; RESTATEMENT (SECOND) OF CONTRACTS § 203(a).

The Government's interpretation would also violate the First Amendment. "The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002). And while it may be more convenient for the Government to impose a sweeping prior restraint on its employees, "[t]he Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse." *Id.* at 255. Indeed, the harm done to the First Amendment by such an all-encompassing prepublication-review requirement is worse than simply a chilling of expression: "If it can be said that a threat of criminal or civil sanctions after publication 'chills' speech, prior restraint 'freezes' it at least for the time." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). As noted above, ambiguous contracts should be interpreted to *avoid* expanding a prior restraint or a chill on free expression. *See Lowe*, 472 U.S. at 203–11; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 207.

Because Ambassador Bolton had no reason to believe that his manuscript contained SCI and every reason to think it did *not*, and because the NSC's chief classification-review authority confirmed that the book did not contain classified information, let alone SCI, the SCI NDA did not apply to his manuscript when he authorized its publication, and he cannot be said to have violated it.

**C.      The Government Has Not Overcome The Heavy Presumption Against The Constitutionality Of The  Prior Restraint It Seeks.**

A prior restraint "forbid[s] certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993). In Anglo-American law, the concept of a prior restraint originated in Tudor and Stuart England, where "printing presses and printers were licensed by the government, and nothing could lawfully be published without the prior approval of a government or church censor." *Id.* at 554 n.2. Prior restraints are not, however, limited to "formal legal sanctions" or situations in which materials have "been seized or banned by the State." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66–67 (1963). Accordingly, the prepublication review process itself is a "form of prior restraint," *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1439 (D.C. Cir. 1996); *United States v. Marchetti*, 466 F.2d 1309, 1317 (4th Cir. 1972), and, of course, an injunction issued by this Court in an effort to stop publication of Ambassador Bolton's book would be a "classic example[] of [a] prior restraint[ ]," *Alexander*, 509 U.S. at 550.

"Any system of prior restraints of expression comes to th[e] Court bearing a heavy presumption against its constitutional validity." *New York Times Co.*, 403 U.S. at 714. "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n*, 427 U.S. at 559; *Carroll*, 393 U.S. at 181. "The damage can be particularly great when the prior restraint falls upon the communication of news and commentary on current events." *Nebraska Press Ass'n*, 427 U.S. at 559.

The Federal Government, to be sure, "has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service," which is why the Supreme Court has sustained the constitutionality of a prepublication review process in principle (though

not the specific process at issue in this case). *Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980) (per curiam). Ambassador Bolton does not challenge that holding here, and the Government's extended defense of prepublication review *in general* is therefore entirely beside the point. *See* Doc. 3 at 15–19. What the Supreme Court has *never* done, however—and something for which the Government cites *no authority*—is approve an injunction barring publication of a book or other form of expression subject to the prepublication review process.

The D.C. Circuit has made clear that, while *Snepp* sustained the Government's authority to put in place a prepublication-review system and to impose otherwise-constitutional *post*-publication penalties, the Government "would bear a much heavier burden" if it "sought an injunction against publication of the censored items"—which is exactly what the Government seeks to do here. *McGehee v. Casey*, 718 F.2d 1137, 1148 n.22 (D.C. Cir. 1983). Where the Government seeks an injunction against publication, *McGehee* instructed that normal prior-restraint doctrine applies, specifically citing *New York Times Co. v. United States* and other prior-restraint cases. *See id.* Thus, under *New York Times*, the Government's request for a preliminary injunction must fail, *even if* Ambassador Bolton's book contained classified information, since the Supreme Court held that "publishing the contents of a classified study" was insufficient to justify a prior restraint. 403 U.S. at 714. The Government does not argue that it can prevail under normal prior-restraint principles, so its request for preliminary-injunctive relief fails.

Even under the slightly less-demanding standard that the D.C. Circuit applies to prepublication review cases where the Government does *not* seek an injunction, the Government is not entitled to an injunction. " '[T]he government has no legitimate interest in censoring unclassified materials,' and, thus, 'may not censor such material, contractually or otherwise.' " *Wilson v. CIA*, 586 F.3d 171, 185 (2d Cir. 2009) (quoting *McGehee v. Casey*, 718

F.2d at 1141. It follows that "[i]f . . . the information was not classified properly, then [the author] may publish the manuscript." *Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003).

Given the obvious danger that classification will be abused to suppress constitutionally protected speech, in determining whether the Government has properly classified the information that it says is still contained in Ambassador Bolton's manuscript despite the exhaustive prepublication review to which it has been subjected, "courts should conduct a *de novo* review of the classification decision." *McGehee*, 718 F.2d at 1148; *see also Wilson*, 586 F.3d at 186 n.17 (comparing review of classification decision to *de novo* standard of review under FOIA). While courts must "giv[e] deference to reasoned and detailed [agency] *explanations* of" a classification decision, they owe no deference to the classification decision *itself. McGehee*, 718 F.2d at 1148 (emphasis added); *see also Wilson,* 586 F.3d at 185; *Shaffer*, 102 F. Supp. 3d at 10–11. Rather, the court must satisfy itself "from the record, *in camera* or otherwise, that the [Government] in fact had good reason to classify, and therefore censor, the materials at issue." *McGehee*, 718 F.2d at 1148. For this reason, the D.C. Circuit has held a court may "require that [Government] explanations justify censorship with reasonable specificity, demonstrating a logical connection between the deleted information and the reasons for classification.' " *Id.*

These are no mere exhortations. *See Penguin Books USA Inc. v. Walsh*, 756 F. Supp. 770, 786–87 (S.D.N.Y.) (reversing prepublication censorship decision based on First Amendment), *judgment vacated on other grounds, appeal dismissed*, 929 F.2d 69 (2d Cir. 1991). This Court has, in fact, reversed prepublication censorship decisions before. In *Wright v. FBI*, two members of the FBI Counter-Terrorism Task Force sought to publish writings critical of the FBI's counterterrorism policy, but the agency objected to numerous passages. 613 F. Supp. 2d 13, 16–19 (D.D.C. 2009). This Court carefully examined each objected-to portion of the writings, placing

the burden firmly on the Government to provide "individualized justifications for censoring" each passage. *Id.* at 30; *see also id.* at 27–29 (examining censorship justifications page-by-page). It demanded that the Government "link a particular [passage] to a specific threat to a specific Government interest." *Id.* at 31. In the end, this Court found that the Government had "fallen far short" of its obligation to justify censoring the material, *id.*, and it reversed the suppression of *all but one* of the passages to which the Government objected, *id.* at 24–32.

Similarly, in *Shaffer*, a military intelligence officer wrote a book about his experiences serving in Afghanistan and submitted it for prepublication review. 102 F. Supp. 3d at 3–4. The Government objected to several passages in the book as being classified. *Id.* at 4. Only after Shaffer spent years in litigation did the Government finally and begrudgingly concede that some of the information contained in Shaffer's book had been publicly disclosed by the agency itself. *Id.* at 11–12. This Court entered summary judgment for Shaffer as to the publicly disclosed information, holding that "it cannot be censored, and it can be published." *Id.* at 12.

The same result is required here. The burden of proving that Ambassador Bolton's manuscript contains classified information that justifies the imposition of a prior restraint is entirely on the Government, so the Ambassador need not offer *any* evidence proving that his manuscript contains no classified material. *See Berntsen v. CIA*, 618 F. Supp. 2d 27, 28 (D.D.C. 2009) (performing a "searching review" of the Government's classification decision even though the plaintiff had not contested the agency's evidence). Nonetheless, Ambassador Bolton has now testified that, in his professional judgment as a former senior official and classification authority, *nothing* in his manuscript may properly be deemed classified.[105] As the Government admits, Ambassador Bolton's judgment has been confirmed by the NSC's senior career prepublication

---

[105] Bolton Decl., Ex. A ¶ 3.

authority, who personally conducted the intensive, four-month prepublication review and concluded that no further edits were necessary after insisting on numerous page-by-page, line-by-line revisions to the manuscript.[106] *See* Doc. 1 ¶ 46. Not until press reports surfaced alerting the White House to the impending release of Ambassador Bolton's book—following six weeks of dead silence after Ms. Knight signed off on the manuscript—did *anyone* in the Government assert that Ambassador Bolton's book contained classified information.[107]

This last-minute assertion must be evaluated against the overwhelming evidence, *see infra* pp. 45–47, that the White House sought to use the prepublication-review process to block the release of Ambassador Bolton's book, at least until after the election. *See McGehee*, 718 F.2d at 1148–49 (courts "should not rely on a presumption of regularity" in assessing a prepublication classification determination (quotation marks omitted)); *Wright*, 613 F. Supp. 2d at 15 (concluding that FBI had engaged in a "determined effort[ ]" "to censor various portions of a 500–page manuscript . . . severely criticizing the FBI's conduct"); *Agee v. CIA*, 500 F. Supp. 506, 509 (D.D.C. 1980) (describing "evidence indicating that the CIA's past enforcement record bears a considerable correlation with the agency's perception of the extent to which the material is favorable to the agency"). As the President openly vowed in February, a few weeks after the prepublication-review process began: "We're going to try and block the publication of [Bolton's] book. After I leave office, he can do this."[108] There can be no serious dispute about what is happening here: the White House is attempting to misuse the national-security apparatus of the

---

[106] *Id.* ¶¶ 10, 16.

[107] *Id.* ¶ 24.

[108] Dawsey, et al., *supra*.

Executive Branch to censor Ambassador Bolton, and the Government is asking this Court to tie the gag.[109]

**D.    Ambassador Bolton's Contract Does Not Entitle
The Government To A Prior Restraint.**

The Government's claim that the contract Ambassador Bolton signed justifies a prior restraint must be rejected for two independent reasons. First, because Ambassador Bolton's book does not contain classified information, the Government "may not censor such material, *contractually or otherwise*." *McGehee*, 718 F.2d at 1141 (emphasis added). The Government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests— especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). "For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to produce a result which (it) could not command directly." *Id.* (quotation marks omitted). Because "[t]he government has no legitimate interest in censoring unclassified material," *McGehee*, 718 F.2d at 1141, any contractual provision allowing the Government to censor Ambassador Bolton's unclassified political expression *after he has left office* would be an unenforceable, unconstitutional condition on public employment, *see id.* at 1141 n.10 ("the government may not impose unconstitutional conditions on government employment"); *Speiser v. Randall*, 357 U.S. 513, 526 (1958).[110]

---

[109] At the very least, if this Court has any doubt about the impropriety of the Government's classification assertions, it should permit Ambassador Bolton to test the good faith of the Government's claim through expedited discovery before imposing a prior restraint.

[110] For the same reason, the Government's argument that Ambassador Bolton waived his First Amendment rights protecting him against an unconstitutional condition of his public employment is meritless. *See* Doc. 3 at 21–22. Moreover, while the NDAs stated "I understand that the United States Government may seek any remedy *available to it* to enforce this Agreement including, but not limited to, application for a court order prohibiting disclosure of information in

Second, the nondisclosure agreements are unenforceable because the Government has violated the covenant of good faith and fair dealing that is implied in all contracts, including Government contracts. "The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005). "The covenant imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Id.* (citing RESTATEMENT (SECOND) OF CONTRACTS, § 205 (1981)); 13 WILLISTON ON CONTRACTS § 77:10; *M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990); *Polito v. Cont'l Cas. Co.*, 689 F.2d 457, 463 (3d Cir. 1982); *Concrete Specialties v. H.C. Smith Constr. Co.*, 423 F.2d 670 (10th Cir. 1970)). It is well settled that the Government is subject to this duty to the same extent as private parties. *E.g.*, *Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1330 (Fed. Cir. 2003); *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000); *Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir.), *modified,* 857 F.2d 787 (Fed. Cir. 1988).

Here, Ambassador Bolton submitted his manuscript, out of an abundance of caution, for the *express purpose* of ensuring that the manuscript did not contain any information that reasonably could be considered classified. He reasonably expected that that purpose would be shared and respected at the other end of the prepublication-review process. Indeed, that limited purpose is also required by Executive Order 13526, which expressly prohibits classifying information to "conceal violations of law," "prevent embarrassment to a person, organization, or agency," or "prevent or delay the release of information that does not require protection in the

---

breach of this Agreement," SCI NDA, Ex. C ¶ 7 (emphasis added), Ambassador Bolton's argument here is that a prior restraint is *not* "available" to the Government because, *inter alia*, such relief violates the First Amendment.

interest of the national security." 75 Fed. Reg. 707, 710 (2009). And Ambassador Bolton's reasonable expectation was further confirmed by Ms. Knight's assurance at the outset of the process that "the sole purpose of prepublication security review is to ensure that SCI or other classified information is not publicly disclosed."[111]

Yet, the evidence is overwhelming that the Government's assertion that the manuscript contains classified information, like the corrupted prepublication review process that preceded it, is pretextual and in bad faith:

- On January 29, the President tweeted that Ambassador Bolton's book is "nasty & untrue," thus implicitly acknowledging that its contents had been at least partially described to him. He also said that the book was "All Classified National Security."[112]

- On February 3, *Vanity Fair* reported that the President "has an enemies list," that "Bolton is at the top of the list," and that the "campaign against Bolton" included Ms. Knight's January 23 letter asserting that the manuscript contained classified information.[113] It also reported that the President "wants Bolton to be criminally investigated."[114]

- On February 21, the *Washington Post* reported that "President Trump has directly weighed in on the White House [prepublication] review of a forthcoming book by his former national security adviser, telling his staff that he views John Bolton as 'a traitor,' that everything he uttered to the departed aide about national security is classified and that he will seek to block the book's publication."[115] The President vowed: "[W]e're going to try and block the publication of [his] book. After I leave office, he can do this."[116]

- As described in detail above, Ambassador Bolton's book went through a four-month prepublication-review process with the career professionals at NSC, during which he made innumerable revisions to the manuscript in response to Ms. Knight's

---

[111] *See* Letter from Charles J. Cooper, Ex. F at 1.

[112] Donald J. Trump (@realDonaldTrump), TWITTER (Jan. 29, 2020, 7:28 AM), https://bit.ly/31fBLmU.

[113] Sherman, *supra*.

[114] *Id.*

[115] Dawsey, et al., *supra*.

[116] *Id.*

concerns. At the end of that exhaustive process, she stated that she had no further edits to the manuscript,[117] thereby confirming, as the Government has admitted, that she had concluded that it did not contain any classified information.[118]

- At the conclusion of the prepublication-review process on April 27, Ms. Knight thought that Ambassador Bolton was entitled to receive the pro-forma letter clearing the book for publication and suggested that it might be ready that same afternoon.[119] She and Ambassador Bolton even discussed how the letter should be transmitted to him.[120]

- During that same April 27 conversation, Ms. Knight described her "interaction" with unnamed others in the White House about the book as having "been very delicate,"[121] and she had "some internal process considerations to work through."

- After April 27, six weeks passed without a word from the White House about Ambassador Bolton's manuscript, despite his requests for a status update.[122]

- When the White House finally had something new to say, it was to assert its current allegations of classified information on June 8, in a letter that—by the White House's own admission—was prompted by press reports that the book was about to be published.[123]

- Even though the manuscript was submitted to NSC on December 30, 2019, and despite the exhaustive four-month review and the six weeks of silence that had passed since Ms. Knight's approval of the manuscript on April 27, the White House's June 8 letter gave itself until June 19—only four days before the book was due to be published—to provide Ambassador Bolton's counsel with a redacted copy of the book identifying the passages the White House purported to believe were classified.

- On the eve of this lawsuit being filed, in response to a question about this lawsuit, the President stated: "I told that to the attorney general before; *I will consider every conversation with me as president highly classified.* So that would mean that if he

---

[117] Bolton Decl., Ex. A ¶ 16.

[118] *Id.*; Doc. 1 ¶ 46.

[119] Bolton Decl., Ex. A ¶ 17.

[120] *Id.*

[121] *Id.*

[122] *Id.* ¶¶ 17–20.

[123] *See* Letter from John Eisenberg, Ex. L.

wrote a book, and if the book gets out, he's broken the law."[124] The President reiterated: "Any conversation with me is classified."[125] The President added that "a lot of people are very angry with [Bolton] for writing a book" and that he "hope[d]" that Ambassador Bolton "would have criminal problems" due to having published the book.[126]

- On June 16, the NSC provided to Ambassador Bolton a copy of the manuscript with wholesale redactions removing the portions it now claims are classified. Consistent with President Trump's claim, statements made by the President have been redacted, as have numerous passages that depict the President in an unfavorable light.[127]

It is clear from this evidence that the White House has abused the prepublication-review and classification process, and has asserted fictional national security concerns as a pretext to censor, or at least to delay indefinitely, Ambassador Bolton's right to speak. That is a clear violation of the covenant of good faith and fair dealing governing the nondisclosure agreements. Accordingly, those agreements are not enforceable and cannot justify any relief to the Government, let alone a prior restraint. *See Metcalf Const. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014) (covenant of good faith and fair dealing "prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value.").

## II. The Remaining Factors Favor Denial of Preliminary Injunctive Relief.

Because there is no classified information in the book, the Government will not suffer any irreparable harm absent the issuance of the injunctive relief it seeks. Indeed, even if there was classified information in the book, neither Ambassador Bolton nor Simon & Schuster have the

---

[124] *See* Press Conference, President Donald J. Trump at 0:54–1:05, (Jun. 15, 2020) (emphasis added), https://politi.co/2Y2Vo1i.

[125] *Id.* at 4:18–21.

[126] *Id.* at 1:05–08, 1:30–36.

[127] Bolton Decl., Ex. A ¶ 23.

ability to stop its release to the public because it has already been printed, bound, and shipped to booksellers throughout the country and around the world, so the Government would suffer its injury *regardless* of whether an injunction is entered against Ambassador Bolton.[128] At the same time, issuance of a prior restraint would inflict immediate and irreparable harm on both Ambassador Bolton and the public. Even if there was classified information in the book (and there is not), the Supreme Court has squarely held that the issuance of a prior restraint to enjoin publication of allegedly classified information on matters of public import is prohibited by the First Amendment. *See New York Times Co.*, 403 U.S. at 713. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *see also Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018). Notably, *Elrod* cited for *New York Times Co.*, 403 U.S. at 713, that proposition. The Government has asked the Court to issue a prior restraint by censoring Ambassador Bolton and suppressing his constitutionally protected speech on matters of immediate and significant public importance. Finally, the public interest and balance of equities factors "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), and "enforcement of an unconstitutional law is always contrary to the public interest," *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *see also Archdiocese of Washington*, 897 F.3d at 335. The Government dismisses the harm to Ambassador Bolton as "merely a delay of the publication of his book," Doc. 3 at 26, but the Supreme Court has held that "[t]he damage can be particularly great when," as here, "the prior restraint falls upon the communication of news and commentary on current events," *Nebraska Press Ass'n*, 427 U.S. at

---

[128] Bolton Decl., Ex. A ¶ 21.

559, where "[a] delay of even a day or two may be of crucial importance in some instances,"

*Carroll*, 393 U.S. at 182. The Government cannot succeed on these factors.

## CONCLUSION

For the foregoing reasons, Ambassador Bolton respectfully submits that this Court should deny the Government's request for a temporary restraining order and preliminary injunction imposing a prior restraint on the publication of his book, and dismiss all claims against Ambassador Bolton for failure to state a claim.

June 18, 2020                                      Respectfully submitted,


                                                  /s/ Charles J. Cooper
                                                  Charles J. Cooper, Bar No. 248070
                                                  Michael W. Kirk, Bar No. 424648

                                                  COOPER & KIRK, PLLC
                                                  1523 New Hampshire Avenue, NW
                                                  Washington, DC  20036
                                                  Telephone: (202) 220-9600
                                                  Facsimile: (202) 220-9601
                                                  Email: ccooper@cooperkirk.com

                                                  *Counsel for Defendant John R. Bolton*