# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br>v.<br><br>JOHN R. BOLTON,<br><br>      Defendant. | Civil Action No. 20-1580-RCL |

**DECLARATION OF JOHN R. BOLTON IN OPPOSITION TO
THE UNITED STATES' EMERGENCY APPLICATION FOR TEMPORARY
RESTRAINING ORDER OR MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to 28 U.S.C. § 1746, I, John R. Bolton, hereby declare as follows:

1. I have served in numerous senior-level capacities under Presidents Ronald Reagan, George H.W. Bush, George W. Bush, and Donald J. Trump. For example, I served as Assistant Attorney General for the Civil Division under President Reagan, Assistant Secretary for International Organization Affairs at the Department of State under President George H. W. Bush, Under Secretary of State for Arms Control and International Security under President George W. Bush, and as Ambassador to the United Nations also under President George W. Bush. Most recently, I served as National Security Advisor to President Trump from April 9, 2018 through September 10, 2019. I have been an original classification authority in some of these positions.

2. Given my extensive government career in matters relating to national security and foreign policy, I am thoroughly knowledgeable and experienced in determining what constitutes classified information and in the proper handling of such information.

3. In drafting the manuscript of my book, *The Room Where It Happened: A White House Memoir*, I took care to avoid including any classified information. In my judgment, based on decades of experience handling classified information, the manuscript for my book contained

1

no classified information before undergoing the prepublication-review process, and it does not contain classified information today.

4. Nevertheless, to ensure that there could be no question of my good-faith compliance with my obligations, I instructed my counsel, Charles J. Cooper, to submit the draft of my manuscript to the National Security Council (NSC) for a prepublication review. True and correct copies of my nondisclosure agreements are attached as Exhibits C and D (with social security numbers of the signatories redacted) to Defendant's Combined Memorandum in Support of His Motion to Dismiss and in Opposition to Plaintiff's Emergency Application for Temporary Restraining Order and Motion for Preliminary Injunction ("Def. Mem.").

5. Mr. Cooper submitted the manuscript on December 30, 2019, to Ms. Ellen Knight, Senior Director for Records, Access, and Information Security Management at the National Security Council, the office responsible for conducting the prepublication review process for the NSC. *See* Letter from Charles J. Cooper to Ellen Knight, Senior Director for Records, Access, and Information Security Management, National Security Council (Dec. 30, 2019), Def. Mem. Ex. F

6. I undertook, in good faith, an exhaustive and lengthy iterative prepublication review process of my manuscript. Over the course of four months, Ms. Knight, who personally conducted the review with the assistance of a senior member of her staff, and I painstakingly reviewed the nearly 500-page manuscript through four waves of changes, page by page and often line by line. During that period, the book's announced publication date had to be pushed back twice.

7. Ms. Knight wrote on January 23 that my manuscript contained "significant amounts of classified information" and that she would provide "detailed guidance regarding next steps that should enable you to revise the manuscript and move forward as expeditiously as possible." *See*

Letter from Ellen Knight, Senior Director for Records, Access, and Information Security Management, National Security Council, to Charles J. Cooper (Jan. 23, 2020), Def. Mem. Ex. H.

8. On January 26, the *New York Times* published an article purporting to describe passages from my manuscript that bore on the ongoing impeachment trial. I do not know who the source of that disclosure was. The government's baseless insinuation that I was the source of this disclosure to the press is completely and categorically false.

9. On February 7, Ms. Knight advised my counsel Mr. Cooper that "to further the iterative process, it would be most efficient for me to meet with your client to review each instance of classified information in detail." *See* Letter from Ellen Knight, Senior Director for Records, Access, and Information Security Management, National Security Council, to Charles J. Cooper (Feb. 7, 2020), Def. Mem. Ex. I.

10. My first meeting with Ms. Knight, the NSC's senior career prepublication authority who personally conducted the intensive, four-month prepublication review, took place on February 21. During the meeting, which lasted four hours, Ms. Knight, as she described it, "reviewed the preliminary results of three chapters in the draft manuscript in detail with" me. *See* Letter from Ellen Knight, Senior Director for Records, Access, and Information Security Management, National Security Council, to Charles J. Cooper (Feb. 24, 2020), Def. Mem. Ex. J. I took five pages of handwritten notes, as I and Ms. Knight discussed her specific concerns page by page, line by line, and sometimes word by word. Ms. Knight and her staff reviewed my notes and returned them to me unclassified and with redactions on February 24. A true and correct copy of the unclassified, redacted version of my notes from the February 21 meeting is attached as Def. Mem. Exhibit O.

11. On February 24, Ms. Knight wrote that the February 21 meeting had been "most productive," and she suggested that "it would be most helpful to the process if we hold one or more

following meetings . . . to discuss the remaining portions of the draft manuscript." *See* Def. Mem. Ex. J.

12. I met with Ms. Knight three more times, on March 2 (approximately four hours), March 3 (over four hours), and March 4 (approximately three hours). In these meetings, we reviewed in meticulous detail each of Ms. Knight's concerns in the remaining 11 chapters, and I produced 34 pages of handwritten notes. Ms. Knight reviewed my notes and returned them to me unclassified and with redactions on March 5. *See* Def. Mem. Ex. O. Following my notes and the guidance provided by Ms. Knight, I revised my manuscript, and by March 9 I had resubmitted all 14 chapters to begin the second round of the iterative review process.

13. I did not hear from Ms. Knight again until March 27, when she wrote: "I appreciate your efforts to address the classification concerns in the latest draft version you submitted. Many of the changes are satisfactory. However, additional edits are required to ensure the protection of national security information. To assist in making the additional required changes, I will provide a list of required edits and language substitutions to guide you in this next stage of revising the draft." *See* Email from Ellen Knight, Senior Director for Records, Access, and Information Security Management, National Security Council, to John Bolton, Former National Security Advisor, National Security Council (Mar. 27, 2020, 3:52 PM), Def. Mem. Ex. K. Her list amounted to 17 typed, single-spaced pages of comments, questions, suggestions of specific alternative language, and citations to publicly available source material. A true and correct copy of Ms. Knight's unclassified March 27 list is attached as Def. Mem. Exhibit P.

14. I responded to all 17 pages on Monday, March 30, accepting the vast majority of Ms. Knight's suggestions and proposing alternative solutions to others.

15. In a telephone conversation on April 13, Ms. Knight provided me her much shorter list of remaining concerns after reviewing my March 30 revisions. Our conversation resulted in entirely agreed-upon language changes, which were delivered to Ms. Knight the next day, April 14. During the April 13 call, Ms. Knight also said she would review the entire manuscript one more time, to recheck the issues previously resolved and ensure that she had not overlooked any.

16. That final review resulted in two further telephone calls, on April 21 and 24, in which Ms. Knight conveyed her final round of edits and some additional citations to publicly available sources. I promptly responded with the requested revisions, and on April 27, Ms. Knight, after clarifying one previously discussed edit, confirmed "that's the last edit I really have to provide for you." Thus, Ms. Knight confirmed that she did not believe the manuscript contained any classified information.

17. At the conclusion of the prepublication review process on April 27, I asked Ms. Knight when I could expect to receive the customary pro-forma letter confirming that the book contained no classified information and was cleared for publication. We even discussed whether the letter should be transmitted to me by electronic transmission or hard copy. During this same conversation, Ms. Knight described her "interaction" with unnamed others in the White House about the book as having "been very delicate," and noted she had "some internal process considerations to work through." She nonetheless thought the letter might be ready that afternoon but would "know more by the end of the day." We also discussed whether the letter should be transmitted by electronic transmission and/or whether I should pick up a hard copy from Ms. Knight's office.

18. My subsequent inquiries of Ms. Knight as to when I would receive the letter clearing the book for publication were answered with formal replies that she had nothing new to

5

report. I received my last communication from Ms. Knight on May 7. It became obvious that the White House had no intention of permitting Ms. Knight to issue the pro-forma clearance letter, but instead was attempting to run out the clock before the election by simply refusing to respond to my requests.

19.     After receiving Ms. Knight's confirmation that the manuscript did not contain classified information on April 27, I so notified my publisher, Simon & Schuster, which thereafter scheduled the book for release on June 23, 2020.

20.     Six weeks of silence from the NSC had passed when, on June 8, following press reports that the book would be published on June 23, John Eisenberg, Deputy White House Counsel and the NSC's counsel, wrote to my counsel, Mr. Cooper, claiming that the manuscript still contained classified information. *See* Letter from John Eisenberg, Legal Advisor, National Security Council, to Charles J. Cooper (Jun. 8, 2020), Def. Mem. Ex. L

21.     Simon & Schuster has printed, bound, and shipped tens of thousands, if not hundreds of thousands, of copies of the book to booksellers across the country and internationally. For example, thousands of copies have been printed in Australia and the United Kingdom, and thousands of books have been shipped to Canada and India for sales in those countries beginning on June 23. A significant number of advance "review" copies of the book have also been provided to a select group of major newspapers and other mass audience outlets, and the book has been preordered by customers.

22.     Under my contract with Simon & Schuster, I have no authority to prevent the book from being sold to the public. I lost such authority after Simon & Schuster accepted the book for publication, which occurred several weeks before Mr. Eisenberg's June 8 letter.

23.     On June 16, the NSC provided me with a copy of the revised manuscript with wholesale redactions removing the portions it now claims are classified. The Government's redactions are extensive and sweeping, apparently eliminating passages describing or recounting a significant majority of the President's conversations with his advisors and with foreign leaders. The Government also redacted numerous passages portraying President Trump in an unflattering light. Along with the redacted copy, the Government sent a cover letter from Deputy Assistant to the President Michael J. Ellis, who asserted that the redactions were "based on [his] initial review." *See* Letter from Michael J. Ellis, Deputy Assistant to the President, to John R. Bolton (Jun. 16, 2020), Def. Mem. Ex. N.

24.     At no point in the prepublication process did Ms. Knight, or anyone else at the NSC, suggest that any version of the manuscript contained Sensitive Compartmentalized Information ("SCI"). Prior to her approval of the manuscript on April 27, in both her written and oral communications with me, her sole concern was her view that earlier versions of the manuscript contained information classified at the Confidential, Secret, and Top Secret levels. Likewise, Mr. Eisenberg's letters of June 8 and June 10 and Mr. Ellis's letter of June 16 did not suggest that my book revealed SCI, nor did the complaint filed by the Government. The first time anyone ever suggested such a possibility was in General Nakasone's declaration of June 17.

I declare under penalty of perjury under the laws of the United States of America that the foregoing Declaration is true and correct to the best of my knowledge.

Executed on the 18th day of June, 2020.

*John R. Bolton* (signature)
John R. Bolton