**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

                Plaintiff,

      v.

JOHN R. BOLTON,

                Defendant.

Case No. 1:20-cv-1580-RCL

---

**BRIEF OF PEN AMERICAN CENTER, INC. AS *AMICUS CURIAE*
IN SUPPORT OF DEFENDANT**

---

Nora Benavidez (GA Bar 698687)
PEN AMERICAN CENTER, INC.
588 Broadway, Suite 303
New York, NY  20012
(646) 779-4818
nbenavidez@pen.org

Theodore J. Boutrous, Jr. (D.C. Bar 420440)
Matthew D. McGill (D.C. Bar 481430)
Russell B. Balikian (D.C. Bar 1018417)
Jason H. Hilborn (*admission pending*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
tboutrous@gibsondunn.com

*Counsel for PEN American Center, Inc.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... ii

INTERESTS OF *AMICUS CURIAE* ........................................................................ 1

INTRODUCTION ...................................................................................................... 1

ARGUMENT .............................................................................................................. 3

      I.      The Government Is Unlikely To Succeed On The Merits. ..................................... 3

            A.      The First Amendment Prohibits Injunctive Relief Of Any Duration. ......... 3

            B.      Bolton Complied With His Prepublication-Review Obligations. ................ 8

      II.     Denying A TRO Would Not Cause Irreparable Harm ........................................... 13

CONCLUSION .......................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. United States*,
   509 U.S. 544 (1993)..................................................................................4

*Allworth v. Howard Univ.*,
   890 A.2d 194 (D.C. 2006) .......................................................................12

*Aronoff v. Lenkin Co.*,
   618 A.2d 669 (D.C. 1992) .......................................................................12

*Ashcroft v. Free Speech Coal.*,
   535 U.S. 234 (2002)..................................................................................4

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963)....................................................................................5

*Bartnicki v. Vopper*,
   532 U.S. 514 (2001)................................................................................14

*Bowers v. Medina*,
   418 So. 2d 1068 (Fla. Dist. Ct. App. 1982) ...........................................13

*Burger King Corp. v. Weaver*,
   169 F.3d 1310 (11th Cir. 1999) ..............................................................13

*CBS v. Davis*,
   510 U.S. 1315 (1994)................................................................................5

*Lane v. Franks*,
   573 U.S. 228 (2014)..................................................................................8

*Lovell v. City of Griffin*,
   303 U.S. 444 (1938)..................................................................................5

*McGehee v. Casey*,
   718 F.2d 1137 (D.C. Cir. 1983) ...............................................................9

\*   *N.Y. Times Co. v. United States*,
   403 U.S. 713 (1971)............................................................2, 4, 5, 6, 7, 14

*Near v. Minnesota ex rel. Olson*,
   283 U.S. 697 (1931)..................................................................................5

\* *Neb. Press Ass'n v. Stuart*,
  427 U.S. 539 (1976).............................................................................4, 5, 6, 13

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
  324 U.S. 806 (1945)...................................................................................13

\* *Procter & Gamble Co. v. Bankers Trust Co.*,
  78 F.3d 219 (6th Cir. 1996) .............................................................2, 4, 5, 13

*In re Providence Journal Co.*,
  820 F.2d 1342 (1st Cir. 1986).......................................................................5

*Regal Knitwear Co. v. NLRB.*,
  324 U.S. 9 (1945)......................................................................................14

*Se. Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975).....................................................................................7

*Snepp v. United States*,
  444 U.S. 507 (1980).....................................................................................9

*Stillman v. CIA*,
  319 F.3d 546 (D.C. Cir. 2003).......................................................................9

*United States v. Frandsen*,
  212 F.3d 1231 (11th Cir. 2000) .....................................................................5

**Constitutional Provision**

\* U.S. Const. amend. I ................................................................1, 2, 3, 4, 5, 6, 7, 8

**Rule**

Fed. R. Civ. P. 65 ...........................................................................................13

**Executive Order**

Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009)...........................................11

**Treatises**

2 Smolla & Nimmer on Freedom of Speech
   § 15:14 ...............................................................................................................6
   § 15:7 .................................................................................................................4

Restatement (Second) of Contracts (1981)
   § 205...................................................................................................................9
   § 228...................................................................................................................12

23 Williston on Contracts § 63:22 (4th ed.)...................................................................9

**Other Authorities**

A. Bickel, *The Morality of Consent* (1975) ...................................................................4

Chuck Cooper, *The White House vs. John Bolton*, Wall St. J. (June 10, 2020) .............................8

David A. Graham, *John Bolton Plumbs the Depth of Trump's Depravity*,
   Atlantic (June 17, 2020)......................................................................................3

Donald J. Trump (@realDonaldTrump), Twitter (June 18, 2020, 12:10 a.m.).............................11

Donald J. Trump (@realDonaldTrump), Twitter (June 18, 2020, 9:08 a.m.)................................11

Gabriel Sherman, *"It's Payback Time": With Acquittal Certain, Trump Plots
   Revenge on Bolton, Impeachment Enemies*, Vanity Fair (Feb. 3, 2020) ................................11

Jennifer Szalai, Book Review, *In 'The Room Where It Happened,' John Bolton
   Dumps His Notes and Smites His Enemies*, N.Y. Times (June 17, 2020) .................................3

John Bolton, *The Scandal of Trump's China Policy*, Wall St. J. (June 17, 2020)..........................3

Josh Dawsey et al., *Trump Wants To Block Bolton's Book, Claiming Most
   Conversations Are Classified*, Wash. Post (Feb. 21, 2020)......................................................11

Josh Dawsey, *Trump Asked Chinese President to Help Him Win Reelection,
   According to Bolton Book*, Wash. Post (June 17, 2020)............................................................3

Michael C. Bender & Rebecca Ballhaus, *Trump Put Re-Election Prospects Ahead
   of National Interest, Bolton Alleges*, Wall St. J. (June 17, 2020) ...................................1, 3, 11

Natasha Bertrand & Daniel Lippman, *Trump Loyalist Installed in Top Intelligence
   Post on National Security Council*, Politico (Mar. 3, 2020).....................................................10

Peter Baker, *Bolton Says Trump Impeachment Inquiry Missed Other Troubling Episodes*, N.Y. Times (June 17, 2020) ...................................................................3

Peter Baker, *Five Takeaways from John Bolton's Memoir*, N.Y. Times (June 18, 2020) ................................................................................................3

Tom Hamburger et al., *Justice Department Seeks Emergency Order To Block Publication Of Bolton's Book*, Wash. Post (June 17, 2020) ...................................11

Tom Hamburger & Josh Dawsey*, Trump Says Bolton Will Have 'Criminal Problems' If His Book Is Released*, Wash. Post (June 15, 2020) ...........................11

## INTERESTS OF *AMICUS CURIAE*

PEN American Center, Inc. ("PEN America" or "PEN") is a nonprofit organization that represents and advocates for the interests of writers, both in the United States and abroad. PEN America is affiliated with more than 100 centers worldwide that comprise the PEN International network. Its Membership includes more than 7,400 journalists, novelists, poets, essayists, and other professionals.

PEN America stands at the intersection of journalism, literature, and human rights to protect free expression and individual writers facing threats for their speech. PEN America has a particular interest in opposing censorship schemes in all forms that inhibit creative expression and critical reporting. PEN champions the freedom of people everywhere to write, create literature, convey information and ideas, and express their views, recognizing the power of the word to transform the world. Its mission and mandate include fighting for the right to speak critically of a governmental body, and for all of the rights associated with a free press, both core elements of a democracy and free expression. PEN America supports the First Amendment right of public employees to produce works that are critical of the government, and of readers to receive their unique perspective unfettered by government censorship.

PEN America submits this brief in support of defendant John Bolton and in opposition to the relief sought by the United States.

## INTRODUCTION

John Bolton has written a book that, according to the Wall Street Journal, provides a "scathing account" of his time serving as National Security Advisor to President Trump, whom Bolton describes as "'stunningly uninformed'" and willing to "consistently prioritiz[e] his re-election and his family's well-being ahead of the national interest." Michael C. Bender & Rebecca Ballhaus, *Trump Put Re-Election Prospects Ahead of National Interest, Bolton Alleges*, Wall St. J. (June 17,

2020).  The government now seeks a temporary restraining order and preliminary injunction (collectively, "TRO") to block the book's publication, ostensibly because Bolton failed to complete a prepublication-review process designed to ensure that the book does not disclose classified information.  The question presented is whether the Court should enter an order purporting to block Bolton from publishing the book.  The answer is resoundingly no.

The "critical starting point" is to recognize that granting a TRO here would make this a "classic case of a prior restraint"—that is, the TRO would be an order "prohibiting publication" of material of great public concern.  *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 224-25 (6th Cir. 1996).  Prior restraints face an almost conclusive presumption of unconstitutionality under the First Amendment.  *E.g.*, *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (*per curiam*).  Indeed, the Supreme Court has *never* upheld a prior restraint on pure speech implicating matters of public importance, even in the Pentagon Papers case, which provided a much stronger case for an injunction.  *Id.*  Thus, irrespective of whether Bolton complied with the prepublication-review process, the government's bid for a TRO will fail on the merits because the First Amendment prohibits the Court from imposing a prior restraint.

The government is also likely to fail on its claim that Bolton neglected to complete the prepublication-review process.  Bolton provided a copy of his manuscript to the relevant National Security Council ("NSC") official and engaged in a lengthy, collaborative process of revising the manuscript over the course of four months.  At the conclusion of that process, the official was satisfied that it contained no classified information.  That should have concluded the matter; instead, the White House has withheld approval and commenced an *additional* review, delaying the book's release date without communicating updates to Bolton.  Meanwhile, President Trump has publicly insulted Bolton, derided the book, instructed his aides to block its publication, and raised

the possibility of criminal charges.  The President also has claimed that *every* conversation with

him is classified.  It is not difficult to see what is going on: The President is employing the appa-

ratus of the federal government to punish his political enemies, thwart freedom of speech, and

pursue his political interests in an election year.  If any party to Bolton's nondisclosure agreement

has violated its obligations, it is the Administration, by unreasonably withholding, in bad faith,

approval of a book that has already been determined by an expert official who conducted a detailed

review not to contain classified information.

Finally, the government cannot show irreparable harm.  Bolton's book, titled *The Room

Where It Happened*, is slated for release next Tuesday, June 23, 2020.  It has already been printed,

bound, and distributed by the publisher.  Advance copies have been delivered to journalists, who

have begun reviewing it and reporting on it.  *E.g.*, Peter Baker, *Five Takeaways from John Bolton's

Memoir*, N.Y. Times (June 18, 2020); Jennifer Szalai, Book Review, *In 'The Room Where It Hap-

pened,' John Bolton Dumps His Notes and Smites His Enemies*, N.Y. Times (June 17, 2020); Peter

Baker, *Bolton Says Trump Impeachment Inquiry Missed Other Troubling Episodes*, N.Y. Times

(June 17, 2020); Josh Dawsey, *Trump Asked Chinese President to Help Him Win Reelection, Ac-

cording to Bolton Book*, Wash. Post (June 17, 2020); David A. Graham, *John Bolton Plumbs the

Depth of Trump's Depravity*, Atlantic (June 17, 2020); Bender & Ballhaus, *supra*; *see also* John

Bolton, *The Scandal of Trump's China Policy*, Wall St. J. (June 17, 2020).  The cat is out of the

bag—any irreparable harm that would be accomplished by disclosure has already been done.

The Court should deny the government's application for a TRO.

## ARGUMENT

## I.    The Government Is Unlikely To Succeed On The Merits.

### A.    The First Amendment Prohibits Injunctive Relief Of Any Duration.

The Court need not decide whether Bolton was authorized to publish his book to resolve

this TRO.  Irrespective of whether Bolton was contractually or legally authorized to publish *The Room Where It Happened*, he has decided to do so, and the First Amendment clearly prohibits the Court from enjoining its publication.

The government brazenly asks the Court to enter "an injunction barring [Bolton] from publishing the book" in "any form or media."  Mot. 27; *accord* Compl. 25 (seeking to enjoin Bolton from "releasing" the book or "disclosing the information" therein).  It also attempts to avoid prior-restraint precedent by seeking *affirmative* injunctions ordering Bolton to mouth words from a ventriloquist court that would seek to halt the publication process, and to take steps to destroy existing copies of the books.  Mot. 27.  The Court should recognize both requests for relief as what they are—prior restraints on speech and on the press.

Judicial orders that "forbid speech activities," including "[t]emporary restraining orders," are "classic examples of prior restraints."  *Alexander v. United States*, 509 U.S. 544, 549 (1993); *see also, e.g.*, *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 556 (1976); *N.Y. Times*, 403 U.S. at 714; 2 Smolla & Nimmer on Freedom of Speech § 15:7.  Although a TRO enjoining speech may look like other TROs, "it is a different beast in the First Amendment context" because a TRO "*disturbs* the status quo and impinges on the exercise of" rights protected by the First Amendment.  *Procter & Gamble*, 78 F.3d at 226 (emphasis added).  Put differently, the status quo under the First Amendment is that words will be spoken and written works will be published—"[a]s a general principle, the First Amendment bars the government from dictating what we see or read or speak or hear." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002).  "If it can be said that a threat of criminal or civil sanctions after publication 'chills' speech, prior restraint 'freezes' it at least for the time." *Neb. Press Ass'n*, 427 U.S. at 559 (citing A. Bickel, *The Morality of Consent* 61 (1975)).

A prior restraint is "the most serious and the least tolerable infringement on First Amend-ment rights," and "one of the most extraordinary remedies known to our jurisprudence." *Neb. Press Ass'n*, 427 U.S. at 559, 562.  Indeed, the "chief purpose" of providing for the liberty of the press was to "prevent previous restraints upon publication." *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713 (1931); *accord Lovell v. City of Griffin*, 303 U.S. 444, 451-52 (1938).  This liberty was "especially cherished" by the founding generation because it allowed for the publication of materials criticizing public officers and for raising charges of official misconduct.  *Near*, 283 U.S. at 717.  In more than "two centuries of existence, the Supreme Court has never upheld a prior restraint on pure speech" pertaining to matters of public concern.  *In re Providence Journal Co.*, 820 F.2d 1342, 1348 (1st Cir. 1986) (Wisdom, J.); *accord Procter & Gamble*, 78 F.3d at 227.

The government's request for a prior restraint thus comes to the Court with a "'heavy pre-sumption' against its constitutional validity." *Neb. Press Ass'n*, 427 U.S. at 558; *N.Y. Times*, 403 U.S. at 714; *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963); *United States v. Frandsen*, 212 F.3d 1231, 1237 (11th Cir. 2000) ("[T]here is a strong presumption against their constitution-ality.").  "Even where questions of allegedly urgent national security … are concerned," a prior restraint could be warranted only "where the evil that would result from the reportage is both great and certain and cannot be militated by less intrusive measures." *CBS v. Davis*, 510 U.S. 1315, 1317 (1994) (Blackmun, J., in chambers).  This is an "extremely narrow class of cases," *N.Y. Times*, 403 U.S. at 726 (Brennan, J., concurring), and the Supreme Court has never actually relied on this reasoning to uphold a prior restraint, *Neb. Press Ass'n*, 427 U.S. at 591 (Brennan, J., con-curring in the judgment).

The burden is not lightened "by the temporary nature of a restraint." *Neb. Press Ass'n*, 427 U.S. at 559.  In *New York Times*, for example, the Court refused to even temporarily enjoin the

publication of a trove of classified information concerning the Vietnam War—even though "a majority of the Court believed that release of the documents … would be harmful to the Nation and might even be prosecuted after publication as a violation of various espionage statutes." *Neb. Press Ass'n*, 427 U.S. at 591-92 (Brennan, J., concurring in judgment).

*New York Times* is particularly instructive.  There, as here, a senior official averred that the material at issue included "Top Secret" information and other classified information that, if published, "would further prejudice the defense interests of the United States and result in irreparable injury to the national defense."  2 Smolla & Nimmer on Freedom of Speech § 15:14 (discussing *N.Y. Times*, 403 U.S. 713).  There, as here, the government "asked for a temporary restraint solely to permit it to study and assess the impact on national security of the lengthy documents at issue." *Neb. Press Ass'n*, 427 U.S. at 559.  The Supreme Court allowed publication anyway.  As Justice Brennan explained, "the First Amendment tolerates absolutely no prior judicial restraints of the press" absent "proof that publication must inevitably, directly, and immediately cause the occurrence of an event kindred to imperiling the safety of a transport already at sea." *N.Y. Times*, 403 U.S. at 725, 726-27 (Brennan, J., concurring).  "Unless and until the Government has clearly made out its case, the First Amendment commands that no injunction may issue." *Id.* at 727.

The Administration has not come close to satisfying this stringent standard here.  In fact, this case presents a significantly lower risk of harm than *New York Times* because the Senior Director of the NSC's Records Access and Information Security Management Directorate, Ellen Knight, has already concluded—after a lengthy, collaborative prepublication-review process—that the book "***d[oes] not contain classified information***."  Compl. ¶ 46 (emphasis added).  Further, Bolton himself possesses decades of experience working in sensitive positions; he too believes

that the book can be published consistent with his nondisclosure obligations.  To be sure, the government has put forward declarations from a few officials who predict, at least for purposes of this litigation, that disclosing information in Bolton's book "could" harm national security interests. Dkt. 3-1 ¶ 15 (Ellis Dec.); Dkt. 3-2 ¶ 6 (Evanina Dec.); Dkt. 3-3 ¶ 13 (Mitman Dec.); Dkt. 3-4 ¶ 8 (Nakasone Dec.); Dkt. 3-6 ¶ 7 (Ratcliffe Dec.); *cf. N.Y. Times*, 403 U.S. at 725 ("The entire thrust of the Government's claim throughout these cases has been that publication of the material sought to be enjoined 'could,' or 'might,' or 'may' prejudice the national interest in various ways.").  But the government itself admits that Knight "bears primary responsibility for the classification review of written works submitted to the NSC for the prepublication review process," Compl. ¶ 25, and she is noticeably absent among the government's declarants.  Her conclusion (conceded in the government's own complaint, *see* Compl. ¶ 46) that the book does not contain classified information places the government's request for a prior restraint on much shakier ground than even the inadequate foundation in *New York Times*, where it was undisputed that the papers being released were part of a "classified study."  403 U.S. at 714 (*per curiam*).

First Amendment freedoms are particularly important in the area of national security because "the only effective restraint upon executive policy and power in the areas of national defense and international affairs may lie in an enlightened citizenry—in an informed and critical public opinion which alone can here protect the values of democratic government."  *N.Y. Times*, 403 U.S. at 728 (Stewart, J., concurring).  Although the government has a legitimate interest in protecting particularly sensitive information, a free society "prefers to punish the few who abuse the rights of speech *after they break the law* than to throttle them and all others beforehand."  *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) (emphasis added).

Denying a TRO is also in the public interest. "There is considerable value … in encouraging, rather than inhibiting, speech by public employees," such as Bolton. *Lane v. Franks*, 573 U.S. 228, 236 (2014). "For governmental employees are often in the best position to know what ails the agencies for which they work. The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." *Id.* (internal quotation marks omitted).

For these reasons, the First Amendment dooms the government's efforts to obtain a prior restraint in the form of a TRO.

**B.     Bolton Complied With His Prepublication-Review Obligations.**

The government is also unlikely to succeed on the merits because Bolton complied with his prepublication-review obligations. The Administration's transparently political attempt to drag out the review process by unilaterally withholding a formal confirmation letter does not change the fact that Bolton held up his end of the bargain.

Federal employees who receive access to sensitive information agree not to disclose that information without authorization. Dkt. 1-1, at 4 ¶ 3 (Nondisclosure Agreement). They also agree to submit for security review any written materials describing activities that relate to sensitive information. *Id.* at 4 ¶ 4. Bolton did that here. He voluntarily "submitted his manuscript for prepublication review," *id.*, and participated in an exhaustive, months-long iterative process of revising and re-revising his book to implement all three rounds of edits he received from the Senior Director of the Records Access and Information Security Management Directorate. Compl. ¶¶ 31-45. By the time Knight had given Bolton what she called her "last edit," he had met with her 4 times for more than 14 hours, taken nearly 40 pages of handwritten notes, implemented 17 single-spaced pages of her typed comments, and spoken with her on the phone at least 4 times. *See* Chuck Cooper, *The White House vs. John Bolton*, Wall St. J. (June 10, 2020); Compl.

¶¶ 31-45. Knight had "completed her review" by the end of April 2020 and "was of the judgment that ***the manuscript draft did not contain classified information***." Compl. ¶ 46 (emphasis added). Thus, the prepublication-review process was complete—Bolton had "adhered to his secrecy agreement," *McGehee v. Casey*, 718 F.2d 1137, 1141 (D.C. Cir. 1983), and the Administration had received more than a "reasonable opportunity to determine whether" the book contained classified information, which the nondisclosure agreement states—and the government acknowledges—is the entire "purpose of the review." Dkt. 1-1, at 4 ¶ 5 (Nondisclosure Agreement); *see* Compl. ¶ 17.

Bolton's submission to the prepublication-review process hardly reflects the conduct of a rogue actor shirking their contractual or fiduciary duties. And it distinguishes Bolton from the agent in *Snepp v. United States*, 444 U.S. 507 (1980), who published a manuscript without engaging in the review process at all. Also inapposite is *Stillman v. CIA*, 319 F.3d 546 (D.C. Cir. 2003), which the Administration cites for the unremarkable proposition that the government may restrict the release of "properly classified information." Mot. 17-18. Here, the Senior Director charged with reviewing Bolton's book concluded that all "properly classified" information had been *removed*, so *Stillman* carries no weight.

If anything, it was the Administration—not Bolton—that departed from its contractual duties here. Every contract imposes an "obligation of good faith and fair dealing" on the parties in their performance and enforcement of the contract. 23 Williston on Contracts § 63:22 (4th ed.). This duty is "obviously" breached when a party "acts in bad faith," *id.*, and it is also violated by "dishonest conduct," such as "rejection of performance for unstated reasons" and "abuse of a power to determine compliance or to terminate the contract." Restatement (Second) of Contracts § 205, cmt. e (1981). The Administration breached this duty here. The day after Knight completed her review, Bolton asked her for an update; she cryptically told him that there was "no update" but

that "the process remained ongoing."  Compl. ¶ 47.  The next day she again told Bolton that there was no "new information about the status of the process" but that she would contact him "if there was an update."  *Id.*  This stonewalling continued into early May, when on May 7, in response to two separate requests for updates, Knight again told Bolton again that there was no "new infor-mation," that "[t]he process remain[ed] ongoing," and that she would contact him "as soon as there is an update to provide."  *Id.* ¶ 49.

In reality, there were significant updates that Bolton was not receiving.  Behind the scenes, Bolton's successor had decided to ignore the results of the prepublication-review process and asked Michael Ellis, a recently promoted White House official, to "commenc[e]" his own "*addi-tional* review."  Compl. ¶ 51 (emphasis added); *see* Dkt. 3-1 ¶ 10 (Ellis Dec.).  Ellis, a "trusted loyalist" who has been in the White House counsel's office since 2017 and played a bit part in the Ukraine episode, had already initiated that review on May 2—five days before Knight emailed Bolton.  Natasha Bertrand & Daniel Lippman, *Trump Loyalist Installed in Top Intelligence Post on National Security Council*, Politico (Mar. 3, 2020); *see* Dkt. 3-1 ¶ 11 (Ellis Dec.).  But Bolton never heard again from the Administration until, on June 7, the media reported that his book was slated to be released on June 23.  *See id.* ¶ 53.  The following day, John Eisenberg, Assistant to the President and Deputy Counsel to the President, wrote to Bolton's lawyer and advised him—for the first time since Knight's sign-off—that the book supposedly contained classified information.  Compl. ¶ 54; *see* Dkt. 1-15 at 2.

It is not difficult to understand why the Administration initiated a completely different, separate review of Bolton's book, notwithstanding Knight's sign-off.  Compl. ¶¶ 25, 30, 46.  It is an election year, and the President has been focused on blocking the release of the book's politi-cally embarrassing details and undermining their credibility.  In February of this year, for example,

the President called Bolton a "traitor" and resolved to "block the publication of the book," telling aides that it "should not see the light of day before the November election."  Josh Dawsey et al., *Trump Wants To Block Bolton's Book, Claiming Most Conversations Are Classified*, Wash. Post (Feb. 21, 2020).  The President reportedly has Bolton "at the top of [his] list" of "enemies" to pay back for his impeachment proceedings, and wants Bolton to be criminally investigated.  Gabriel Sherman, *"It's Payback Time": With Acquittal Certain, Trump Plots Revenge on Bolton, Impeachment Enemies*, Vanity Fair (Feb. 3, 2020).  He believes that "Wacko John Bolton's" unflattering portrayal of him in the book consists of "lies & fake stories,"[1] "all intended to make [him] look bad."[2]  And he just recently "urged aides … to seek to block the publication of the book."  Tom Hamburger et al., *Justice Department Seeks Emergency Order To Block Publication Of Bolton's Book*, Wash. Post (June 17, 2020).

The purportedly ongoing review of Bolton's book is particularly troubling in light of the President's recent statement that he considers *every* conversation with himself to be highly classified.  Tom Hamburger & Josh Dawsey*, Trump Says Bolton Will Have 'Criminal Problems' If His Book Is Released*, Wash. Post (June 15, 2020); Bender & Ballhaus, *supra*.  Classification decisions ought not turn on the President's subjective beliefs.  An established set of rules, set forth in Executive Order 13526, determines what types of information can be classified.  75 Fed. Reg. 707 (Dec. 29, 2009).  Briefly stated, these rules require both that disclosure of the information be damaging to national security, and that it fall into a specified category of information—for example, information pertaining to military plans, weapons systems, or intelligence activities.  *Id.* §§ 1.2(a), 1.4.

---

[1]  Donald J. Trump (@realDonaldTrump), Twitter (June 18, 2020, 12:10 a.m.), https://twitter.com/realDonaldTrump/status/1273468029712707584.

[2]  Donald J. Trump (@realDonaldTrump), Twitter (June 18, 2020, 9:08 a.m.), https://twitter.com/realDonaldTrump/status/1273603410340843520.

The classification rules expressly *prohibit* classifying information in order to conceal inefficiencies or violations of law, to avoid embarrassment, or to otherwise prevent or delay the release of information that does not require protection in the interest of national security. *Id.* § 1.7(a)(1)-(2), (4). There is a difference between information that is sensitive for *national-security* reasons and information that is sensitive for *political* reasons. Unfortunately, the President's dislike of Bolton and sweeping view of classification suggests that the government here may be conflating the two.

   Here, the Administration's aggressive efforts to prevent the release of Bolton's book during an election year suggest political bad faith on the part of the Administration. And they certainly do not suggest that *Bolton* has failed to comply with *his* obligations. Bolton submitted his book to the prepublication-review process and participated in that process until he received sign-off from the Senior Director charged with conducting it. Publication of his book moved forward only after it was clear that the Administration was stonewalling him. If anything, the Administration's refusal to provide written confirmation of Bolton's compliance with his obligations was *itself* a breach of the relevant agreements and precludes a TRO. A contractual party's withholding of satisfaction "may be tested for reasonableness," *Aronoff v. Lenkin Co.*, 618 A.2d 669, 678 (D.C. 1992), and in this case the facts support a finding that "a reasonable person . . . would be satisfied" with Bolton's performance, Restatement (Second) of Contracts § 228 (1981). Moreover, "all contracts contain an implied duty of good faith and fair dealing." *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006). This means that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract," including "evad[ing] the spirit of the contract," engaging in "inaction," or breaking with "the justified expectations of the other party." *Id.* at 201-02. The Administration's conduct hits on each of these ways to show bad faith—and because a "party's good-faith cooperation is an implied condition

precedent to performance of a contract," the Administration's conduct provides an independent reason why the government may be "estopped from availing [itself] of [its] own wrong doing" by seeking a TRO. *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315 (11th Cir. 1999) (quoting *Bowers v. Medina,* 418 So. 2d 1068, 1069 (Fla. Dist. Ct. App. 1982)). These doctrines track the age-old maxim that "he who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). All of them support a finding that the government is unlikely to succeed in obtaining equitable relief.

## II. Denying A TRO Would Not Cause Irreparable Harm.

Finally, a TRO is independently inappropriate because the government cannot establish that denying a TRO would cause it any irreparable harm. In deciding whether to grant a TRO, the Court must "assess the probable efficacy of prior restraint on publication as a workable method of protecting" the interests asserted by the Government. *Neb. Press Ass'n*, 427 U.S. at 565. Here, the government repeatedly stresses that "confidentiality is lost for all time" once confidential documents are released because, at that point, "the cat is out of the bag" and it is "practically impossible to remedy the damage." Mot. 23-24 (quoting several cases). That proposition is true—and it forecloses any possible showing of irreparable harm.

Granting a TRO would be futile. Bolton has already decided to publish the book, and the book has been printed, bound, and distributed. Advance copies have been read by journalists. The book is being reported on in the media and has been "widely publicized," *Procter & Gamble*, 78 F.3d at 225, including by the President himself. *See also supra*, at 3 (citing news articles). Nothing the Court can do could remedy the damage, if any exists.

The government points to Federal Rule of Civil Procedure 65(d) as a basis for attempting to enjoin non-parties, including the publisher and downstream resellers. But Rule 65(d) does not enable the Court to independently enjoin parties that the Administration decided not to name as

defendants.  That rule simply brings within an injunction's grasp third parties who could aid and abet a party in violating it.  *Regal Knitwear Co. v. NLRB.*, 324 U.S. 9, 14 (1945).  As just explained, the publisher and resellers cannot aid Bolton in deciding to publish the book because he has already done so.  Here, as in *New York Times*, "access to the documents by many [purportedly] unauthorized people is undeniable, and the efficacy of equitable relief … to avert anticipated damage is doubtful at best."   *New York Times*, 403 U.S. at 733 (White, J., concurring).  In any event, there would be no occasion to enjoin the publisher because Simon & Schuster "lawfully obtained information of public interest" from Bolton, and there is no indication that it was involved in any "initial illegality." *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001).  It would be "quite remarkable to hold that speech by a law-abiding possessor of information," such as Simon & Schuster or subsequent resellers, "can be suppressed in order to deter conduct by a [purportedly] non-law-abiding third party."  *Id.*

## CONCLUSION

The Court should deny the government's application for a TRO.

Dated:  June 19, 2020

Respectfully submitted,

Nora Benavidez (GA Bar 698687)
PEN AMERICAN CENTER, INC.
588 Broadway, Suite 303
New York, NY  20012
(646) 779-4818
nbenavidez@pen.org

 /s/ Theodore J. Boutrous, Jr.
Theodore J. Boutrous, Jr. (D.C. Bar 420440)
Matthew D. McGill (D.C. Bar 481430)
Russell B. Balikian (D.C. Bar 1018417)
Jason H. Hilborn (*admission pending*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
tboutrous@gibsondunn.com

*Counsel for PEN American Center, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of June, 2020, I electronically filed the foregoing

document using the CM/ECF system.  Service was accomplished by the CM/ECF system.

  /s/ Theodore J. Boutrous, Jr.
Theodore J. Boutrous, Jr. (D.C. Bar 420440)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
tboutrous@gibsondunn.com

*Counsel for PEN American Center, Inc.*