UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-1580 (RCL) |
| | ) | |
| JOHN R. BOLTON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**FIRST AMENDED COMPLAINT**

**INTRODUCTION**

1.    This is a civil action by the United States to prevent Defendant John R. Bolton, a former National Security Advisor, from compromising national security by publishing a book containing classified information—in clear breach of agreements he signed as a condition of his employment and as a condition of gaining access to highly classified information and in clear breach of the trust placed within him by the United States Government.  From April 2018 to September 2019, Defendant served as the Assistant to the President for National Security Affairs, the National Security Advisor to the President, a high-level role in which he regularly came into possession of some of the most sensitive classified information that exists in the U.S. government. Within two months of his departure from government service, Defendant had negotiated a book deal allegedly worth about $2 million and had drafted a 500-plus page manuscript rife with classified information, which he proposed to release to the world.  But in light of agreements he signed obligating him to submit any manuscript to the government for pre-publication review, Defendant sent the book to the National Security Council ("NSC"), which quickly identified significant quantities of classified information that it asked Defendant to remove.  An iterative

process between NSC Staff and Defendant then began, as required by the binding agreements he signed, with changes to the book and other information being securely passed between Defendant and NSC staff.   Soon, though, Defendant apparently became dissatisfied at the pace of NSC's review.   Rather than wait for the process to conclude, Defendant decided to take matters into his own hands.   On June 7, 2020, without Defendant giving any prior notice to the NSC, press reports revealed that Defendant and his publisher had resolved to release the book on June 23, without completing the pre-publication review process.   Subsequent correspondence with Defendant's attorney confirmed that public reporting.   Simply put, Defendant struck a bargain with the United States as a condition of his employment in one of the most sensitive and important national security positions in the United States Government and now wants to renege on that bargain by unilaterally deciding that the prepublication review process is complete and deciding for himself whether classified information should be made public.

2.      The United States seeks an order requiring Defendant to abide by his contractual and fiduciary duties to complete the prepublication review process and not disclose classified information without written authorization, thereby protecting the national security of the United States.   Because that prepublication review process is ongoing, the United States also seeks an order directing Defendant to specifically perform his contractual obligations by taking all actions within his power to stop the publication and dissemination of his book as currently drafted.   The United States is not seeking to censor any legitimate aspect of Defendant's manuscript; it merely seeks an order requiring Defendant to complete the prepublication review process and to take all steps necessary to ensure that only a manuscript that has been officially authorized through that process—and is thus free of classified information—is disseminated publicly.   Given that Defendant has already taken steps to disclose or publish the manuscript to unauthorized persons

without prior written authorization, the United States also seeks an order establishing a constructive trust on any profits obtained from the disclosure or dissemination of *The Room Where it Happened*, particularly if Defendant refuses to complete the prepublication review process and obtain the required prior written authorization before proceeding with publishing the book.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1345.

4.      Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(b)(2) because the District of Columbia is the judicial district in which the White House and National Security Council is located; in which the NSC performs prepublication reviews; and in which Defendant signed several of his secrecy agreements and exit forms.

## PARTIES

5.      Plaintiff is the United States of America (hereafter "United States" or "Government").

6.      Defendant is a United States citizen and resident of Maryland who served as United States National Security Advisor in 2018 and 2019.  Defendant is an attorney who received his J.D. from Yale Law School in 1974.  Defendant previously served through a recess appointment as United States Ambassador to the United Nations in 2005 and 2006, as Under Secretary of State for Arms Control and International Security Affairs from 2001 to 2005, as Assistant Secretary of State for International Organization Affairs from 1989 to 1993, and as Assistant Attorney General in the United States Department of Justice from 1985 to 1989.

## Factual Allegations

### The Responsibilities of the National Security Council and National Security Advisor to the President With Respect to National Security

7.      The National Security Advisor, formally known as the Assistant to the President for National Security Affairs, is an advisor to the President of the United States who serves as part of the Executive Office of the President ("EOP").  The National Security Advisor is, apart from the President, the principal leader of the National Security Council, and is appointed to his position by the President without confirmation by the United States Senate.  The National Security Advisor frequently leads Principals meetings that require Sensitive Compartmented Information ("SCI")[1] clearance to attend and generally discuss or concern the latest SCI-derived intelligence.  These meetings often, and the National Security Advisor's role generally, concern activities that produce or relate to SCI.

8.      The National Security Council is the President's principal forum for considering national security and foreign policy matters with his senior national security advisors and Cabinet officials.  *See* National Security Presidential Memorandum ("NSPM")-4 (Apr. 4, 2017). The NSC's function is to advise and assist the President on national security policies and to serve as the President's arm for coordinating these policies among various government agencies.  The NSC was established by the National Security Act of 1947, 61 Stat. 496; 50 U.S.C. § 402, as amended by the National Security Act Amendments of 1949, 63 Stat. 579; 50 U.S.C. § 401 *et seq*.).  Its current constitution and functions are set forth in detail in NSPM-4.  The NSC is contained within the EOP.

---

[1]      Sensitive Compartmented Information is a subset of Classified National Intelligence concerning or derived from intelligence sources, methods or analytical processes that is required to be protected within formal access control systems established by the Director of National Intelligence.

**Defendant's Employment and Secrecy Agreements With the United States**

9.      Defendant was appointed as the National Security Advisor and served in that position from April 9, 2018, until September 10, 2019.

10.     As a condition of his appointment and to permit him access to classified information, Defendant entered into and signed a Classified Information Nondisclosure Agreement, titled a Standard Form 312 ("SF 312"). Defendant also entered into and signed two Sensitive Compartmented Information Nondisclosure Agreements, each titled a Standard Form 4414 ("Form 4414"). As noted in these NDAs, unauthorized disclosure of classified information is also illegal and can result in criminal penalties. *See generally* 18 U.S.C. § 798. These non-disclosure agreements were entered into with the United States and the EOP on April 5, 2018. True and correct copies of these secrecy agreements, redacted to omit relevant personal information, are attached as Exhibit A to the Complaint (hereafter "NDAs").

11.     Each of these NDAs was signed by Defendant at the White House located within the District of Columbia. Pursuant to Defendant's position, he generally worked in the White House in the District of Columbia.

12.     Defendant, who is an attorney, voluntarily, willingly, and knowingly entered into these NDAs. These NDAs were executed as a condition of his employment and appointment as National Security Advisor and as a condition of him being granted access to classified information and other information, which, if disclosed in an unauthorized manner, would jeopardize intelligence activities of the United States Government.

13.     By signing the NDAs, Defendant expressly acknowledged that he understood and accepted that the United States Government was placing "special confidence and trust" in him by granting him access to classified information and sensitive compartmented information. *See* Exh. A, SF 312 ¶ 1; *id.*, Form 4414 ¶ 1.

14.     As a condition of employment, and under the terms of the NDAs and his exit forms, Defendant was required never to "divulge classified information to anyone" without having "officially verified that the recipient has been properly authorized by the United States Government to receive it" or having received "prior written notice of authorization from the United States Government" entity responsible for its classification.  Exh. A, SF 312 ¶ 3; *see id.*, Form 4414 ¶ 3 (requiring Defendant "never [to] divulge anything marked as SCI or . . . know[n] to be SCI to anyone" without authorization.)

15.     Given his role as National Security Advisor, *see supra* ¶ 7, and as a condition of employment, and under the terms of the NDAs, Defendant was required to "submit for security review" to the United States Government "any writing or other preparation in any form, including a work of fiction, that contains or purports to contain any SCI or description of activities that produce or relate to SCI or that [he had] reason to believe are derived from SCI."  Exh. A, Form 4414 ¶ 4.  Disclosure of such preparations to anyone without authorized access to SCI is prohibited until "[he has] received written authorization" from the government.  *Id.*  Likewise, Defendant was required "to confirm from an authorized official that [any other] information is unclassified" before disclosing such information whenever "[he is] uncertain about the classification status."  *Id.*, SF 312, ¶ 3.  This prepublication obligation applies both during his employment or other service during which time he had "access to SCI" or "access to classified information," and "at all times thereafter."  *Id.* SF 312 ¶ 8; *id.* Form 4414 ¶¶ 4, 9.

16.     Defendant was required to submit his material for prepublication review "prior to discussing [the work] with or showing it to anyone who is not authorized to have access to" the classified or SCI information.  Exh. A, Form 4414 ¶ 4; *see id.*, SF 312, ¶ 3.

17.     As Defendant acknowledged in the NDAs, the purpose of this prepublication review "is to give the United States a reasonable opportunity to determine whether" SCI itself, the description of activities that produce or relate to SCI, or information "derived from SCI" is contained in the information submitted.  Exh. A, Form 4414 ¶ 5.  And upon confirmation that such SCI-related information or classified information existed in a submitted work, he agreed not to disclose the work without obtaining written authorization.  *See id.* ¶ 4; *see also* SF 312 ¶ 3.

18.     Defendant acknowledged and agreed in the NDAs that the obligations undertaken by him in executing the NDAs would remain valid and binding upon him after the termination of his employment with the NSC, unless he obtained a written release.  *See* Exh. A, SF 312 ¶ 8; Form 4414 ¶ 9.

19.     Defendant also agreed in the NDAs that all classified information acquired by him during the course of his employment was the property of the United States Government, *see* Exh. A, SF 312 ¶ 7; Form 4414 ¶ 8; that there were established procedures for reporting any concerns about unlawful or improper intelligence activities, *id.* SF 312 ¶¶ 10-11; Form 4414 ¶¶ 13-14; and that if he violated any of the terms of the Agreement, the Government "may seek any remedy available to it to enforce this Agreement including, but not limited to, application for a court order prohibiting disclosure of information in breach of this Agreement."  *Id.* SF 312 ¶ 6; Form 4414 ¶ 7.

20.     Defendant also specifically agreed, in addition to any other remedy to which the United States Government may become entitled, to "assign to the United States Government all rights, title, and interest, and all royalties, remunerations and emoluments that have resulted or will result or may result from any disclosure, publication or revelation not consistent with the terms of the" NDAs.  Form 4414 ¶ 12; *see* SF 312 ¶ 5.

21.     During his employment as National Security Advisor, Defendant was entrusted with classified information and SCI that related to some of the most sensitive matters of national security, including information regarding intelligence sources and methods as well as numerous codeword programs and SCI access.  In granting Defendant access to such information, the United States Government relied on the expectation that Defendant would respect the rights and obligations created by the NDAs and his fiduciary duties, including the prepublication review requirement.  Upon separating from his position as National Security Advisor, Defendant signed a Memorandum regarding Post-Employment Obligations acknowledging that he understood that he continued to be "prohibited from disclosing any classified or confidential information," and that he "may not use or disclose nonpublic information"—defined as "information gained by reason of [his] federal employment" and that "has not been made available to the general public," including information that is "confidential or classified."  A true and correct redacted copy is attached hereto as Exhibit B.  Defendant signed this Memorandum on September 13, 2019.

22.     Upon separation, Defendant also received a letter from the Legal Advisor to the NSC dated September 10, 2019, reiterating his "continuing obligations and responsibilities to protect all confidential, privileged, and classified information," specifically noting the "terms of [his] nondisclosure agreements."  A true and correct redacted copy is attached hereto as Exhibit C.  The letter emphasized to Defendant that unauthorized disclosure of such information "could cause irreparable injury to the United States or be used to advantage by a foreign nation."  The letter also reminded Defendant that he had "agreed to consult with the [Executive Office of the President], even after [his] employment, regarding whether information . . . might be classified," and to "submit for security review . . . any writing or other material in any form that could contain classified information *before* submitting the writing or material *to anyone* without proper

authorization." Exh. C (second emphasis added). The letter added that the United States Government "will take all appropriate steps . . . to ensure compliance" with the NDAs. *Id.*

23. Defendant's appointment as the National Security Advisor to the President ended in September 2019. Either before or near November 9, 2019, Defendant entered into a book deal with Simon & Schuster, a publisher, for an unknown sum of money—reported in the press to be approximately $2 million—for the rights to a book he was drafting concerning his time as National Security Advisor.

24. At no time has Defendant received a release from the terms and conditions of his NDAs. At no time has Defendant received "written authorization" as required by the NDAs that disclosure of the book "is permitted." The opposite is true. Defendant was repeatedly advised in writing that the prepublication review process was ongoing.

**The NSC's Prepublication Review Process**

25. The NSC is not an agency of the United States and does not act pursuant to any formal regulations governing its prepublication review process. The NSC's Records Access and Information Security Management Directorate bears primary responsibility for the classification review of written works submitted to the NSC for the prepublication review process.

26. The Records Access and Information Security Management Directorate is headed by a Senior Director who holds original classification authority. The Senior Director is assisted by a staff who review the submitted written works. Generally, the length of the written work, the amount of and sensitivity of the classified information, and the recency of that information are all factors that influence the duration of the review.

27. Practically speaking, a staff employee of the Records Access and Information Security Management Directorate conducts a first-level review of the submitted work by reviewing the work, the Executive Order, and any relevant classification guide and by conducting research

regarding information that may be classified.   After completion, a second-level review is conducted by a more senior member of the Records Access and Information Security Management Directorate, who takes whatever additional steps may be needed to ensure the protection of the classified information.

28.     The prepublication review process is iterative, and the Records Access and Information Security Management Directorate makes efforts to work with authors to allow them to publish their work consistent with the vital need to protect the national security of the United States.   Sometimes this iterative process can involve numerous communications over months to identify and work with an author regarding the classification of information.   The author can provide cites to official releases and other information in an effort to show that information has been officially released and is not classified.   In other instances, the staff of the Records Access and Information Security Management Directorate might provide suggested edits and changes.

29.     As specified in the NDAs, receipt of formal written notice of authorization is necessary to complete the prepublication process.   Upon completion of that process, the staff of the Records Access and Information Security Management Directorate generally advises the submitter of a work *in writing*, either by email or letter, that the NSC's classification concerns have been addressed and that the author is free to publish their work.

**Defendant Begins the NSC's Prepublication Review Process But Moves Forward With Publication Without Obtaining Prior Written Authorization After Being Told the Review Process Was Ongoing**

30.     Ellen Knight, who holds original classification authority under operative Executive Order, is the Senior Director for Records Access and Information Security Management at the NSC.   She has held the position since December 18, 2019.

31.     On December 30, 2019, Defendant, through his lawyer, contacted Ms. Knight. During the telephone conversation, Defendant's lawyer informed Ms. Knight that Defendant wanted to submit his book for prepublication review to be in compliance with Defendant's non-disclosure agreement and to be cautious.  Defendant's lawyer, in apparent possession of the manuscript, made arrangements to submit it by hand delivery on December 30, 2019.  Defendant's lawyer included a letter with the manuscript, a copy of which is attached as Exhibit D, which included that lawyer's understanding of the prepublication process, including his (erroneous) understanding that the prepublication review process was restricted to career government officials and employees conducting the review and that the manuscript would not otherwise be disclosed to others.  Ms. Knight's office began immediate review of the manuscript.  Ms. Knight contacted NSC's Office of the Legal Advisor ("NSC Legal") at various points throughout the prepublication process.

32.     On January 6, 2020, Defendant's lawyer telephoned Ms. Knight to inquire about the status of the review.  During that call, Ms. Knight explained that her office was in the process of conducting a first review, after which her office would conduct a second review and quality control, and she would provide feedback as soon as possible.  Ms. Knight noted that unlike shorter documents, the process for review of a manuscript (which in this case exceeded 500 pages) often involves an iterative back-and-forth.  During that call, Ms. Knight also indicated that her office needed to conduct more research because of how close in time the events described were, as compared to more historical writings.  Ms. Knight inquired whether a release date had been set and was informed that one had not yet been set but the publisher was considering an April 2020 release.

33.     On January 23, 2020, Ms. Knight informed Defendant's lawyer by letter, a copy of which is attached as Exhibit E, that, "[b]ased on our preliminary review, the manuscript appears to contain significant amounts of classified information," including information classified "at the TOP SECRET" level.  The letter further stated that based on the NDAs, the "manuscript may not be published or otherwise disclosed without the deletion of this classified information," and that the "manuscript remains under review in order for us to do our best to assist your client by identifying the classified information within the manuscript, while at the same time ensuring that publication does not harm the national security of the United States."  *Id.*

34.     Nevertheless, on or about January 25, 2020, the book was made available for pre-sale, and the title was announced as "*The Room Where it Happened*."  The publisher describes the book as a "substantive and factual account" of Defendant's "time in the room where it happened." The book's subtitle—"A White House Memoir"—indicates on its face that it is based in large part on information obtained by Defendant in the course of his employment as National Security Advisor.

35.     On January 26, 2020, the *New York Times* published an article describing information purportedly "included in drafts of a manuscript" that Defendant, apparently without any protections for classified national security information, had "circulated in recent weeks to close associates."  The article set forth information allegedly contained in "dozens of pages" of the manuscript.  A true and correct copy of this article is attached hereto as Exhibit F.

36.     On information and belief, the January 26, 2020 article led to a tremendous surge in publicity for the pre-sales of the book, including hundreds of news articles, discussion on major television networks, statements by members of Congress, and widespread circulation of the article's content on social media.

37.     On January 27, 2020, the *Washington Post* published a separate article describing content contained in *The Room Where it Happened*, relying on the statements of "two people familiar with the book," indicating, on information and belief, that Defendant had disclosed a draft of the manuscript to others without receiving prior written authorization from the U.S. Government.  A true and correct copy of this article is attached hereto as Exhibit G.

38.     Thus, notwithstanding this admonition, in late January 2020, prominent news outlets reported that drafts of Defendant's manuscript had been circulated to associates of Defendant.  These articles included reports from individuals supposedly familiar with the book, which indicates, on information and belief, that Defendant had already violated his non-disclosure agreements while purporting to comply with the prepublication review process.  *See supra* ¶¶ 27, 29; *see also* Exhs. E,  F, & G.

39.     In late January 2020, Defendant's lawyer contacted Ms. Knight to request prioritization of review of certain information in the manuscript because of the possibility that Defendant would be called to testify in the U.S. Senate.  Ms. Knight agreed to prioritize review of that information at Defendant's lawyer's request but confirmed in writing that the chapter in question contained classified information.

40.     On February 7, 2020, Ms. Knight sent an additional letter, a copy of which is attached as Exhibit H, to Defendant's lawyer confirming that the manuscript contained "numerous instances" of classified information.  The February 7, 2020, letter noted that because of "the volume of classified information" Defendant "should modify and revise the manuscript to remove all classified information and resubmit it."  *Id*.  Ms. Knight then offered to meet with Defendant as soon as the following week to review each instance of classified information.  *Id*.  The following

week, citing Defendant's travel schedule that complicated the scheduling of a meeting, Defendant's lawyer asked for a call to identify a date and time for an initial meeting.

41.     Ms. Knight and Defendant ultimately agreed to meet the afternoon of February 20, 2020 at the request of Defendant's lawyer.  However, Defendant's scheduling issues resulted in a request to delay this meeting until the following morning.  Ms. Knight accommodated this request and met with Defendant for four hours on February 21, 2020.  Ms. Knight followed up this meeting with Defendant's lawyer in a February 24, 2020, letter, a copy of which is attached as Exhibit I (without attachment), describing the four-hour meeting as "most productive."  Over the course of that four-hour meeting, Ms. Knight and Defendant reviewed preliminary results of three chapters in detail and a sample of review findings throughout the manuscript to provide examples.  Because it was apparent that additional follow-on meetings would be helpful, Defendant and Ms. Knight agreed to meet again.  Ms. Knight also provided a copy of Defendant's notes from that meeting that had undergone a classification review.

42.     Ms. Knight and Defendant subsequently met again on March 2, March 3, and March 4, 2020, for multiple hours each day.  Around that time, Defendant began to submit revised chapters to the NSC for additional review of his revisions based on the guidance he had received during these meetings.  On March 16, 2020, Defendant and Ms. Knight spoke by phone to discuss the status of the review process and Defendant confirmed in writing the following day that the review process of the revised manuscript was ongoing.  Ms. Knight advised Defendant again on March 23, 2020, that the review remained in process and was progressing and that she would provide an update when she had one.

43.     During one of the meetings in March 2020, Mr. Bolton remarked to Ms. Knight that the release date of his book had been changed by the publisher without his knowledge.  On

March 3, 2020, *CNN* published an article indicating that the release date of Defendant's book had moved to May 12, 2020.  The article quoted the publisher as stating that the "new date reflects the fact that the government review of the work is ongoing."  A true and correct copy of this article is attached hereto as Exhibit J.

44.     On March 27, 2020, Ms. Knight advised Defendant that while "[m]any of the changes are satisfactory," the review indicated that "additional edits are required to ensure the protection of national security information."  Exhibit K (March 27, 2020 email from E. Knight to C. Cooper).  To aid and expedite review, Ms. Knight offered "to provide a list of required edits and language substitutions to guide [Defendant] in this next stage of revising the draft." *Id.*  Ms. Knight then stated that even if all the changes were made she "will have to review the edited manuscript again to ensure the edits were completed, checking both your work and mine to ensure no classified information remains in the manuscript." *Id.*  Further, Ms. Knight reminded Defendant again that the prepublication review "remains in process" and that "[e]ven after making the edits, you are not authorized to publish or further disseminate the manuscript or its contents until expressly given clearance by me to do so." *Id.*  On March 27, 2020, Ms. Knight provided Defendant with 17 single-spaced pages noting specific passages and changes.

45.     Defendant submitted a further revised manuscript on March 30, 2020, and Ms. Knight began working on these edits.  Defendant and Ms. Knight spoke by phone about these revisions and the status of her continued review on April 3, 2020.  Following this call, Defendant continued to provide what he referred to as cites related to specific topics, many of which were references to press reports.  Defendant and Ms. Knight spoke again on April 13, 2020, during which Ms. Knight provided additional concerns to Defendant.  After the call on April 13, Defendant provided additional changes on April 14 in an effort to meet these concerns.  Ms. Knight

continued to work on these revisions and she and Defendant spoke again on April 21, 2020, by phone so that she could discuss a few sections of the draft.  This portion of the iterative process continued in late April as Ms. Knight continued to request citations and information and Defendant responded to these requests.  Defendant submitted additional changes to Ms. Knight on April 24, 2020, and Defendant provided a corrected page to this submission on April 27, 2020.

46.     On or around April 27, 2020, Ms. Knight had completed her review and was of the judgment that the manuscript draft did not contain classified information.  Ms. Knight informed NSC Legal of the status of the review.

47.     On April 28, 2020, in response to an inquiry from Defendant, Ms. Knight advised that she had no update other than to say the process remained ongoing.  In response to Defendant's specific request for a letter regarding Ms. Knight's review, which he sent in writing on April 29, 2020, Ms. Knight stated again that she did not have any new information about the status of the process, but advised Defendant that if there was an update she would reach out.

48.     On April 29, 2020, *Politico* published an article indicating that the release date of Defendant's book had moved again from May 12, 2020 to June 23, 2020, citing the ongoing prepublication review process as the reason for the necessary shift in release.  A true and correct copy of this article is attached hereto as Exhibit L.

49.     On May 1, 2020, and May 6, 2020, Defendant again inquired about whether the letter would be available.  In response, on May 7, 2020, Ms. Knight unequivocally stated that she did not have any new information, that "[t]he process remains ongoing," and that she would "reach out as soon as there is an update to provide."  A true and correct copy of this email is attached as Exhibit M.

50.     Defendant did not inquire further with Ms. Knight about the status of the review or the letter he sought following May 7, 2020.   Nor did Ms. Knight correspond further with Defendant.   Instead, Defendant had, without such authorization, delivered the book to a publisher and confirmed through counsel that it would in fact be published on June 23, 2020.

51.     Yet, as Ms. Knight stated, the process was ongoing.   On May 2, 2020, Michael Ellis, the NSC's Senior Director for Intelligence, commenced an additional review of the manuscript.  Mr. Ellis assumed his current position on March 1, 2020, and has served as an Original Classification Authority since assuming that position, under authority that had been delegated to the APNSA dated March 29, 2017.   He commenced this review at the request of the Assistant to the President for National Security Affairs, who, upon review of the version of the manuscript reflecting Ms. Knight's latest guidance, was concerned that the manuscript still appeared to contain classified information, in part because the same Administration that the Author served is still in office and that the manuscript described sensitive information about ongoing foreign policy issues. Mr. Ellis completed his initial review on June 9, 2020.  Mr. Ellis became an OCA upon assuming his position.   In accordance with Executive Order 13,526 section 1.3(d), Mr. Ellis received his annual training on June 10, 2020.  After completing the training, Mr. Ellis reviewed his work and concluded that the information he received in the training did not alter his decisions.

52.     Based on Mr. Ellis's position as Senior Director for Intelligence Programs, he routinely receives extremely sensitive intelligence reports and analysis that most members of the NSC staff, including Ms. Knight do not.  He also routinely attends senior-level meetings related to national security and foreign policy decisions, including meetings of the Principals Committee and Deputies Committee convened under NSPM-4; convenes Policy Coordination Committee meetings on intelligence activities related to national security and foreign policy decisions; and

provides advice to the Assistant to the President for National Security Affairs and other senior White House officials on national security and foreign policy decisions. As such, he is in a position to know intelligence information and internal foreign policy deliberations and developments that others of the NSC staff do not know. For the same reasons, he has a broader base of knowledge to identify and determine information that is classified that others may not be able to identify and determine as classified.

**Defendant Abandons the Prepublication Review Process He Had Agreed to Follow.**

53.     While Mr. Ellis was still conducting his review and finding classified information in the manuscript, on June 7, 2020, media reports indicated that—notwithstanding the absence of prior written authorization and despite repeated written confirmation as recently as May 7 that the process was ongoing—Defendant "is planning to publish even if the White House does not give publication approval." The *Washington Post* reported that Defendant and his publisher would proceed to release the book on June 23, 2020. A true and correct copy of this article is attached hereto as Exhibit N.

54.     On June 8, 2020, the Legal Advisor to the NSC wrote Defendant's lawyer confirming, yet again, that Defendant may not publish or disseminate the manuscript because the current draft contained classified information and that publication could not occur "until the prepublication review process is complete and he receives the necessary authorization at the conclusion of that process . . . ." Exhibit O (June 8, 2020 Letter from J. Eisenberg to C. Cooper). The letter indicated that the NSC would provide Defendant with a copy of Defendant's manuscript with redactions on or before June 19, 2020.

55.     On June 10, 2020, in response to a June 8, 2020 letter from the Legal Advisor to the NSC confirming that Defendant may not publish or disseminate the manuscript because the

current draft contained classified information, Defendant's lawyer confirmed that "Ambassador Bolton and his publisher, Simon & Schuster, moved forward with publication of [Defendant's] book" and that "[t]he book has now been printed, bound, and shipped to distributors across the country." A true and correct copy of this letter is attached has Exhibit P.

56.     On June 11, 2020, the Legal Advisor to the NSC wrote to Defendant's counsel, emphasizing that "the manuscript still contains classified information, because, among other things, it includes information that he himself classified and designated for declassification only after the lapse of twenty-five years." The Legal Advisor further reminded Mr. Bolton that he "remains under an obligation to stop the dissemination of the manuscript, which still contains classified information that belongs to the United States Government, the unauthorized disclosure of which could reasonably be expected to cause serious damage to national security." A true and correct copy of this letter is attached as Exhibit Q.

57.     On June 16, 2020, Mr. Ellis sent Defendant a copy of the latest version of his manuscript with redactions identifying passages that, based on his initial review, appear to contain classified information. Mr. Ellis also sent a letter to Mr. Bolton on June 16, 2020, reiterating that "your manuscript in its current form would constitute a breach of your nondisclosure agreements and laws governing access to classified information and could have serious legal consequences."

**Publication of *The Room Where it Happened* At This Time Would Violate the Terms of Defendant's NDAs**

58.     The content of *The Room Where it Happened* is covered by Defendant's NDAs, and the book as submitted for pre-publication review contained classified information that has not been publicly acknowledged or previously released. Although Defendant has eliminated some classified information from the book in response to extensive comments from NSC staff, NSC has determined that classified information remains in the manuscript.

59. NSC has determined that the manuscript in its present form contains certain passages—some up to several paragraphs in length—that contain classified national security information.  In fact, the NSC has determined that information in the manuscript is classified at the Confidential, Secret, Top Secret, and Top Secret/SCI levels.   Accordingly, the publication and release of *The Room Where it Happened* would cause irreparable harm, because the disclosure of instances of classified information in the manuscript reasonably could be expected to cause serious damage, or exceptionally grave damage, to the national security of the United States.  Completion of the prepublication review process and the provision of written authorization to Defendant as specified by the contract would ameliorate such harm.

60. Under the terms of the NDAs, Defendant is obligated not to publish *The Room Where it Happened*, or otherwise share the classified information contained therein with others, until receiving "prior written authorization from the United States Government . . . responsible for the classification of information or last granting [Defendant] a security clearance that such disclosure is permitted."

61. In response to his most recent specific request for such prior written authorization, Defendant was expressly informed in writing on May 7, 2020, that there was no new information that could be provided at that time and that the process remained ongoing.  Defendant was further advised that the NSC would reach out as soon as there was an update.

62. Despite previously having agreed to delay the release date, Defendant did not advise or indicate to the NSC, following the May 7, 2020, written communication, that he and his publisher had decided to press forward with the June 23, 2020 release date for *The Room Where it Happened* regardless of whether he obtained the legally-required prior written authorization.

63.     Instead, the NSC first learned that Defendant had proceeded with steps to publish the book without final authorization from June 7, 2020 media reports.  On June 8, 2020, the NSC stated again that the iterative prepublication review process was ongoing and that the book contained classified information.  Exh. O.  The NSC further stated that it would provide Defendant, no later than June 19, 2020, a copy of his draft manuscript with redactions for that information that has been identified as classified.  *Id.*

64.     On June 10, 2020, counsel for Defendant confirmed that "Ambassador Bolton and his publisher, Simon & Schuster, moved forward with publication of [Defendant's] book" and that "[t]he book has now been printed, bound, and shipped to distributors across the country."  Exh. P.

65.     Pursuant to the terms of Defendant's NDAs, the United States Government is entitled to apply for a court order prohibiting the disclosure of the information in *The Room Where it Happened* in breach of the NDAs and Defendant's contractual obligations and fiduciary duties to the United States.

66.     Pursuant to the express terms of Defendant's NDAs, all rights, title, and interest in any and all royalties, remunerations, and emoluments that have resulted, or will result from any disclosure, publication, or revelation of classified information contained in *The Room Where it Happened* that is not consistent with the terms of the NDA have been assigned to the United States Government.

67.     Given that Defendant and his publisher twice agreed to shift the release date of Defendant's book based on the ongoing prepublication review process, on information and belief, Defendant and the publisher possess the authority to continue to delay the release date until such time as the prepublication review process results in a written authorization that publication of Defendant's book is permitted.

## CLAIMS FOR RELIEF

**Count One: Breach of Contract and Fiduciary Duty; Violation of Prepublication Review Requirement**

68.     All preceding paragraphs are incorporated by reference, as if fully set forth herein.

69.     Defendant voluntarily, willingly, and knowingly entered into contractual agreements with the United States of America when he signed his NDAs and he agreed to be bound by their terms and conditions.  Among those terms and conditions is a requirement that Defendant submit the material in *The Room Where it Happened* to the United States Government for prepublication review.  Moreover, having been advised that the draft manuscript contained classified information, Defendant had an obligation not to divulge or disclose it to anyone until receiving written authorization from the United States Government to do so.

70.     Defendant knowingly, willfully, and deliberately breached his NDAs by sharing drafts of the manuscript with others prior to completion of the prepublication review process, and before Defendant had received prior written authorization from the United States Government to do so.

71.     Under both the common law and the NDAs, and in equity, Defendant had a fiduciary relationship with the United States of America based on his placement in positions of trust and special confidence.  Defendant served as National Security Advisor to the President, made recommendations to the President regarding national security and foreign policy, represented the United States in its relations with other countries, was entrusted with classified and SCI information that related to some of the most sensitive matters of national security, and entered into the NDAs.

72.     Defendant owes to the United States a fiduciary duty of loyalty to protect from unauthorized disclosure of information pertaining to or derived from classified information,

sensitive compartmented information and intelligence sources and methods, including signals intelligence activities and information; to submit to the United States Government for review any materials subject to his prepublication review obligations; and to not disseminate those materials or information unless and until the United States Government completes its prepublication review processes and provides written approval of disclosure.

73.     Defendant breached his fiduciary duties by sharing drafts of *The Room Where it Happened* with others prior to the completion of the prepublication security review and prior to receiving written permission to share information in the manuscript.

74.     As a direct and proximate result of Defendant's breach of his contractual and fiduciary duties, the United States has been damaged and harmed by, *inter alia*, the public disclosure of classified information, which reasonably could be expected to cause serious damage, or exceptionally grave damage, to the national security of the United States.

75.     Allowing Defendant's breach of his contractual and fiduciary duties to result in the release of his book on June 23, 2020 without specific performance and completion of the prepublication review process will compound this damage and result in irreparable harm.

76.     Defendant has engaged in a course of conduct evidencing a propensity to commit further breaches of his contractual and/or fiduciary duties and to cause further damage to the United States, including irreparable injury for which the United States has no adequate remedy at law.

### Count Two: Breach of Contract and Fiduciary Duty; Violation of Duty Not to Disseminate Classified Information

77.     All preceding paragraphs are incorporated by reference, as if fully set forth herein.

78.     Among the terms and conditions in Defendant's NDA was an express requirement that Defendant never "divulge classified information to anyone" without having "officially verified

that the recipient has been properly authorized by the United States Government to receive it" or having received "prior written notice of authorization from the United States Government" entity responsible for its classification.  Exh. A, SF 312 ¶ 3.

79.     Without receiving prior written notice of authorization from the United States Government, Defendant distributed his draft manuscript—containing classified information—to numerous persons not authorized by the United States Government to receive it.   On information and belief, those individuals included his attorney, his publisher, numerous acquaintances and friends, and members of the news media.  He did so numerous times at various stages of his never-completed prepublication review.

80.     By disclosing classified information, some instances of which reasonably could be expected to cause serious damage, or exceptionally grave damage, to the national security of the United States, Defendant caused irreparable harm to the United States for which there is no remedy at law.

### Count Three: Breach of Contract and Fiduciary Duty; Unjust Enrichment; Constructive Trust

81.     All preceding paragraphs are incorporated by reference, as if fully set forth herein.

82.     Defendant undertook unauthorized disclosures of classified information in violation of his NDAs in order to profit from classified information learned in the course of his employment as the highest national security advisor to the President of the United States.

83.     Prior to obtaining written authorization, Defendant also undertook unauthorized publication of his book despite being expressly advised that the prepublication review was ongoing and that he would be notified with an update on its status.

84.     Several of his unauthorized disclosures were undertaken for the specific purpose of garnering publicity for his book in order to increase sales and revenue.

85.     Defendant has been, and will continue in the future to be, unjustly enriched in the amount of profits, advances, royalties, and other advantages resulting from the publicity given to the unauthorized disclosure of the draft of his book.

86.     Defendant agreed in the contract he signed to "assign to the United States Government all royalties, remunerations, and emoluments that have resulted, will result or may result from any disclosure, publication, or revelation of classified information not consistent with the terms" of the non-disclosure agreements.

## PRAYER FOR RELIEF

**WHEREFORE**, the United States of America respectfully requests that the Court award the following relief:

A.     Declare that Defendant has breached his legal obligations, embodied in his NDAs, as well as his fiduciary obligations, by submitting for publication and otherwise disclosing information in *The Room Where it Happened* without completing prepublication review;

B.     Declare that Defendant has breached his contractual obligations, embodied in his NDAs, as well as his fiduciary obligations, by submitting for publication and otherwise disclosing information in *The Room Where it Happened* that contains classified information;

C.     Enter an Order directing Defendant to notify his publisher that he was not authorized to disclose *The Room Where It Happened* because he has not completed prepublication review and because it contains classified information; to instruct or request his publisher, insofar as he has the authority to do so, to further delay the release date of *The Room Where it Happened* until completion of the prepublication review process; and to instruct or request his publisher, insofar as he has the authority to do so, to take any and all available steps to retrieve and dispose of any copies of *The Room Where it Happened* that may be in the possession of any third party in a manner acceptable to the United States;

D.      Enjoin Defendant from any further violations of the terms and conditions of the NDAs and his contractual obligations and fiduciary duties to the United States by taking any steps towards publicly disclosing the information in *The Room Where it Happened* without first obtaining written permission from the United States through the prepublication review process; by releasing *The Room Where it Happened* in any form or media; by otherwise exercising any and all rights in and to *The Room Where it Happened*; or by otherwise breaching his NDAs and contractual and fiduciary duties;

E.      In light of the steps already taken by Defendant to disclose or publish *The Room Where it Happened*, and especially in the event that Defendant does not complete the prepublication review process by obtaining prior written authorization as required by the contract, impose a constructive trust for the benefit of the United States over, and require an accounting of, all monies, gains, profits, royalties, and other advantages that Defendant and his agents, assignees, or others acting on his behalf have derived, or will derive, from the publication, sale, serialization, or republication in any form, including any movie rights or other reproduction rights, of *The Room Where it Happened*;

F.      Declare that, pursuant to Fed. R. Civ. P. 65(d)(2), this order binds Defendant's agents and other persons who are in active concert or participation with Defendant or his agents, if they receive actual notice of the order, including Simon & Schuster, Inc. and other such persons in the commercial distribution chain of Defendant's book;

G.      Grant to the United States such other relief as the Court may deem just and proper, including, but not limited to, the Government's attorneys' fees and costs herein.


*     *     *

Dated:  June 19, 2020

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

MICHAEL SHERWIN
Acting United States Attorney

ETHAN P. DAVIS
Principal Deputy Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director
Federal Programs Branch

*/s/ Daniel F. Van Horn*
Daniel F. Van Horn (D.C. Bar. No. 924092)
Assistant United States Attorney
555 Fourth Street N.W., Room E4226,
Washington, D.C. 20530
Tel: 202-252-2506
Email: daniel.vanhorn@usdoj.gov

*/s/ Michael J. Gerardi*
Michael J. Gerardi (D.C. Bar No. 1017949)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 11514
Washington, D.C. 20005
Tel: (202) 616-0680
Fax: (202) 616-8460
E-mail: michael.j.gerardi@usdoj.gov

*Counsel for Plaintiff*