UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN R. BOLTON,<br><br>　　　　Defendant. | Case No. 1:20-cv-1580 (RCL) |

## MEMORANDUM ORDER

Before the Court is the government's motion for a temporary restraining order and preliminary injunction to enjoin defendant John Bolton from publishing his book. Mot., ECF No. 3. The book, a political memoir reflecting on Bolton's tenure as National Security Advisor, has been printed, bound, and shipped across the country. It is due for national release on Tuesday, June 23, 2020. The government insists that the book contains sensitive information that could compromise national security and alleges that Bolton prematurely halted his prepublication review process in order to proceed to publication. Defendant Bolton characterizes his actions differently—he emphasizes his substantial and extensive compliance with the review process and dismisses the government's recent objections to his manuscripts as pretextual and politically motivated. While Bolton's unilateral conduct raises grave national security concerns, the government has not established that an injunction is an appropriate remedy.

**I.     BACKGROUND**

John Bolton accepted a role as National Security Advisor in April 2018. In this position, Bolton directed and supervised the work of the National Security Council ("NSC") staff on behalf of the President. He left his post on September 10, 2019. Within two months, Bolton had secured a book deal with publisher Simon & Schuster.

1

The government anticipates that public officials will seek to publish accounts of their experiences. When those officials have access to sensitive information that implicates national security, the government guards that information by conditioning employment on a guarantee of nondisclosure. Bolton accepted this condition of employment and executed multiple nondisclosure agreements with the government. In one agreement, Standard Form 312, Bolton agreed that he would "never divulge classified information to anyone unless: (a) [he has] officially verified that the recipient has been properly authorized by the United States Government to receive it; or (b) [he has] been given prior written notice of authorization from the United States Government . . . that such disclosure is permitted." SF 312 ¶ 3. In the event Bolton was "uncertain about the classification status of information, [he was] required to confirm from an authorized official that the information is unclassified before [he] may disclose it." *Id.* Violation could result in "assign[ing] to the United States Government all royalties, remunerations, and emoluments that have resulted, will result or may result from any disclosure, publication, or revelation of classified information not consistent with the terms of [SF 312]." *Id.* ¶ 5. Bolton agreed to abide by the restrictions in SF 312 "[u]nless and until [he is] released in writing by an authorized representative of the United States Government." *Id.* ¶ 8.

Another agreement, Form 4414, detailed conditions Bolton must follow to gain access to highly classified sensitive compartmented information ("SCI"). Here, Bolton agreed to "submit for security review . . . any writing or other preparation in any form . . . that contains or purports to contain any SCI or description of activities that produce or relate to SCI or that [he has] reason to believe are derived from SCI, that [he] contemplate[s] disclosing to any person not authorized to have access to SCI or that [he has] prepared for public disclosure." Form 4414 ¶ 4. Bolton promised "not [to] disclose the contents of such preparation with, or show[] it to, anyone who is

not authorized to have access to SCI until [he had] received written authorization . . . that such disclosure is permitted." *Id.*

In December 2019, Bolton submitted a draft manuscript to the NSC for prepublication review. Over the following four months, Bolton worked to incorporate the edits he received from the Senior Director for Records Access and Information Security Management at the NSC, Ellen Knight. These edits were iterative and extensive, and on April 27, 2020, Knight communicated to Bolton that she no longer considered the manuscript to contain classified material. Bolton Decl. ¶ 16, ECF No. 9-1. Bolton claims that he and Knight discussed the possibility that the final written authorization might be ready as early as that afternoon. *Id.* ¶ 17.

The written authorization did not issue, and Knight soon clarified that the process was ongoing. Mitman Decl., Ex. I, ECF No. 3-14. Weeks passed without further communication between Bolton and the government. On June 8, 2020, John Eisenberg, Deputy White House Counsel and Legal Advisor to the NSC, issued a letter to Bolton that claimed the manuscript still contained classified information. Mitman Decl., Ex. J, ECF No. 3-15. By that point, Bolton had already delivered a final manuscript to his publisher for printing and shipping, without written authorization and without notice to the government.

What is the government asking this Court to do about it? Its proposed order seeks a Temporary Restraining Order ("TRO") or Preliminary Injunction that would:

1. Enjoin Bolton from "proceeding with the publication of his book in any form or media without first obtaining written authorization from the United States through the prepublication review process;"

2. Require Bolton to "ensure that his publisher and resellers receive notice that the book contains classified information that he was not authorized to disclose;"

3. Require Bolton to "instruct his publisher to delay the release date of the book pending the completion of the prepublication review process and authorization from the United States that no classified information remains in the book;"

4. Require Bolton to "instruct his publisher to take any and all available steps to retrieve and destroy any copies of the book that may be in the possession of any third party;"

5. Enjoin Bolton from "taking any additional steps toward[s] public[ly] disclosing classified information without first obtaining authorization from the United States through the prepublication review process;" and

6. Require Bolton to "ensure that his publisher and resellers receive notice of [the injunction]."

Proposed Order, ECF No. 3-19.

The government does not name Simon & Schuster as a defendant in the case. Instead, the government seeks to secure Simon & Schuster's compliance by way of enjoining Bolton. Federal Rule of Civil Procedure 65(d)(2) instructs that an injunction or TRO binds not only the parties, but also "the parties' officers, agents, servants, employees, and attorneys," and "all other persons who are in active concert or participation with" the parties, if they receive actual notice of the order.

## II.   LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy." *Winter v. Natural. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The movant must make a "clear showing that four factors, taken together, warrant relief." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). The four factors are: "(1) a substantial likelihood of success on the merits, (2) that the movant would

suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

In the past, the D.C. Circuit has applied a "sliding scale" approach to the four factors, holding that injunctive relief "may be granted with either a high likelihood of success and some injury, or vice versa." *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985). The Supreme Court, however, suggests that the "sliding scale" approach has fallen out of favor. *See Winter*, 555 U.S. at 22–24. In *Winter*, the Court specifically stated that regardless of a movant's high likelihood of success on the merits, he or she still must "demonstrate that irreparable injury is likely in the absence of an injunction." *Id.* at 22.

The D.C. Circuit has expressly declined to address the viability of the "sliding scale" approach post-*Winter*. *See Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009) (stating that "[w]e need not decide whether" that approach is still viable "because the [movants] fail even under the 'sliding scale' analysis"). Other courts have found that *Winter* prohibits use of the "sliding scale" approach. *See, e.g.*, *Am. Trucking Ass'n v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009); *Dairy Caller v. U.S. Dep't of State*, 152 F. Supp. 3d 1, 5–6 (D.D.C. 2015); *see also Singh v. McConville*, 187 F. Supp. 3d 152, 160 (D.D.C. 2016). Then-Judge Kavanaugh's concurrence in *Davis* dismissed the applicability of the "sliding scale" approach because *Winter* requires a movant to "meet four independent requirements" to obtain injunctive relief. *Davis*, 571 F.3d at 1295–96.

This Court will apply the standard set forth in *Winter*—the government must clearly establish all four factors.

### III. DISCUSSION

#### a. Is the government likely to succeed on the merits?

Yes. Bolton disputes that his book contains any such classified information and emphasizes his months-long compliance with the prepublication review process. He bristles at the mixed messages sent by prepublication review personnel and questions the motives of intelligence officers. Bolton could have sued the government and sought relief in court. Instead, he opted out of the review process before its conclusion. Unilateral fast-tracking carried the benefit of publicity and sales, and the cost of substantial risk exposure. This was Bolton's bet: If he is right and the book does not contain classified information, he keeps the upside mentioned above; but if he is wrong, he stands to lose his profits from the book deal, exposes himself to criminal liability, and imperils national security. Bolton was wrong.

The government submitted classified declarations for the Court's *ex parte* review *in camera*. ECF No. 4. On June 19, 2020, the Court held a sealed *ex parte* hearing for further *in camera* review with the government. ECF 6/19/20. Upon reviewing the classified materials, as well as the declarations filed on the public docket, ECF No. 3-1–5, the Court is persuaded that Defendant Bolton likely jeopardized national security by disclosing classified information in violation of his nondisclosure agreement obligations.

Bolton was the National Security Advisor to the President. He was entrusted with countless national secrets and privy to countless sensitive dealings. To Bolton, this is a selling point: His book is entitled *The Room Where It Happened*. He rushed to write an account of his behind-closed-doors experiences and produced over 500 pages of manuscript for review. Not four months later, Bolton pulled the plug on the process and sent the still-under-review manuscript to the publisher for printing. Many Americans are unable to renew their passports

within four months, but Bolton complains that reviewing hundreds of pages of a National Security Advisor's tell-all deserves a swifter timetable. Access to sensitive intelligence is rarely consolidated in individuals, and it comes as no surprise to the Court that the government requested several iterations of review headed by multiple officers. But what is reasonable to the Court was intolerable to Bolton, and he proceeded to publication without so much as an email notifying the government.

It is well-settled that a mandated prepublication review process is not an unconstitutional prior restraint. This Circuit upheld the Central Intelligence Agency's prepublication review scheme in *McGehee v. Casey*, 718 F.2d 1137 (D.C. Cir. 1983). There, the Circuit held that "the government has a substantial interest in assuring secrecy in the conduct of foreign intelligence operations." *McGehee*, 718 F.2d at 1140. First Amendment rights are preserved so long as restrictions "protect a substantial government interest unrelated to the suppression of free speech," and "the restriction [is] narrowly drawn to 'restrict speech no more than is necessary to protect the substantial government interest.'" *Id.* at 1142–43 (quoting *Brown v. Glines*, 444 U.S. 348, 354–55 (1980)). The Supreme Court agrees: "[T]his Court's cases make clear that—even in the absence of an express agreement—the CIA [can] act[] to protect substantial government interests by imposing reasonable restrictions on employee activities that in other contexts might be protected by the First Amendment." *Snepp v. United States*, 444 U.S. 507, 510 n.3 (1980). For the purposes of resolving this motion, the Court is satisfied that the government's prepublication review of Bolton's book fell within these bounds.

The NDAs barred publication of classified materials. Bolton likely published classified materials. The government is likely to succeed on the merits. But a single factor is not sufficient for an injunction to issue—the Court now proceeds to the second.

### b. Will the government suffer irreparable injury if an injunction is not granted?

The government has not carried its burden of establishing that an injunction will prevent irreparable injury. At the hearing on the injunction, the Court remarked that given the widespread dissemination of the books, the "horse is already out of the barn." According to Simon & Schuster Chief Executive Jonathan Karp's affidavit, "[m]ore than 200,000 copies of the Book have already been shipped domestically . . . to retail booksellers large and small, from large national chains and online entities to a host of small, independent, booksellers." Karp Decl. ¶ 19, ECF No. 9-17. Indeed, "thousands of copies of the Book [have been shipped] to booksellers around the world, including in Continental Europe, India and the Middle East." *Id.* Reviews of and excerpts from the book are widely available online. As noted at the hearing, a CBS News reporter clutched a copy of the book while questioning the White House press secretary. By the looks of it, the horse is not just out of the barn—it is out of the country.

Counsel for the government still press for an injunction. In its motion, the government asks this Court to order Bolton "to instruct his publisher to take any and all available steps to retrieve and destroy any copies of the book that may be in the possession of any third party." Mot. 27, ECF No. 3. For reasons that hardly need to be stated, the Court will not order a nationwide seizure and destruction of a political memoir.

If nothing else, the government argues, an injunction today would at least prevent any *further* spread of the book, such as limiting its audiobook release. The argument is unavailing. In taking it upon himself to publish his book without securing final approval from national intelligence authorities, Bolton may indeed have caused the country irreparable harm. But in the Internet age, even a handful of copies in circulation could irrevocably destroy confidentiality. A single dedicated individual with a book in hand could publish its contents far and wide from his

local coffee shop. With hundreds of thousands of copies around the globe—many in newsrooms—the damage is done. There is no restoring the status quo.

Remarking on the same, counsel for Bolton questioned the government's standing to seek a preliminary injunction. Article III of the Constitution requires a plaintiff to allege injury-in-fact, causation, and redressability. *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement."); *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) ("[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.") (internal quotations omitted). While the government has made its case for injury and causation, this Court could reframe the factor two reasoning above as demonstrating a lack of redressability. Rather than delve into a full justiciability analysis, the Court is content to rely on both the *Winter* factors and the standing argument as sufficient grounds for denial. The Court therefore need not reach further First Amendment concerns in its current posture.

## c. Would an injunction substantially injure other interested parties, and would the public interest be furthered by the injunction?

In keeping with the above, any injunction considered by this Court would be so toothless as to not substantially injure anyone. And perhaps the public interest would be nominally served by the gesture. But an injunction remains an untimely solution—resolving these third and fourth *Winter* factors in the government's favor does not revive the motion's prospects.

IV.     CONCLUSION

Defendant Bolton has gambled with the national security of the United States. He has exposed his country to harm and himself to civil (and potentially criminal) liability. But these facts do not control the motion before the Court. The government has failed to establish that an injunction will prevent irreparable harm. Its motion is accordingly **DENIED**.

It is **SO ORDERED**.

SIGNED this 20th day of June, 2020.

*/s/ Royce Lamberth*
Royce C. Lamberth
United States District Judge