IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | No. 20-1580 (RCL) |
| JOHN R. BOLTON, | |
| Defendant. | |

**BRIEF OF AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA, AND KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY AS AMICI CURIAE IN SUPPORT OF DEFENDANT'S OPPOSITION TO THE GOVERNMENT'S EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR A PRELIMINARY INJUNCTION**

Brett Max Kaufman (D.D.C. Bar No. NY0224)
Vera Eidelman
Alexia Ramirez
Ben Wizner
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
T: 212.549.2500
F: 212.549.2654
bkaufman@aclu.org
veidelman@aclu.org
aramirez@aclu.org
bwizner@aclu.org

Jameel Jaffer (D.D.C. Bar No. MI0067)
Alex Abdo
Ramya Krishnan
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
T: 646.745.8500
jameel.jaffer@knightcolumbia.org
alex.abdo@knightcolumbia.org
ramya.krishnan@knightcolumbia.org

Arthur B. Spitzer (D.D.C. Bar No. 235960)
Scott Michelman
American Civil Liberties Union of District of
  Columbia
915 15th Street NW, Second Floor
Washington D.C. 20005
T: 202.457.0800
aspitzer@acludc.org
smichelman@acludc.org

*Counsel for Amici Curiae*

**Interests of *Amici***

The ACLU is a nationwide, nonprofit, nonpartisan organization with nearly two million members dedicated to defending the principles embodied in the Constitution and our nation's civil rights laws. For nearly a century, the ACLU has been at the forefront of efforts nationwide to protect the full array of civil rights and civil liberties. Since its founding in 1920, the ACLU has frequently appeared before this Court in First Amendment cases, both as direct counsel and as amicus curiae. The ACLU of the District of Columbia is the Washington, D.C. affiliate of the ACLU, and has likewise appeared many times in this court in First Amendment cases.

The Knight First Amendment Institute at Columbia University is a nonpartisan, not-for-profit organization that works to defend the freedoms of speech and the press in the digital age through strategic litigation, research, and public education. The Institute's aim is to promote a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity, accountability, and effective self-government.

The Institute and the ACLU are co-counsel in several lawsuits relating to the intelligence agencies' prepublication review regimes, including two Freedom of Information Act lawsuits, *see ACLU v. CIA*, No. 16-cv-1256 (D.D.C.); *Knight First Amendment Inst. at Columbia Univ. v. DOD*, No. 18-cv-1129 (D.D.C.), and a First Amendment challenge to the constitutionality of the prepublication review system in its current form, *see Edgar v. Ratcliffe*, No. 19-cv-985 (D. Md.), No. 20-1568 (4th Cir.).

**Introduction**

In our system, any request for a prior restraint against publication is unusual, but the request the government makes here is outlandish. The book the government seeks to suppress has already been distributed around the world and excerpted on the front pages of major newspapers. The sweeping injunction the government has in mind would bind not just the author but also the publisher, which has not been made a party to the suit, as well as distributors and booksellers that the government has not even identified. And the government would have the Court enter this injunction without reference to the landmark Supreme Court decision holding that a prior restraint far narrower than the one the government seeks here was foreclosed by the First Amendment.

The Court could reject the government's request here on the ground that the remedy the government asks for would not prevent the harm it seeks to avoid. *Amici* submit this brief to underscore that the First Amendment stands as a further barrier to the injunction the government has requested. In the *Pentagon Papers* case, the Supreme Court emphasized that any prior restraint against the publication of matters of public concern "comes to this Court bearing a heavy presumption against its constitutional validity." *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (quotation marks and citation omitted). For the reasons discussed below, the government cannot overcome this presumption here. Nor should it be permitted to circumvent that presumption by mischaracterizing the prior restraint it seeks—against the book's publisher and commercial retailers, Gov't Br. 27–29 & n.6—as a routine application of a "basic principle of federal remedies," *id.* at 28.

**Argument**

In *Pentagon Papers*, the United States sought to enjoin the *New York Times* and the *Washington Post* from publishing the contents of a classified study on the history of the Vietnam

War that they had obtained from Daniel Ellsberg, then a military analyst employed by the RAND Corporation. 403 U.S. at 714. While the newspapers had already published summaries and portions of the study, the government claimed that further publication would cause "irreparable injury to the national defense." *United States v. N.Y. Times Co.*, 328 F. Supp. 324, 326 (S.D.N.Y. 1971). In a per curiam opinion, the Supreme Court refused to grant the injunction. *Pentagon Papers*, 403 U.S. at 714. The Court wrote that the government "carries a heavy burden of showing justification for the imposition of such a restraint" on publication, and that the government had failed to carry that burden. *Id.* (quotation marks and citations omitted). The Court reached this conclusion "despite the fact that a majority of the Court believed that release of the documents, which were classified 'Top Secret-Sensitive' and which were obtained surreptitiously, would be harmful to the Nation and might even be prosecuted after publication as a violation of various espionage statutes." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 591–92 (1976) (Brennan, J., concurring, joined by Stewart & Marshall, J.J.).

While several of the Justices, in concurring opinions, declined to rule out entirely the possibility that national security might justify a prior restraint in other circumstances, they made clear that any exception to the rule against prior restraints should be construed "very, very narrowly." *Id.*[1] For example, Justice Stewart wrote that national security could justify a prior restraint only when disclosure "will surely result in direct, immediate, and irreparable damage to

---

[1] Indeed, two Justices rejected the existence of even a limited exception. 403 U.S. at 714 (Black J., concurring, joined by Douglas, J.) ("In my view it is unfortunate that some of my Brethren are apparently willing to hold that the publication of news may sometimes be enjoined. Such a holding would make a shambles of the First Amendment."); *id.* at 720 (Douglas, J., concurring, joined by Black, J.) (The First Amendment "leaves, in my view, no room for governmental restraint on the press.").

our Nation or its people." 403 U.S. at 730 (Stewart, J., joined by White, J., concurring). Similarly, Justice Brennan explained his view that "only governmental allegation and proof that publication must inevitably, directly, and immediately cause the occurrence of an event kindred to imperiling the safety of a transport already at sea can support even the issuance of an interim restraining order." *Id.* at 726–27 (Brennan, J., concurring). And Justice White observed that the "concededly extraordinary protection against prior restraints enjoyed by the press under our constitutional system" is not overcome even by a showing that "revelation of these documents will do substantial damage to public interests." *Id.* at 730–31 (White, J., concurring, joined by Stewart, J.).

*Pentagon Papers* controls this case. The government seeks an injunction against the defendant that would "also bind his publisher, Simon & Schuster," Gov't Br. 27, as well as "[c]ommercial resellers further down the distribution chain, such as booksellers," so long as they have actual notice of the injunction, *id.* at 29 n.6. In every way that matters, the government seeks a prior restraint akin to—and indeed far broader than—the one the Supreme Court declined to grant in *Pentagon Papers*.[2]

The government attempts to sideline *Pentagon Papers* by contending that Federal Rule of Civil Procedure 65(d)(2) authorizes the relief it seeks here. *See* Gov't Br. 28–29. The Court should reject this effort to evade the First Amendment. As a threshold matter, the government appears to

---

[2] *Pentagon Papers* would supply the relevant framework even if the government were seeking an injunction binding only the defendant. As the D.C. Circuit recognized in *McGehee v. Casey*, there is a critical constitutional difference between a declaratory judgment that an agency has "properly classified the deleted items" in a publication, and "an injunction against publication of the censored items." 718 F.2d 1137, 1147 n. 22 (D.C. Cir. 1983). Citing *Pentagon Papers*, the court observed that, where the government seeks an injunction against publication, it "bear[s] a much heavier burden." *Id.*

misapprehend the reach of Rule 65(d), which "depends on an appraisal of [the] relations and behavior" between the defendant and the publisher and booksellers—to determine, for example, whether the publisher and downstream booksellers are "subject to [the defendant's] control." *See Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 14–15 (1945). While the government has proffered no evidence of the existence of such control, the defendant has submitted a bevy of evidence indicating the absence of it. *See* Def.'s Br. 30–33.

More importantly, even if the language of Rule 65(d) could be read to reach the defendant's publisher and the booksellers, it would not change the nature or import of the government's requested injunction—and the government would be required to carry the same burden it would have had to carry had it joined the publisher and booksellers directly. When the government says that "the Free Speech Clause does not entitle book sellers to special exemptions from the application of general, speech-neutral laws such as Rule 65," Gov't Br. 28, it forgets that general, speech-neutral laws have no special exemption from the First Amendment when the government uses them specifically to target speech. *See, e.g.*, *NAACP v. Button*, 371 U.S. 415, 434 (1963) (holding unconstitutional a regulation of speech that, based on a vague statutory definition of "agency," would have potentially reached untold third parties); *Texas v. Johnson*, 491 U.S. 397, 402 (1989) (holding that statute prohibiting "desecration of a venerated object" could not be applied to criminalize flag-burning, regardless of the facial constitutionality of the statute). Indeed, the broader authority of district courts to issue *any* injunction is "a general, speech-neutral" authority. Whether the exercise of that authority, or of the authority under Rule 65, warrants First Amendment scrutiny turns principally on whether the authority is being directed at conduct protected by the First Amendment. *Id.* at 403.

Here, the requested injunction is directed squarely at First Amendment–protected activity—the publication and dissemination of a book—and accordingly it is *Pentagon Papers* that governs. But the government cannot remotely satisfy the requirements of that case. As an initial matter, it would be a grave constitutional misstep to grant the far-reaching injunction the government requests when that injunction would be utterly ineffective. To obtain a prior restraint, the government must show that the restraint would "serve its intended purpose." *Nebraska Press*, 427 U.S. at 569. Here, the cat is not simply out of the bag; it has left the country. Hundreds of thousands of copies of the defendant's book have been distributed around the country and the world.[3] The press has reported on its most revealing and sensitive contents.[4] One newspaper has excerpted an entire chapter.[5] Late-night host Stephen Colbert has even read portions of his copy of the book on the air.[6] To grant an injunction in this scenario would defy not just *Pentagon Papers*, but common sense as well. *See Pentagon Papers*, 403 U.S. at 722 n.3 (Douglas, J., concurring,

---

[3] Charlie Savage, *Justice Dept. Escalates Legal Fight With Bolton Over Book*, N.Y. Times, June 17, 2020, https://nyti.ms/30R0RKx; *see* Def.'s Br. 30–33.

[4] *See, e.g.*, Peter Baker, *Bolton Says Trump Impeachment Inquiry Missed Other Troubling Episodes*, June 17, 2020, https://nyti.ms/2UVvGdi; Michael C. Bender & Rebecca Ballhaus, *Trump Put Re-Election Prospects Ahead of National Interest, Bolton Alleges*, Wall St. J., June 17, 2020, https://on.wsj.com/3hIlZZe; Rosalind S. Helderman & Josh Dawsey, *In New Book, Bolton Belatedly Says Trump Attempted to Use Military Aid to Pressure Ukraine on Political Investigations*, Wash. Post, June 17, 2020, https://wapo.st/3hIRnH5; David Ignatius, *John Bolton's Book Is Full of Startling Revelations He Should Have Told Us Sooner*, Wash. Post, June 17, 2020, https://wapo.st/37Eft14; Peter Baker, *Five Takeaways From John Bolton's Memoir*, N.Y. Times, June 18, 2020, https://nyti.ms/2zJeH6t.

[5] *See* John Bolton, *John Bolton: The Scandal of Trump's China Policy*, Wall St. J., June 17, 2020, https://on.wsj.com/30W1zGb.

[6] *See* Late Show with Stephen Colbert, "Leaked Excerpts From Bolton's Book Detail Trump's Pattern of Corruption and Obstruction," YouTube (June 17, 2020), https://youtu.be/Dl3GGCwHeSM?t=377.

joined by Black, J.) (characterizing as manifestly untenable a prior restraint "where there already is rather wide distribution of the material that is destined for publicity, not secrecy"); *id.* at 733 (White, J., concurring, joined by Stewart, J.) (explaining that where "publication has already begun and a substantial part of the threatened damage has already occurred . . . the efficacy of equitable relief against [third parties] to avert anticipated damage is doubtful at best"); *see also, e.g.*, *United States v. Wash. Post Co.*, 446 F.2d 1327, 1329 (D.C. Cir. 1971) (per curiam) (explaining that the "massive character" of the disclosures already made by newspapers "raise[s] substantial doubt that effective relief of the kind sought by the government can be provided by the judiciary"), *aff'd by Pentagon Papers*.[7]

It is highly doubtful that the government could surmount the high bar for an injunction even if the defendant's book had not been disseminated so broadly. Again, to justify a prior restraint, the government would need to show that the relief it seeks would prevent "direct, immediate, and irreparable damage" to the nation. *Pentagon Papers*, 403 U.S. at 730 (Stewart, J., joined by White, J., concurring); *see id.* at 726–27 (Brennan, J., concurring). Here, there are sound reasons to doubt the government's claims of harm. As the government acknowledges, a senior career national security official informed the defendant, after leading a nearly five-month review, that the version of the book now in bookstores does not contain any classified information. Compl. ¶ 46. That an assortment of political appointees now claim, in sealed declarations, that they have discovered classified information that the National Security Council's ordinary review channels

---

[7] The ineffectiveness of the government's requested relief is relevant not only to its likelihood of success on the merits of its claim, but also to the other preliminary-injunction factors. *See, e.g.*, *Int'l Internship Programs v. Napolitano*, 463 F. App'x 2, 4 (D.C. Cir. 2012) (citing *Animal Legal Def. Fund v. Shalala*, 53 F.3d 363, 366 (D.C. Cir. 1995)).

missed is not irrelevant—but the Court should read these declarations with extreme skepticism. Arbitrary, selective, and politicized classification decisions are the frequent result of a prepublication review system that invests executive officials with broad discretion to suppress disfavored speech, and the dysfunction of this system has been well documented. *See, e.g.*, Jack Goldsmith & Oona Hathaway, Op-ed., *The Government's Prepublication Review Process is Broken*, Wash. Post, Dec. 25, 2015, https://wapo.st/3dks2A8 (explaining that the system is "racked with pathologies"); H.R. Rep. No. 114–573, at 7 (2016) (issuing a still-unheeded demand for the Director of National Intelligence to prepare a new prepublication review policy that would apply to all intelligence agencies and that would "yield timely, reasoned, and impartial decisions that are subject to appeal"). The possibility that the government is selectively overclassifying information in this particular case is especially acute. The President has publicly criticized the defendant and, according to reports, privately directed his staff to prevent the defendant's book from being published before the election.[8]

Even if the Court accepts the government's representations that information in the defendant's book is classified, it should not defer to the assertion that this information is *properly* classified. More than two decades ago, Senator Daniel Patrick Moynihan's Commission on

---

[8] *See* Josh Dawsey, Tom Hamburger & Carol D. Leonnig, *Trump Wants to Block Bolton's Book, Claiming Most Conversations Are Classified*, Wash. Post, Feb. 21, 2020, https://wapo.st/2NcE9Et (reporting that President Trump has told not only staff, but news media, off the record, that "We're going to try and block publication of the book. . . . After I leave office, he can do this. But not in the White House."); @realDonaldTrump, Twitter (June 18, 2020, 9:08 AM), https://twitter.com/realDonaldTrump/status/1273603410340843520 ("Bolton's book, which is getting terrible reviews, is a compilation of lies and made up stories, all intended to make me look bad. Many of the ridiculous statements he attributes to me were never made, pure fiction. Just trying to get even for firing him like the sick puppy he is!").

Protecting and Reducing Secrecy cautioned of the dangers of a half century of creeping overclassification, the result of a system administered and overseen almost entirely within the executive branch. *See* Daniel Patrick Moynihan et al., Report of the Commission on Protecting and Reducing Secrecy, S. Doc. No. 105–2 (1997). Today, leading members of the intelligence community have acknowledged that not all classification decisions would withstand judicial scrutiny, and that many disclosures of classified material may not lead to any harm at all.[9] Indeed, in *Pentagon Papers* itself, the government claimed that disclosure would "pose a grave and immediate danger to the security of the United States," Br. for Appellant at 3, *Pentagon Papers*, 403 U.S. 713 (Nos. 1873, 1885), 1971 WL 167581, at *2, *7, *21, *26 (June 26, 1971), but the Solicitor General in that case later admitted that he "[had] never seen any trace of a threat to the national security from the publication" and had not "seen it even suggested that there was such an actual threat," Erwin Griswold, *Secrets Not Worth Keeping*, Wash. Post, Feb. 16, 1989, https://wapo.st/2vybD7n. Rather, he explained, "there is massive overclassification and . . . the principal concern of the classifiers is not with national security, but rather with governmental embarrassment of one sort or another." *Id.*

---

[9] *See, e.g.*, *Nom. of Lt. Gen. James Clapper, Jr., USAF, Ret., to Be Dir. of Nat'l Intelligence: Hearing Before S. Select Comm. on Intel.*, 111th Cong. 18 (July 20, 2010) (testimony of then-nominee to the position of the Director of National Intelligence James Clapper), https://fas.org/irp/congress/2010_hr/clapper.pdf (stating that "we do overclassify" both as an "administrative default" and to "hide or protect things for political reasons," and suggesting that "we can be a lot more liberal . . . about declassifying, and we should be"); *Oversight of the FBI: Hearing Before the S. Comm. on the Judiciary*, 115th Cong. (May 3, 2017), 2017 WL 1684512 (testimony of then–FBI Director James Comey) (agreeing that "over classification is a very significant problem within the executive branch" and that often the release of classified material may not cause any harm).

Still more fundamentally, the fact that information is classified—even properly classified—does not control the question of whether the First Amendment permits a prior restraint against its publication. The ultimate question is one of harm, not executive branch labels. As the Supreme Court and many lower courts have emphasized, the uncritical acceptance of government claims of damage to national security "would trivialize the court's role, which the Supreme Court has clearly admonished 'cannot be abdicated to the caprice of executive officers.'" *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1082 (9th Cir. 2010) (en banc) (quoting *United States v. Reynolds*, 345 U.S. 1, 9–10 (1953)); *Reynolds*, 345 U.S. at 8 (cautioning that "abandonment of judicial control [over the state secrets privilege] would lead to intolerable abuses"); *In re Wash. Post Co.*, 807 F.2d 383, 392 (4th Cir. 1986) ("A blind acceptance by the courts of the government's insistence on the need for secrecy, without notice to others, without argument, and without a statement of reasons, would impermissibly compromise the independence of the judiciary and open the door to possible abuse."). The *Pentagon Papers* case itself makes clear that the mere fact that information is properly classified does not mean that the government is entitled to enjoin its disclosure.

Our courts have never granted the government the kind of relief it seeks here. That is no accident. To justify a prior restraint against publication, the government must satisfy one of the most stringent tests in all of American law—a recognition of the weight our Constitution gives to the freedoms of speech and the press, as well as the public's right to know. The government certainly has not justified this extraordinary remedy on the facts presented here.

## Conclusion

The Court should deny the government's motion for a temporary restraining order and a preliminary injunction.

June 19, 2020                                    Respectfully submitted,

 /s/ Brett Max Kaufman
Brett Max Kaufman (D.D.C. Bar No. NY0224)        Jameel Jaffer (D.C. Bar No. MI0067)
Vera Eidelman                                    Alex Abdo
Alexia Ramirez                                   Ramya Krishnan
Ben Wizner                                       Knight First Amendment Institute
American Civil Liberties Union Foundation          at Columbia University
125 Broad Street, 18th Floor                     475 Riverside Drive, Suite 302
New York, NY 10004                               New York, NY 10115
T: 212.549.2500                                  T: 646.745.8500
F: 212.549.2654                                  jameel.jaffer@knightcolumbia.org
bkaufman@aclu.org                                alex.abdo@knightcolumbia.org
veidelman@aclu.org                               ramya.krishnan@knightcolumbia.org
aramirez@aclu.org
bwizner@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman
American Civil Liberties Union of District of
  Columbia
915 15th Street NW, Second Floor
Washington D.C. 20005
T: 202.457.0800
aspitzer@acludc.org
smichelman@acludc.org                            *Counsel for Amici Curiae*