## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE UNITED STATES OF AMERICA,

                         Plaintiff,

v.

JOHN R. BOLTON,

                        Defendant.

Civil Action No. 20-1580-RCL

## MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Pursuant to Federal Rule of Civil Procedure 12(b)(6), and for the reasons stated in the accompanying memorandum, Defendant John R. Bolton moves to dismiss all counts in Defendant's Amended Complaint for failure to state a claim.

July 16, 2020

Respectfully submitted,

/s/ Charles J. Cooper
Charles J. Cooper, Bar No. 248070
Michael W. Kirk, Bar No. 424648
John D. Ohlendorf, Bar No. 1024544

COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC  20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
Email: ccooper@cooperkirk.com

*Counsel for Defendant John R. Bolton*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE UNITED STATES OF AMERICA,

                         Plaintiff,

v.

JOHN R. BOLTON,

                         Defendant.

Civil Action No. 20-1580-RCL

## DEFENDANT'S MEMORANDUM IN SUPPORT OF HIS
## MOTION TO DISMISS THE AMENDED COMPLAINT

July 16, 2020

Charles J. Cooper, Bar No. 248070
Michael W. Kirk, Bar No. 424648
John D. Ohlendorf, Bar No. 1024544

COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC  20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
Email: ccooper@cooperkirk.com

*Counsel for Defendant John R. Bolton*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ................................................................................................................1

STATEMENT ....................................................................................................................3

I.      The Nondisclosure Agreements Signed by Ambassador Bolton .......................................3

        A.      The Classified Information NDA ..........................................................................4

        B.      The SCI NDA .....................................................................................................6

II.     Ambassador Bolton's Memoir ....................................................................................9

ARGUMENT .....................................................................................................................17

I.      Ambassador Bolton Has Fully Complied With the Classified Information NDA.............19

        A.      The Classified Information NDA Did Not Require Ambassador Bolton
                To Submit His Manuscript to Prepublication Review. ..........................................19

        B.      The Classified Information NDA Did Not Require Ambassador Bolton
                To Receive Written Authorization Before Publishing His Manuscript. ...............22

II.     Ambassador Bolton Has Fully Complied With the SCI NDA. .......................................28

        A.      The SCI NDA Does Not Apply Because it Is Limited to Information that Is
                Classified Or in Process of Classification When the Disclosure Is Authorized. ...29

        B.      The SCI NDA Does Not Apply Because it Is Limited to Information That Is
                Marked as SCI, That the Employee Knows To Be SCI, or That He Has Reason
                To Believe Is SCI. .............................................................................................30

        C.      Interpreting the SCI NDA To Require Prepublication Review of Works that
                an Employee Has No Reason To Believe Contain SCI Would Violate the
                First Amendment. .............................................................................................35

III.    The Common-Law, Equitable, and Quasi-Contractual Duties Invoked by the
        Government Do Not Impose any Rights or Duties that Are Different or Inconsistent
        with the Express Terms of the Classified Information and SCI NDAs. ..........................37

CONCLUSION...................................................................................................................40

.

# TABLE OF AUTHORITIES

**Cases**                                                            **Page**

*Alexander v. United States*, 509 U.S. 544 (1993) ....................35, 36

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002).................35, 37

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................17

*DeGeer v. Gillis*, 707 F. Supp. 2d 784 (N.D. Ill. 2010).................38

*Everett Plywood Corp. v. United States*, 651 F.2d 723 (Ct. Cl. 1981) ...............25, 33

*Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123 (1992).................38

*Gray v. American Exp. Co.*, 743 F.2d 10 (D.C. Cir. 1984).................25, 33

*Hinton v. Corrections Corp. of Am.*, 624 F. Supp. 2d 45 (D.D.C. 2009) ...................16

*In re APA Assessment Fee Litig.*, 766 F.3d 39 (D.C. Cir. 2014).................38

*Lowe v. SEC*, 472 U.S. 181 (1985) ...................37

*Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995) ...............25, 33

\* *McGehee v. Casey*, 718 F.2d 1137 (D.C. Cir. 1983) ...............36, 37

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995).................1

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) ...............1, 36

\* *New York Times Co. v. United States*, 403 U.S. 713 (1971)...............1, 25, 36

*Niemotko v. Maryland*, 340 U.S. 268 (1951) ...................39

\* *Russello v. United States*, 464 U.S. 16 (1983) ...................23

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018).................39

*Shaffer v. Def. Intelligence Agency*, 102 F. Supp. 3d 1 (D.D.C. 2015) ...................8

*Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969) ...............36, 38

*Snepp v. United States*, 444 U.S. 507 (1980).................6, 26, 36

*Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975).................39

\* *T. Brown Constructors, Inc. v. Pena*, 132 F.3d 724 (Fed. Cir. 1997).................24, 32

\* *United States v. Marchetti*, 466 F.2d 1309 (4th Cir. 1972) ...............26, 36

*United States v. Raymond*, 228 F.3d 804 (7th Cir. 2000) ...................25

\* *US Airways, Inc. v. McCutchen*, 569 U.S. 88 (2013) ...................38

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982).................39

*Washington All. of Tech. Workers v. United States Dep't of Homeland Sec.*, 892 F.3d 332 (D.C. Cir. 2018)...................17

*Weaver v. United States Info. Agency*, 87 F.3d 1429 (D.C. Cir. 1996) ...............36, 37

*William Kaufman Org., Ltd. v. Graham & James LLP*, 703 N.Y.S.2d 439 (N.Y. 2000)..............38

**Executive Materials**

Executive Order No. 13526, 75 Fed. Reg. 707 (Dec. 29, 2009)..................................................8, 9

**Other Authorities**

Central Intelligence Agency, Form 368, Secrecy Agreement.....................................26, 33

Federal Bureau of Investigation Records Management Division, Prepublication
     Review Policy Guide (2015) ..............................................................................27

Federal Bureau of Investigation, FBI Employment Agreement .................................27, 33

Knight First Amendment Institute, Interactive Chart: Prepublication Review by
     Agency and Secrecy Agreement (Aug. 27, 2019), https://bit.ly/2NamBc6 .....................26

James Madison, *The Report of 1800* (Jan. 7, 1800), *available at:*
     https://founders.archives.gov/documents/Madison/01-17-02-0202 ..........................................1

\* Restatement (Second) of Contracts............................................................. 24, 25, 32, 33, 37

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation
     of Legal Texts (2012) ......................................................................24, 25, 32, 37

\* 11 Williston on Contracts ..................................................................................24, 32

## INTRODUCTION

Speech on a politically important and controversial topic "is the essence of First Amendment expression. . . . No form of speech is entitled to greater constitutional protection." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). When the Government erects a scheme designed to foreclose that speech even before it is uttered by imposing a "prior restraint . . . upon the communication of news and commentary on current events," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976), it must shoulder "a heavy burden of showing justification for the imposition of such a restraint," *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971). And it has been settled since the Early Republic that the Government cannot escape First Amendment scrutiny by switching to the tactic of punishing core political speech *after* the fact,

> since a law inflicting penalties on printed publications, would have a similar effect with a law authorizing a previous restraint on them. It would seem a mockery to say, that no law should be passed, preventing publications from being made, but that laws might be passed for punishing them in case they should be made.

James Madison, *The Report of 1800* (Jan. 7, 1800), *available at:* https://founders.archives.gov/documents/Madison/01-17-02-0202. The Court must not forget these bedrock constitutional principles in evaluating the Government's attempt in this case to punish the President's former National Security Advisor, Defendant John R. Bolton, for publishing speech that is embarrassing to the President.

Ambassador Bolton has written a memoir, *The Room Where It Happened*, describing his interactions with President Trump during the seventeen-month period in which he served as National Security Advisor to the President. Ambassador Bolton, who has decades of experience properly dealing with classified information, diligently and conscientiously attempted to avoid including anything in the book that would reveal classified information. Out of an abundance of caution, he submitted the manuscript to the National Security Council ("NSC") for

prepublication security review. The career professionals regularly charged with conducting such reviews, Ellen Knight, the NSC's Senior Director for Records, Access, and Information Security Management, and a member of her staff, personally undertook a painstaking, iterative prepublication examination that lasted almost four months, going through the nearly 500-page manuscript in four waves, page by page and often line by line, and directing Ambassador Bolton to make a host of revisions. At the end of that review, on April 27, Ms. Knight confirmed to Ambassador Bolton her "judgment that the manuscript draft did not contain classified information." First Amended Complaint ¶ 46 (June 19, 2020), Doc. 18 ("Am. Compl."). All of these facts are undisputed, and they are set forth in the Government's own Amended Complaint and accompanying exhibits. Again, the allegations in *the Government's own Complaint* confirm that at the conclusion of her intensive four-month review, the senior Government official charged with conducting prepublication review for the NSC confirmed "that the manuscript draft did not contain classified information." *Id.*

At that moment, Ambassador Bolton more than fulfilled any obligation he had under the express terms of his two non-disclosure agreements with the Government. For *neither* of those agreements imposes on a former government employee any obligation—none at all—to submit for prepublication review, and await written confirmation before publishing, a writing that the employee *does not believe* contains any classified information and *has no reason* to believe contains any classified information. And those NDAs *certainly* do not impose such a requirement where, as here, the employee has gone so far as to seek and receive *confirmation from the senior Government official in charge of prepublication review* that the writing contains no classified information.

Nevertheless, the Government sought to delay publication of the book by withholding the customary pro-forma letter memorializing that the book was cleared for publication, and they now seek to punish Ambassador Bolton for going forward with the publication, by sweeping into the Government's coffers all profits from the book. The Government's claims are all foreclosed by the text of the very contractual documents upon which they purport to be based, since those contracts simply cannot reasonably be interpreted as imposing the contractual duty that the Government claims Ambassador Bolton breached: the duty to submit to prepublication review, and await written authorization before publishing, a book that he had *no reason whatsoever to believe* contained any classified material. And even if those contracts were susceptible to an interpretation imposing such a requirement—in effect, a blanket prior restraint of virtually *any speech* by former government employees—that requirement would be flatly contrary to the First Amendment. The Court thus labors under the solemn constitutional duty to avoid interpreting the contracts, if at all possible, as imposing such a blanket prior restraint—and if such an interpretation is not possible, the even more solemn duty to invalidate that plainly unconstitutional requirement.

## STATEMENT

### I.     The Nondisclosure Agreements Signed by Ambassador Bolton

Ambassador Bolton has had a long and distinguished career serving his country as a senior official in multiple presidential administrations. Prior to his time as National Security Advisor for President Trump, Ambassador Bolton served in numerous capacities under Presidents Ronald Reagan, George H.W. Bush, and George W. Bush—including as Assistant Attorney General for the Civil Division under President Reagan, Assistant Secretary of State for International Organization Affairs under President George H. W. Bush, and Ambassador to the United Nations under President George W. Bush. Am. Compl. ¶ 46.

When he became National Security Advisor in April of 2018, Ambassador Bolton was required to sign two form nondisclosure agreements: the Classified Information Nondisclosure Agreement and the Sensitive Compartmented Information Nondisclosure Agreement (the latter of which he signed on two separate occasions). *Id.* ¶ 10; *see also* Classified Information Nondisclosure Agreement, included at pp. 1–2 of Exhibit A to the Complaint, Doc. 1-1 (hereinafter, the "Classified Information NDA"); Sensitive Compartmented Information Nondisclosure Agreement, included at pp. 3–4 and 5–6 of Exhibit A to the Complaint, Doc. 1-1 (hereinafter, the "SCI NDA"). Because the Government's claims in this case principally arise out of Ambassador Bolton's purported breach of these two agreements, and because the plain text of these agreements refute the Government's claims, we discuss their terms in close detail.

A.      **The Classified Information NDA**

The Classified Information NDA does not impose on the employee who signs it an obligation to submit to a prepublication review process in all cases. Instead, Paragraph 3 of the Classified Information NDA sets forth two separate Government review processes that apply in two different circumstances: (1) when the employee wishes to "divulge classified information," or (2) when the employee wishes to "confirm . . . that . . . information is unclassified before . . . disclos[ing] it." Classified Information NDA at ¶ 3. Under the first path, if the employee wishes to *divulge information he knows to be classified*, he must either (a) "officially verif[y] that the recipient has been properly authorized by the United States Government to receive it," or (b) obtain "prior written notice of authorization from the United States Government Department or

Agency (hereinafter Department or Agency) responsible for the classification of information or last granting [the employee] a security clearance that such disclosure is permitted." *Id.*[1]

The second path, by contrast, expressly applies only where the employee is "uncertain about the classification status of information" and wishes to *confirm that the information is unclassified* before disclosing it. Under this second type of review, the employee must "confirm from an authorized official that the information is unclassified before [he] may disclose it, except to a person as provided in (a) or (b), above"—that is, except for disclosures to a recipient who the employee has officially verified (under the first path) is authorized or permitted to receive the information even if it is classified. *Id.* ¶ 3.

Paragraphs 4 through 6 of the Classified Information NDA lay out the potential consequences for violation of the agreement. Paragraph 4 warns that failure to comply with the procedures established in Paragraph 3 "may result," *inter alia*, in "termination of any security clearances [the employee] hold[s]." *Id.* ¶ 4. It also warns that "any unauthorized disclosure of classified information by [the employee] may constitute a violation, or violations, of United States criminal laws." *Id.* In addition, Paragraph 6 warns that "the United States Government may seek any remedy available to it to enforce this Agreement including, but not limited to, application for a court order prohibiting disclosure of information in breach of this Agreement." *Id.* ¶ 6. And Paragraph 5 "assign[s] to the United States Government all royalties, remunerations,

---

[1] The Classified Information NDA, in Paragraph 1, defines "classified information" as follows: "marked or unmarked classified information, including oral communications, that is classified under the standards of Executive Order 13526, or under any other Executive order or statute that prohibits the unauthorized disclosure of information in the interest of national security; and unclassified information that meets the standards for classification and is in the process of a classification determination as provided in sections 1.1, 1.2, 1.3 and 1.4(e) of Executive Order 13526, or under any other Executive order or statute that requires protection for such information in the interest of national security." *Id.* ¶ 1.

and emoluments that have resulted, will result or may result from any disclosure, publication, or revelation of classified information not consistent with the terms of this Agreement." *Id.* ¶ 5. This provision purports to authorize the Government "to impose a constructive trust on" any profits the employee might derive from the publication of any information in violation of the Classified Information NDA. *Id*; *see Snepp v. United States*, 444 U.S. 507, 516 (1980).

Finally, Paragraph 8 governs the duration of the Agreement, providing that "all conditions and obligations imposed . . . by this Agreement apply during the time [the employee is] granted access to classified information, and at all times thereafter," "[u]nless and until [he is] released in writing by an authorized representative of the United States Government." Classified Information NDA ¶ 8. Accordingly, as Defendant's counsel explained at the June 20, 2020 hearing before the Court, the obligations imposed by the NDA endure under Paragraph 8 until they are ended in one of two ways: the employee's death or the execution of a written release by an authorized representative of the Government. Paragraph 8 does not, however, purport to alter or add to the substance of the "conditions and obligations imposed . . . by th[e] Agreement." *Id.*

B. **The SCI NDA**

As opposed to information that is simply classified, the other NDA signed by Ambassador Bolton governs the disclosure of a subset of classified information known as "sensitive compartmented information," or "SCI," which the agreement defines as information that "involves or derives from intelligence sources or methods" and that, *at the time of the disclosure*, "is classified or is in the process of classification." SCI NDA ¶ 1.

Similarly to the Classified Information NDA, Paragraph 3 of the SCI NDA sets forth two different conditions or "triggers" that determine whether government review of a contemplated disclosure is required: one that applies when an employee wishes to publish information that *he knows is classified as SCI*, and another that applies when he wishes to confirm that information

6

he wishes to publish *is not classified as SCI*. Under the first trigger, which governs information "marked as SCI or that [the employee] know[s] to be SCI," the employee agrees to "never divulge" such information "to anyone who is not authorized to receive it without prior written authorization from the United States Government department or agency (hereinafter Department or Agency) that last authorized [his] access to SCI." *Id.* ¶ 3. The second trigger provides as follows:

> I understand that it is my responsibility *to consult with appropriate management authorities* in the Department or Agency that last authorized my access to SCI, whether or not I am still employed by or associated with that Department or Agency or a contractor thereof, in order to ensure that I know whether information or material within my knowledge or control that I have reason to believe might be, or related to or derived from SCI, is considered by such Department or Agency to be SCI.

*Id.* (emphasis added).

In contrast with the Classified Information NDA, however, the SCI NDA establishes a mandatory prepublication review process—and a requirement of written authorization—when *either* of these conditions is met. Paragraph 4 of the SCI NDA provides that the employee must

> submit for security review by the Department or Agency that last authorized my access to such information or material [i.e., information or material within his knowledge or control that he has reason to believe might be SCI, or related to or derived from SCI] any writing or other preparation in any form . . . that contains or purports to contain any SCI or description of activities that produce or relate to SCI or that I have reason to believe are derived from SCI, that I contemplate disclosing to any person not authorized to have access to SCI or that I have prepared for public disclosure.

*Id.* ¶ 4.

Paragraph 5 of the SCI NDA states that "the purpose of the [prepublication] review described in paragraph 4 is to give the United States a reasonable opportunity to determine whether the preparation submitted pursuant to paragraph 4 sets forth any SCI." *Id.* ¶ 5. Paragraph 5 also imposes a time limit of "30 working days from date of receipt" of the material to "act

7

upon it . . . and make a response." *Id.* The SCI NDA forbids the disclosure of any writing governed by the prepublication review process set forth in Paragraphs 3 and 4 "until [the employee] ha[s] received written authorization from the Department or Agency that last authorized [his] access to SCI that such disclosure is permitted." *Id.* ¶ 4. Paragraphs 6, 7, and 12 of the SCI NDA provide for materially similar potential consequences for violation of the agreement as for violation of the Classified Information NDA. *See id.* ¶¶ 6–7, 12.

The criteria used by the Executive Branch to determine whether information is classified is found in Executive Order No. 13526, 75 Fed. Reg. 707, 708 (Dec. 29, 2009). *See Shaffer v. Def. Intelligence Agency*, 102 F. Supp. 3d 1, 8 (D.D.C. 2015). Section 1.2(a) of Executive Order 13526 describes the type of harm that must reasonably be expected to result from the disclosure of information for such information to be classified:

> Information may be classified at one of the following three levels:
>
> (1) ''Top Secret'' shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to the national security that the original classification authority is able to identify or describe.
>
> (2) ''Secret'' shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security that the original classification authority is able to identify or describe.
>
> (3) ''Confidential'' shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause damage to the national security that the original classification authority is able to identify or describe.

75 Fed. Reg. 707–08. Section 1.4 of Executive Order 13526 describes the type of information that is subject to potential classification:

> Information shall not be considered for classification unless its unauthorized disclosure could reasonably be expected to cause identifiable or describable

8

damage to the national security in accordance with section 1.2 of this order, and it pertains to one or more of the following:

> (a) military plans, weapons systems, or operations;
>
> (b) foreign government information;
>
> (c) intelligence activities (including covert action), intelligence sources or methods, or cryptology;
>
> (d) foreign relations or foreign activities of the United States, including confidential sources;
>
> (e) scientific, technological, or economic matters relating to the national security;
>
> (f) United States Government programs for safeguarding nuclear materials or facilities;
>
> (g) vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security; or
>
> (h) the development, production, or use of weapons of mass destruction.

*Id.* at 709.

Section 1.7(a) of Executive Order 13526 warns that "[i]n no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to," *inter alia*:

- "conceal violations of law,"

- "prevent embarrassment to a person, organization, or agency," or

- "prevent or delay the release of information that does not require protection in the interest of the national security."

*Id.* at 710.

## II.   Ambassador Bolton's Memoir

Following his service as National Security Advisor to President Trump, Ambassador Bolton wrote a memoir, titled *The Room Where it Happened*, describing his interactions with the

President during his seventeen months of service. Am. Compl. ¶¶ 1, 23, 34. The Amended Complaint does not allege that Ambassador Bolton knew that any of the information in the manuscript was classified, or that he was uncertain whether any of the information in the manuscript might be classified. Nor does it allege that any of the information in the manuscript was marked as SCI, known by Ambassador Bolton to be SCI, or that Ambassador Bolton had reason to believe that any of this information was SCI, or was related to or derived from SCI. Nor, finally, is there any basis or support for such allegations in the pleadings or the record. Nonetheless, so that there could be no question of his compliance with his obligations, Ambassador Bolton directed his counsel, Charles J. Cooper, to submit the manuscript to the NSC for prepublication review. Am. Compl. ¶ 31; *see also* Letter from Charles J. Cooper to Ellen Knight at 1 (Dec. 30, 2019), attached as Exhibit D to the Complaint, Doc. 1-4 ("December 30, 2019 Letter") ("[W]e do not believe that prepublication review is required. We are nonetheless submitting this manuscript out of an abundance of caution . . . .").

Mr. Cooper reached out to Ellen J. Knight on December 30, 2019, to discuss submitting the manuscript for prepublication review. Am. Compl. ¶ 31. As noted above, and as the Government concedes, Ms. Knight is the Senior Director who supervises the office responsible for overseeing the prepublication review process at the NSC. Am. Compl. ¶ 30; *see also id.* ¶¶ 25–27. Mr. Cooper noted that, in submitting his manuscript for prepublication review, Ambassador Bolton was relying on regulations restricting the scope of prepublication review to identifying and preventing the disclosure of classified information and limiting the review process to those career government officials regularly charged with that responsibility. Am. Compl. ¶ 31. Ms. Knight assured Mr. Cooper that "the sole purpose of prepublication security

review is to ensure that SCI or other classified information is not publicly disclosed." December

30, 2019 Letter at 1.

Specifically relying on this understanding of the limited purpose of the prepublication

review process, Ambassador Bolton (via Mr. Cooper) hand-delivered a hard copy of his

manuscript to Ms. Knight's office. *Id.* at 1. Mr. Cooper included a cover letter reiterating that

Ambassador Bolton "carefully sought to avoid any discussion in the manuscript of sensitive

compartmented information ('SCI') or other classified information, and [he] accordingly do[es]

not believe that prepublication review is required." *Id.* Ambassador Bolton "nonetheless

submitt[ed] [h]is manuscript out of an abundance of caution." *Id.* Mr. Cooper emphasized that

Ambassador Bolton was relying upon his understanding (which the Government now alleges was

"erroneous," Am. Compl. ¶ 31) that the contents of the manuscript would not be shared with

anyone other than the career officials regularly involved in conducting such reviews. December

30, 2019 Letter at 1.

On January 23, at 3:33 p.m., as the impeachment trial of the President was underway in

the United States Senate, Ms. Knight emailed Mr. Cooper a letter stating:

> Based on our preliminary review, the manuscript appears to contain significant
> amounts of classified information. It also appears that some of this classified
> information is at the TOP SECRET level, which is defined by Executive Order
> 13526 as information that "reasonably could be expected to cause exceptionally
> grave harm to the national security" of the United States if disclosed without
> authorization. Under federal law and the nondisclosure agreements your client
> signed as a condition for gaining access to classified information, the manuscript
> may not be published or otherwise disclosed without the deletion of this classified
> information.

Letter from Ellen Knight to Charles J. Cooper (Jan. 23, 2020), attached as Exhibit E to the

Complaint, Doc. 1-5. While Ms. Knight's letter states her view that Ambassador Bolton's

manuscript contained information classified "at the TOP SECRET level," the letter does not

contain any assertion, suggestion, or intimation that it included SCI. Ms. Knight's letter closed by promising to provide "additional, more detailed guidance regarding next steps that should enable you to revise the manuscript and move forward as expeditiously as possible." *Id.*

On February 7, Ms. Knight sent Mr. Cooper a letter asserting that the manuscript "contains classified discussions between the President and foreign heads of state, classified foreign government information, details about classified military plans and operations, and classified details about intelligence sharing and activities." Letter from Ellen Knight to Charles J. Cooper at 1 (Feb. 7, 2020), attached as Exhibit H to the Complaint, Doc. 1-8. Once again, while Ms. Knight's letter asserted that the manuscript included "classified information"—and, indeed, quotes Executive Order 12526's definition of "classified information"—it contains no suggestion that the manuscript included SCI. *Id.* Ms. Knight offered to meet with Ambassador Bolton "to review each instance of classified information in detail and, as necessary, assist in the prioritization of any particular portions." *Id.* She asserted that her February 7 letter, along with her January 23 letter, "constitute NSC's initial response for the purposes of the nondisclosure agreements signed by [Ambassador Bolton]." *Id.* at 2.

Ambassador Bolton's first meeting with Ms. Knight took place on February 21. Am. Compl. ¶ 41. In the meeting, which lasted four hours, Ms. Knight, as she described it, "reviewed the preliminary results of three chapters in the draft manuscript in detail with" Ambassador Bolton. Letter from Ellen Knight to Charles J. Cooper at 1 (Feb. 24, 2020), attached as Exhibit I to the Complaint, Doc. 1-9. Three days later, on February 24, Ms. Knight wrote that the meeting had been "most productive," and she suggested that "it would be most helpful to the process if we hold one or more follow-on meetings . . . to discuss the remaining portions of the draft manuscript." *Id.* Ms. Knight's February 24 letter notes she and Ambassador Bolton had

discussed "the classification standards and categories found in Executive Order 13526," and had reviewed "many of the specific instances of classified information identified in the draft manuscript." *Id.* The letter does not indicate—and the Government has not alleged—that there was any suggestion during this intensive four-hour meeting that the manuscript contained SCI.

Ambassador Bolton met with Ms. Knight three more times, on March 2, March 3, and March 4, each time for multiple hours. Am. Compl. ¶ 42 Following the guidance provided by Ms. Knight during these meetings, Ambassador Bolton revised his manuscript and resubmitted the revised draft to begin the second round of the iterative review process. *Id.*

Ambassador Bolton did not hear from Ms. Knight again until March 27, when she wrote:

I appreciate your efforts to address the classification concerns in the latest draft version you submitted. Many of the changes are satisfactory. However, additional edits are required to ensure the protection of national security information. To assist in making the additional required changes, I will provide a list of required edits and language substitutions to guide you in this next stage of revising the draft.

Email from Ellen Knight to John Bolton (Mar. 27, 2020, 3:52 PM), attached as Exhibit K to the Complaint, Doc. 1-11 ("March 27, 2020 Email"). As described by the Government, Ms. Knight's list amounted to "17 single-spaced pages noting specific passages and changes." Am. Compl. ¶ 44. Ms. Knight also indicated that after receiving responsive revisions, she would "review the edited manuscript again . . . to ensure no classified information remains in the manuscript." March 27, 2020 Email. Once again, Ms. Knight's email contained no reference to SCI, and no suggestion that the manuscript then contained, or ever had contained, SCI. *Id.* Working through the weekend, Ambassador Bolton responded to all 17 pages on Monday, March 30. Am. Compl. ¶ 45.

In a telephone conversation on April 13, Ms. Knight provided Ambassador Bolton her remaining concerns after reviewing his March 30 revisions. *Id.* Further revisions engendered by

this conversation resulted in two further telephone calls, on April 21 and 24, in which Ms. Knight and Ambassador Bolton discussed "a few sections of the draft" and Ms. Knight requested some remaining "citations and information." *Id.* Finally, Ambassador Bolton responded with the remaining requested revisions on April 27. *Id.* At that point, as the Government itself describes it, "Ms. Knight had completed her review and was of the judgment that the manuscript draft did not contain classified information." *Id.* ¶ 46. Because SCI is, by definition, a subset of classified information, *see* SCI NDA ¶ 1, Ms. Knight's judgment that the manuscript did not contain any classified information at this point necessarily encompasses the further judgment that it did not contain any SCI (a concern that, again, Ms. Knight apparently *never* had, given that she did not so much as *whisper* that the manuscript contained SCI at any point during her four-month interaction with Ambassador Bolton).

All told, over the course of four months, Ambassador Bolton and Ms. Knight made four passes through the manuscript, page-by-page and often line-by-line. At the end of this painstaking process, Ms. Knight confirmed that the manuscript contained no classified information of any kind. Again: the Government itself admits that the senior NSC official responsible for determining whether proposed publications contain classified information concluded that Ambassador Bolton's book, as revised, contained none. Am. Compl. ¶ 46.

When Ambassador Bolton inquired as to the status of the *pro forma* closing letter memorializing in writing Ms. Knight's confirmation that the book contained no classified information, however, he began to receive cryptic and formal replies that the process was ongoing and that she had nothing new to report. *Id.* ¶¶ 47, 49. Six weeks of silence from the NSC had passed when, on June 8, following press reports that Ambassador Bolton intended to publish his book on June 23, John Eisenberg, Deputy White House Counsel and the NSC's counsel,

wrote to Ambassador Bolton's counsel claiming that manuscript still contained classified information. Letter from John Eisenberg to Charles J. Cooper (Jun. 8, 2020), attached as Exhibit O to the Complaint, Doc. 1-15 ("June 8, 2020 Letter"). As the Government's Amended Complaint explains, on May 2, NSC Senior Director for Intelligence Michael Ellis (a political appointee in the NSC) had apparently taken the unprecedented and extraordinary step of "commenc[ing] an additional review of the manuscript" at the request of the Assistant to the President for National Security Affairs (another political appointee—in fact, Ambassador Bolton's successor). Am. Compl. ¶ 51; *see also* Am. Compl. ¶ 27 (admitting that the prepublication review process ordinarily involves review only by the Records Access and Information Security Management Directorate's staff and senior employees). While Mr. Eisenberg did not disclose Mr. Ellis's involvement in his June 8 letter, he did indicate that he would "provide [Ambassador Bolton's counsel], no later than June 19, 2020, a copy of your client's draft manuscript with redactions for the information that has been identified as classified." June 8, 2020 Letter. Yet again, while Mr. Eisenburg's letter asserted that the manuscript "still contains classified information," it did not assert or in any way suggest that it contained SCI. *Id.*

On June 10, Ambassador Bolton's counsel wrote to Mr. Eisenberg, explaining that the White House was clearly attempting to suppress Ambassador Bolton's book, that Ambassador Bolton had fulfilled all of his contractual and any other obligations to the Federal Government, and that the exhaustive prepublication review conducted by Ms. Knight confirmed that the book, as revised, contained no classified information. Letter from Charles J. Cooper to John Eisenberg (Jun. 10, 2020), attached as Exhibit P to the Complaint, Doc. 1-16. In any event, counsel explained, Simon & Schuster had already printed, bound, and shipped the book to booksellers

across the country, and Ambassador Bolton had no authority to stop the book from being made available to the public on June 23. *Id.*

On June 16, Mr. Ellis delivered to Ambassador Bolton a copy of the book with new redactions based on Mr. Ellis's extraordinary, additional round of review. Am. Compl. ¶ 57. Mr. Ellis included a cover letter with the draft asserting that the redactions were "based on [his] initial review." Letter from Michael J. Ellis, Deputy Assistant to the President, to John R. Bolton (Jun. 16, 2020), attached hereto as Exhibit 1.[2] While he claimed that "[t]he manuscript still contains classified information," even in this final letter—hand delivered only hours before the Government filed the instant suit—Mr. Ellis did not assert or even hint that the manuscript contained, or had ever contained, SCI. *Id.*

The Government filed this lawsuit hours later, and it moved for a temporary restraining order or preliminary injunction on June 17. The Government's 85-paragraph complaint alleged, repeatedly and in detail, that "the NSC has determined that information in the manuscript is classified at the Confidential, Secret, and Top Secret levels," Compl. ¶ 58, but it did not include any allegation or intimation that the manuscript contained SCI. In its June 17 motion for a TRO or preliminary injunction, however, the Government asserted—for the first time ever—that the manuscript contained "information classified at the Confidential, Secret, Top Secret, and Top Secret/SCI levels." Emergency App. for TRO and Mot. for Prelim. Inj. at 6 (June 17, 2020), Doc. 3.

---

[2] While the Government did not include a copy of this letter with its Complaint, because the Amended Complaint relies upon, cites, and indeed quotes from the letter, the Court may nonetheless consider it under Rule 12(b)(6), without converting Defendant's motion into one for summary judgment, "even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Hinton v. Corrections Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009) (collecting cases).

Defendant opposed the Government's motion for emergency injunctive relief and cross-moved to dismiss the Complaint. On June 19, in an effort to insulate the Complaint from Defendant's motion to dismiss, the Government amended its Complaint to add the allegation that Ambassador Bolton's book contains information classified at the "Top Secret/SCI level[ ]." Am. Compl. ¶ 59. On June 20, the Court denied the Government's motion for a TRO or preliminary injunction, concluding that such relief was not appropriate because the book had already been widely released and disseminated. Memorandum Order (June 20, 2020), Doc. 27. On June 29, the Court denied Defendant's motion to dismiss as moot, due to the Government's amendment of its complaint. Minute Order (June 29, 2020). Ambassador Bolton now moves to dismiss the Government's Amended Complaint for likewise failing to state a claim for relief.

## ARGUMENT

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted). The complaint meets this standard "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A complaint must provide 'more than labels and conclusions'; although it 'does not need detailed factual allegations,' the factual allegations 'must be enough to raise a right to relief above the speculative level.' " *Washington All. of Tech. Workers v. United States Dep't of Homeland Sec.*, 892 F.3d 332, 343 (D.C. Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Government's Amended Complaint, like its initial Complaint, fails to state a claim for relief—and for many of the same reasons.

The Government's first and second claims for relief are both based on two fundamental premises, *both* of which must be true for either claim to prevail: that the NDAs Ambassador Bolton signed impose on him, as the Government puts it in its Amended Complaint, (1) "a requirement that Defendant submit the material in *The Room Where it Happened* to the United States Government for prepublication review," and (2) "an obligation not to divulge or disclose it to anyone until receiving written authorization from the United States Government to do so." Am. Compl. ¶ 69; *see also* Am. Compl. ¶ 78 (second count based on allegation that Ambassador Bolton's NDAs required him to obtain "prior written notice of authorization from the United States Government" before distributing his manuscript). After all, if Ambassador Bolton was under no contractual obligation to submit his manuscript for prepublication review in the first place, his decision to publish the book "prior to completion of the prepublication review process," Am. Compl. ¶ 70, breached nothing. Moreover, even if the Government could show that Ambassador Bolton was bound by the NDAs to submit the manuscript to the NSC for prepublication review, that would *not be sufficient* for the Government's claims of breach, for the Government must also show that after the review process was begun—and even after he *received oral confirmation that the manuscript contains no classified information*—Ambassador Bolton was still contractually required to await "written authorization from the United States Government," Am. Compl. ¶ 69, before authorizing the book's publication. The Government cannot establish either of these necessary elements of its contract breach claims.

The plain text of the two NDAs conclusively shows (1) that Ambassador Bolton had no obligation under the NDAs to submit the manuscript for prepublication review in the first place, and his decision to do so, out of an abundance of caution, was entirely gratuitous, and (2) that, in any event, the oral confirmation he received from Ms. Knight that the book contained no

classified information satisfied any contractual obligation that he may have had. Moreover, the allegations that would be necessary to show that Ambassador Bolton violated the duties that those NDAs *actually do* impose are entirely absent from the Amended Complaint. And while the Amended Complaint includes a third count based on a hodge-podge of common-law, equitable, and quasi-contractual doctrines, none of these doctrines is capable, as a matter of law, of imposing duties on Ambassador Bolton that are inconsistent with the express contractual language to which both parties agreed.

## I.   Ambassador Bolton Has Fully Complied With the Classified Information NDA.

Again, the Classified Information NDA simply does not impose either of the duties that the Government must establish to state a valid claim for breach: (A) a duty to submit the manuscript of his book to pre-publication review (which he did anyway), or (B) a duty to await written authorization before publishing the book. In fact, Mr. Bolton's conduct, as alleged in the Amended Complaint, complied with the plain terms of the Classified Information NDA to the letter—and beyond.

### A.   The Classified Information NDA Did Not Require Ambassador Bolton To Submit His Manuscript to Prepublication Review.

Paragraph 3 of the Classified Information NDA (also known as Standard Form ("SF") 312), provides, in full, as follows:

> I have been advised that the unauthorized disclosure, unauthorized retention, or negligent handling of classified information by me could cause damage or irreparable injury to the United States or could be used to advantage by a foreign nation. *I hereby agree that I will never divulge classified information to anyone unless*: (a) I have officially verified that the recipient has been properly authorized by the United States Government to receive it; or (b) I have been given prior written notice of authorization from the United States Government Department or Agency (hereinafter Department or Agency) responsible for the classification of information or last granting me a security clearance that such disclosure is permitted. *I understand that if I am uncertain about the classification status of information, I am required to confirm from an authorized official that the information is unclassified before I may disclose it*, except to a person as provided

19

in (a) or (b) above. I further understand that I am obligated to comply with laws
and regulations that prohibit the unauthorized disclosure of classified information.

Classified Information NDA ¶ 3 (emphases added). As discussed above, this language, by its

plain text, *does not impose* a general requirement of prepublication review of any written work

that relates to an employee's government employment. Instead, the Classified Information NDA

provides for two separate, and deliberately different, types of review, depending on whether the

employee wishes to (1) publish information *he knows is classified* or, rather, (2) confirm that the

information he wishes to publish *is not classified*. And *neither* type of review includes the duties

the Government alleges that Ambassador Bolton breached.

Under the first type of review, if Ambassador Bolton had wished to "divulge classified

information"—that is, if he had known that his manuscript contained classified information but

*wished to publish it anyway*—he would have been required to "(a) . . . officially verif[y] that the

recipient has been properly authorized by the United States Government to receive it; or (b)

[obtain] prior written notice of authorization from the United States Government . . . that such

disclosure is permitted." Classified Information NDA ¶ 3. But this first prepublication review

requirement did not apply *at all*, because the Government's Amended Complaint contains no

allegation (and no support for any allegation) that Ambassador Bolton *knew* that his manuscript

contained classified information but wished to publish it notwithstanding that knowledge. To the

contrary, the Amended Complaint, and the exhibits it incorporates, instead conclusively

demonstrate that when Ambassador Bolton submitted his manuscript to the NSC on December

30, 2019, he believed that he had "carefully . . . avoid[ed] any discussion in the manuscript of

sensitive compartmented information ('SCI') or other classified information" and that he only

"submit[ed] [h]is manuscript out of an abundance of caution." December 30, 2019 Letter at 1.

Because he was confident that the manuscript *did not* contain classified information, he had no

obligation under this first portion of Paragraph 3 of the Classified Information NDA either to "officially verif[y]" that any recipient of his disclosure was authorized to receive it or to seek "written notice of authorization" that the disclosure was permitted. Classified Information NDA ¶ 3. He submitted the manuscript for prepublication review, again, only out of an abundance of caution.

Nor was prepublication review of the manuscript required under the second portion of Paragraph 3, which by its terms only applies if the author "is uncertain about the classification status of information" he wishes to disclose. *Id.* Again, there is simply no allegation that Ambassador Bolton was ever uncertain about whether his manuscript included classified information. And again, the documentary record constituted by the exhibits attached to the Government's Amended Complaint demonstrates, to the contrary, that Ambassador Bolton believed that the manuscript *did not* contain "any discussion . . . [of] classified information." December 30, 2019 Letter at 1.

Moreover, the Government's claims fail even if this second type of review established in Paragraph 3 of the Classified Information NDA *did* apply—either because Ambassador Bolton was uncertain whether his manuscript contained classified information when he submitted it (contrary to the Amended Complaint's allegations and exhibits) or because his communications with Ms. Knight led him to *become* uncertain, during the course of their four-month long interaction, about whether it contained classified information. For even if this second portion of Paragraph 3 did apply for one or both of these reasons, this provision, by its express terms, required only that he "confirm from an authorized official that the information is unclassified before [he] [could] disclose it." Classified Information NDA ¶ 3. *That is precisely what he did.* As the Government itself alleges, Ambassador Bolton submitted his manuscript to the NSC's

Records Access and Information Security Management Directorate, which "bears primary responsibility for the classification review of written works submitted to the NSC for the prepublication review process," and he engaged in a four-month, four-round, exhaustive review of his manuscript with Ms. Knight, who insisted on, and received, a host of revisions and who, as the Government itself admits, "holds original classification authority under operative Executive Order" and, as "the Senior Director for Records Access and Information Security Management at the NSC," is the "head[ ]" of that office. Am. Compl. ¶¶ 25–26, 30. And as the Government itself further admits, "[o]n or around April 27, 2020, Ms. Knight had completed her review and was of the judgment that the manuscript draft did not contain classified information." Am. Compl. ¶ 46.

Thus, on April 27, Ambassador Bolton received "confirm[ation] from an authorized official that the information [in his book] is unclassified"—allowing him, under the plain terms of the Classified Information NDA, to "disclose it." Classified Information NDA ¶ 3. Or, to put the same point differently, even if Ambassador Bolton harbored uncertainty (and he did not) over whether his manuscript contained classified information, that uncertainty was quite obviously *eliminated* when the Senior Director in charge of prepublication review at the NSC confirmed her "judgment that the manuscript draft did not contain classified information." Am. Compl. ¶ 46. He had thus fully satisfied any prepublication review process that the Classified Information NDA even conceivably required of him.

## B.   The Classified Information NDA Did Not Require Ambassador Bolton To Receive Written Authorization Before Publishing His Manuscript.

As just shown, the Classified Information NDA did not require Ambassador Bolton to submit his manuscript for prepublication review to begin with. There is also nothing in this NDA requiring Ambassador Bolton, once he submitted the manuscript, to await "written

authorization"—on top of Ms. Knight's oral confirmation "that the manuscript draft did not contain classified information," *Id.*—before publishing the book. That is evident from the absence of any "written authorization" requirement from the second type of review required by Paragraph 3—which, as just shown, was the only type of review that even conceivably applied. And it is also evident from the contrast between this second type of review, which does not require written authorization, and the *first* type of review, which *does* expressly require "written authorization" where (unlike here) it actually applies.

It is thus clear from the Classified Information NDA's plain language that the obligation to obtain "prior written notice of authorization" from the Government applies *only* in the *first* type of review set out in Paragraph 3: that is, the review required when an employee *knows* that the information he wishes to disclose is classified but wishes to disclose it to an unauthorized recipient *anyway*. The second type of review established by Paragraph 3, in contrast, *does not* require prior written authorization; instead, it merely requires that an employee who *does not* wish to disclose classified information but who is uncertain about whether his work contains such information first "confirm from an authorized official that the information is unclassified."

The Government apparently reads the Classified Information NDA differently, as requiring "prior written notice of authorization" not only when an employee wishes to disclose information he knows to be classified, but also when he wishes to disclose information about whose classification status he is *uncertain*. That reading violates numerous bedrock principles of contractual interpretation. To begin, it flouts the basic principle that where a legal instrument contains a word or phrase in one provision but not another, the disparate inclusion and exclusion of the word or phrase must be presumed to be intentional. *See Russello v. United States*, 464 U.S. 16, 23 (1983). Put simply, if the parties to the Classified Information NDA had intended to

require "prior written notice of authorization" *both* when an employee seeks to publish information he knows is classified *and* when he seeks confirmation that the information he wishes to publish *is not* classified, they would have said so *both* times, not just the first time.

Moreover, reading the "written authorization" requirement as applying to both types of review would render either the first half or the second half of Paragraph 3 wholly superfluous, violating one of the most basic principles of contract interpretation. *See T. Brown Constructors, Inc. v. Pena*, 132 F.3d 724, 730–31 (Fed. Cir. 1997) ("A contract should be interpreted, if possible, to give effect to all provisions. An interpretation which renders portions of the contract meaningless, useless, ineffective, or superfluous should be eschewed." (citation omitted)); *see also* 11 WILLISTON ON CONTRACTS § 32:5 (4th ed.); RESTATEMENT (SECOND) OF CONTRACTS § 203(a) (1981); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174–79 (2012). After all, if prior written authorization is required *both* with respect to information the employee knows to be classified and information about which he is uncertain, then the two separate types of review that are carefully delineated in Paragraph 3 are in fact identical, and they collapse into each other, rendering one or the other entirely redundant. That, too, is inconsistent with the most basic ground rules of contractual interpretation.

It is also contrary to the final phrase of the second half of Paragraph 3, which confirms beyond any doubt that the second type of review set forth in this portion of the paragraph (governing information about whose classification status the employee is uncertain) is in fact *separate and distinct* from the first type of review (governing information the employee knows to be classified). As the penultimate sentence of Paragraph 3 states, "if [the employee is] uncertain about the classification status of information, [he is] required to confirm from an authorized official that the information is unclassified before [he] may disclose it, *except to a*

*person as provided in (a) or (b) above*." Classified Information NDA ¶ 3 (emphasis added). As the italicized phrase makes clear, the second type of review *is separate and distinct* from, and less onerous than, the first type of review—given that where an employee has gone through the *first* type of review and *obtained* written authorization "as provided in (a) or (b)," he *obviously need not go through* the *second* type of review and "confirm from an authorized official that the information is unclassified." *Id.*

Further, interpreting the "written notice of authorization" requirement as applying only to information that the author knows to be classified, as it plainly says, is also consistent with the principle that any ambiguity in a contract is to be construed against its drafter. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995); RESTATEMENT (SECOND) OF CONTRACTS § 206. That principle applies with heightened force in this case, moreover, since the Classified Information NDA is a classic contract of adhesion that "should be strictly construed." *Gray v. American Exp. Co.*, 743 F.2d 10, 18 (D.C. Cir. 1984) (applying New York law); *see also Everett Plywood Corp. v. United States*, 651 F.2d 723, 726 (Ct. Cl. 1981) ("The contract was one of 'adhesion' in that bidders had to accept the contract terms the government wrote . . . ."). And this interpretation of the Classified Information NDA is also required by the principle that prior restraints must be interpreted narrowly to avoid doubts about their constitutionality. *See Lowe v. SEC*, 472 U.S. 181, 203–11 (1985); *United States v. Raymond*, 228 F.3d 804, 815 (7th Cir. 2000), *overruled in part on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013); *see also* SCALIA & GARNER, READING LAW, *supra*, at 247–51. The ordinary constitutional-avoidance principle is even stronger in the context of prior restraints, since normally a prior restraint would "bear[ ] a heavy presumption against its constitutional validity." *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam).

25

Finally, the conclusion that the Classified Information NDA does not demand prior "written authorization" unless an employee wishes to publish information he *knows* to be classified is confirmed by the expansively worded NDA's signed by employees of other government agencies. For example, the CIA requires its employees to sign a "Secrecy Agreement" that mandates prepublication review of any material that "contains any mention of intelligence data or activities" and specifies that the employee "will not take any steps towards public disclosure until [he or she] ha[s] received *written permission* to do so from the Central Intelligence Agency."[3] This sweeping language is why the Supreme Court in *Snepp* concluded that the former CIA employee at issue had agreed "not to publish any information without prepublication clearance." *Snepp*, 444 U.S. at 508. And that is also why the Fourth Circuit in *United States v. Marchetti* concluded that Marchetti, another former CIA employee, was bound "not to release any writing relating to the Agency or to intelligence without prior authorization." 466 F.2d 1309, 1311 (4th Cir. 1972); *see id.* at 1312 n.2 (Marchetti's secrecy agreement forbade him to "divulge, publish, or reveal . . . any information relating to the national defense and security and . . . Central Intelligence Agency operations, sources, methods, personnel, fiscal data, or security measures to anyone . . . without the express written consent of the Director of Central Intelligence . . .").

In stark contrast, the Classified Information NDA that Ambassador Bolton signed does not require *any* prepublication review of information an employee believes is *not* classified, regardless of whether the information otherwise pertains to issues of national security—and does

---

[3] CENTRAL INTELLIGENCE AGENCY, FORM 368, SECRECY AGREEMENT ¶ 5 (emphasis added). CIA and FBI documents discussed herein may be found at KNIGHT FIRST AMENDMENT INSTITUTE, INTERACTIVE CHART: PREPUBLICATION REVIEW BY AGENCY AND SECRECY AGREEMENT (Aug. 27, 2019), https://bit.ly/2NamBc6.

not require *written*, as opposed to oral, confirmation "from an authorized official" prior to publication of information the employee is uncertain about. Again, where an employee is uncertain whether information he wishes to publish is classified, all the NDA requires of him is precisely what Ambassador Bolton did—he received "confirm[ation] from an authorized official that the information is unclassified." Classified Information NDA ¶ 3. In contrast to the CIA's Secrecy Agreement, the word "written" simply does not appear in this phrase.

Like the CIA, the NSC (setting aside constitutional concerns) could have customized its own NDA form and required Ambassador Bolton to sign a broader NSC-specific NDA *in addition to* the two standard NDAs he signed and that are used across the Government. Like the CIA's Secrecy Agreement, such a hypothetical NSC-specific NDA could have required prepublication review for non-classified materials "related to" the employee's former activities with the NSC, and it could have required the author to obtain *written* authorization before publishing them. The FBI has also taken that route. The FBI requires its employees to sign the standard SCI NDA and Classified Information NDA insofar as those employees have access to such information,[4] but it *also* requires employees to sign its own NDA that broadly requires prepublication review for "any information or material from or related to FBI files or any other information acquired by virtue of [the employee's] official employment."[5] And it specifically forbids disclosure of such information "without prior official *written authorization* by the FBI."[6] There is a reason why the CIA and FBI impose broad prepublication review and a specific

---

[4] FEDERAL BUREAU OF INVESTIGATION RECORDS MANAGEMENT DIVISION, PREPUBLICATION REVIEW POLICY GUIDE § 6 (2015).

[5] FEDERAL BUREAU OF INVESTIGATION, FBI EMPLOYMENT AGREEMENT ¶ 3.

[6] *Id.* (emphasis added).

written-authorization requirement: such requirements are *not* imposed by the standard Classified Information NDA that FBI employees—just like NSC employees—must sign.

\* \* \* \* \*

The Government does not, and cannot, allege that Ambassador Bolton *knew* that his manuscript contained classified information. It also does not allege that he was uncertain whether or not it did. But again, even if Ambassador Bolton *was* uncertain about the classification status of the information the manuscript contained—either at the outset or at some point later in the four-month, multi-tiered prepublication review process—any contract obligations that his uncertainty would have given rise to under the Classified Information NDA were *fully satisfied* when Ms. Knight confirmed "that the manuscript draft did not contain classified information," Am. Compl. ¶ 46, thereby *conclusively resolving* any conceivable uncertainty about whether the manuscript contained information that was classified. The Classified Information NDA required nothing more, and Counts One and Two of the Government's Amended Complaint must therefore be dismissed, to the extent they are based on this NDA.

## II.    Ambassador Bolton Has Fully Complied With the SCI NDA.

After Ambassador Bolton moved to dismiss, the Government belatedly realized that it needed to find some SCI in the manuscript, and it hastily amended its original Complaint to allege that Ambassador Bolton's manuscript contains SCI. That late-breaking allegation—never asserted at *any point* during Ambassador Bolton's four-month prepublication interactions with the Government and carefully omitted from all of its correspondence with Ambassador Bolton and its original Complaint—is not sufficient to drag its claims across the goal line. Once again, for Counts One and Two to state a claim for relief, the Government must have adequately alleged that Ambassador Bolton had a duty: (A) to submit his manuscript to pre-publication review, and (B) to then await written authorization before publishing it. The SCI NDA did not

28

require *either* of these things, because it *did not apply at all* to Ambassador Bolton's manuscript. That is so for multiple independent reasons.[7]

### A.    The SCI NDA Does Not Apply Because it Is Limited to Information that Is Classified Or in Process of Classification When the Disclosure Is Authorized.

The Amended Complaint fails to state any claim for breach of the SCI NDA for the threshold reason that it does not include any allegation satisfying that NDA's express temporal limitation. The SCI NDA unambiguously states that it governs *only* SCI: "This Agreement concerns SCI and does not set forth such other conditions and obligations not related to SCI as may now or hereafter pertain to my employment by or assignment or relationship with the Department or Agency." SCI NDA ¶ 10. And it specifically defines SCI as information that "involves or derives from intelligence sources or methods *and is classified or is in process of a classification determination . . .*" *Id.* ¶ 1. Accordingly, to state a claim that Ambassador Bolton breached any portion of this NDA, the Government cannot simply allege that he disclosed information that "involves or derives from intelligence sources or methods," or that he disclosed information that was classified as SCI at *some* point in time; rather, it must allege that *at the time Ambassador Bolton authorized the disclosure* of the information in question, it was "classified or . . . in process of a classification determination" as SCI. *Id.*

The Amended Complaint contains no such allegation. To be sure, paragraph 59, as amended, alleges that the Government has *now* "determined that the manuscript in its present form contains certain passages . . . classified at the . . . Top Secret/SCI level[ ]." But it *does not*

---

[7] While Defendant's counsel stated at the June 20, 2020 hearing that the Government's amendment of its complaint effectively mooted Ambassador Bolton's first Motion to Dismiss, Transcript 36:3–23, for the reasons discussed in this Part, the Government's addition of an allegation that it has now determined that Ambassador Bolton's book contains SCI is still not sufficient to state a claim for breach of the SCI NDA.

allege that those passages had been classified as SCI, or were in the process of classification, when Ambassador Bolton authorized the publication of the book.

> **B.** **The SCI NDA Does Not Apply Because it Is Limited to Information That Is Marked as SCI, That the Employee Knows To Be SCI, or That He Has Reason To Believe Is SCI.**

As discussed in the Statement, while the SCI NDA does require prepublication review in some circumstances, that requirement applies only to a specific, defined type of writing. Paragraph 3 of the SCI NDA provides in full:

> I have been advised that the unauthorized disclosure, unauthorized retention, or negligent handling of SCI by me could cause irreparable injury to the United States or be used to advantage by a foreign nation. *I hereby agree that I will never divulge anything marked as SCI or that I know to be SCI to anyone who is not authorized to receive it without prior written authorization from the United States Government* department or agency (hereinafter Department or Agency) that last authorized my access to SCI. *I understand that it is my responsibility to consult with appropriate management authorities* in the Department or Agency that last authorized my access to SCI, whether or not I am still employed by or associated with that Department or Agency or a contractor thereof, *in order to ensure that I know whether information or material within my knowledge or control that I have reason to believe might be, or related to or derived from SCI, is considered by such Department or Agency to be SCI.* I further understand that I am also obligated by law and regulation not to disclose any classified information or material in an unauthorized fashion.

SCI NDA ¶ 3 (emphases added). As discussed in the Statement, this language on its face mandates prepublication review only when one of two different conditions is met. First, paragraph 3 provides that where an employee wishes to disclose information that is "marked as SCI or that [he] know[s] to be SCI," he must obtain "prior written authorization from the United States Government department or agency (hereinafter Department or Agency) that last authorized [his] access to SCI." SCI NDA ¶ 3. Second, if the employee wishes to disclose "information or material within [his] knowledge or control that [he] ha[s] reason to believe might be [SCI], or related to or derived from SCI," he must likewise "consult with appropriate management authorities in the Department or Agency that last authorized my access to SCI" to

determine whether the information or material in question "is considered by such Department or Agency to be SCI." *Id.*

Paragraph 4 then provides further detail concerning how the employee "consult[s] with appropriate management authorities" in this circumstance:

> I hereby agree to submit for security review by the Department or Agency that last authorized my access to such information or material any writing or other preparation in any form . . . that contains or purports to contain any SCI or description of activities that produce or relate to SCI or that I have reason to believe are derived from SCI, that I contemplate disclosing to any person not authorized to have access to SCI or that I have prepared for public disclosure. . . . I further agree that I will not disclose the contents of such preparation with, or show it to, anyone who is not authorized to have access to SCI until I have received written authorization from the Department or Agency . . . .

*Id.* ¶ 4.

Thus, with respect to information (1) that is marked as SCI, (2) that is known by the employee to be SCI, or (3) that the employee has reason to believe is SCI (or related to or derived from SCI), the SCI NDA clearly requires the employee to obtain prior written authorization for any disclosure. But importantly, this requirement cannot be read to apply beyond the three specified categories: information that is "marked as SCI," that the employee "know[s] to be SCI," or that he "ha[s] reason to believe might be [SCI], or related to or derived from SCI." *Id.* ¶ 3.

And paragraph 4 must be so limited as well, because (1) it refers back to paragraph 3, indicating that it is a further elucidation of the review process described by paragraph 3, *see id.* ¶ 4 (requiring review by "the Department or Agency that last authorized my access to *such information or material*"—i.e., the "information or material . . . that [the employee] ha[s] reason to believe" contains SCI, as described in paragraph 3); and (2) its language closely mirrors that of Paragraph 3, confirming that indication, *see id.* (covering a work that "contains or purports to

31

contain any SCI" or descriptions of activities that "relate to SCI" or that the employee "ha[s] reason to believe are derived from SCI").

Moreover, any broader interpretation of paragraph 4—as requiring prepublication review even for works that the employee has *no reason whatsoever to believe* contain SCI—would violate basic rules of contractual interpretation and would, moreover, be patently absurd. It would violate basic rules of interpretation because it would render all of paragraph 3, and the bulk of paragraph 4, *entirely superfluous*. *See T. Brown Constructors*, 132 F.3d at 730–31; 11 WILLISTON ON CONTRACTS § 32:5; RESTATEMENT (SECOND) OF CONTRACTS § 203(a); SCALIA & GARNER, READING LAW, *supra*, at 174–79. After all, if prepublication review were required even for works that the employee has *no reason to believe* contain SCI, then it matters not whether the work contains information that is "marked" as SCI, whether it "purports to contain any SCI," whether it contains information the employee "know[s] to be SCI," or whether it contains information that the employee has "reason to believe might be" SCI, *id.* ¶¶ 3 & 4—for prepublication review would be required *whether or not* any of these conditions were met, so long as the work *could theoretically* (however unlikely) contain SCI. And this interpretation would be patently absurd because it would as a practical matter require that any federal employee who signs the SCI NDA would have no choice but to submit *any* "writing or preparation in any form," and certainly any writing that could even *theoretically* contain SCI, to prepublication review, and then await written authorization before publishing that writing. From Op-Eds and blog posts to cookbooks and even everyday written correspondence, former employees would be required to pre-clear them all with the Government, even if the employee had no reason whatsoever to think that they contain SCI, so long as that remains a theoretical possibility. The SCI NDA *cannot* require *that*.

This reading is once again confirmed by the *other* government-agency NDA's that *do* require broader pre-publication review. As discussed above, the CIA's Secrecy Agreement—the agreement at issue in *Snepp*, *Marchetti*, and many of the other cases cited by the Government— requires prepublication review of any material that "contains any mention of intelligence data or activities."[8] And as also discussed above, the FBI's Bureau-specific NDA requires prepublication review of "any information or material from or related to FBI files or any other information acquired by virtue of [the employee's] official employment."[9] These agencies have thus crafted language that avoids the absurd result of requiring prepublication review of *every* writing a former employee makes, but does require review of a broad set of materials: any information that "mention[s]" or is "related to" agency activities. But once again, the SDI NDA contains nothing like this.

Finally, to the extent there is any doubt over the correct reading of the SCI NDA, that doubt must, as with the Classified Information NDA, be resolved in Ambassador Bolton's favor—both because the Government *drafted* the NDA, precluding it from claiming the benefit of any ambiguity within it, *see Mastrobuono*, 514 U.S. at 62; RESTATEMENT (SECOND) OF CONTRACTS § 206, and because Ambassador Bolton had no ability to affect the terms that the Government wrote, making the NDA a paradigmatic contract of adhesion, *see Gray*, 743 F.2d at 18; *Everett Plywood Corp.*, 651 F.2d at 726.

Accordingly, the SCI NDA's prepublication review requirement applies only where, at the most, the employee has "reason to believe" a writing contains information that "might be [SCI], or related to or derived from SCI." *Id.* ¶ 3. And here, that means that the SCI NDA did not

---

[8] CENTRAL INTELLIGENCE AGENCY, FORM 368, SECRECY AGREEMENT ¶ 5 (emphasis added).

[9] FEDERAL BUREAU OF INVESTIGATION, FBI EMPLOYMENT AGREEMENT ¶ 3.

apply to Ambassador Bolton's manuscript at all. As recounted at length above, when Ambassador Bolton submitted his manuscript for prepublication review on December 30, 2019, his counsel stated Ambassador's Bolton's considered view that the manuscript *did not* contain "any discussion . . . of sensitive compartmented information ('SCI')." December 30, 2019 Letter at 1. Over the next four months, he (or his counsel) and Ms. Knight exchanged more than a dozen emails and letters, participated in numerous phone calls, and sat through more than a dozen hours of face-to-face meetings, painstakingly reviewing Ambassador Bolton's manuscript chapter-by-chapter, page-by-page, and in some cases word-by-word. Yet, in all that time, Ms. Knight never asserted—or even hinted—that the manuscript contained SCI, even as she asserted that earlier drafts contained other sorts of classified information. After conducting an exhaustive process in which she reviewed the manuscript through *at least four waves of changes*, Ms. Knight concluded that it contains no classified information—let alone *SCI*—as the Government itself admits. Nor did Mr. Eisenberg assert in either his June 8 or June 11 letters that the manuscript contains SCI. Nor did Mr. Ellis assert in his June 16 letter that the manuscript contains SCI. Indeed, *not even the Government's initial complaint* asserted that the manuscript contains SCI, even as it specifically alleged that it contains "Confidential, Secret, and Top Secret" information. Compl. ¶ 58.

For nearly six months, it was thus common ground between the NSC and Ambassador Bolton that his manuscript does *not* contain SCI. The Government's allegations do not contradict, but rather confirm, all of this. Accordingly, it simply cannot be maintained that when Ambassador Bolton authorized Simon & Schuster to publish his manuscript, not long after receiving Ms. Knight's confirmation that the book did not contain classified information of any kind, he somehow had "reason to believe" that it might contain SCI. SCI NDA ¶ 3. Indeed, quite

the opposite: the Government had given him *every reason to believe* that it agreed with him that

the book did *not* contain SCI. And even today, Ambassador Bolton has no reason to believe that

his book contains SCI that was "classified or . . . in the process of a classification determination"

at the time he authorized its publication. *See supra*, Part II.A. Accordingly, the SCI NDA by its

terms *did not apply*, and it thus *did not require* Ambassador Bolton to submit his manuscript to

prepublication review or to await prior written authorization before publishing it. Counts One

and Two of the Amended Complaint must therefore be dismissed, to the extent that they are

based on the SCI NDA.

> **C.      Interpreting the SCI NDA To Require Prepublication Review of Works that
>           an Employee Has No Reason To Believe Contain SCI Would Violate the First
>           Amendment.**

As just shown, the SCI NDA's prepublication review mandate simply does not apply

unless the employee has, at the very least, *reason to believe* that a work he has written might

contain SCI. Because Ambassador Bolton, on the Government's own allegations, had no reason

to believe that his manuscript contained any SCI—and every reason to believe that it did not—

the Government's claim that he breached the SCI NDA depends on a dramatically broader

interpretation of the scope of the NDA—an interpretation requiring prepublication review even

where an employee has *no reason whatsoever* to believe that his work contains information that

had been classified as SCI or was then in the process of such a classification determination. That

reading of the NDA is contrary to its text and settled principles of contractual interpretation, as

just shown. It is also contrary to the First Amendment.

"The Constitution gives significant protection from overbroad laws that chill speech

within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coal.*, 535

U.S. 234, 244 (2002). And the "prior restraint"—a rule "*forbidding* certain communications

when issued in advance of the time that such communications are to occur," *Alexander v. United*

*States*, 509 U.S. 544, 550 (1993)—has, since the founding of the Republic, been viewed as "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n*, 427 U.S. at 559. Because any governmental prepublication review requirement is a "form of prior restraint," *Weaver v. United States Info. Agency*, 87 F.3d 1429, 1439 (D.C. Cir. 1996); *accord Marchetti*, 466 F.2d at 1317, it thus "comes to th[e] Court bearing a heavy presumption against its constitutional validity," *New York Times*, 403 U.S. at 714, and can be upheld only if it is governed by criteria that "reasonably confine the resulting censorship to cases in which a substantial governmental interest is served" and "do not sweep too broadly because they impede disclosure only when it poses a reasonable probability of 'serious" harm.' *McGehee v. Casey*, 718 F.2d 1137, 1143 (D.C. Cir. 1983); *see also Weaver*, 87 F.3d at 1439 (prepublication review requirement must be "reasonably necessary" to protect the Government's interests); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969) (A governmental action "subjecting the exercise of First Amendment freedoms to [a] prior restraint . . . without narrow, objective, and definite standards to guide the [governmental] authority, is unconstitutional.").

Ambassador Bolton does not dispute that prepublication review can satisfy these constitutional limits in principle. *See Snepp*, 444 U.S. at 509 n.3. Nor does he contend that the prepublication review requirement *actually* imposed on him by the SCI NDA—governing materials he has *reason to believe* could contain SCI—violates the First Amendment. But the imagined review requirement apparently advocated by the Government—mandating review even for materials that an employee *reasonably does not believe* contain SCI—is a different matter entirely.

As discussed above, such a requirement would, in effect, require Government preapproval of *virtually any* "writing or other preparation in any form," SCI NDA ¶ 4, produced

by a former employee who has signed the SCI NDA—from a letter to the editor to email correspondence with a friend or colleague—so long as there was even the barest theoretical possibility, however unlikely, that it contained SCI. Such an interpretation of the NDA simply cannot be squared with our cherished First Amendment traditions. For a prepublication review requirement that applies even to materials that an employee *has no reason to believe* contain SCI is plainly not a "reasonably necessary" means of advancing any legitimate Government interest, *Weaver*, 87 F.3d at 1439, since it "impede[s] disclosure" not "only when it poses a reasonable probability of 'serious' harm," *McGehee*, 718 F.2d 1143, but when it poses no probability of harm whatsoever. While it may be more convenient for the Government to impose a sweeping prior restraint that requires its former employees to preclear *all* of their speech, "[t]he Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse." *Free Speech Coalition*, 535 U.S. at 255.

The interpretation of the SCI NDA that is required to sustain the Government's claim would thus be flatly contrary to the First Amendment. The Court should accordingly decline to adopt it *even if it could* be squared with the NDA's text and structure (which it cannot). *See Lowe*, 472 U.S. at 203–11 (ambiguous contracts should be interpreted to avoid expanding a prior restraint or a chill on free expression); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 207; SCALIA & GARNER, READING LAW, *supra*, at 247–51.

## III.   The Common-Law, Equitable, and Quasi-Contractual Duties Invoked by the Government Do Not Impose any Rights or Duties that Are Different or Inconsistent with the Express Terms of the Classified Information and SCI NDAs.

Finally, the Government asserts that Ambassador Bolton has violated the common law doctrines of unjust enrichment and fiduciary duty. *See* Am. Compl. ¶¶ 80–85. But these claims are based on the same conduct underlying the Government's breach-of-contract claims, and if the

contract claim fails, so also must these claims. *See US Airways, Inc. v. McCutchen*, 569 U.S. 88, 98 (2013) ("A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment" (quoting RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 2(2), p. 15 (2010))); *DeGeer v. Gillis*, 707 F. Supp. 2d 784, 795 (N.D. Ill. 2010) ("Courts have frequently found that claims for breach of contract and claims for breach of fiduciary duty are duplicative of one another and must be dismissed." (citation omitted)); *William Kaufman Org., Ltd. v. Graham & James LLP*, 703 N.Y.S.2d 439, 442 (N.Y. 2000). The rationale for this rule is that "court[s] will not displace the terms of [a] contract and impose some other duties not chosen by the parties." *In re APA Assessment Fee Litig.*, 766 F.3d 39, 46 (D.C. Cir. 2014) (quotation marks and citation omitted). If a contract says that a party must perform a duty within two years, it cannot be that the party has a fiduciary duty to perform within one year. In the same way, because the NDAs did not require Ambassador Bolton to obtain written authorization to publish his book, such a requirement cannot be imposed by fiduciary or unjust-enrichment principles.

More importantly, even if the common law permitted such duplicative claims, they would certainly be barred by the First and Fifth Amendments. In the NDAs, the Government set out in precise detail the steps that Ambassador Bolton needed to take to remove the prior restraint on his speech and to avoid civil and criminal penalties. As noted above, a governmental action "subjecting the exercise of First Amendment freedoms to [a] prior restraint . . . without narrow, objective, and definite standards to guide the [governmental] authority, is unconstitutional." *Shuttlesworth*, 394 U.S. at 150–51; *see also Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). It would be a clear violation of the First Amendment to allow the Government to prolong its censorship of Ambassador Bolton or to punish him for his speech based on an alleged

violation of unwritten obligations going beyond the duties expressly set forth in the contracts. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975); *see also Niemotko v. Maryland*, 340 U.S. 268, 271–73 (1951).

In the same way, it would violate the Due Process Clause of the Fifth Amendment to subject Ambassador Bolton to the forfeiture of any remuneration for his book and to threaten him with potential criminal liability based on unwritten procedures or duties *even though* he scrupulously complied with the contracts specifying how he could avoid such penalties. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) ("If . . . the law interferes with the right of free speech or of association, a more stringent vagueness test should apply."); *see also Sessions v. Dimaya*, 138 S. Ct. 1204, 1212–13 (2018) (plurality opinion); *see also id.* at 1228–29 (Gorsuch, J., concurring in part and concurring in the judgment).[10] Accordingly, count three of the Amended Complaint likewise fails to state a claim.

---

[10] The Due Process violation is compounded by the Government's arbitrary and irregular deviation from the normal NSC prepublication review process. As the Government itself alleges, the normal prepublication-review process would entail "a first-level review" by "a staff employee of the Records Access and Information Security Management Directorate," followed by a "second-level review" "by a more senior member" of the Directorate." Am. Compl. ¶ 27. Once the iterative process with the Directorate is completed, "the staff of" the Directorate issues the pro-forma letter memorializing that the manuscript does not contain classified information. Am. Compl. ¶¶ 28–29. At *no point* does the process normally involve a *third* round of review by the National Security Advisor himself and his hand-picked political appointee, as it did here. *See* Am. Compl. ¶ 51. The procedure defended by the Government would allow it to add review-upon-review atop the normal process and delay the publication of Ambassador Bolton's book indefinitely. This arbitrary, additional layer of review—upon which the Government's entire lawsuit depends—does not comport with due process. *See Village of Hoffman Estates*, 455 U.S. at 499.

## CONCLUSION

For the foregoing reasons, the Court should dismiss all claims against Ambassador Bolton under FED. R. CIV. P. 12(b)(6).

July 16, 2020                                   Respectfully submitted,

                                                /s/ Charles J. Cooper
                                                Charles J. Cooper, Bar No. 248070
                                                Michael W. Kirk, Bar No. 424648
                                                John D. Ohlendorf, Bar No. 1024544

                                                COOPER & KIRK, PLLC
                                                1523 New Hampshire Avenue, NW
                                                Washington, DC 20036
                                                Telephone: (202) 220-9600
                                                Facsimile: (202) 220-9601
                                                Email: ccooper@cooperkirk.com

                                                *Counsel for Defendant John R. Bolton*

# EXHIBIT 1

No. 20-1580-RCL

NATIONAL SECURITY COUNCIL
WASHINGTON, D.C. 20504

June 16, 2020

John R. Bolton
9107 Fernwood Road
Bethesda, Maryland 20817

<u>SENT VIA HAND DELIVERY</u>

Dear Mr. Bolton:

As you know, the pre-publication review process for your manuscript remains ongoing. To further that process, enclosed is a copy of the latest version of your manuscript with redactions identifying passages that, based on my initial review, appear to contain classified information.

As you and your counsel have been repeatedly informed, your manuscript in its current form is still not approved for public release and will not be approved until the pre-publication review process is complete. The manuscript still contains classified information. The review process required by the agreements you signed has not been completed. Dissemination of this manuscript in its current form would constitute a breach of your nondisclosure agreements and laws governing access to classified information and could have serious legal consequences.

I am available to meet with you to discuss the removal of classified information from the manuscript.

Sincerely,

Michael J. Ellis
Deputy Assistant to the President and
    Senior Director for Intelligence Programs

cc: Charles J. Cooper, Esq. (by email, w/o enclosure)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE UNITED STATES OF AMERICA,

                 Plaintiff,

v.

JOHN R. BOLTON,

                 Defendant.

Civil Action No. 20-1580-RCL

### [PROPOSED] ORDER

Before this Court is Defendant's motion to dismiss for failure to state a claim. Upon consideration of the motion, the briefing in support and opposition to the motion, and all other parts of the record, Defendant's motion is **GRANTED.** A separate document entering final judgment in favor of Defendant will issue forthwith. *See* Fed. R. Civ. P. 58(a).

        **SO ORDERED.**

Dated:_____

_____
HONORABLE ROYCE C. LAMBERTH
United States District Court Judge