UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, **)** | |
| **)** | |
| Plaintiff, **)** | |
| **)** | |
| v. **)** | Civil Action No. 20-1580 (RCL) |
| **)** | |
| JOHN R. BOLTON, **)** | |
| **)** | |
| Defendant. **)** | |
| **)** | |

## <u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff, the United States of America, by and through its attorneys, respectfully files this Motion for Summary Judgment regarding the Government's First Amended Complaint. In support of the Motion, Plaintiff refers the Court to (1) the Combined Memorandum In Support Of Plaintiff's Motion For Summary Judgment And In Opposition To Defendant's Motion To Dismiss; (2) the unclassified declaration of Matthias J. Mitman attached to this Motion; (3) unclassified declarations and exhibits previously lodged with the Court; and (4) a statement of undisputed material facts. A proposed order is attached for the Court's consideration.

Dated:  July 30, 2020

Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General

MICHAEL SHERWIN
Acting United States Attorney

DAVID M. MORRELL
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director
Federal Programs Branch

*/s/ Daniel F. Van Horn*
Daniel F. Van Horn (D.C. Bar. No. 924092)
Assistant United States Attorney
555 Fourth Street N.W.
Washington, D.C. 20530
Tel: (202) 252-2506
Email: daniel.vanhorn@usdoj.gov

*/s/ Michael J. Gerardi*
Michael J. Gerardi (D.C. Bar No. 1017949)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 11514
Washington, D.C. 20005
Tel: (202) 616-0680
Fax: (202) 616-8460
E-mail: michael.j.gerardi@usdoj.gov

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA,  ) | |
|  ) | |
| Plaintiff,  ) | |
|  ) | |
| v.  ) | Civil Action No. 20-1580 (RCL) |
|  ) | |
| JOHN R. BOLTON,  ) | |
|  ) | |
| Defendant.  ) | |
| _____ ) | |

## COMBINED MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ......................................... 4

   I.   The Responsibilities of the National Security Advisor. ..................................... 4

   II.  Defendant's Nondisclosure Agreements With the United States. ..................... 7

   III. Defendant Submits His Manuscript for Prepublication Review. ...................... 9

   IV. Defendant Abandons Prepublication Review and Proceeds With
       Publication. ................................................................................................. 13

PROCEDURAL HISTORY ...................................................................................... 14

STANDARD OF REVIEW ....................................................................................... 14

ARGUMENT .......................................................................................................... 15

   I.   Defendant's Manuscript Was Subject to Mandatory Prepublication
       Review. ....................................................................................................... 16

      A.   Form 4414 Mandated Prepublication Review of Defendant's
          Manuscript ........................................................................................ 18

      B.   SF 312 Mandated Prepublication Review. ............................................ 25

   II.  Defendant Breached His Nondisclosure Agreements By Publishing His
       Manuscript Before Completing Prepublication Review. .................................. 33

   III. Enforcement of Defendant's Nondisclosure Agreements Does Not Run
       Afoul of the First Amendment. ..................................................................... 36

   IV. Plaintiffs Are Entitled To the Remedy of a Constructive Trust .................... 40

CONCLUSION ....................................................................................................... 42

# TABLE OF AUTHORITIES

### Cases

*Armenian Assembly of America v. Cafesjian,*

    692 F. Supp. 2d 20 (D.D.C. 2010) ............................................................ 16

*Ashcroft v. Iqbal,*

    556 U.S. 662 (2009) ................................................................................ 15

*Boehner v. McDermott,*

    484 F.3d 573 (D.C. Cir. 2007) ................................................................ 16

*Celotex Corp. v. Catrett,*

    477 U.S. 317 (1986) ................................................................................ 14

*Counihan v. Allstate Ins. Co.,*

    194 F.3d 357 (2d Cir. 1999) .................................................................... 41

*Graham Cnty Soil & Water Conservation Dist. v. U.S. ex rel. Wilson,*

    559 U.S. 280 (2010) ................................................................................ 30

*Kolodziej v. Mason,*

    774 F.3d 736 (11th Cir. 2014) ................................................................ 29

*Leonard v. Pepsico, Inc.,*

    88 F. Supp. 2d 116 (S.D.N.Y. 1999) ...................................................... 28

*McGehee v. Casey,*

    718 F.2d 1137 (D.C. Cir. 1983) ................................................ 26, 35, 39

**Snepp v. United States,*

    444 U.S. 507 (1980) ..................................................................... *passim*

*Spinelli v. Nat'l Football League,*

    903 F.3d 185 (2d Cir. 2018)...................................................................... 29

*Stillman v. CIA,*

    319 F.3d 546 (D.C. Cir. 2003) ...........................................................36, 39

*Stillman v. CIA,*

    517 F. Supp. 2d 32 (D.C.C. 2007) ......................................................38, 39

*United States v. Aguilar,*

    515 U.S. 593 (1995) .................................................................................. 36

*United States v. Marchetti,*

    466 F.2d 1309 (4th Cir. 1972) ......................................................... *passim*

*United States v. Pappas,*

    94 F.3d 795 (2d Cir.1996)........................................................................ 36

*United States v. Ring,*

    628 F. Supp. 2d 195 (D.D.C. 2009) ........................................................ 16

*United States v. Silvano,*

    812 F.2d 754 (1st Cir.1987)..................................................................... 16

*United States v. Snepp,*

    897 F.2d 138 (4th Cir. 1990) .............................................................35, 38

*Wayne Land & Min. Grp. LLC v. Del. River Basin Comm'n,*

    894 F.3d 509 (3d Cir. 2018)..................................................................... 30

*Wilson v. Central Intelligence Agency,*

    586 F.3d 171 (2d Cir. 2009).................................................................23, 36

**Statutes**

18 U.S.C. § 793................................................................................................ 9, 40

18 U.S.C. § 641................................................................................................... 40

50 U.S.C. § 401..................................................................................................... 4

50 U.S.C. § 402..................................................................................................... 4

50 U.S.C. § 403(d)(3).......................................................................................... 20

**Rules**

Fed. R. Civ. P. 56 .............................................................................................. 14

Fed. R. Civ. P. 12(b)(6)…………………………………………………........14

# INTRODUCTION

Former National Security Advisor John Bolton was entrusted with the Nation's most important national security secrets.  As consideration for this access, he agreed, repeatedly and in writing, not to share classified information, or even certain types of related information, without the express written consent of the U.S. Government as part of its prepublication review process.  Despite those obligations, he shared early drafts of a memoir that contained classified information when the prepublication review process was far from complete, and subsequently published the memoir without obtaining written authorization from the Government confirming that all classified information had been removed.  The memoir triggered his contractual and fiduciary obligations to complete the prepublication process, even if his (ultimately incorrect) view that the manuscript never contained classified information were borne out.  It is undisputed that he failed to comply with that process because he never received written authorization necessary to complete the prepublication-review process.  Under well-established Supreme Court case law, these failures violated his contractual and fiduciary obligations to the Government, and the appropriate remedy for this wrong is the creation of a constructive trust over the proceeds of his book to prevent unjust enrichment.

Defendant was subject to three prepublication-review agreements.  He signed two Form 4414 agreements, which required him not to disclose the content of works that, among other things, "relate to" Sensitive Compartmented Information ("SCI") absent final written authorization confirming that the prepublication-review process

was complete and the manuscript contained no SCI.  Defendant's official duties as National Security Advisor necessarily involved activities that produce or relate to SCI, and he described those official duties in great detail in his memoir.  He was thus required to complete the prepublication-review process, which he failed to do.  Bolton also signed an SF 312 agreement, which prohibited him from releasing classified information absent prior written consent.   He did not receive such consent. Defendant's response that he did not "believe" that this information was, in fact, classified is legally irrelevant.  The Supreme Court held in *Snepp v. United States*, 444 U.S. 507 (1980), that the prepublication-review requirement applies *regardless of whether the information released is, in fact, classified*.  Thus, even if he believed the information was not classified or that the prepublication-review process was consuming too much time, the appropriate course of action under settled law was to initiate a lawsuit against the Government to obtain judicial resolution of these matters, not to unilaterally distribute his book to the entire world.

Ignoring the obvious import of these agreements, Defendant has renewed his motion to dismiss the Government's claims, arguing that they did not obligate him to even to participate in prepublication review, much less wait for the completion of that review.  But his implausible, subjective interpretations of these agreements must be rejected.  The core purpose of these agreements would be completely negated if the requirement of written approval were contingent on the author's unilateral determination that all classified information had been removed from a work intended for publication, as Defendant argues here.   Moreover, enforcing Defendant's

nondisclosure agreements does not run afoul of the First Amendment; it is well-established that where, as here, an employee agrees not to disclose classified information, the First Amendment does not preclude prepublication-review procedures such as those at issue here.  Nor can he be excused from his contractual and fiduciary obligations.  While he claims "substantial" compliance, his agreements with the Government require *full* compliance and in any event, his compliance was in no way "substantial" where it deprived the Government of the final say over whether a manuscript containing classified information should be published. Defendant was repeatedly told that he could not publish the book absent written authorization, both before and after he submitted the manuscript for prepublication review.  He did not, and has not, received such authorization.

The United States is entitled to the remedy of a constructive trust to remediate Defendant's unjust enrichment.  Such a remedy has been explicitly affirmed by the Supreme Court in *Snepp*, and accords with long-standing equitable principles. Because Defendant has already endangered national security by his precipitous decision to publish, a constructive trust is necessary to deter similar actions in the future by others entrusted with the handling of classified information.

For these reasons, and as explained in greater detail below, the Court should deny Defendant's motion to dismiss, grant the United States' motion for summary judgment.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

**I.      The Responsibilities of the National Security Advisor.**

The National Security Advisor, formally known as the Assistant to the President for National Security Affairs, is a senior White House staff member. Unclassified Declaration of Matthias J. Mitman ("Second Mitman Decl.") ¶ 4.  He is appointed to his position by the President without confirmation by the United States Senate.  *Id.*  He serves as a principal in-house advisor to the President on domestic, foreign, military, and economic issues, whether discrete or far-reaching, affecting the national security.  *Id.*  The National Security Advisor regularly offers advice to the President on the formulation and implementation of policy concerning matters of national security.  *Id.*  He is responsible for coordinating the views of executive departments and agencies to inform Presidential decision-making on such matters. *Id.*  In turn, he is responsible for ensuring that the President's decisions on matters of national security are communicated to the necessary departments and agencies, and he facilitates the implementation of the President's decisions.  *Id.*

The National Security Advisor is also, apart from the President, the principal leader of the National Security Council ("Council" or "NSC") process.  NSC was established by the National Security Act of 1947, 61 Stat. 496; 50 U.S.C. § 402, as amended by the National Security Act Amendments of 1949, 63 Stat. 579 (50 U.S.C. § 401 et seq.).  NSC, which is a component of the EOP, is the President's principal forum for considering national security and foreign policy matters, and to coordinate domestic, foreign, and economic policies across the Executive Branch relating to the national security.  Second Mitman Decl. ¶ 3; *see also* National Security Presidential

4

Memorandum ("NSPM-4") (Apr. 4, 2017), *available at* https://www.whitehouse.gov/presidential-actions/national-security-presidential-memorandum-4/.

The National Security Advisor's role requires him "at all times [to be] able to discuss information that is classified SCI information, describes activities that produce or relate to classified SCI information, or is derived from classified SCI information." Second Mitman Decl. ¶ 21. SCI is "a subset of Classified National Intelligence concerning or derived from intelligence sources, methods or analytical processes that is required to be protected within formal access control systems established by the Director of National Intelligence," is a pervasive aspect of the National Security Advisor's job duties. Intelligence Community Directive 703 (June 21, 2013), https://www.dni.gov/files/documents/ICD/ICD%20703.pdf. And SCI is a pervasive aspect of the National Security Advisor's job duties. Every individual on the NSC staff must have a TOP SECRET / SCI level security clearance and a secured e-mail account. Second Mitman Decl. ¶ 11. While serving in that position, the National Security Advisor is "granted access to numerous compartments and sub-compartments within each SCI control system," and had a "need-to-know for vast amounts of classified information at the TOP SECRET / SCI level." *Id.* ¶ 6. For example, he has access to a special access program "for all policy matters concerning covert action," *id.* ¶¶ 7–8, and could request a briefing on any special access program created by the Director of National Intelligence, the Attorney General, or the

Secretary of State, Defense, Energy or Homeland Security, many of which safeguard information at the TOP SECRET / SCI level, *id.* ¶ 9.

This broad access is necessary given the National Security Advisor's role as a coordinator of the Executive Branch's national security policy.  He is "a regular attendee at meetings of the National Security Council" along with the President, Cabinet members, and senior intelligence officials, which "frequently involve discussion or dissemination of classified SCI information." *Id.* ¶ 12. He approves for distribution to the President and other relevant officials materials necessary "to facilitate executive decision-making and to implement and coordinate the execution of any decisions made" that "frequently contain SCI, describe activities that produce or relate to SCI, or are derived SCI." *Id.* ¶ 13.  He also "convene[s] and chair[s]" meetings of the "Principals Committee" of the NSC, which is the "Cabinet-level senior interagency forum for considering policy issues affecting national security interests of the United States." *Id.* ¶ 14.  These "meetings frequently involve discussions or dissemination of SCI, or involve descriptions or discussions of activities that produce or relate to SCI or that are derived from SCI." *Id.*  The National Security Advisor's duties as the chairperson of these meetings also frequently involve the handling of SCI or materials related to, or derived from, SCI. *Id.* ¶¶ 14–15.

The National Security Advisor's other official duties also relate to SCI in significant ways.  For example, as a senior advisor to the President, the National Security Advisor is one of a limited number of officials with access to the "President's Daily Brief," a "highly classified intelligence product" that "regularly contains

information that is SCI, describes activities that produce or relate to SCI, or is derived from SCI." *Id.* ¶ 17. He also "regularly attends the oral briefings provided to the President concerning the President's Daily Brief," *id.* as well as other briefings intended to "inform the decision-making of the Chief Executive and Commander in Chief on national security and foreign policy matters." *Id.* ¶ 18. He receives "frequent updates . . . from the National Security Council staff and others" on national security matters and may be required to swiftly coordinate a response to a developing situation based on information that is SCI, describes activities that produce or relate to SCI, or is derived from SCI. *Id.* ¶ 19. Finally, he engages with "counterparts around the world on matters of national security" and receives briefings and materials before such meetings that "is SCI, describes activities that produce or relate to SCI, or is derived from SCI." *Id.* ¶ 20. SCI is, in short, a regular feature of the National Security Advisor's day-to-day experience.

## II.    Defendant's Nondisclosure Agreements With the United States.

Defendant served as the National Security Advisor from April 9, 2018, until September 10, 2019. To serve in this role, he was required to obtain and maintain a security clearance that was conditioned on his acceptance of certain non-disclosure obligations. One of the agreements Defendant entered, entitled Standard Form 312 ("SF 312"), governs access to classified information generally. Security Agreements, Declaration of Matthias Mitman ("First Mitman Decl."), Exh. A, ECF No. 3-6. Two further agreements, known as Form 4414 agreements, governed Defendant's access to SCI. *Id.* ("Form 4414"). In all three agreements, Defendant recognized that the Government would be placing "special confidence and trust" in him by permitting him

access to classified information, SF 312 ¶ 1; Form 4414 ¶ 1, and that improper handling of classified information could result in criminal penalties, SF 312 ¶ 4; Form 4414 ¶ 6 (citing, *inter alia*, 18 U.S.C. § 793).  When he departed Government service, Defendant was reminded of, and acknowledged, his continuing obligation to protect classified information as spelled out in these agreements.  Letter from J. Eisenberg to J. Bolton (Sept. 10, 2019), First Mitman Decl., Exh. C, ECF No. 3-8; Memo. From S. Gast to J. Bolton (Sept. 13, 2019) First Mitman Decl., Exh. B, ECF No. 3-7.

The two Form 4414 agreements Defendant signed required Defendant to "submit for security review by the Department or Agency that last authorized my access to [SCI] any writing or other preparation in any form, including a work of fiction, that contains or purports to contain any SCI or description of activities that produce or relate to SCI or that I have reason to believe are derived from SCI, that I contemplate disclosing to any person not authorized to have access to SCI or that I have prepared for public disclosure."  Form 4414 ¶ 4.  Defendant further agreed that he would "not disclose the contents of such preparation with, or show it to, anyone who is not authorized to have access to SCI until I have received written authorization from the Department or Agency that last authorized my access to SCI that such disclosure is permitted."  *Id.*  Although the obligations in this paragraph are intended to prevent the unauthorized disclosure of SCI, the threshold for triggering them is far broader and extends to any "description of activities that produce or relate to SCI" or that the individual has "reason to believe are derived from SCI."  *Id.*

In the SF 312, Defendant agreed that he would not disclose classified information to persons not authorized by the Government to receive it unless "I have been given prior written notice of authorization from the United States Government Department or Agency . . . responsible for the classification of information or last granting me a security clearance that such disclosure is permitted." SF 312 ¶ 3. Defendant further agreed that if he was "uncertain about the classification status of information, I am required to confirm from an authorized official that the information is unclassified before I may disclose it, except to a person" who is authorized to receive it or for whom the Government has provided written approval. *Id.*

The Government's remedies for a breach of an employee's obligations under either Form 4414 or the SF 312 are similar. Defendant agreed to "assign to the United States Government all rights, title, and interest, and all royalties, remunerations, and emoluments that have resulted, will result, or may result from any disclosure, publication, or revelation not consistent with the terms of this Agreement." Form 4414 ¶ 12; *see also* SF 312 ¶ 5. And both agreements recognize the Government's right to "seek any remedy available to it to enforce this Agreement." SF 312 ¶ 6; Form 4414 ¶ 7.

## III.    Defendant Submits His Manuscript for Prepublication Review.

At the time of his departure from the Government, Defendant was reminded that he had "agreed to submit for security review any writing or other material in any form that could contain classified information *before* submitting the writing or material to anyone without proper authorization to access such information." First Mitman Decl., Exh. C. Shortly thereafter, Defendant entered into an agreement with

Simon & Schuster, a publisher, for the rights to publish a memoir of Defendant's time in the White House serving as National Security Advisor.

On December 30, 2019, Defendant, through his attorney, submitted to Ellen Knight, the Senior Director of the Records Access and Information Security Management Directorate at NSC, the "manuscript of a book [Defendant] has prepared relating in large part to his service as National Security Advisor to the President." Letter from C. Cooper to E. Knight (Dec. 30, 2019), First Mitman Decl., Exh. D, ECF No. 3-9. Defendant's counsel further stated in the letter that Defendant "carefully sought to avoid any discussion in the manuscript of [SCI] or other classified information, and we accordingly do not believe that prepublication review is required. We are nonetheless submitting this manuscript out of an abundance of caution, as contemplated by the nondisclosures agreements that he entered, commencing with those of April 5, 2018 immediately prior to his entry on duty." *Id.*

In a letter dated January 23, 2020, Ms. Knight responded that, "[b]ased on our preliminary review, the manuscript appears to contain significant amounts of classified information," some of which was classified "at the TOP SECRET level." Letter from E. Knight to C. Cooper (Jan. 23, 2020), First Mitman Decl., Exh. E, ECF No. 3-10. In a follow-up letter sent on February 7, 2020, Ms. Knight elaborated on this conclusion:

> As I noted in my letter of January 23, 2020, our preliminary review determined that the draft contains numerous instances of classified information. For example, the draft contains classified discussions between the President and foreign heads of state, classified foreign government information, details about classified military plans and operations, and classified details about intelligence sharing and

> activities.   As the former Assistant to the President for National
> Security Affairs, your client understands the sensitivity of these
> categories of information and the potential harm that could be expected
> to result from its unauthorized disclosures.

Letter from E. Knight to C. Cooper (Feb. 7, 2020), First Mitman Decl., Exh. F, ECF

No. 3-11.  In light of these preliminary findings and in order to expedite the review

process, Ms. Knight offered to "meet with [Defendant] to review each instance of

classified information in detail and, as necessary, assist in the prioritization of any

particular portions."   She also reminded him, in the interim, not "to publish or

otherwise disclose the manuscript or any of its underlying information until

[Defendant] has addressed our concerns and received authorization to do so from our

office."  *Id.*  Over the next several weeks, Defendant met with Ms. Knight four times

to discuss revisions to the book in order to remove classified material.  Decl. of John

R. Bolton in Opposition to the United States' Emergency Application for Temporary

Restraining Order or Motion for Preliminary Injunction ("Bolton Decl.") ¶¶ 9–12, ECF

No. 9-1.  On March 9, Defendant submitted a revised manuscript to Ms. Knight for

review.  *Id.* ¶ 12.

On March 27, 2020, Ms. Knight sent an e-mail to Defendant regarding the

revised manuscript.  E-mail from E. Knight to J. Bolton (Mar. 27, 2020), First Mitman

Decl., Exh. H, ECF No. 3-13.  While she noted that "[m]any of the changes" Defendant

made to the manuscript were "satisfactory," she explained that "additional edits are

required to ensure the protection of national security information."   Ms. Knight and

Defendant continued to exchange edits to address these concerns throughout the

month of April.  Bolton Decl. ¶¶ 13–16.  As revised, Ms. Knight was of the judgment

that there was no classified information remaining in the manuscript.[1]  Unclass. Decl. of Michael Ellis ¶ 9 ("Ellis Decl."); *see also* Bolton Decl. ¶ 16.  During a phone call on April 27, Defendant and Ms. Knight discussed how written confirmation of completion of prepublication review would be transmitted in the event other officials within NSC signed off, but Ms. Knight also told Defendant that there were still "some internal process considerations to work through" and did not provide a precise timetable as to when Defendant could expect to receive written authorization to publish.  Bolton Decl. ¶ 17.

After Ms. Knight completed her review of the draft manuscript, the current National Security Advisor, Robert C. O'Brien, reviewed the manuscript and concluded that it still appeared to contain classified information.  Ellis Decl. ¶¶ 9–10.  Mr. O'Brien asked the NSC's Senior Director for Intelligence Programs, Michael Ellis, to conduct a further review of the manuscript and on Saturday, May 2, 2020, Mr. Ellis commenced that review.  *Id.* ¶¶ 10–11.  Like Ms. Knight, Mr. Ellis is an Original Classification Authority.  Ellis Decl. ¶ 8.  Mr. Ellis completed his initial review of the manuscript on June 9.  Ellis Decl. ¶ 12.  Mr. Ellis agreed that the revisions already made to the manuscript had not removed all classified information, including

---

[1]      Contrary to Defendant's assertion, the Government never alleged that "Ms. Knight confirmed to Ambassador Bolton her 'judgment that the manuscript draft did not contain classified information.'"  MTD at 2, 22.  On the contrary, the Government merely alleged that: "On or around April 27, 2020, Ms. Knight had completed her review and was of the judgment that the manuscript draft did not contain classified information.  Ms. Knight informed NSC Legal of the status of the review."  First Amended Complaint ¶ 46 (June 19, 2020), ECF No. 18.

information classified at the Confidential, Secret, Top Secret, and Top Secret/Sensitive Compartmented Information (SCI) levels. Ellis Decl. ¶¶ 19–20. In Mr. Ellis's judgment, and the judgment of other senior national security officials, disclosure of certain passages in the manuscript "will damage the national security of the United States." Ellis Decl. ¶ 22; *see also* Declaration of William R. Evanina ¶ 6, ECF No. 3-2; Declaration of Paul M. Nakasone ¶ 8, ECF No. 3-4; Declaration of John L. Ratcliffe ¶¶ 6–7, ECF No. 3-5.

## IV. Defendant Abandons Prepublication Review and Proceeds With Publication.

After the April 27 call, Ms. Knight conveyed to Defendant that he did not have clearance to publish and "[t]he process remains ongoing. I will reach out as soon as there is an update to provide." E-mail from E. Knight to J. Bolton (May 7, 2020), First Mitman Decl., Exh. I, ECF No. 3-14. Despite being informed that the "process remain[ed] ongoing," *id.*, Defendant "scheduled the book for release on June 23, 2020." Bolton Decl. ¶ 19. NSC only became aware that Defendant was forging ahead with publication through June 7 press reports. Letter from J. Eisenberg to C. Cooper (June 8, 2020), First Mitman Decl., Exh. J, ECF No. 3-15. By this point, the book had already been distributed to booksellers around the world and to members of the media for review, and Defendant claimed that he had "no authority to prevent the book from being sold to the public." Bolton Decl. ¶ 22–23.

13

## PROCEDURAL HISTORY

The Government filed this lawsuit on June 16, 2020, and applied to the Court for a temporary restraining order and preliminary injunction to prevent publication of Defendant's book on June 17. The Government filed the operative amended complaint on June 19. On June 20, the Court denied the Government's application on the grounds that it could not fashion appropriate injunctive relief to prevent publication of Defendant's book, but agreed that the Government "is likely to succeed on the merits." ECF No. 27, at 7. The Court noted that Bolton had "opted out of the review process before its conclusion" without any notice to the Government, and not only "gambled with" but "likely jeopardized" the national security of the United States by his conduct. *Id.* at 6, 10.

## STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Dismissal under Fed. R. Civ. P. 12(b)(6) is appropriate only if, assuming the truth of all well-pleaded factual allegations, the Government has failed to state a claim upon which relief can be granted. To pass muster, a complaint must contain "sufficient factual matter" to "state a claim to relief that is plausible on its face."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A court must accept well-pleaded factual allegations as true and construe them in the light most favorable to the plaintiff.  *Id.*

## ARGUMENT

The Government is entitled to summary judgment because there is no genuine issue of material fact that Defendant breached his nondisclosure agreements with the Government.  As a condition of accepting a position of public trust with the Government, Defendant voluntarily agreed to submit certain types of written work to NSC for prepublication review.  His manuscript, a nearly six-hundred-page-long account of his experiences in one of the most prominent national security roles in the Government, written just months after he left the post, triggered those prepublication-review obligations.[2]  Defendant failed to complete this requirement. Instead, he chose to move forward with publication of his book despite Ms. Knight's admonition that the "process remain[ed] ongoing" and her repeated instructions that Mr. Bolton was not authorized to publish until NSC provided *written* authorization to do so, as explicitly required by the nondisclosure agreements.  Defendant's flagrant violation of his nondisclosure agreements also dooms his motion to dismiss.

Now that preventing publication of Defendant's book is no longer an option, the appropriate remedy for this wrong is a constructive trust over the proceeds of

---

[2]     The Court need not make factual findings on the question whether the manuscript *actually contains* classified information or SCI in order to rule in the Government's favor on its motion for summary judgment, *Snepp*, 444 U.S. at 511, though the allegations that the draft contained classified information alone forecloses Plaintiff's motion to dismiss, Am. Compl. ¶ 59, since his security agreements prohibited the disclosure of such information, SF 312 ¶ 3; Form 4414 ¶¶ 3–4.

Defendant's book.   Defendant explicitly assigned his right to "all royalties, remunerations, and emoluments that have resulted, will result, or may result from any disclosure, publication, or revelation not consistent with the terms of this Agreement."   Form 4414 ¶ 12; *see also* SF 312 ¶ 5.   A constructive trust is a well-established means for enforcing the terms of such an assignment when breach of a nondisclosure agreement is established.   For these reasons, and as outlined in greater detail below, entry of summary judgment in the Government's favor on Count III of its Amended Complaint is appropriate.

## I.   Defendant's Manuscript Was Subject to Mandatory Prepublication Review.

As one of the most senior national security officials of the United States, Defendant has a fiduciary relationship with the United States Government based on his placement in a position of trust and special confidence.   *See Boehner v. McDermott*, 484 F.3d 573, 579 (D.C. Cir. 2007) ("[T]hose who accept positions of trust involving a duty not to disclose information they lawfully acquire while performing their responsibilities have no First Amendment right to disclose that information."); *United States v. Ring*, 628 F. Supp. 2d 195, 207 (D.D.C. 2009) (recognizing that a public official acts as 'trustee for the citizens and the State ... and thus owes the normal fiduciary duties of a trustee, e.g., honesty and loyalty' to them") (quoting *United States v. Silvano*, 812 F.2d 754, 759 (1st Cir.1987)); *Armenian Assembly of America v. Cafesjian*, 692 F. Supp. 2d 20, 43 (D.D.C. 2010) (recognizing protection of proprietary information as among fiduciary duties);.   The National Security Advisor to the President has unique access to classified information.   While serving in this

capacity, Defendant was entrusted with substantial amounts of classified information, including SCI, related to the most sensitive matters of national security. Defendant owed to the United States a fiduciary duty of loyalty to protect this information from unauthorized disclosure and to refrain from disseminating his book until the United States Government completed its prepublication-review processes and affirmatively and expressly confirmed that all classified information had been removed. *See Snepp*, 444 U.S. at 515 n. 11.[3]

As set forth above, Defendant also executed three separate nondisclosure agreements in which he promised to protect—and not to use for his own gain—the classified information to which he gained access as the National Security Advisor to the President. These agreements were two SCI Nondisclosure Agreements (Form 4414) and a Classified Information Nondisclosure Agreement (SF 312). Thus, separate and apart from his fiduciary obligations, Defendant was subject to the prepublication-review obligations expressly created by written agreement.

---

[3]    Defendant does not dispute the existence of these fiduciary duties, but argues that his nondisclosure agreements displace them. Def.'s Br., at 37–39. This position contradicts *Snepp*, which recognized that employees have "a fiduciary obligation to protect confidential information obtained during the course of his employment" and that this obligation is "considerably more expansive" than the obligation to protect classified information. *Snepp*, 444 U.S. at 515 n.11. Nonetheless, because Defendant's book falls within the scope of both of the nondisclosure agreements he signed (which was also true in *Snepp*), the Court does not need to resolve the question whether a constructive trust should be imposed here under common-law principles.

## A.     Form 4414 Mandated Prepublication Review of Defendant's Manuscript

In the two Form 4414 agreements he was required to sign to become National Security Advisor, Defendant agreed to "not disclose the contents of" works subject to prepublication review to those unauthorized to view SCI "until I have received written authorization from the Department or Agency that last authorized my access to SCI that such disclosure is permitted."  Form 4414 ¶ 4.  The prepublication review requirement applies not only if the manuscript "contain[s] or purports to contain any SCI" or "description of activities" that the author has "reason to believe are derived from SCI," but also to the "description of *activities that produce or relate to SCI*."  *Id.* (emphasis added).

There is no material dispute that the prepublication-review requirement of Form 4414 encompasses Defendant's book.  Defendant's duties required him to handle materials that contained SCI information, describe activities that produce or relate to classified SCI information, or that were derived from classified SCI information on a nearly daily basis.  Second Mitman Decl. ¶¶ 6–21.  That is why Defendant was required to have "access to the highest levels of national security and intelligence information" at all times to carry out these duties.  *Id.* ¶ 21.  As such, Defendant's memoir of his time serving in this role, which describes his daily activities as the National Security Advisor (frequently in minute detail), includes descriptions of activities of that produce or relate to SCI and clearly falls within the prepublication requirements of Form 4414.  Importantly, the applicability of this prepublication requirement does not hinge on whether Defendant's manuscript

18

*actually contains* SCI, either now or when Defendant submitted it for review. *See also supra* fn. 2 (even though Defendant's motion for summary judgment does not depend on presence of classified information, Plaintiff's motion to dismiss fails regardless, because the Government has alleged presence of classified information).  Rather, the triggers sweep more broadly than SCI information, or even classified information, to encompass any written description of "activities that produce or relate to SCI." Defendant's nearly 600-page memoir detailing his experience as the President's National Security Advisor easily meets that threshold.

Defendant disputes the breadth of Form 4414, asserting that the Government must show either that the information is marked as SCI, the employee knows it to be SCI, or that the employee has reason to believe it contains SCI.  He justifies this interpretation by attempting to tie the prepublication requirement of Paragraph 4 to the preceding Paragraph 3 through the use of the term "such information or material" in Paragraph 4.[4]  Def.'s MTD at 31.  But Defendant's reading of Paragraph 4 as an "elucidation" of Paragraph 3 finds no support in the text.   The phrase "such

---

[4]      The relevant passage of Paragraph 4 reads as follows:

> In consideration of being granted access to SCI and of being assigned or retained in a position of special confidence and trust requiring access to SCI, I hereby agree to submit for security review by the Department or Agency that last authorized my access to such information or material, any writing or other preparation in any form, including a work of fiction, that contains or purports to contain any SCI or description of activities that produce or relate to SCI or that I have reason to believe are derived from SCI, that I contemplate disclosing to any person not authorized to have access to SCI or that I have prepared for public disclosure.

Form 4414 ¶ 4.

information or material" in Paragraph 4 does not purport to be a reference back to Paragraph 3, and instead refers to the information "the Department or Agency . . . last authorized my access to receive" referenced earlier in Paragraph 4—namely, SCI information.   Paragraph 4 then spells out the signatory's agreement to a prepublication-review scheme that is completely independent of Paragraph 3 and the agreement does not rely on the phrase "information or material" in either Paragraph 3 *or* Paragraph 4.   This reading does not render Paragraph 3 superfluous, as Defendant asserts, because Paragraph 3 applies to any attempt to divulge classified information, including oral disclosures, whereas Paragraph 4 applies solely to "writing[s] or other preparation[s] in any form."

Defendant's textual argument is not made more persuasive by the canon of contract interpretation that ambiguity in contract terms should be construed against the drafter.   For starters, there is no genuine ambiguity as to whether Paragraph 4's standards for prepublication review apply here such that the canon would apply.   But even if there were ambiguity, there is no reason to favor Defendant's interpretation of Form 4414.   The rule that contracts are construed against the drafter is not an inexorable command.   Restatement (Second) of Contracts § 206, cmt. a (noting that canon should only be employed "so long as other factors are not decisive").   In *Snepp*, the Court rejected the argument that general contract law principles should be applied without modification or consideration for the unique contexts of government agreements to protect classified information.   *See Snepp*, 555 U.S. at 513 n.9 ("A body of private law intended to preserve competition, however, simply has no bearing on a

contract made by the Director of the CIA in conformity with his statutory obligation to 'protec[t] intelligence sources and methods from unauthorized disclosure.'") (citing 50 U.S.C. § 403(d)(3).)   No surprise, then, that none of the cases Defendant relies upon to support this argument involved classified information.  Def.'s MTD 33.

Nor can Form 4414 be considered a "contract of adhesion," as Defendant asserts.  *Id.*  Defendant, who is himself a lawyer and an experienced practitioner in national security circles, voluntarily accepted the obligations of Form 4414 in consideration for the privilege of serving as the President's closest national security advisor and for being granted access to extraordinarily broad and sensitive information encompassed by that role, including classified information.  That role and access gave rise to a concomitant set of fiduciary duties of loyalty to the Government.  The prepublication-review provisions found in Paragraph 4 of Form 4414 are completely consistent with those duties, and serve the Executive Branch's legitimate interest in protecting classified information.  It makes no sense to interpret Form 4414 as if it were a refrigerator service contract.

Defendant's textual arguments are a fig leaf for his core claim about Form 4414: that it would "be patently absurd" to require prepublication review "even for works that the employee has no reason whatsoever to believe contain SCI," and therefore such an interpretation cannot be correct, regardless of whether the contract's language compels such an interpretation.   Def.'s MTD 32 (emphasis removed).  Although Defendant devotes significant space to justifying the correctness of his subjective understanding that the manuscript contained no SCI in light of the

21

facts pled in the complaint, *id.* at 33–35, this is ultimately not relevant.  Whether Paragraph 4 applies depends on whether the preparation includes a "description of activities that produce or relate to SCI," not what the author purportedly "believes." As such, Form 4414, like the prepublication requirements imposed by the FBI or CIA, is appropriately limited to "avoid the absurd result of requiring prepublication review of *every* writing a former employee makes."  Def.'s MTD 33.  Activities that produce or relate to SCI will necessarily be tied to the signing official's on-the-job duties, and the provision therefore does not encompass every writing a former employee makes in the fanciful way Defendant asserts.

In a similar mode, Defendant asserts that Form 4414, as "advocated by the Government," would violate the First Amendment because it imposes an unconstitutional prior restraint.  Def.'s MTD 36.  Defendant does not contest, as the Government will explain in greater detail later, that there is any constitutional problem per se with a nondisclosure agreement for classified information.  *Id.*  Rather, he asserts that "an interpretation requiring prepublication review even where an employee has no reason whatsoever to believe that his work contains information that had been classified as SCI or was then in the process of such a classification determination" would violate the First Amendment.  *Id.* at 35 (emphasis removed). This is simply another flavor of Defendant's "absurdity" argument, and it fails for the same reasons a constitutional challenge to the SF 312 or to the nondisclosure agreements imposed by the CIA or FBI would fail.

If anything, it is the Defendant's interpretation, not the Government's, that will create absurd results. On Defendant's view of Form 4414, anyone is permitted to opt-out of prepublication review so long as they have sufficient subjective certainty that their manuscript does not contain SCI and is not a description of activities that produce or relate to SCI. That view would defeat the purpose of entering such an agreement in the first place. "When a former [employee] relies on his own judgment about what information is detrimental, he may reveal information that the [Agency]—with its broader understanding of what may expose classified information and confidential sources—could have identified as harmful." *Snepp v. United States*, 444 U.S. 507, 512 (1980); *see also Wilson v. Central Intelligence Agency*, 586 F.3d 171, 194 (2d Cir. 2009) ("[T]he Supreme Court has recognized the CIA's authority to preclude disclosure of even superficially innocuous information when it might facilitate the discovery of more sensitive matters." (quotation omitted)); *United States v. Marchetti*, 466 F.2d 1309, 1318 (4th Cir. 1972) ("What may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context."). These risks are just as significant, if not more so, for a former high-ranking official who may lack the current and detailed knowledge of specific intelligence programs in order to assess a disclosure issue, as they are for a rank-and-file employee that lacks a broader perspective on the impact of a disclosure in his narrow area of knowledge.

Form 4414 is intended to counter these risks. The point of reviewing works that are merely "related" to SCI "is to ensure *in advance* . . . that information

detrimental to national interest is not published," as, "[w]ithout a reliable procedure, no intelligence agency or responsible Government official could be assured that an employee privy to sensitive information *might not conclude on his own—innocently or otherwise—that it should be disclosed to the world*." *Snepp*, 444 U.S. at 513 n. 8 (second emphasis added). The only way an author can proceed with publication is if he receives "written authorization" from the reviewing Agency. Form 4414 ¶ 4. And the means for addressing a disagreement over the review process is a lawsuit, not self-help based on the author's beliefs, because the latter approach risks inadvertent disclosures that may endanger national security. Those risks were especially acute here, given Defendant's role (National Security Advisor), the subject of the manuscript (a memoir of his service in that role), the scope of his exposure to classified information (which was nearly unequalled in government), the length of the manuscript (approaching six hundred pages), and the temporal proximity of the manuscript to the events in question (just months after Defendant had left his post).

Defendant also argues (contrary to his position during oral argument over the preliminary injunction) that the complaint fails to state a claim because it does not allege that "at the time Ambassador Bolton authorized disclosure of the information in question, it was 'classified or . . . in process of a classification determination' as SCI." Def.'s MTD 29 (quoting Form 4414 ¶ 1). But the strict temporal requirement Defendant advocates does not emerge from the text of Form 4414, and makes no sense. As noted, the prepublication-review obligation arises regardless of whether the manuscript contained SCI. Form 4414 ¶ 4. Moreover, even if an agency

determines that information is SCI for the first time after receiving a work for prepublication review, it is entitled to insist that the author remove that information before publication. Again, the triggers for the prepublication-review requirement are broader than previously classified SCI—and the whole point of a prepublication-review process is to guard against unauthorized disclosure of information that, if disclosed, would damage national security. That purpose would be defeated if the Government were powerless to stop the disclosure of classifiable information, simply because it was not identified as classified until the prepublication-review process. Certainly nothing in the text of Form 4414 tethers the Government's ability to prevent the disclosure of such information to the fortuities of timing of formal classification review. On the contrary, Form 4414 defines the sole means of concluding the review process as "written authorization" to proceed, which, of course, has never been provided to Defendant.

No agency tasked with handling classified information would agree to a scheme in which prepublication review depends entirely on the author's unilateral determination about whether his manuscript contained SCI. Form 4414 is no different, and Defendant has given no sound reason for according it such a self-defeating interpretation. Accordingly, Defendant was required to obtain written authorization from NSC before publishing his book.

**B.    SF 312 Mandated Prepublication Review.**

In addition to the obligations imposed by Form 4414, Defendant agreed in his SF 312 that he would not disclose classified information to anyone not authorized to

receive such information until "given prior written notice of authorization from the United States Government Department or Agency . . . responsible for the classification of information or last granting me a security clearance that such disclosure is permitted," and to "confirm from" relevant officials that information is unclassified should he be "uncertain about [its] classification status." SF 312 ¶ 3. Absent compliance with that requirement of written authorization, Bolton agreed to forfeit "all royalties, remunerations, and emoluments that have resulted, will result, or may result from any disclosure, publication, or revelation not consistent with the terms of this Agreement." SF 312 ¶ 5.

Courts have found similar language to give rise to prepublication-review obligations. For instance, in *United States v. Marchetti*, 466 F.2d 1309 (4th Cir. 1972), the defendant, a former CIA employee, agreed that he would "never divulge, publish, or reveal . . . any classified information . . . unless specifically authorized in writing, in each case, by the Director of Central Intelligence or his authorized representatives." *Id.* at 1312 n. 1. The Fourth Circuit, in affirming the district court's entry of an injunction against defendant, held that this agreement "was not in derogation of [defendant's] constitutional rights" and that "[i]ts *provision for submission of material to the CIA for approval prior to publication* is enforceable," provided the CIA "acts promptly upon such submissions" and "withholds approval of publication only of information which is classified and which has not been placed in the public domain by prior disclosure." *Id.* at 1318 (emphasis added); *see also McGehee v. Casey*, 718 F.2d 1137, 1141 n. 8 (D.C. Cir. 1983) (noting that former CIA

employee did not contest preclearance requirement even though his secrecy agreement did not "explicitly require him to preclear" publications but only prohibited publication of "classified information"). Likewise, the SF 312, which requires written approval before disclosing classified information, imposed a prepublication requirement on Defendant that was not satisfied until Defendant received written authorization from the NSC that no classified information was present in his manuscript. And as the Supreme Court recognized in *Snepp*, this requirement is not contingent on whether "the book actually contained classified information." 444 U.S. at 511.

Defendant is wrong about what SF 312 requires. He appears to view the SF 312 as imposing two distinct types of review, "depending on whether the employee wishes to (1) publish information *he knows is classified* or, rather, (2) confirm that the information he wishes to publish *is not classified*." Def.'s MTD at 20. Under Defendant's view, the difference between these reviews is apparently whether he was required to have written authorization (if the book contained classified information) or oral authorization (if he only was uncertain about the status of that information). *See id.* at 20-22. There are two fundamental contractual disagreements between the parties: (1) whether the SF 312 requires prepublication review if a person subjectively believes that information is or may be classified, or whether it applies if there if an objective person would share such a belief; and (2) whether the authorization pursuant to such prepublication review must be in writing, or whether it may be oral.

As set out herein, prepublication review depends on the objective status of the information, and requires written, not oral, confirmation. *See also supra* fn. 2.

First, the text of the SF 312 does not depend on the signatory's subjective interpretation about the status of whether information is classified. The basic premise of Defendant's argument is that it matters whether "he knows [the information he wishes to publish] is classified." Def.'s MTD at 20. But the SF 312 does not turn on whether he knows the information is classified, or whether he believes it is, or even whether he believes it is not: the requirement is simply that he "never divulge classified information." SF 312 ¶ 3. That is an objective requirement; his subjective beliefs are simply irrelevant. And the objective nature of that element informs the second SF 312 requirement—that a person is "required to confirm" that information is unclassified if he is "uncertain" about the status of the information, *id*. Plaintiff suggests that this requirement, too, depends on his "subjective" understanding of the status of the information. But it does not make sense to say that a person cannot disclose classified information, regardless of his subjective understanding of the status of the information, *but* that his obligation to confirm the classification status of that information depends on his *subjective* assessment of the information.

The requirement that classified information not be disclosed is an absolute obligation; it does not depend on a person's subjective views, but whether the information is, in fact, objectively classified. *See* SF 312 ¶ 3 (signatory shall "never divulge" classified information). It similarly makes sense to view the requirement

that a person confirm that information is not classified if there is doubt to require *objective*, not *subjective*, doubt as to the status of the information.  That conclusion aligns with the general principle that contracts are interpreted based on an "objective reasonable person standard," rather than a party's "subjective intent."  *See, e.g.*, *Leonard v. Pepsico, Inc.*, 88 F. Supp. 2d 116, 127 (S.D.N.Y. 1999) (looking to how an objective, reasonable person would have understood communication); *Kolodziej v. Mason*, 774 F.3d 736, 741 (11th Cir. 2014) (same).  It also harmonizes the two provisions of SF 312: requiring that a person not release information if it is classified; and to confirm that information is not classified.  *See, e.g.*, *Spinelli v. Nat'l Football League*, 903 F.3d 185, 201 (2d Cir. 2018) (Court must strive to harmonize all of [a contract's] terms") (internal citation and quotation marks omitted).

Requiring that a person seek authorization to disclose information if there is objective doubt as to its status, rather than subjective doubt, also accords with the overall purpose of contracts prohibiting the disclosure of classified information: the *Government*, not an individual, gets to decide if information is, in fact, classified. Putting these two provisions together, then, there is a single prepublication requirement: if information is classified, it cannot be released absent specific authorization, and confirmation is reasonably required before that occurs. Accordingly, the best reading of the SF 312 is that it impose a single prepublication review requirement: if there is an objective question as to whether information is classified, the writer must obtain advance approval to release that information.

29

Second, Plaintiff argues that the obligation to obtain "written" authorization only applies before he may release classified information but that he may receive authorization that information is *not* classified verbally. *See* Def.'s MTD at 22-27. But this conclusion, again, does not follow. His essential argument is that the contract uses "prior written notice of authorization" to refer to the authorization required before classified information can be released, but that it uses "required to confirm from an authorized official that the information is unclassified before I disclose it," SF 312 ¶ 3, and the fact that the latter provision does not explicitly use the term "written" means that verbal confirmation is acceptable. Not so. It is a basic canon of textual construction, known as *noscitur a sociis*, that an ambiguous words should be determined by considering the words with which it is associated in context. *E.g.*, *Graham Cnty Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 287 (2010); *Wayne Land & Min. Grp. LLC v. Del. River Basin Comm'n*, 894 F.3d 509, 532 (3d Cir. 2018) (applying *noscitur a sociis* to contract interpretation). Here, "required to confirm from an authorized official" is, read in isolation, at best ambiguous about whether such confirmation must be in writing or whether it may be verbal; but the fact that the contract previously specifies that confirmation must be in writing (with respect to the release of classified information) strongly indicates that here, too, the authorization must be in writing. That also accords with the purpose of these contracts, which is to make sure that the Government has the final say (subject to any judicial review) as to whether information is classified. Written confirmation allows for such unambiguous statements on behalf of the United States;

30

verbal statements, which could be construed only as the opinion of an individual, do not.  By contrast, Defendant never explains why the Government would ever enter a contract along the lines he suggests.

Defendant's other objections are unavailing.  He first argues that requiring written authorization "when he wishes to disclose information about whose classification status he is *uncertain*" conflicts with the basic principle that when a legal instrument contains a word or phrase in one provision, but not another, that disparate inclusion and exclusion must be intentional.  Def.'s MTD at 23-24.  But that principle works best where there are parallel phrases; here, the phrases are not constructed with such grammatical parity.  Next, he says that applying "written authorization" to both provisions would "render[] one or the other entirely redundant."  Def.'s MTD at 24.  Not so.  Requiring written confirmation that information is either (1) classified, but may be properly released, or (2) not classified, if there was doubt as to its status, does not collapse the review requirements into one; rather, it gives meaning to both scenarios.  There is no redundancy between these two scenarios, which cover information of different classification statuses.  And while Defendant latches onto the fact that a person is not required to confirm that information is unclassified if he *already has permission to disclose it, see* Def.'s  MTD at 24-25; there is no need to confirm whether the information can be released at that point, since the signatory already has the answer from the Government to the question of "can I release this?"  Finally, the fact that other contracts that other

31

agencies use have different terms, *see* Def.'s MTD at 26-27, says nothing about the requirements imposed by *this* contract.

Defendant also argues that any ambiguity should be construed against the drafter, particularly when there is a contract of adhesion.  *See* Def.'s MTD at 25.  As discussed above with respect to Form 4414, Defendant was not coerced into undertaking the obligations of National Security Advisor.  Even if the contract were truly ambiguous such that the canon were arguably relevant, there is no sound reason for applying it in the context of this case, where classified information is at stake.

In any event, the disputes about whether authorization to publish must be written or oral, or whether the obligation to seek approval only attaches to information he believes might be classified, is largely academic.  Even taking Defendant's construction as the proper interpretation (and it is not), he *still* had an obligation to wait for written authorization before publishing his book.  First, assuming that the obligation to seek written authorization applies only to information he *subjectively* believes is classified (an interpretation that cannot be supported by the text of the SF 312), and that he was truly "certain" his book did not contain classified information, Defendant was on notice after submitting his manuscript that it "appears to contain significant amounts of classified information." First Mitman Decl., Exh. E.  *At a minimum*, after his communications with Ms. Knight, any reasonable person in Defendant's position would have had some doubt as to whether the book contained classified information.  The only way Defendant's interpretation could be correct would be to say that a *subjective* view that information

is unclassified is sufficient to forestall review altogether, even if that view *later* becomes objectively unreasonable.  He offers no precedent for such a proposition, nor would such a proposition comport with the purpose of prepublication review.

The prepublication-review obligation would have indisputably attached at that point, even if it may not have attached earlier (though of course it had).  And that doubt triggered the obligation to "confirm from an authorized official that the information is unclassified before [Defendant] may disclose it."  SF 312 ¶ 3. Defendant states that Ms. Knight told him, in a phone call on April 27, "that's the last edit I really have to provide for you."  Bolton Decl. ¶ 16.  But Defendant is wrong to state that this constitutes "confir[mation] from an authorized official that the information is unclassified," Def.'s MTD at 22 (quoting SF 312 ¶ 3).  On the contrary, Ms. Knight explicitly told Defendant that "[t]he process remains ongoing" when he sought an update on the written authorization required by his nondisclosure agreements.  First Mitman Decl., Exh. I.  As such, even under his own interpretation of SF 312, Defendant needed written authorization before he could proceed to publication.

## II.  Defendant Breached His Nondisclosure Agreements By Publishing His Manuscript Before Completing Prepublication Review.

Defendant was not permitted to publish his manuscript until the prepublication-review process was complete.  *See Snepp*, 444 U.S. at 513 n. 8.  Indeed, the text of the nondisclosure agreements Defendant signed require "written authorization" from the agency before an author is allowed to publish a work

undergoing prepublication review.  Form 4414 ¶ 4; SF 312 ¶ 3.  And there is no dispute that Defendant failed to receive such written authorization here.

The course of dealing between Defendant and the NSC underscores that Defendant defied his prepublication-review obligations by abandoning the process without notice and publishing without authorization.  After Ms. Knight identified a significant quantity of classified information in the manuscript he submitted on December 30, 2019, Defendant spent months working with Ms. Knight to revise the manuscript.  Throughout the process, she repeatedly admonished Defendant, consistent with his nondisclosure agreements, not to share the manuscript until he received express written approval from her to do so.[5]  Ms. Knight never provided such approval.  Quite the contrary: her communications with Defendant take pains to emphasize that he had no such authorization and that the process remained ongoing. *See* First Mitman Decl., Exh. I.  Defendant's repeated requests for this written authorization only underscore his understanding that it was a necessary condition for proceeding with publication that had yet to be satisfied.

---

[5]     Letter from E. Knight to C. Cooper (Feb. 7, 2020), First Mitman Decl., Exh. F, ECF No. 3-11, at 1 ("In the meantime, your client has a duty not to publish or otherwise disclose the manuscript or any of its underlying information until he has addressed our concerns and received authorization to do so from our office."); Letter from E. Knight to C. Cooper (Feb. 24, 2020), First Mitman Decl., Exh. G, ECF No. 3-12, at 2 ("Please note that the prepublication review remains in process, and your client may not publish or further disseminate the manuscript or any of its contents until authorized."); E-Mail from E. Knight to J. Bolton (Mar. 27, 2020), First Mitman Decl., Exh. H, ECF No. 3-13 ("I must reiterate that the prepublication review remains in process.  Even after making the edits, you are not authorized to publish or further disseminate the manuscript or its contents until expressly given clearance by me to do so.").

Although Defendant criticizes the time NSC allowed to lapse between Ms. Knight's May 7 e-mail and its next communication with him on June 8, Defendant decided shortly after his April 27 phone discussions with Ms. Knight to proceed with publication, despite not receiving written authorization to publish. Bolton Decl. ¶ 19; Daniel Lippman, "Bolton Book Release Pushed Back Again, to Late June," *Politico*, April 29, 2020 (reporting on shift of publication date to June 23). In so doing, Defendant "lost [his] authority" to halt publication of the book "several weeks before" NSC reached out to him. As such, any alleged reliance by Defendant on any delay on NSC's part is, at best, a *post hoc* rationalization for his precipitous decision to abandon prepublication review when Ms. Knight did not immediately provide him with the written authorization that both Form 4414 and SF 312 required in order to move ahead with publication.

Ultimately, whatever reason Defendant gives for his decision to publish without completing the prepublication-review process, the conclusion is the same: by publishing the manuscript without written authorization, Defendant violated the terms of his nondisclosure agreements. If Defendant believed at any point in the process that NSC was prohibiting him from publishing *un*classified information, he could have filed a lawsuit to vindicate any asserted First Amendment rights while diffusing any risk of compromising the Government's equities in classified information. Courts have long recognized this judicial "safety valve" for First Amendment rights in the context of nondisclosure agreements, and placed the burden on the author, not the Government, to invoke it. *Marchetti*, 466 F.2d at 1317 (holding

that an author "is entitled to judicial review of any action . . . disapproving publication of the material" in light of the author's First Amendment rights, but that, in light of "the sensitivity of the area and confidentiality of the relationship in which the information was obtained . . . we find no reason to impose the burden of obtaining judicial review on [the agency]. It ought to be on [the author]."); *see also United States v. Snepp*, 897 F.2d 138, 142–43 (4th Cir. 1990) (reaffirming *Marchetti*'s holding that the burden lies on the author, not the agency, to seek judicial review); *McGehee*, 718 F.2d at 1145 ("[W]e note that the agent may seek judicial review of the CIA's classification decision."). Defendant's decision to resort to self-help is inexcusable, and the Government is accordingly entitled to summary judgment on liability as to at least Count III in its first amended complaint.

## III. Enforcement of Defendant's Nondisclosure Agreements Does Not Run Afoul of the First Amendment.

Nothing in the First Amendment prevents the United States from securing a constructive trust over assets derived from publication of Defendant's book. It is settled law that restrictions on the publication of classified information are judicially enforceable. Where "a government employee signs an agreement not to disclose information properly classified pursuant to executive order, that employee 'simply has no first amendment right to publish' such information." *Wilson v. C.I.A.*, 586 F.3d 171, 183 (2d Cir. 2009) (quoting *Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003)). The Government is thus "entitled to enforce its agreements to maintain the confidentiality of classified information," *United States v. Pappas*, 94 F.3d 795, 801 (2d Cir.1996), without needing to comply with "the same stringent standards that

would apply to efforts to impose restrictions on unwilling members of the public," *United States v. Aguilar*, 515 U.S. 593, 606 (1995).

The leading case in this area is *Snepp*, which involved a former CIA agent who, in violation of his nondisclosure agreement, published a book about CIA activities without first obtaining the Agency's approval.  After the book had been published, the United States sued Snepp for breach of contract and breach of fiduciary duties.  The government secured not only the imposition of a constructive trust over all of Snepp's profits from the book, but also a forward-looking injunction against future unauthorized disclosures by Snepp.  *See* 444 U.S. at 508.  The Supreme Court affirmed both remedies.  *See id.* at 514-16.

The Supreme Court explained that a prepublication-review requirement imposed on a government employee with access to classified information is not an unconstitutional prior restraint. *See id.* at 510-11. The Court found the secrecy agreement to be a "reasonable means" for vindicating the Government's "compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service."  *Id.* at 509 n. 3.  The Court also concluded that "[w]hether Snepp violated his trust does not depend upon whether his book actually contained classified information."  *Id.* at 511.  Rather, Snepp violated that trust when he published his book without first obtaining authorization from the CIA to do so, as required by his secrecy agreement.  "When a former agent relies on his own judgment about what information is detrimental, he may reveal information that the CIA—

with its broader understanding of what may expose classified information and confidential sources—could have identified as harmful." *Id.* at 512. The Court held that, because Snepp "deliberately and surreptitiously violated his obligation to submit all material for prepublication review," *id.* at 511, a constructive trust over his book's proceeds would appropriately "require[] him to disgorge the benefits of his faithlessness." *Id.* at 515.

Even before *Snepp*, the Fourth Circuit upheld the validity and enforceability of nondisclosure agreements in *United States v. Marchetti*, 466 F.2d 1309 (4th Cir. 1972). There, as in *Snepp* and the instant case, the United States sued a former employee to enforce a secrecy agreement; the United States sought to prevent Marchetti from publishing a book about his intelligence experiences in the CIA. *Id.* at 1311. The court held that the United States could properly require Marchetti to submit all intelligence-related materials intended for publication for prepublication review to protect classified information. *Id.* at 1313-17. The court further held that there was no First Amendment problem with the secrecy agreements, because Marchetti could seek judicial review of any action by the CIA disapproving publication of the material. *Id.*; *see also United States v. Snepp*, 897 F.2d 138, 143 (4th Cir. 1990) (confirming that the burden is on the author to seek judicial review of any agency decision not to approve publication).

Consistent with these authorities, courts have reaffirmed the validity of nondisclosure agreements in the face of First Amendment challenges. In *Stillman v. CIA*, for example, a former employee of the Los Alamos National Laboratories sought

to publish a book about China's nuclear weapons program and challenged the delay on publication imposed by prepublication review, as well as determinations by various agencies that portions of his manuscript were classified.  *See* 517 F. Supp. 2d 32, 34 (D.D.C. 2007) ("*Stillman II*").   In rejecting Stillman's First Amendment challenge, this Court explained that "[c]ourts have uniformly held that current and former government employees have no First Amendment right to publish properly classified information to which they gain access by virtue of their employment."  *Id.* at 38.  The D.C. Circuit, in earlier proceedings in *Stillman*, had reached the same conclusion: "If the Government classified the information properly, then Stillman simply has no first amendment right to publish it."  *Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003) ("*Stillman I*") (reversing district court's preliminary order granting Stillman's counsel access to the manuscript and remanding for further proceedings).  Relying on *Snepp*, this Court granted judgment to the Government, emphasizing that "the government's ability to maintain secrecy is essential and [recognizing] that the government is in the best position to judge the harm that would result from disclosure."  *Stillman II*, 517 F. Supp. 2d at 39.

Likewise, in *McGehee v. Casey*, a former CIA officer brought a declaratory judgment action, before publication, challenging "an agreement that on its face bar[red] him from revealing classified information without prior . . . approval."  This Court denied relief, and the D.C. Circuit affirmed.  718 F.2d 1137, 1139 (D.C. Cir. 1983).  The D.C. Circuit reasoned that the "classification and censorship scheme,"

including the requirement of prepublication review, "protects critical national interests" and "satisf[ies] the applicable constitutional tests." *Id.*

It follows from these decisions that there is no First Amendment bar to enforcement of Defendant's nondisclosure agreements here.  The Government is seeking, as it has done in the past, to enforce the terms of its nondisclosure agreements regarding classified information executed by Defendant when he joined the Government as National Security Advisor.  Defendant accepted the terms of these agreements in consideration for his access to this information, and there is no valid constitutional objection to the Government seeking relief under their terms.

## IV.   Plaintiffs Are Entitled To the Remedy of a Constructive Trust

As the Supreme Court has explicitly held, the proper remedy for violation of a person's contractual agreements to undertake prepublication review is the imposition of a constructive trust on all proceeds of his book—including amounts Defendant may already have received (which he should be required to disgorge) and any and all amounts he may receive in the future as royalties or otherwise.  "A constructive trust . . . protects both the Government and the former agent from unwarranted risks.  This remedy is the natural and customary consequences of a breach of trust." *Snepp*, 444 U.S. at 515.  Unlike an action for punitive damages, which risks exposing classified information to revelation in open court, a constructive trust "deals fairly with both parties by conforming relief to the dimensions of the wrong.   If the agent secures prepublication clearance, he can publish with no fear of liability.   If the agent published unreviewed material in violation of his fiduciary and contractual obligation, the trust remedy simply requires him to disgorge the benefits of his

faithlessness." *Id.* Such a remedy is particularly appropriate here, when the information has already been released. "Since the remedy is swift and sure, it is tailored to deter those who would place sensitive information at risk. And since the remedy reaches only funds attributable to the breach, it cannot saddle the former agent with exemplary damages out of all proportion to his gain." *Id.* at 515-16.

Such a remedy is certainly called for here. Defendant had a fiduciary duty to the United States to protect classified information, a duty underscored by the criminal penalties associated with unauthorized disclosure of classified materials. *See, e.g.*, 18 U.S.C. §§ 641, 793, 794, 798, 952, 1924. But Defendant "gambled with the national security of the United States" by publishing his manuscript without completing prepublication review. ECF No. 27, at 10. As a result of this gamble, Defendant has been unjustly and materially enriched—to the tune of $2 million dollars—by information he had no right to release. *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 361 (2d Cir. 1999) ("Unjust enrichment results when a person retains a benefit which, under the circumstances of the transfer and considering the relationship of the parties, it would be inequitable to retain."). Entry of a constructive trust is the appropriate remedy to redress Defendant's use of classified information for personal gain. *See, e.g.*, *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 361 (2d Cir. 1999) ("A constructive trust is an equitable remedy, necessarily flexible to accomplish its purpose. Its purpose is to prevent unjust enrichment.").

## CONCLUSION

The Court should deny Defendant's motion to dismiss, grant the United States'

motion for summary judgment, and direct the United States to file, within 30 days of

granting summary judgment, a proposed plan for any further remedial proceedings.

Dated:  July 30, 2020                         Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General

MICHAEL SHERWIN
Acting United States Attorney

DAVID M. MORRELL
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director
Federal Programs Branch

*/s/ Daniel F. Van Horn*
Daniel F. Van Horn (D.C. Bar. No. 924092)
Assistant United States Attorney
555 Fourth Street N.W.
Washington, D.C. 20530
Tel: (202) 252-2506
Email: daniel.vanhorn@usdoj.gov

*/s/ Michael J. Gerardi*
Michael J. Gerardi (D.C. Bar No. 1017949)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 11514
Washington, D.C. 20005
Tel: (202) 616-0680
Fax: (202) 616-8460
E-mail: michael.j.gerardi@usdoj.gov

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|                                      |     |                                    |
|--------------------------------------|-----|------------------------------------|
| UNITED STATES OF AMERICA,            | )   |                                    |
|                                      | )   |                                    |
| Plaintiff,                           | )   |                                    |
|                                      | )   |                                    |
| v.                                   | )   | Civil Action No. 20-1580 (RCL)     |
|                                      | )   |                                    |
| JOHN R. BOLTON,                      | )   |                                    |
|                                      | )   |                                    |
| Defendant.                           | )   |                                    |

_____

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

1.     The National Security Council is the President's principal forum for considering matters of national security and foreign policy.  Its functions are to advise and assist the President on national security and foreign policy matters, and to coordinate domestic, foreign, and economic policies across the Executive Branch relating to the national security.  Unclassified Declaration of Matthias J. Mitman ("Second Mitman Decl.") ¶ 3.

2.     The Assistant to the President for National Security Affairs ("APNSA"), also known as the National Security Advisor, is a senior White House staff member who serves as a principal advisor to the President on domestic, foreign, military, and economic issues, whether discrete or far-reaching, affecting the national security.  *Id.* ¶ 4.

3.     The National Security Advisor regularly offers advice to the President on the formulation and implementation of policy concerning matters of national

security.  He is responsible for coordinating the views of executive departments and agencies to inform Presidential decision-making on such matters.  In turn, he is responsible for ensuring that the President's decisions on matters of national security are communicated to the necessary departments and agencies, and he facilitates the implementation of the President's decisions.  The position requires appointment by the President without confirmation by the United States Senate.  *Id.* ¶ 4.

4.     The National Security Advisor is supported by the staff of the National Security Council.  Organizationally, the NSC staff is a component of the Executive Office of the President ("EOP").  *Id.* ¶ 5.

5.     To execute his responsibilities, the National Security Advisor must hold a security clearance at the TOP SECRET/SENSITIVE COMPARTMENTED INFORMATION (SCI) level.  Within the TOP SECRET/SCI level, the National Security Advisor is further granted access to numerous compartments and sub-compartments within each SCI control system.  He can also access a wide variety of special access programs, each designed to protect certain intelligence source and methods or exceptionally sensitive classified national security information.  In summary, to execute his responsibilities, the National Security Advisor has a "need-to-know" for vast amounts of classified information at the TOP SECRET/SCI level.  *Id.* ¶ 6.

6.     For example, the National Security Advisor has access to—and, in fact, establishes—a special access program at the TOP SECRET level for all policy matters concerning covert action.  Changes to this special access program must be approved

by the National Security Advisor, and he chairs NSC meetings that address covert action.  As defined in 50 U.S.C. § 3093, outside of certain exceptions, "covert action" means an activity or activities of the United States Government to influence political, economic, or military conditions abroad, where it is intended that the role of the United States Government will not be apparent or acknowledged publicly.  *Id.* ¶¶ 7–8.

7.     In addition, as detailed in Section 4.3 of Executive Order 13526, the National Security Advisor must, upon request, be briefed on any special access program created by the Director of National Intelligence, the Attorney General, or the Secretary of State, Defense, Energy, or Homeland Security.  These special access programs safeguard classified information, frequently at the TOP SECRET/SCI level. *Id.* ¶ 9.

8.     To discharge his responsibilities, the APNSA engages in a wide variety of activities on a daily basis involving information that is classified at the TOP SECRET/SCI level ("SCI"), describes activities that produce or relate to SCI, or is derived from classified SCI. *Id.* ¶ 10.

9.     Every individual on the NSC staff, including each administrative assistant, is required to hold an active security clearance at the TOP SECRET/SCI level.  Every NSC staff member, including each administrative assistant, also has an e-mail address on a network designed and used for secure communications, including at the TOP SECRET/SCI level.  The work of the NSC staff could not be accomplished

without a significant amount of correspondence occurring at the TOP SECRET/SCI level. *Id.* ¶ 11.

10.     As detailed in National Security Presidential Memorandum-4 (NSPM-4) dated April 4, 2017, the National Security Advisor is responsible for determining the agenda for the National Security Council, ensuring all necessary papers are prepared for the same, and recording actions of the Council.  The National Security Advisor is a regular attendee at meetings of the National Security Council.  Other regular attendees include the President, the Vice President, and various Cabinet-level officials who head the Executive Branch departments and agencies responsible for national security and foreign policy such as the Secretary of State, the Secretary of the Treasury, the Secretary of Defense, the Attorney General, the Secretary of Energy, and the Secretary of Homeland Security.  Additional regular attendees include other senior intelligence and defense officials in the Executive Branch, such as the Director of National Intelligence, the Chairman of the Joint Chiefs of Staff, and the Director of the Central Intelligence Agency.  Other senior EOP staff invited to meetings of the National Security Council include the Chief of Staff to the President, the Counsel to the President, and the Deputy Counsel to the President for National Security Affairs, who is also the NSC Legal Advisor.  As the principal forum for considering and advising the President on national security and foreign policy matters, National Security Council meetings frequently involve discussion or dissemination of SCI, or involve descriptions or discussions of activities that produce or relate to SCI or that are derived from SCI.  *Id.* ¶¶ 1, 12.

11.     To execute the responsibilities prescribed by NSPM-4 relating to the National Security Council, the National Security Advisor approves for distribution materials to the President, Vice President, and relevant heads of executive departments and agencies, senior intelligence and defense officials, and senior White House officials.  These materials, which are produced to facilitate executive decision-making as well as to implement and coordinate the execution of any decisions made, frequently contain SCI, describe activities that produce or relate to SCI, or are derived from SCI.  It is standard practice for these materials to be reviewed and approved by the National Security Advisor prior to dissemination.  *Id.* ¶ 13.

12.     Pursuant to the NSPM-4, the National Security Advisor also convenes and chairs meetings of the Principals Committee, which is the Cabinet-level senior interagency forum for considering policy issues affecting the national security interests of the United States.  The National Security Advisor extends invitations to Principals Committee meetings to the heads of certain Executive Branch departments and agencies and other senior officials relevant to addressing the national security issues requiring attention at the highest levels of the U.S. Government.  As a Cabinet-level senior interagency forum, Principals Committee meetings frequently involve discussions or dissemination of SCI, or involve descriptions or discussions of activities that produce or relate to SCI or that are derived from SCI.  Second Mitman Decl. ¶ 14.

13.     As the chair of Principals Committee meetings, the National Security Advisor frequently requires materials that contain SCI, describe activities that

produce or relate to SCI, or are derived from SCI.  His responsibilities include approving for circulation all agendas, briefing papers, and other background documents relating to these meetings prior to the meeting.  In preparation to chair a Principals Committee meeting, the National Security Advisor regularly receives briefings that contain SCI, describe activities that produce or relate to SCI, or are derived from SCI.  After chairing a Principals Committee meeting, the National Security Advisor directs the documentation and dissemination of the outcome of the meeting, coordinates the implementation of any policy decision made during the meeting, and, as appropriate, plans for any next steps.  To do so, he regularly uses or relies on information that contains SCI, describes activities that produce or relate to SCI, or is derived from SCI.  *Id.* ¶ 15.

14.     As a senior advisor to the President on national security issues, the National Security Advisor has access to the highest levels of classified national security and intelligence information, and he receives frequent updates on national security matters and intelligence activities.  These updates frequently include information classified at the highest levels, including TOP SECRET/SCI.  For example, the National Security Advisor is provided with access to the President's Daily Brief, a highly classified intelligence product with an extremely limited readership.  The President's Daily Brief regularly contains information that is SCI, describes activities that produce or relate to SCI, and/or is derived from SCI.  In addition to having access to the President's Daily Brief, the National Security Advisor regularly attends the oral briefings provided to the President concerning the

President's Daily Brief.  These briefings regularly contain information that is SCI, describe activities that produce or relate to SCI, and/or is derived from SCI.  *Id.* ¶¶ 16–17.

15.    The National Security Advisor also regularly attends other intelligence briefings, both with the President and in preparation for meetings with the President. These intelligence briefings inform the decision-making of the Chief Executive and Commander in Chief on national security and foreign policy matters.  These briefings regularly contain information that is SCI, describes activities that produce or relate to SCI, or is derived from SCI.  *Id.* ¶ 18.

16.    The National Security Advisor receives frequent updates—often multiple times each day—from the National Security Council staff and others on quickly developing national security-related events, activities, or issues.  To discharge his responsibilities, the National Security Advisor must frequently alert Cabinet-level officials, senior intelligence and military officials, and senior White House advisors of the information.  He may also convene a meeting under NSPM-4, coordinate action across Executive Branch departments and agencies, brief and advise the President on the information, and execute any decision made by the President.  In all of these actions, he frequently uses or relies on information that is SCI, describes activities that produce or relate to SCI, or is derived from SCI.  *Id.* ¶ 19.

17.    The National Security Advisor, as a senior advisor to the President, also communicates with his counterparts around the world on matters of national

security.   Prior to and in preparation for these conversations and meetings, the National Security Advisor receives briefings and preparatory materials from the NSC staff.  These materials frequently contain information that is SCI, describes activities that produce or relate to SCI, or is derived from SCI.  *Id.* ¶ 20.

18.    To execute his responsibilities as a senior advisor to the President on national security issues, the National Security Advisor must not only have access to the highest levels of national security and intelligence information, but he must have access to classified communications systems 24 hours a day, 7 days a week, including the ability to transmit and receive information that is SCI, describes activities that produce or relate to SCI, or is derived from SCI.  For that reason, when the National Security Advisor travels, he must always be able to access secure communications. As a result, he is at all times able to discuss information that is SCI, describes activities that produce or relate to SCI, or is derived from SCI.  *Id.* ¶ 21.

19.    To serve in the role of National Security Advisor, Defendant was required to obtain and maintain a security clearance that was conditioned on his acceptance of certain non-disclosure obligations.  One of the agreements Defendant entered, entitled Standard Form 312 ("SF 312"), governs access to classified information generally.  Two further agreements, known as Form 4414 agreements, governed Defendant's access to SCI.  Security Agreements, First Declaration of Matthias Mitman ("First Mitman Decl."), Exh. A, ECF No. 3-6.

20.    When Defendant departed Government service, Defendant was reminded of, and acknowledged, his continuing obligation to protect classified

8

information as spelled out in these agreements.  Letter from J. Eisenberg to J. Bolton (Sept. 10, 2019), First Mitman Decl., Exh. C, ECF No. 3-8; Memo. From S. Gast to J. Bolton (Sept. 13, 2019) First Mitman Decl., Exh. B, ECF No. 3-7.

21.    The two Form 4414 agreements Defendant signed required Defendant to "submit for security review by the Department or Agency that last authorized my access to [SCI] any writing or other preparation in any form, including a work of fiction, that contains or purports to contain any SCI or description of activities that produce or relate to SCI or that I have reason to believe are derived from SCI, that I contemplate disclosing to any person not authorized to have access to SCI or that I have prepared for public disclosure."  Form 4414 ¶ 4.  Defendant further agreed that he would "not disclose the contents of such preparation with, or show it to, anyone who is not authorized to have access to SCI until I have received written authorization from the Department or Agency that last authorized my access to SCI that such disclosure is permitted."  *Id.*

22.    By signing SF 312, Defendant agreed that he would not disclose classified information to persons not authorized by the Government to receive it unless "I have been given prior written notice of authorization from the United States Government Department or Agency . . . responsible for the classification of information or last granting me a security clearance that such disclosure is permitted."  SF 312 ¶ 3.  Defendant further agreed that if he was "uncertain about the classification status of information, I am required to confirm from an authorized official that the information is unclassified before I may disclose it, except to a person"

who is authorized to receive it or for whom the Government has provided written approval.  *Id.*

23.    Under both the Form 4414 agreements and the SF 312 agreement, Defendant "assign[ed] to the United States Government all rights, title, and interest, and all royalties, remunerations, and emoluments that have resulted, will result, or may result from any disclosure, publication, or revelation not consistent with the terms of this Agreement."  Form 4414 ¶ 12; *see also* SF 312 ¶ 5.

24.    Both agreements recognize the Government's right to "seek any remedy available to it to enforce this Agreement."  SF 312 ¶ 6; Form 4414 ¶ 7.

25.    At the time of his departure from the Government, Defendant was reminded that he had "agreed to submit for security review any writing or other material in any form that could contain classified information *before* submitting the writing or material to anyone without proper authorization to access such information."  First Mitman Decl., Exh. C.

26.    On December 30, 2019, Defendant, through his attorney, submitted to Ellen Knight, the Senior Director of the Records Access and Information Security Management Directorate at NSC, the "manuscript of a book [Defendant] has prepared relating in large part to his service as National Security Advisor to the President."  Letter from C. Cooper to E. Knight (Dec. 30, 2019), First Mitman Decl., Exh. D, ECF No. 3-9.

27.    Defendant's counsel further stated in the letter that Defendant "carefully sought to avoid any discussion in the manuscript of [SCI] or other classified

information, and we accordingly do not believe that prepublication review is required. We are nonetheless submitting this manuscript out of an abundance of caution, as contemplated by the nondisclosures agreements that he entered, commencing with those of April 5, 2018 immediately prior to his entry on duty." *Id.*

28.     In a letter dated January 23, 2020, Ms. Knight stated, "[b]ased on our preliminary review, the manuscript appears to contain significant amounts of classified information," some of which was classified "at the TOP SECRET level." Letter from E. Knight to C. Cooper (Jan. 23, 2020), First Mitman Decl., Exh. E, ECF No. 3-10.

29.     In a letter dated February 7, 2020, Ms. Knight stated: "As I noted in my letter of January 23, 2020, our preliminary review determined that the draft contains numerous instances of classified information.  For example, the draft contains classified discussions between the President and foreign heads of state, classified foreign government information, details about classified military plans and operations, and classified details about intelligence sharing and activities.  As the former Assistant to the President for National Security Affairs, your client understands the sensitivity of these categories of information and the potential harm that could be expected to result from its unauthorized disclosures."  Letter from E. Knight to C. Cooper (Feb. 7, 2020), First Mitman Decl., Exh. F, ECF No. 3-11.

30.     Ms. Knight offered to "meet with [Defendant] to review each instance of classified information in detail and, as necessary, assist in the prioritization of any particular portions."  She also reminded him, in the interim, not "to publish or

otherwise disclose the manuscript or any of its underlying information until [Defendant] has addressed our concerns and received authorization to do so from our office." *Id.*

31. Over the next several weeks, Defendant met with Ms. Knight four times to discuss revisions to the book in order to remove classified material. On March 9, Defendant submitted a revised manuscript to Ms. Knight for review. Decl. of John R. Bolton in Opposition to the United States' Emergency Application for Temporary Restraining Order or Motion for Preliminary Injunction ("Bolton Decl.") ¶¶ 9–12, ECF No. 9-1.

32. On March 27, 2020, Ms. Knight sent an e-mail to Defendant regarding the revised manuscript. While she noted that "[m]any of the changes" Defendant made to the manuscript were "satisfactory," she explained that "additional edits are required to ensure the protection of national security information." E-mail from E. Knight to J. Bolton (Mar. 27, 2020), First Mitman Decl., Exh. H, ECF No. 3-13.

33. Ms. Knight and Defendant continued to exchange edits to address these concerns throughout the month of April. Bolton Decl. ¶¶ 13–16.

34. As revised, Ms. Knight was of the judgment that there was no classified information remaining in the manuscript. Unclass. Decl. of Michael Ellis ¶ 9 ("Ellis Decl."), ECF No. 3-1.

35. During a phone call on April 27, Defendant and Ms. Knight discussed how written confirmation of completion of prepublication review would be transmitted in the event other officials within NSC signed off, but Ms. Knight also

told Defendant that there were still "some internal process considerations to work through." Bolton Decl. ¶ 17.

36.     After Ms. Knight completed her review of the draft manuscript, she informed NSC's legal department of her conclusions, and the current Assistant to the President for National Security Affairs, Robert C. O'Brien, undertook a review and concluded the manuscript still appeared to contain classified information. Ellis Decl. ¶¶ 9–10.   He asked the NSC's Senior Director for Intelligence Programs, Michael Ellis, to conduct a further review of the manuscript and on Saturday, May 2, 2020, Mr. Ellis commenced that review. *Id.* ¶¶ 10-11.

37.     Mr. Ellis completed his initial review of the manuscript on June 9. Ellis Decl. ¶ 12.   Mr. Ellis agreed with Mr. O'Brien  that the manuscript contained information subject to both the Standard Form 312 and the Form 4414 signed by Defendant, and that the revisions already made to the manuscript had not removed all classified information, including information classified at the Confidential, Secret, Top Secret, and Top Secret/Sensitive Compartmented Information (SCI) levels. *Id.* ¶¶ 19, 20.  In Mr. Ellis's judgment, as well as the judgment of other senior national security officials, disclosure of certain passages in the manuscript would "damage the national security of the United States." *Id.*   In Mr. Ellis's judgment, disclosure of certain passages in the manuscript "will damage the national security of the United States."   Ellis Decl. ¶ 22; *see also* Declaration of William R. Evanina ¶ 6, ECF No. 3-2; Declaration of Paul M. Nakasone ¶ 8, ECF No. 3-4; Declaration of John L. Ratcliffe ¶¶ 6–7, ECF No. 3-5.

38.  After the April 27 call, Ms. Knight conveyed to Defendant that "[t]he process remains ongoing.  I will reach out as soon as there is an update to provide." E-mail from E. Knight to J. Bolton (May 7, 2020), First Mitman Decl., Exh. I, ECF No. 3-14.

39.  Despite being informed that the "process remain[ed] ongoing," *id.*, Defendant and his publisher, Simon & Schuster, "scheduled the book for release on June 23, 2020." Bolton Decl. ¶ 19.

40.  NSC became aware of the development through June 7 press reports that Defendant was proceeding with publication without written approval.  Letter from J. Eisenberg to C. Cooper (June 8, 2020), First Mitman Decl., Exh. J, ECF No. 3-15.

41.  By this point, the book had already been distributed to booksellers around the world and to members of the media for review, and Defendant claimed that he had "no authority to prevent the book from being sold to the public."  Bolton Decl. ¶ 22–23.

\*   \*   \*

Dated:  July 30, 2020          Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General

MICHAEL SHERWIN
Acting United States Attorney

DAVID M. MORRELL
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director
Federal Programs Branch

*/s/ Daniel F. Van Horn*
Daniel F. Van Horn (D.C. Bar. No. 924092)
Assistant United States Attorney
555 Fourth Street N.W.
Washington, D.C. 20530
Tel: (202) 252-2506
Email: daniel.vanhorn@usdoj.gov

*/s/ Michael J. Gerardi*
Michael J. Gerardi (D.C. Bar No. 1017949)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW, Room 11514
Washington, D.C. 20005
Tel: (202) 616-0680
Fax: (202) 616-8460
E-mail: michael.j.gerardi@usdoj.gov

*Counsel for Plaintiff*

UNCLASSIFIED

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>v. )<br><br>JOHN R. BOLTON, )<br><br>Defendant. )<br>_____ ) | Civil Action No. 1:20-cv-01580-RCL |

### DECLARATION OF MATTHIAS MITMAN

I, Matthias Mitman, declare under penalty of perjury that the following is true and correct:

1.       I am the Executive Secretary of the National Security Council (NSC).[1]  I was appointed Executive Secretary of the NSC on October 29, 2019.  I also serve as Deputy Assistant to the President.  I am a career member of the Senior Foreign Service, class of Minister-Counselor.  Per 50 U.S.C. § 3021, the National Security Council "shall have a staff headed by a civilian executive secretary appointed by the President."  National Security Presidential Memorandum-4 (NSPM-4) dated April 4, 2017 further clarifies that "[a]ll policy and staff activity decisions will be transmitted to the Executive Secretary for appropriate distribution and awareness."

---

[1]  Both the National Security Council and the staff of the National Security Council are commonly and colloquially referred to as the "NSC."  As explained below, the National Security Council is the body that advises the President, which counts among its regular attendees the Assistant to the President for National Security Affairs.  The Assistant to the President for National Security Affairs, in turn, is supported by the staff of the National Security Council.  For clarity, "NSC" as used in this declaration refers to the advisory body; "NSC staff" refers to the individuals that support the work of the Assistant to the President for National Security Affairs.

UNCLASSIFIED

**UNCLASSIFIED**

2.      By virtue of my duties and authorities as Executive Secretary, I have access to

and personal awareness of the following information.

3.      The National Security Council is the President's principal forum for considering

matters of national security and foreign policy.  Its functions are to advise and assist the

President on national security and foreign policy matters, and to coordinate domestic, foreign,

and economic policies across the Executive Branch relating to the national security.

4.      The Assistant to the President for National Security Affairs ("APNSA") is a

senior White House staff member who serves as a principal advisor to the President on domestic,

foreign, military, and economic issues, whether discrete or far-reaching, affecting the national

security.  The APNSA regularly offers advice to the President on the formulation and

implementation of policy concerning matters of national security.  He is responsible for

coordinating the views of executive departments and agencies to inform Presidential decision-

making on such matters.  In turn, he is responsible for ensuring that the President's decisions on

matters of national security are communicated to the necessary departments and agencies, and he

facilitates the implementation of the President's decisions.  The position requires appointment by

the President without confirmation by the United States Senate.

5.      The APNSA is supported by the staff of the National Security Council.

Organizationally, the NSC staff is a component of the Executive Office of the President

("EOP").  The EOP is composed of a number of offices and agencies that provide the President

with the support and information he needs to perform his constitutionally assigned functions and

govern effectively.

6.      To execute his responsibilities, the APNSA must hold a security clearance at the

TOP SECRET/SENSITIVE COMPARTMENTED INFORMATION (SCI) level.  Within the

**UNCLASSIFIED**

UNCLASSIFIED

TOP SECRET/SCI level, the APNSA is further granted access to numerous compartments and sub-compartments within each SCI control system.  He can also access a wide variety of special access programs, each designed to protect certain intelligence sources and methods or exceptionally sensitive classified national security information.  In summary, to execute his responsibilities, the APNSA has a "need-to-know" for vast amounts of classified information at the TOP SECRET/SCI level.

7.      For example, the APNSA has access to—and, in fact, establishes—a special access program at the TOP SECRET level for all policy matters concerning covert action.  Changes to this special access program must be approved by the APNSA, and the APNSA chairs NSC meetings that address covert action.

8.      As defined in 50 U.S.C. § 3093, outside of certain exceptions, "covert action" means an activity or activities of the United States Government to influence political, economic, or military conditions abroad, where it is intended that the role of the United States Government will not be apparent or acknowledged publicly.

9.      In addition, as detailed in Section 4.3 of Executive Order 13526, the APNSA must, upon request, be briefed on any special access program created by the Director of National Intelligence, the Attorney General, or the Secretary of State, Defense, Energy, or Homeland Security.  These special access programs safeguard classified information, frequently at the TOP SECRET/SCI level.

10.     To discharge his responsibilities, the APNSA engages in a wide variety of activities on a daily basis involving information that is classified at the TOP SECRET/SCI level ("SCI"), describes activities that produce or relate to SCI, or is derived from SCI.

UNCLASSIFIED

UNCLASSIFIED

11.     In fact, the whole working environment of the NSC staff is set up to function at

the TOP SECRET/SCI level.  Every individual on the NSC staff, including each administrative

assistant, is required to hold an active security clearance at the TOP SECRET/SCI level.  Every

NSC staff member, including each administrative assistant, also has an e-mail address on a

network designed and used for secure communications, including at the TOP SECRET/SCI

level.  The work of the NSC staff could not be accomplished without a significant amount of

correspondence occurring at the TOP SECRET/SCI level.

12.     As detailed in NSPM-4, the APNSA is responsible for determining the agenda for

the National Security Council, ensuring all necessary papers are prepared for the same, and

recording actions of the Council.  The APNSA is a regular attendee at meetings of the National

Security Council.  Other regular attendees of the National Security Council include the President,

the Vice President, and various Cabinet-level officials who head the Executive Branch

departments and agencies responsible for national security and foreign policy, such as the

Secretary of State, the Secretary of the Treasury, the Secretary of Defense, the Attorney General,

the Secretary of Energy, and the Secretary of Homeland Security.  Additional regular attendees

include other senior intelligence and defense officials in the Executive Branch, such as the

Director of National Intelligence, the Chairman of the Joint Chiefs of Staff, and the Director of

the Central Intelligence Agency.  Other senior EOP staff invited to meetings of the National

Security Council include the Chief of Staff to the President, the Counsel to the President, and the

Deputy Counsel to the President for National Security Affairs, who is also the NSC Legal

Advisor.  As the principal forum for considering and advising the President on national security

and foreign policy matters, National Security Council meetings frequently involve discussion or

UNCLASSIFIED

UNCLASSIFIED

dissemination of SCI, or involve descriptions or discussions of activities that produce or relate to SCI or that are derived from SCI.

13.     To execute the responsibilities prescribed by NSPM-4 relating to the National Security Council, the APNSA approves for distribution materials to the President, Vice President, and relevant heads of executive departments and agencies, senior intelligence and defense officials, and senior White House officials.  These materials, which are produced to facilitate executive decision-making as well as to implement and coordinate the execution of any decisions made, frequently contain SCI, describe activities that produce or relate to SCI, or are derived from SCI.  It is standard practice for these materials to be reviewed and approved by the APNSA prior to dissemination.

14.     Under NSPM-4, the APNSA also convenes and chairs meetings of the Principals Committee, which is the Cabinet-level senior interagency forum for considering policy issues affecting the national security interests of the United States.  The APNSA extends invitations to Principals Committee meetings to the heads of certain Executive Branch departments and agencies and other senior officials relevant to addressing the national security issues requiring attention at the highest levels of the U.S. Government.  As a Cabinet-level senior interagency forum, Principals Committee meetings frequently involve discussions or dissemination of SCI, or involve descriptions or discussions of activities that produce or relate to SCI or that are derived from SCI.

15.     As the chair of Principals Committee meetings, the APNSA frequently requires materials that contain SCI, describe activities that produce or relate to SCI, or are derived from SCI.  His responsibilities include approving for circulation all agendas, briefing papers, and other background documents relating to these meetings prior to the meeting.  In preparation to chair a

UNCLASSIFIED

**UNCLASSIFIED**

Principals Committee meeting, the APNSA regularly receives briefings that contain SCI,

describe activities that produce or relate to SCI, or are derived from SCI.  After chairing a

Principals Committee meeting, the APNSA directs the documentation and dissemination of the

outcome of the meeting, coordinates the implementation of any policy decision made during the

meeting, and, as appropriate, plans for any next steps.  To do so, the APNSA regularly uses or

relies on information that contains SCI, describes activities that produce or relate to SCI, or is

derived from SCI.

     16.    As a senior advisor to the President on national security issues, the APNSA has

access to the highest levels of classified national security and intelligence information, and he

receives frequent updates on national security matters and intelligence activities.  These updates

frequently include information classified at the highest levels, including TOP SECRET/SCI.

     17.    For example, the APNSA is provided with access to the President's Daily Brief, a

highly classified intelligence product with an extremely limited readership.  The President's

Daily Brief regularly contains information that is SCI, describes activities that produce or relate

to SCI, or is derived from SCI.  In addition to having access to the President's Daily Brief, the

APNSA regularly attends the oral briefings provided to the President concerning the President's

Daily Brief.  These briefings regularly contain information that is SCI, describes activities that

produce or relate to SCI, or is derived from SCI.

     18.    The APNSA also regularly attends other intelligence briefings, both with the

President and in preparation for meetings with the President.  These intelligence briefings inform

the decision-making of the Chief Executive and Commander in Chief on national security and

foreign policy matters.  These briefings regularly contain information that is SCI, describes

activities that produce or relate to SCI, or is derived from SCI.

**UNCLASSIFIED**

19.     The APNSA receives frequent updates—often multiple times each day—from the National Security Council staff and others on quickly developing national security-related events, activities, or issues.  To discharge his responsibilities, the APNSA must frequently alert Cabinet-level officials, senior intelligence and military officials, and senior White House advisors of the information.  He may also convene a meeting under NSPM-4, coordinate action across Executive Branch departments and agencies, brief and advise the President on the information, and execute any decision made by the President.  In all of these actions, the APNSA frequently uses or relies on information that is SCI, describes activities that produce or relate to SCI, or is derived from SCI.

20.     The APNSA, as a senior advisor to the President, also communicates with his counterparts around the world on matters of national security.  Prior to and in preparation for these conversations and meetings, the APNSA receives briefings and preparatory materials from the NSC staff.  These materials frequently contain information that is SCI, describes activities that produce or relate to SCI, or is derived from SCI.

21.     To execute his responsibilities as a senior advisor to the President on national security issues, the APNSA must not only have access to the highest levels of national security and intelligence information, but he must have access to classified communications systems 24 hours a day, 7 days a week, including the ability to transmit and receive information that is SCI, describes activities that produce or relate to SCI, or is derived from SCI.  For that reason, when the APNSA travels, the APNSA must always be able to access secure communications.  As a result, the APNSA is at all times able to discuss information that is SCI, describes activities that produce or relate to SCI, or is derived from SCI.

**UNCLASSIFIED**

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 30th day of July, 2020 in the City of Washington, District of Columbia.

MATTHIAS MITMAN

8

**UNCLASSIFIED**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | **)** | |
| | **)** | |
| Plaintiff, | **)** | |
| | **)** | |
| v. | **)** | Civil Action No. 20-1580 (RCL) |
| | **)** | |
| JOHN R. BOLTON, | **)** | |
| | **)** | |
| Defendant. | **)** | |
| | **)** | |

## [PROPOSED] ORDER

It is hereby ORDERED that Defendant's Motion to Dismiss the First

Amended Complaint is DENIED, and Plaintiff's Motion for Summary Judgment is

GRANTED.

The Court further ORDERS that the Government submit, within thirty days

of this Order, a proposed plan for further remedial proceedings.


DATE:_____                                _____

                                          UNITED STATES DISTRICT JUDGE