**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE UNITED STATES OF AMERICA,

                      Plaintiff,

v.

JOHN R. BOLTON,

                  Defendant.

Civil Action No. 20-1580-RCL

**DEFENDANT'S REPLY IN SUPPORT OF HIS
<u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

August 14, 2020

Charles J. Cooper, Bar No. 248070
Michael W. Kirk, Bar No. 424648
John D. Ohlendorf, Bar No. 1024544

COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC  20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
Email: ccooper@cooperkirk.com

*Counsel for Defendant John R. Bolton*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... ii

INTRODUCTION ................................................................................1

ARGUMENT ....................................................................................2

I.     The SCI NDA Does Not Apply for Multiple Independent Reasons..................................3

      A.     The Government Has Not Alleged that the Book Contained Information
           that Was Classified, or in the Classification Process, at the Time
           of Disclosure. .......................................................................3

      B.     The Government Has Not Alleged that Bolton Had Reason To Believe
           that the Manuscript Contained SCI or Information Related to SCI.........................7

II.    The Classified Information NDA also Does Not Apply, and even if it Did,
      Bolton Did Not Breach It. .................................................................17

III.   The Fiduciary Duties Invoked by the Government Cannot Support its Claims. ...............24

CONCLUSION.................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                                     **Page**

*Brandenburg v. Ohio*, 395 U.S. 444 (1969).................................................................................1

*BWX Elecs., Inc. v. Control Data Corp.*, 929 F.2d 707 (D.C. Cir. 1991)...................................11

*Cities of Campbell v. F.E.R.C.*, 770 F.2d 1180 (D.C. Cir. 1985) .............................................20

*De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806 (1997)..........................9, 16

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)...........................................................5

*Franconia Assocs. v. United States*, 536 U.S. 129 (2002) ..........................................................11

\* *Gray v. American Exp. Co.*, 743 F.2d 10 (D.C. Cir. 1984)........................................................10

*Grosjean v. American Press Co.*, 297 U.S. 233 (1936) ................................................................1

*In re APA Assessment Fee Litig.*, 766 F.3d 39 (D.C. Cir. 2014) .................................................25

\* *Keepseagle v. Perdue*, 856 F.3d 1039 (D.C. Cir. 2017) ...........................................................5

\* *Lowe v. SEC*, 472 U.S. 181 (1985) ..........................................................................................20

\* *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995) .........................................10

\* *McGehee v. Casey*, 718 F.2d 1137 (D.C. Cir. 1983) .................................................................10

*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995)...............................................................................................................16

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015)....................................................................5

*Russello v. United States*, 464 U.S. 16 (1983) ...........................................................................22

*S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547 U.S. 370 (2006)...........................................23

*Snepp v. United States*, 444 U.S. 507 (1980)...............................................................8, 11, 19, 25

*Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975)................................................25

\* *T. Brown Constructors, Inc. v. Pena*, 132 F.3d 724 (Fed. Cir. 1997).....................................9, 18

*United States v. Marchetti*, 466 F.2d 1309 (4th Cir. 1972) .............................................13, 19, 22

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982).................25

*Wilson v. CIA*, 586 F.3d 171 (2d Cir. 2009) ..................................................................13, 19, 22

## INTRODUCTION

Under the Government's interpretation of the nondisclosure agreements at issue, it has the contractual right to punish an author for publishing a book without first obtaining its leave, (1) even if the author *did not know* that the book contained any classified information or "secure compartmentalized information" ("SCI"), (2) even if the author *reasonably believed* that the book *did not* contain any classified information or SCI, (3) even if the author reasonably believed that the book did not contain any information *even related to* SCI, and (4) even if, prior to publication, the author's belief that the book contained no classified information, let alone SCI, was confirmed by an authorized Government official after a painstaking review. And most troubling of all, under the Government's interpretation, it is entitled to seize all earnings from the book *even if these reasonable beliefs were correct* because the book *did not contain* any information, as the contract expressly required, that was "classified or . . . in process of being classified" as SCI at the time it was published, so long as the Government, even *years after publication*, decides to *retroactively* classify some information that is in the book, or that is related to material in the book, as SCI. To our knowledge, *no Government agency has ever written*, and *no court has ever addressed*, an NDA or secrecy agreement purportedly imposing obligations this sweeping. Indeed, the authority the Government claims under Ambassador Bolton's NDAs is so capricious that the many laws and restrictions that have been struck down throughout the history of the Republic as palpably contrary to the First Amendment—from newspaper licensing fees that impose a "tax on knowledge," *see Grosjean v. American Press Co.*, 297 U.S. 233, 245–50 (1936), to criminal bans on the "mere advocacy" of a disfavored viewpoint, *Brandenburg v. Ohio*, 395 U.S. 444, 449 (1969)—appear *reasonable* by comparison, since at least these measures did not seek to retroactively punish speech that *violated no legal duty or obligation when spoken*.

1

The First Amendment would thus demand the rejection of the Government's interpretation of the two NDAs at issue even if it could be reconciled with the text of those contracts and basic principles of interpretation. It cannot.

## ARGUMENT

The Government does not dispute that, to state a claim for relief, it must allege and establish both of two propositions: (1) that Ambassador Bolton had an obligation to *submit* his memoir to pre-publication review (for he cannot have breached a duty of any kind by failing to await the conclusion of a review process he had no obligation to engage in to begin with), and (2) that upon commencing the prepublication review process, he had an obligation to await *written* confirmation before publishing the book (for there is no genuine dispute that an authorized government official *orally* confirmed that the manuscript, as revised, contained no classified information).[1] None of the three sources cited by the Government establishes these necessary propositions:

(I)      The SCI NDA does not suffice because the prepublication review process set forth in that instrument *never* applied to Bolton's book;

(II)     The Classified Information NDA also does not suffice because the relevant provision of this NDA does not require written, as opposed to oral, confirmation that a manuscript submitted for review contains no classified information; and

(III)    The fiduciary duties invoked by the Government also do not suffice because they cannot impose duties that are inconsistent with the obligations spelled out in the express contractual terms governing the parties' relationship.

---

[1] The Government asserts, in a footnote, that while it alleged that Ms. Knight *reached* the "judgment that the manuscript draft did not contain classified information," it "never alleged that Ms. Knight confirmed [that judgment] to Ambassador Bolton." Govt. Br. 12 n.1. But the (undisputed) fact that Ms. Knight orally relayed her judgment to Bolton is evident from the email the Government included as Exhibit I to its Complaint, Doc. 3-14, as well as from the Government's allegations that beginning the day after Ms. Knight completed her review, Defendant began requesting a written confirmation of her judgment, Am. Compl. ¶¶ 47–49.

I.     **The SCI NDA Does Not Apply for Multiple Independent Reasons.**

A.     **The Government Has Not Alleged that the Book Contained Information that Was Classified, or in the Classification Process, at the Time of Disclosure.**

The SCI NDA does not apply, first, because the Government has failed to allege that any SCI that Bolton's book supposedly contains was classified as such *at the time that he authorized its publication*. The Government itself claims that Bolton authorized publication "shortly after his April 27 phone discussions with Ms. Knight," Govt. Br. 35 (July 30, 2020), Doc. 44. Under the plain text of the SCI NDA, that means that the Government must allege that any SCI purportedly disclosed by the book was, as Paragraph 1 plainly requires, "classified or . . . in process of a classification determination" *at that time*—not at some *later* date. That timing requirement holds true on *any* of the Government's ever-more-expansive interpretations of what triggers prepublication review. It matters not at all whether the SCI NDA requires review of materials that are "objectively" classified as SCI, rather than materials that the employee has *reason to believe* are SCI; nor does it matter whether the phrase "related to" SCI is understood in the most expansive sense possible. *But see infra*, Part I.B. For even if the Government prevails on these issues, it remains the case that under Paragraph 1 the *underlying SCI*—the SCI that the manuscript purportedly sets forth, is derived from, or is related to—*must have been classified as SCI, or in that process, at the time the disclosure was authorized*.

The Government cannot make that showing, and it does not even try. The Amended Complaint is utterly devoid of any allegation that the SCI allegedly contained in Bolton's book was classified or in the process of being classified as SCI by April 27 (or shortly thereafter). Nor does the Government's brief assert that this timing requirement was met—an absence that is even more conspicuous given our emphasis of this requirement in our opening brief. Instead, the

Government asserts that this "strict temporal requirement . . . does not emerge from the text of [the SCI NDA] and makes no sense." Govt. Br. 24. Yes it does on both scores.

The "temporal requirement" at issue, *id.*, is set forth in express contractual language. Paragraphs 3 and 4 of the NDA describe a variety of materials with different relationships to SCI: from information "marked as SCI" or that the employee "know[s] to be SCI," SCI NDA ¶ 3, to material that "purports to contain any SCI" or that he "ha[s] reason to believe [is] derived from SCI," *id.* ¶ 4. But what unites *all* of these descriptions—no matter how broadly they are understood—is that all of them *contemplate the existence of actual SCI.* Indeed, Paragraph 10 makes this obvious point explicit, declaring in unequivocal language that "[t]his Agreement concerns SCI and does not set forth . . . other conditions and obligations not related to SCI." And Paragraph 1, in turn, *expressly defines* what constitutes "SCI" for purposes of the contract: information that "involves or derives from intelligence sources or methods *and is classified or is in the process of a classification determination* under the standards of Executive Order 13526 or other Executive order or statute." *Id.* ¶ 1 (emphasis added). The conclusion that follows from the plain text of these provisions is inescapable: if the information that an employee discloses *does not contain*, and *is not derived from or related to* information that, at that time, "is classified or is in process of a classification determination" as SCI *id.*, then the SCI NDA *simply does not apply.*

In addition to being contrary to the SCI NDA's text, it is the Government's interpretation—requiring prepublication review if the information is *ever* classified as SCI at *any* point in time, including *after its disclosure*—that makes no sense. For starters, the very notion of prepublication review of material that, as here, has already been published is oxymoronic. Moreover, if the Government's understanding is correct, Paragraph 1's inclusion of the phrase "or in process of a classification determination" is utterly inexplicable. Only if prepublication review applies, as we

argue, where the material at issue is classified as SCI, or is in that process, at the time of disclosure does Paragraph 1's inclusion of information that is both *presently* classified and "in process of" being classified make sense; if the contract allowed the Government to classify the material as SCI at *any* point in time, including after its disclosure, *there would be no need* to also define SCI in such a way as to encompass information "in process of a classification determination."

More generally, the Government's interpretation would mean that it has the power to penalize publication of a manuscript by *retroactively* classifying material it contains as SCI. "No [employee] tasked with handling classified information would agree to a scheme in which [the employee's obligation] depends entirely on the [Government's] unilateral [and *retroactive*] determination about whether his manuscript contained SCI." Govt. Br. 25. The Government's interpretation is thus so irrational that the Court should adopt it only if required by clear contractual language—and certainly not when the language of the contract *forecloses* it. *See Keepseagle v. Perdue*, 856 F.3d 1039, 1047 (D.C. Cir. 2017) (courts must avoid an "interpretation of [a] contract that 'would be absurd' ").

Moreover, the constitutional problems with giving the Government this sort of retroactive power are too obvious to require extended discussion. A scheme that allows the Government to claim an author's earnings from the publication of a book that violated no law or contractual duty *when it was published* simply because the Government *later* decides to classify some information within it (or *related to* it) as SCI cannot be squared with the Due Process Clause. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see also* Def.'s Br. 39 & n.10 (July 16, 2020), Doc. 40-1. And the First Amendment difficulties with the Government's interpretation are equally stark. It is blackletter law that an effort by the Government to punish speech, because of its content, is unconstitutional unless it meets strict scrutiny, *see Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155,

163 (2015); but the authority that the Government claims here—the power to punish speech that violated no duty when it occurred by deeming it classified *after the fact*—is simply beyond the pale. If the Government's interpretation of the SCI NDA is correct, the contract is unconstitutional on its face, and the Court must strike it down.

The Government does not even address our Due Process argument, and its only discussion of the First Amendment is comprised of a lengthy recitation of the "settled law" that there is "no first amendment right to publish" "information properly classified." Govt. Br. 36. True but irrelevant. We expressly noted in our opening brief that we have no quarrel with that settled law, Def.'s Br. 36, but *not one* of the cases cited by the Government offers any support for the startling proposition that the First Amendment allows it to punish the publication of information *that was not classified at all* at the time of publication. Indeed, the entire premise of the "safety valve" that the Government says resolves any First Amendment difficulties—the availability of judicial review—is that the classification decision must take place *before disclosure occurs*.

That also suffices to dispose of the Government's argument that it cannot be left "powerless to stop the disclosure of classifiable information, simply because it was not identified as classified until the prepublication-review process." Govt. Br. 25. No such power is at issue here at all. What the Government seeks here is *not* the authority to "stop the disclosure of classifiable information" that is belatedly identified; what it seeks is the right to penalize the employee for a publication *that has already taken place*. The consequences of that position are startling. By the Government's logic, it should be able to retroactively deem material contained in a book to be classified as SCI *even years after publication* and then seek to confiscate the author's earnings. Once the "strict temporal requirement," Govt. Br. 24, set forth in Section 1 of the SCI NDA itself is discarded, the Government's power provides no temporal limit on the NDA's scope *whatsoever*.

**B.      The Government Has Not Alleged that Bolton Had Reason To Believe that the Manuscript Contained SCI or Information Related to SCI.**

The SCI NDA did not apply here for a second, independent reason: Bolton never had any "reason to believe" that his book contained information that "might be [SCI], or related to or derived from SCI." SCI NDA ¶ 3.

1.      The SCI NDA at most requires prepublication review of a writing that an employee has some *reason to believe* contains information related to SCI. Def.'s Br. 30–33. The Government contrives a more-expansive reading of the NDA, one that, in effect, would impose *strict liability* on an employee for publishing material later deemed to contain SCI, or information related to or derived from SCI, *even if he had no knowledge or reason to be aware of it*. Such an extraordinary, strict-liability requirement obviously cannot be read into Paragraph 3 of the SCI NDA, since that provision on its face only applies to information "marked as SCI or that I know to be SCI," or "that I have reason to believe might be [SCI], or related to or derived from SCI." SCI NDA ¶ 3.

The Government attempts to evade the clear limitation set forth in Paragraph 3 by claiming that Paragraph 4 sets forth "a prepublication-review scheme that is completely independent of Paragraph 3," one that "depends on whether the preparation includes a 'description of activities that produce or relate to SCI,' not what the author purportedly 'believes.' " Govt. Br. 19, 22. In other words, Paragraph 4, according to the Government, mandates prepublication review of any material "relate[d] to SCI" *regardless* of the employee's state of knowledge. But even if Paragraph 4 is considered as a stand-alone contract unto itself, unrelated to the other provisions of the NDA, such an interpretation is contrary to its text and basic canons of construction. And once Paragraph 4 is read in harmony with the rest of the contract, the interpretation becomes completely untenable.

Paragraph 4's text sets forth three separate triggers that require a writing to undergo prepublication review: if it (1) "contains or purports to contain any SCI," (2) "contains or purports

to contain any . . . description of activities that produce or relate to SCI," (3) or "contains or purports to contain any . . . description of activities . . . that I have reason to believe are derived from SCI." SCI NDA ¶ 4. The Government homes in on the second, reading it as a strict-liability provision requiring prepublication review for any writing containing "any . . . description of activities that relate to SCI," regardless of whether the author knew or had reason to believe that it did. But that interpretation cannot be squared with the presence of the *third* trigger: information "that I have reason to believe [is] derived from SCI." *Id.* That third trigger's inclusion of an express *scienter* requirement—"reason to believe"—strongly indicates that the application of Paragraph 4, like Paragraph 3, was meant to depend on the employee's state of mind, not to apply in the strict-liability manner proposed by the Government.

Even more fundamentally, however, the Government's strict-liability interpretation of the second trigger cannot be correct because it renders the third trigger *utterly superfluous*. After all, if prepublication review is required for all writings that contain either SCI itself or a "description of activities that . . . relate to SCI," *whether or not the employee knows or has reason to know it*, the result is that the employee must submit *any* writing that relates to his government service. Indeed, the Government could not be clearer about that point: the very purpose of its strict-liability interpretation of the "relate to" trigger, it explains, is to render the NDA equivalent in scope to the agreements used by other agencies, such as the CIA in *Snepp v. United States*, 444 U.S. 507 (1980), which cover writings that are in any way "tied to the signing official's on-the-job duties." Govt. Br. 22. And if that interpretation of Paragraph 4's second trigger is correct, then the third trigger adds nothing whatsoever to the scope of review that is required. The secrecy agreement in *Snepp*—requiring review of "any information or material relating to the Agency, its activities or intelligence activities generally," 444 U.S. at 508—would not have been broadened in the slightest

by additionally requiring review where the employee "ha[s] reason to believe" his manuscript contains a "description of activities . . . derived from" classified information. So too here: if Paragraph 4's first and second triggers really required, as the Government says, that an employee submit any manuscript "tied to the signing official's on-the-job duties," it would be utterly pointless to *separately* require the submission of a manuscript that he "ha[s] reason to believe" contains a "description of activities . . . derived from SCI." SCI NDA ¶ 4.

The Court should reject an interpretation that creates such senseless redundancy. *See T. Brown Constructors, Inc. v. Pena*, 132 F.3d 724, 730–31 (Fed. Cir. 1997). Accordingly, the first and second triggers must *at a minimum* be read as applying only where the employee has a *reason to believe* that the writing at issue contains SCI, or information related to SCI.[2]

The Government's interpretation of the "related to" phrase is also contrary to several other principles of construction. First, the Government effectively acknowledges that it would be "absurd" to interpret the SCI NDA as requiring prepublication review of virtually *every* writing by a former employee, Govt. Br. 22, from op-eds to personal emails. But that is *precisely* the result that the Government's interpretation of Paragraph 4 yields. As the Supreme Court has observed in a different context, since "everything is related to everything else," "really, universally, relations stop nowhere." *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 813 & n.7 (1997) (brackets and quotation marks omitted). The Government's strict-liability interpretation of Paragraph 4 would thus effectively require a former employee to submit to prepublication review *every* writing touching on his government service, lest some obscure passage be later deemed by the Government, unbeknownst by the employee or anyone else, to "relate" to SCI.

---

[2] Indeed, because the third, "reason to believe" trigger reads most naturally as a *broadening* of the scope of prepublication review, the best reading is that triggers one and two require *actual knowledge* on the part of the employee that the writing contains SCI or information related to SCI.

That is plainly contrary to the First Amendment. *See* Def.'s Br. 35–37; *Lowe v. SEC*, 472 U.S. 181, 203–11 (1985) (contractual interpretation should avoid expanding a chill on free speech). As noted above, the Government attempts to square its interpretation with the Constitution by reciting the "settled law" that prepublication review *in general* is consistent with the freedom of speech. Govt. Br. 36. But the very cases it relies upon also establish that a scheme of prepublication review passes constitutional muster only if it is limited by criteria that "do not sweep too broadly because they impede disclosure only when it poses a reasonable probability of 'serious' harm." *McGehee v. Casey*, 718 F.2d 1137, 1143 (D.C. Cir. 1983). A restraint that bars a former employee from publishing even those materials that he *has no "reason to believe"* contain SCI (or information related to or derived from SCI) cannot sensibly be said to meet that requirement. And at the very least, both the First Amendment and Due Process preclude reading the NDA to impose such a prior restraint, unlimited by any *scienter* requirement, *unless it does so explicitly and unambiguously* as did the contract in *Snepp* and all of the other CIA cases the Government cites.

Any ambiguity on this score must also be resolved against the Government's interpretation under the familiar rule of *contra proferentem*, *see Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995)—particularly given that the NDA is an obvious contract of adhesion, *see Gray v. American Exp. Co.*, 743 F.2d 10, 18 (D.C. Cir. 1984). The Government disputes this, arguing that Bolton is "a lawyer and an experienced practitioner in national security circles" and he signed the NDA "in consideration for the privilege of serving as the President's closest national security advisor." Govt. Br. 21. These responses are all beside the point, because the "contract of adhesion" principle turns not on the parties' respective sophistication, nor on the presence of consideration, but rather on whether the contract "is a standardized contract form offered without realistic opportunity to bargain." *Gray*, 743 F.2d at 18 (quotation marks omitted). The Government

10

does not dispute that it was. It does briefly claim that "general contract law principles" such as the rule of *contra proferentem* should not apply *at all* to Bolton's contracts, Govt. Br. 20, but the only authority it cites for that astonishing proposition—*Snepp*—says nothing of the kind. All *Snepp* rejected was the dissent's attempt to draw an analogy between the secrecy agreement there and commercial "noncompete" agreements. *See Snepp*, 444 U.S. at 513 n.9. Nothing in the opinion purports to overturn the settled rule that "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Franconia Assocs. v. United States*, 536 U.S. 129, 141 (2002).

Accordingly, even if Paragraph 4 *were* interpreted in isolation from the rest of the SCI NDA, Govt. Br. 20, the best reading of its terms is that they *at most* (*see supra* n.2) require prepublication review where an employee has "reason to believe" that his writing contains a "description of activities that . . . relate to SCI. And the case for that interpretation of Paragraph 4 becomes overwhelming when it is read in harmony "with the contract as a whole." *BWX Elecs., Inc. v. Control Data Corp.*, 929 F.2d 707, 711 (D.C. Cir. 1991). Most importantly, as explained in our opening brief, Paragraph 4 of the SCI NDA is best read as a further elucidation of the prepublication review requirement established in Paragraph 3—which, as noted above, explicitly conditions agency review on the employee possessing "reason to believe" that the information he wishes to disclose "might be [SCI], or related to or derived from SCI." Far from harmonizing the two paragraphs, the Government's interpretation of Paragraph 4 as mandating review on a strict-liability basis would effectively *nullify* Paragraph 3's *scienter* requirement.

The Government responds that the two Paragraphs retain some independent meaning because "Paragraph 3 applies to any attempt to divulge classified information, including oral disclosures," while Paragraph 4 is limited to disclosures in writing. Govt. Br. 20. But that (at most,

partial) response runs into an equally serious difficulty: why on earth would the parties *want* to draw such an arbitrary line between oral and written disclosures? On the Government's interpretation, for instance, while an employee would be free to *call* a reporter at the New York Times to convey politically salient information that the employee had no "reason to believe" might be SCI, or related to or derived from SCI, Paragraph 4 would inexplicably require him to seek prepublication review if he decided instead to put the information in an email. The Government offers no justification for reading the SCI NDA as imposing so nonsensical a distinction.

In addition to Paragraph 3, the Government's strict-liability interpretation of Paragraph 4's "related to" language is also in fundamental tension with multiple other provisions of the SCI NDA. From top to bottom, the contract is plainly concerned with the proper handling of information that the employee knows or at least *has some reason to believe* is SCI—that is, information that Paragraph 1, again, defines as "involve[ing] or deriv[ing] from intelligence sources or methods and is classified or is in process of a classification determination." Indeed, defining SCI to include information "in process of a classification determination" plainly assumes *awareness* by the employee of the information's classification status.

Accordingly, the text of Paragraph 4, basic principles of interpretation, and the terms of the SCI NDA as a whole all unite in dooming the Government's interpretation of Paragraph 4 as requiring prepublication review of materials that "relate to" SCI *whether or not* the employee has any knowledge or reason to be aware of the fact. The Government's principal response is that its strict-liability reading is necessary because it "would defeat the purpose" of the SCI NDA if an employee were "permitted to opt-out of prepublication review so long as they have sufficient subjective certainty that their manuscript does not contain SCI and is not a description of activities that produce or relate to SCI." Govt. Br. 23. That argument merely erects, and then slays, an

12

elaborate straw man. *No one* advocates a reading of the NDA that makes prepublication review contingent on the employee's "unilateral determination about whether his manuscript contained SCI," Govt. Br. 25, since Paragraph 3 makes clear that so long as the employee has "reason to believe" information in the contemplated disclosure "might be [SCI], or related to or derived from SCI" his duty to "consult with appropriate management authorities" is triggered, SCI ND ¶ 3. The SCI NDA thus plainly adopts—on *our* interpretation—the very "objective reasonable person standard" the Government elsewhere advocates. Govt. Br. 29. What the Government's interpretation imposes is something altogether different—a strict liability standard that would put the employee on the hook *regardless* of what an "objective reasonable person" would believe.

The Government invokes *Snepp*, *United States v. Marchetti*, 466 F.2d 1309, 1318 (4th Cir. 1972), and *Wilson v. CIA*, 586 F.3d 171, 194 (2d Cir. 2009), but those cases all support our interpretation. The agreements at issue there were, again, materially different from the SCI NDA— requiring prepublication review of a much broader class of information. *See Snepp*, 444 U.S. at 508 ("any information or material relating to the Agency, its activities or intelligence activities generally"); *Wilson*, 586 F.3d at 178 ("any mention of intelligence data or activities"); *Marchetti*, 466 F.2d at 1312 n.2 ("any information relating to the national defense and security"). The Government never explains why the NDA it wrote and had Bolton sign should be interpreted the same way as these other agreements despite their dispositive textual differences.

2.      The Amended Complaint thus fails to state a claim for breach of the SCI NDA because it does not include any allegations that Bolton knew, or even that he had *reason to believe,* his memoir contained SCI or information related to or derived from SCI. Nor does it allege what information he had that should have given him such reason to believe. The *sole* allegation on this point is the naked (and late-breaking) allegation that "the NSC has determined that information in

the manuscript is classified at the . . . Top Secret/SCI levels." Am. Compl. ¶ 59 (June 19, 2020), Doc. 18. There is no allegation that this information (at the time of disclosure) was *marked* as SCI, that Bolton *knew* it was SCI, or that he had *reason to believe* it was SCI. Nor is there any allegation that Bolton had *reason to believe* that anything in the book described activities *related to or derived from* SCI. Indeed, in keeping with the Government's erroneous strict-liability interpretation, there is no allegation about Bolton's *scienter* at all. Given that both Paragraphs 3 and 4, as just discussed, require *some* level of knowledge by the employee before prepublication review is triggered—even if only "reason to believe"—the absence of any of these allegations is fatal to the Government's claim. It is simply not sufficient, as the Government asserts, to allege that "the manuscript *actually contains* . . . SCI," Govt. Br. 15 n.2, without some further allegation about Bolton's *scienter*.

The allegations that are in the Complaint in fact conclusively show that Bolton had every reason to believe that his book *did not* contain any such information. The Government *concedes* that when Bolton submitted his manuscript for review, he believed in good faith that it *did not* contain "any discussion . . . of sensitive compartmented information ('SCI')." December 30, 2019 Letter at 1, Doc. 1-4; *see also* Govt. Br. 10. The Government *does not and cannot dispute* that during his four-month interaction with Ms. Knight, she at no point so much as hinted that the manuscript contained any SCI, or any description of an activity related to or derived from SCI, although she said it contained classified information. To the contrary, the Government *concedes* that upon the conclusion of her review, Ms. Knight "was of the judgment that there was no classified information remaining in the manuscript." Am. Compl. ¶ 46; *see also* Govt. Br. 11-12. Indeed, the original Complaint did not even allege that the book contained any SCI at all; not until the filing of its preliminary injunction papers did the Government *ever* suggest that the manuscript contains SCI, or material derived from or related to information classified as SCI.

In addition to establishing that Bolton had no reason to believe prepublication review was required under the SCI NDA, his interactions with Ms. Knight make doubly irrelevant the Government's argument—discussed above—that the NDA does not allow an employee to avoid review based on his "unilateral," "subjective" beliefs. Govt. Br. 2. Far from acting based on his *unilateral* judgment that his manuscript did not contain any SCI, the Government *admits* that Bolton in fact *confirmed* with the senior NSC official charged with conducting prepublication review, over a painstaking, four-month process, that *she shared* his "judgment the manuscript draft did not contain classified information," let alone SCI. Am. Compl. ¶ 46.

The Government's latest brief sharply pivots away from its belated allegation that the manuscript contains information classified as SCI, going so far as to assure the Court that it need not address "the question whether the manuscript *actually contains* . . . SCI." Govt. Br. 15 n.2. Instead, the Government now urges that the SCI NDA's "triggers sweep more broadly than SCI information, . . . to encompass any written description of 'activities that produce or relate to SCI.' " *Id.* at 19 (quoting SCI NDA ¶ 4). This gambit does not improve the Government's position.

For starters, while the Government nakedly asserts that the book "includes descriptions of activities that produce or relate to SCI," *Id.* at 18, it tellingly *never identifies*—not in its complaint, not in its brief, and not by declaration—a *single passage* that it actually contends meets this requirement. Instead, it rests on the argument that because Bolton's "official duties as National Security Advisor necessarily involved activities that produce or relate to SCI" and "required him to handle materials" involving SCI "on a nearly daily basis," any book "describ[ing] his daily activities as the National Security Advisor" *must necessarily* include information related to SCI. *Id.* at 2, 18. That the National Security Advisor reviews SCI—information that "involves or is derived from intelligence sources or methods and is classified or in process of classification"—on

a "nearly daily basis" does not mean that anything a former National Security Advisor writes concerning his service necessarily describes activities that relate to SCI. Lawyers have access to confidential client information on a "nearly daily basis," yet they routinely prepare written works that neither reveal client confidences nor describe matters related to client confidences. Simply put, allegations that Bolton had access to SCI on a routine basis do not establish that his book contains SCI or describes activities related to SCI.

As discussed above, "many a curbstone philosopher has observed" that "everything is related to everything else," *De Buono*, 520 U.S. at 813 n.7, but Bolton's contract with the Government—which imposes legal obligations and penalties and restricts speech protected by the First Amendment—cannot reasonably be interpreted in the manner of a hypothetical in a sophomore philosophy class. And if the Government's expansive understanding of what information is "related to" SCI were correct, it would necessarily entail the result (which the Government itself tacitly acknowledges to be "fanciful," Govt. Br. 22) that *everything* written by a former National Security Advisor that touches on his former government role would be subject to prepublication review. That is essentially what the NDAs of some intelligence agencies require, but not this one. No, as a matter of legal interpretation and common sense, the SCI NDA's reference to information "relate[d] to" SCI must be read as requiring that the information bears some *genuine and direct* relationship to SCI. *Cf. New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 661 (1995) (interpreting the phrase "relate to" in ERISA's preemption clause to exclude "only a tenuous, remote, or peripheral connection").

Ultimately, however, the Government's claims must be dismissed *regardless* of how broadly the phrase "relate to" is interpreted. For as shown *supra*, in Part I.B.1, under the SCI NDA, the bare *presence* of information "relate[d] to . . . or derived from SCI" does not suffice to trigger

prepublication review. SCI NDA ¶ 4. Rather, the Government must additionally meet the NDA's *scienter* requirement—by alleging that the employee knew or, at a minimum, had *reason to believe* that his manuscript includes such information. And as noted above, the Government's Amended Complaint *contains no such allegation*.

## II. The Classified Information NDA also Does Not Apply, and even if it Did, Bolton Did Not Breach It.

As explained in our opening brief, the Classified Information NDA sets forth two separate and distinct types of review:

(1): "I hereby agree that I will never divulge classified information to anyone unless: (a) I have officially verified that the recipient has been properly authorized by the United States Government to receive it; or (b) I have been given prior written notice of authorization from the United States Government Department or Agency (hereinafter Department or Agency) responsible for the classification of information or last granting me a security clearance that such disclosure is permitted."

(2): "I understand that if I am uncertain about the classification status of information, I am required to confirm from an authorized official that the information is unclassified before I may disclose it, except to a person as provided in (a) or (b) above."

Classified Information NDA ¶ 3. The first type of review does require "written notice of authorization," but it never applied to Bolton because it is expressly limited to situations where the employee wishes to divulge information he *knows* to be classified. And the second type of review does not require *written* confirmation "that the information is unclassified." *Id.* The Government's efforts to rebut these points fail.

A. The Government argues that the first type of review set forth by the Classified Information NDA "does not turn on whether [the employee] knows the information is classified, or whether he believes it is, or even whether he believes it is not: the requirement is simply that he 'never divulge classified information.' " Govt. Br. 28 (quoting Classified Information NDA ¶ 3). The fundamental problem with this strict-liability interpretation is that it reads the *second* type of

review established by the NDA—the *entire second half of Paragraph 3*—out of the contract entirely. For if the provision that an employee "never divulge classified information" applied to information that is classified *even though the employee does not know it*, there would be no purpose at all in *separately* requiring the employee, when he is "uncertain about the classification status of information," to "confirm from an authorized official that the information is unclassified." Classified Information NDA ¶ 3. That situation would *already* be covered by the supposed requirement that anything containing "classified information" must be submitted for review *regardless* of the employee's knowledge—and the express language of the second review provision allowing him to "disclose the information" after he has "confirm[ed] from an authorized official that the information is unclassified" would be eliminated entirely. The Court should not adopt an interpretation that creates such redundancy. *T. Brown Constructors*, 132 F.3d at 730–31.

The NDA's careful separation of the two types of review that the Government conflates is also evident from the second type of review's reference back to the first. The second half of Paragraph 3 makes clear that the review scheme triggered when an employee is "uncertain about the classification status of information" does not apply if the review set forth in the first half of the Paragraph has already taken place, such that the employee only intends to disclose the information "to a person as provided in (a) or (b), above." Classified Information NDA ¶ 3. The Government's cryptic response to this point—that "there is no need to confirm whether the information can be released at that point, since the signatory already has the answer from the Government to the question of 'can I release this?' "—merely *restates* the point *as though* it is refuting it.

The Government's efforts to avoid the redundancy created by its interpretation of Paragraph 3 border on the incomprehensible. It alternately says that the first type of review "informs the second," or that they should be read "together" as "impos[ing] a single prepublication

review requirement." Govt. Br. 28, 29. Those contentions simply cannot be squared with the plain language of Paragraph 3, which on its face sets forth two deliberately *separate* schemes of review.

Ultimately the Government admits that "it does not make sense to say that a person cannot disclose classified information, regardless of his subjective understanding of the status of the information" (*i.e.*, that the first half of Paragraph 3 requires review *regardless* of the employee's *scienter*) "*but* that his obligation to confirm the classification status of that information depends on his *subjective* assessment of the information" (*i.e.* that the second half of the Paragraph only requires review where the employee is in fact *uncertain* whether the information is classified). Govt. Br. 28. The solution to this conundrum of the Government's making is not to adopt the Government's procrustean interpretation that *reads the word "uncertain"*—as well as the *entire second half of the Paragraph*—out of the contract. Rather, the solution is to interpret the *first* type of review in the sensible way we have proposed: as applying only where the employee wishes to disclose information that *he knows* is classified.

This interpretation is again confirmed by the differently worded NDAs used by other agencies. As noted above, those other contracts sweep much more broadly—requiring prepublication review where a book contains "any information or material relating to the Agency, its activities or intelligence activities generally," *Snepp,* 444 U.S. at 508, "any mention of intelligence data or activities," *Wilson*, 586 F.3d at 178, or "any information relating to the national defense and security," *Marchetti*, 466 F.2d at 1312 n.2. The Government does not explain why the Classified Information NDA's *very different* language should be interpreted in an identical way. It asserts that "the fact that other contracts that other agencies use have different terms, says nothing about the requirements imposed by *this* contract," Govt. Br. 31–32 (citation omitted), but that is not so: the different wording of these contracts shows that the Government—which *drafted all* of

the contracts at issue—knows how to impose a more expansive prepublication review requirement when it wishes to. *Cf. Cities of Campbell v. F.E.R.C.*, 770 F.2d 1180, 1186–90 (D.C. Cir. 1985) (interpreting utility contract in light of "similar language in other contracts regulated by the [Federal Power Act]"). And at the very least, these dispositive textual differences conclusively refute the Government's attempt to draw support from the cases interpreting those other contracts "to give rise to prepublication-review obligations." Govt. Br. 26.[3]

Our interpretation of the first type of review—as requiring *knowledge* that information being disclosed is classified, rather than imposing strict liability—is also required by the canons of construction discussed above. The First Amendment difficulties with the Government's strict-liability interpretation—which would require former employees to preclear virtually *all* of their speech touching on their public service, lest something they say is later deemed to include classified information of which they were completely unaware—should cause the Court to recoil from the construction. *See Lowe*, 472 U.S. at 203–11. And any remaining doubt must be resolved in *Bolton*'s favor, not the Government's, given that the NDA is a contract of adhesion that the Government drafted and presented to him on a take-it-or-leave-it basis. *See supra*, pp. 10–11.

Finally, the Government once again trots out its argument that "the overall purpose" of nondisclosure agreements requires that an employee seek Government confirmation if there is any "*objective*, not *subjective*, doubt as to the status of the information." Govt. Br. 29. Once again this is a straw man of the Government's making, not ours. We have never suggested that the Classified Information NDA leaves an employee free to unilaterally disclose information no matter how

---

[3] Indeed, in *McGehee*—the only case the Government cites involving an NDA that *did not* "explicitly require [the employee] to preclear all [CIA-related] publications"—the court *acknowledged* that fact, and read the agreement as requiring "prepublication review" *only* because the employee chose not to "contest the preclearance requirement." 718 F.2d at 1141 & n.8.

*unreasonable* his uncertainty may be. Indeed, that interpretation is itself unreasonable on its own terms. Interpreting the contract to dispense with the standard "reasonable person standard," *id.,* surely would require clear language and, here, would be hard to square with (1) Paragraph 2's requirement that the employee undergo "a security indoctrination concerning the nature and protection of classified information" and verify that he "understand[s] these procedures," Classified Information NDA ¶ 2, and (2) Paragraph 3's separate provision restricting the "negligent handling of classified information," *id.* ¶ 3. Instead, the basis for our motion to dismiss is that Bolton's actions—as established by the Government's own allegations—*complied* with any "reasonable person standard." *See supra*, pp. 13–15.

This final point is alone sufficient to reject the Government's reliance on the Classified Information NDA. Again, the bottom line of the Government's interpretation is that the NDA as a whole "impose[s] a single prepublication review requirement": one that applies if, at the time of disclosure, "there is objective doubt as to [the classification] status" of the information in a manuscript, as measured by the "reasonable person standard." Govt. Br. 29. Bolton's good faith belief that his manuscript "carefully . . . avoid[ed] any discussion . . . [of] classified information," December 30, 2019 Letter, coupled with Ms. Knight's judgment, after an intensive four-month review process, "that the manuscript draft did not contain classified information," Am. Compl. ¶ 46, *easily satisfies* the Government's (and our) reasonableness standard. Weighing against this evidence of Bolton's reasonable belief that the book contained no classified information is . . . nothing. No where does the Government allege facts that would cast doubt on the objective reasonableness of Bolton's, and Ms. Knight's, belief.

B.      The Government's brief attempt to show that the second type of review set forth by Paragraph 3 requires *written* authorization before publication fares no better. The brute fact is this:

the scheme of review set forth in the *first* half of Paragraph 3 expressly says that the employee must receive "prior written notice of authorization," but the review requirement set forth in the *second* half *does not*. Classified Information NDA ¶ 3. Elementary rules of interpretation, not to mention common sense, establish that when a writing deliberately includes a phrase in one sentence but not the other, that disparate inclusion and exclusion *presumably has significance*. *See Russello v. United States*, 464 U.S. 16, 23 (1983). If the second half of Paragraph 3 stood on its own, there could be no plausible case that it required *written* confirmation, because it simply does not include that word. And the case for that interpretation does not *improve* because the contract, in the *preceding* sentence, *does* require confirmation in writing. The Government's only response is to claim that this disparate wording should be ignored because the two "phrases are not constructed with . . . grammatical parity." Govt. Br. 31. What? That is nonsense. The two halves of Paragraph 3 *obviously* set forth "parallel phrases," *id.*, as the Government well knows, *see id.* at 28 (interpretation of the first review requirement "informs the second . . . requirement"); *id.* at 29 (seeking to "harmonize[ ] the two provisions").

The Government's reading is also undermined, yet again, by the differently worded agreements utilized by *other* agencies—which are *clear* that they require "written authorization" before publication, plano. *See Wilson*, 586 F.3d at 178 (requiring "written permission"); *Marchetti*, 466 F.2d at 1312 n.2 (requiring "the express written consent of the Director of Central Intelligence or his authorized representative"). And further still, in addition to nullifying the Government's own choice in drafting Paragraph 3 to require "written notice of authorization" for the first type of review but not the second, the Government's interpretation would nullify the decision to separate the two types of review to begin with. The Government responds that "[t]here is no redundancy" because the two types of review "cover information of different classification statuses," but the

point is that the decision to erect two different types of review is *nonsensical from the start* if the same process must be followed *no matter which* "scenario[ ]" applies. *Id.* at 31.

The Government argues that the canon *noscitur a sociis* supports its view by requiring "that an ambiguous words [sic] should be determined by considering the words with which it is associated in context." *Id.* at 30. The Government's argument never gets off the ground, since there is simply no ambiguity about whether the phrase "confirm from an authorized official" actually means "confirm from an authorized official *in writing*." And again, the case for adding those two words *is not made stronger* by noting that in the preceding sentence, the Government demonstrated that it *knew* how to require *written* authorization when it wished to by *doing so expressly*. The Government seeks to use context not to interpret a word in light of a list of similar words that surrounds it, but rather to *add* words that simply *are not there*. The *noscitur a sociis* canon is not up to the task. *See S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547 U.S. 370, 378–80 (2006).

Nor can the Government find support in "[t]he course of dealing" between the Government and Bolton. Govt. Br. 34. Defendant made clear from the very beginning that he was submitting his manuscript for review only out of "an abundance of caution" and that he did "not believe that prepublication review is required." December 30, 2019 Letter. The Government asserts that Ms. Knight "repeatedly admonished" Bolton that he needed to obtain "express written approval" before publishing the manuscript, Govt. Br. 34, but the falsity of that claim is conclusively demonstrated by the very communications cited to support it (which the Government at least has the good grace to reproduce in a footnote, *see id.* at 34 n.5), *none of which mention* any requirement of *written* approval. Nowhere in their complaint do they make this false allegation.

The Government also argues that "Defendant's repeated requests for this written authorization" imply "his understanding that it was a necessary condition." *Id.* at 34. But a written

letter memorializing the Government's agreement that the revised manuscript contains no classified information is customary and pro forma, and Bolton can hardly be faulted for wanting a written confirmation that would eliminate the possibility of any later dispute by the Government about its "judgment that the manuscript draft did not contain classified information," Am. Compl. ¶ 46. And any conceivable inference from Bolton's request for written confirmation that he understood such confirmation to be required was almost immediately dispelled when, in the Government's words, he "decided shortly after his April 27 phone discussions with Ms. Knight to proceed with publication, despite not receiving written authorization to publish." Govt. Br. 35.

Finally, the Government argues that even if Paragraph 3 only required Bolton to obtain oral, as opposed to written, "cofirm[ation] . . . that the information is unclassified," Ms. Knight's "judgment that the manuscript draft did not contain classified information" did not suffice, Am. Compl. ¶ 46, because when he asked for "news on the letter" memorializing that judgment, she responded that "[t]he process remains ongoing," May 7, 2020 E-Mail, attached as Exhibit M to the Complaint, Doc. 1-13; *see* Govt. Br. 33. But as the context of that response makes clear, the "process" that "remain[ed] ongoing" was *the process of sending the pro-forma letter* recording Ms. Knight's judgment that the manuscript was clear of any classified information. There is *no* suggestion in *any* of Ms. Knight's communications—and certainly no allegation in the Amended Complaint—that Ms. Knight had at any point come to doubt her conclusion that, as the Government admits, "the manuscript draft did not contain classified information." Am. Compl. ¶ 46.

## III.   The Fiduciary Duties Invoked by the Government Cannot Support its Claims.

Because Bolton complied—*to the letter*—with the express contractual provisions governing his use and disclosure of classified information, the Government's suggestion that he somehow violated his duties to the Government *anyway* is not credible. As we explained in our

opening brief, "a court will not displace the terms of [a] contract and impose some other duties not chosen by the parties." *In re APA Assessment Fee Litig.*, 766 F.3d 39, 46 (D.C. Cir. 2014). And replacing the duties and obligations expressly chosen by the parties with "implied" ones—whether framed as arising from equity, "quasi" contract, or fiduciary duty—would not only violate the common law, it would fall afoul of basic constitutional principles of Free Speech and Due Process. *See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); Def.'s Br. 38–39.

The Government does not meaningfully address any of these problems—indeed, it informs the Court that it "does not need to resolve the question" of whether Bolton violated some implied, fiduciary duty. Govt. Br. 17 n.3. Instead, the Government's sole defense of its fiduciary-duty claims is that our "position contradicts *Snepp*," which it reads as recognizing "a fiduciary obligation to protect confidential information" that *is not* displaced by express contractual language governing the parties' relationship. *Id.* Once again, the Government has sought to read far more into one of *Snepp*'s footnotes than it can reasonably contain. All the cited footnote says is that "in the absence of a written contract, an employee has a fiduciary obligation to protect confidential information," but that "we need not look to the common law to determine the scope of Snepp's fiduciary obligation" because "this case involves the breach of a trust agreement." 444 U.S. at 515 n.11. It requires quite the feat of mystic interpretation to read this footnote as *requiring* this Court to "look to the common law" in the very circumstances that *Snepp declined* to do so.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendant's Motion to Dismiss.

August 14, 2020                                  Respectfully submitted,

                                                 /s/ Charles J. Cooper
                                                 Charles J. Cooper, Bar No. 248070
                                                 Michael W. Kirk, Bar No. 424648
                                                 John D. Ohlendorf, Bar No. 1024544

                                                 COOPER & KIRK, PLLC
                                                 1523 New Hampshire Avenue, NW
                                                 Washington, DC 20036
                                                 Telephone: (202) 220-9600
                                                 Facsimile: (202) 220-9601
                                                 Email: ccooper@cooperkirk.com

                                                 *Counsel for Defendant John R. Bolton*