# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | |
| Plaintiff, | Civil Action No. 20-1580-RCL |
| v. | |
| JOHN R. BOLTON, | |
| Defendant. | |

## MOTION TO DEFER CONSIDERATION OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(d)

Pursuant to Federal Rule of Civil Procedure 56(d), and for the reasons stated in the accompanying memorandum and declaration, Defendant John R. Bolton moves to defer consideration of Plaintiff's July 30, 2020 Motion for Summary Judgment, Doc. 44—or, in the alternative, to deny that motion without prejudice to refiling at a later date—so that Defendant has a full and fair opportunity to engage in necessary and appropriate discovery.

Pursuant to LCvR 7(m), Defendant's counsel states that he reached out to counsel for the United States, Mr. Morrell, to notify him of our intent to file the instant motion, and Mr. Morrell has represented that the United States opposes the motion.

August 20, 2020

Respectfully submitted,

/s/ Charles J. Cooper
Charles J. Cooper, Bar No. 248070
Michael W. Kirk, Bar No. 424648
John D. Ohlendorf, Bar No. 1024544

COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC  20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
Email: ccooper@cooperkirk.com

*Counsel for Defendant John R. Bolton*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE UNITED STATES OF AMERICA,

                    Plaintiff,

v.

JOHN R. BOLTON,

                    Defendant.

Civil Action No. 20-1580-RCL

**DEFENDANT'S MEMORANDUM IN SUPPORT OF HIS MOTION
TO DEFER CONSIDERATION OF PLAINTIFF'S MOTION FOR
<u>SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(d)</u>**

August 20, 2020

Charles J. Cooper, Bar No. 248070
Michael W. Kirk, Bar No. 424648
John D. Ohlendorf, Bar No. 1024544

COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC  20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
Email: ccooper@cooperkirk.com

*Counsel for Defendant John R. Bolton*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

STATEMENT .................................................................................................................... 3

ARGUMENT ..................................................................................................................... 8

     I.     Defendant Has Outlined Particular Facts Necessary to the Litigation that He Intends to Discover ................................................................................... 9

     II.    Defendant Cannot Currently Present the Facts at Issue Because Discovery Has Not Yet Begun. .................................................................................... 15

     III.   Defendant Has Shown that Discovery Will Likely Uncover the Facts at Issue. ... 16

CONCLUSION ............................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*American Sur. Co. v. Baldwin*, 287 U.S. 156 (1932)................................................................21

\* *Convertino v. United States Dep't of Justice*,
    684 F.3d 93 (D.C. Cir. 2012) ...................................................1, 3, 8, 15, 16, 19, 23

\* *General Dynamics Corp. v. United States*, 563 U.S. 478 (2011) .........................................21, 22

*Jencks v. United States*, 353 U.S. 657 (1957).........................................................................20

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) .........................................................20, 21

*McGehee v. Casey*, 718 F.2d 1137 (D.C. Cir. 1983) .........................................................11, 22, 23

*Metcalf Constr. Co. v. United States*, 742 F.3d 984 (Fed. Cir. 2014).........................................12

*Nelson v. Adams USA, Inc.*, 529 U.S. 460 (2000)....................................................................21

*Philip Morris USA v. Williams*, 549 U.S. 346 (2007).................................................................21

*Service Emps. Int'l Union Nat'l Indus. Pension Fund v. Castle Hill Health Care
    Providers, LLC*, 312 F.R.D. 678 (D.D.C. 2015) ...........................................................15

*Shaffer v. Defense Intelligence Agency*, 102 F. Supp. 3d 1 (D.D.C. 2015) ..................................4

*Stillman v. CIA*, 319 F.3d 546 (D.C. Cir. 2003) .................................................................11, 22

*Strang v. United States Arms Control & Disarmament Agency*,
    864 F.2d 859 (D.C. Cir. 1989)...............................................................................15

\* *United States ex rel. Folliard v. Government Acquisitions, Inc.*,
    764 F.3d 19 (D.C. Cir. 2014) ..................................................................................8

\* *United States v. Reynolds*, 345 U.S. 1 (1953) ..................................................................20, 21


**Rules and Administrative Materials**

FED. R. CIV. P. 12(a)(4)(A) .......................................................................................16

FED. R. CIV. P. 56(c)(1) ............................................................................................1

\* FED. R. CIV. P. 56(d) ............................................................................................8

Executive Order No. 13526, 75 Fed. Reg. 710 (Dec. 29, 2009)....................................................11


**Other Authorities**

\* RESTATEMENT (SECOND) OF CONTRACTS (Am. Law Inst. 1981)...............................................2, 12

# INTRODUCTION

"While the district court enjoys broad discretion in structuring discovery, summary judgment is premature unless all parties have had a full opportunity to conduct discovery." *Convertino v. United States Dept. of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012) (citations and quotation marks omitted). The Government's summary judgment motion—filed less than six weeks after its complaint—not only seeks to limit Ambassador Bolton's "full opportunity to conduct discovery," *id.*, it seeks to *block discovery altogether*. Discovery is necessary here for two reasons.

First, by the Government's own account, its claims that Ambassador Bolton breached the two NDAs he signed, as a condition of his government service, necessarily rest on the factual allegations that his memoir contains (1) classified information, and (2) "Sensitive Compartmented Information" ("SCI"), or a description of activities related to or derived from SCI. Ambassador Bolton's pending motion to dismiss explains why these propositions are not *sufficient* for the Government to state a claim—and for that reason alone, as explained in our motion to dismiss papers, the case should be dismissed under Rule 12(b)(6). But even if the Court concludes otherwise, there can be no question that these two factual allegations are *necessary* to the Government's claims. And as the record stands today, Defendant has had *no opportunity* to take discovery into whether these necessary allegations are true, and *the only evidence* the Government has offered for them are three utterly conclusory declarations and a sealed filing that Ambassador Bolton *has not been permitted to view*. The notion that these necessary facts "cannot be . . . genuinely disputed," Fed. R. Civ. P. 56(c)(1), is risible.

Second, this case is in its infancy, and Ambassador Bolton has not yet had the opportunity to file an Answer to the Amended Complaint, which, under Rule 12, is due *after* the adjudication

of the motion to dismiss, and seek discovery of information supporting any affirmative defenses to the Government's claims. If the motion to dismiss is denied and an answer becomes necessary, Ambassador Bolton intends to assert at least one affirmative defense: that any remaining contractual duties he may have had related to the prepublication review of his book, following Ms. Knight's confirmation on April 27 that the draft contained no classified information, were discharged, excused, and waived by the Government's own prior breach of the NDAs by its bad-faith abuse of the review process for purely political purposes. Under established principles of contract law, one party's breach of a contractual duty excuses the other party from complying with any related correlative duties. *See* Restatement (Second) of Contracts § 237 (Am. Law Inst. 1981). And one duty implied in *every* contract, including contracts with the Government, is the obligation to perform fairly and in good faith. *See id.* at § 205. The facts in the public record overwhelmingly indicate that the Government violated that implied duty here, by undertaking and conducting the second, and unprecedented, further prepublication review by Mr. Ellis of Ambassador Bolton's book *unfairly* and in *bad* faith—for the political purpose of suppressing, or at least delaying until after the 2020 election, the publication of a book that reported facts portraying President Trump in an unfavorable and embarrassing light. Ambassador Bolton quite obviously needs to engage in discovery on this issue before he will be in a position to present all of the evidence establishing it, and the Government cannot be permitted to obviate his affirmative defense *before he even has a chance to plead it*, by obtaining judgment on its claims before discovery has opened.

In these circumstances, Rule 56(d) provides that if the party opposing a premature summary judgment motion "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," the Court should defer or deny the summary

judgment motion. Accompanying this brief is a detailed declaration of counsel showing with particularity the facts Ambassador Bolton intends to present; why he currently needs discovery to support those facts with evidence, given the nascent stage of the litigation; and why he believes in good faith that he will be able to obtain that evidence in discovery. The accompanying declaration easily satisfies Rule 56(d) under the "generous approach" adopted by the D.C. Circuit, and given the early posture of the case, it "should be granted almost as a matter of course," *Convertino*, 684 F.3d at 99, 102 (quotation marks omitted).

For the reasons explained in our July 16 motion to dismiss, the Government's claims all fail as a matter of law, and its Amended Complaint should be dismissed. But if the Court denies the motion, the suggestion that *the Government is entitled to judgment* based on the skeletal factual record before the Court is completely untenable. The Government's premature summary judgment motion must be deferred—or denied without prejudice—to allow Ambassador Bolton a full and fair opportunity to test the Government's conclusory factual assertions through the discovery process.

## STATEMENT

The Government initiated this litigation on June 16, 2020, alleging that the then-imminent publication of Ambassador Bolton's memoir, *The Room Where it Happened*, violated two form non-disclosure agreements he was required to sign when he became National Security Advisor: the Classified Information Nondisclosure Agreement and the Sensitive Compartmented Information Nondisclosure Agreement (the latter of which he signed on two separate occasions). *See* Classified Information Nondisclosure Agreement, included at pp. 1–2 of Exhibit A to the Complaint, Doc. 1-1 (hereinafter, the "Classified Information NDA"); Sensitive Compartmented

Information Nondisclosure Agreement, included at pp. 3–4 and 5–6 of Exhibit A to the Complaint, Doc. 1-1 (hereinafter, the "SCI NDA").

As set forth at greater length in our pending motion to dismiss, the Classified Information NDA provides, in Paragraph 3, for two separate Government review processes that apply in two different circumstances: (1) when the employee wishes to "divulge classified information," or (2) when the employee wishes to "confirm . . . that . . . information is unclassified before . . . disclos[ing] it." Classified Information NDA at ¶ 3; *see* Def.'s Memorandum in Supp. of his Mot. to Dismiss the Am. Compl. at 4–6 (July 16, 2020). Doc. 40-1 ("Def.'s MTD Br."). The SCI NDA governs the disclosure of a subset of classified information known as "sensitive compartmented information," or "SCI," which the agreement defines as information that "involves or derives from intelligence sources or methods" and that, *at the time of the disclosure*, "is classified or is in the process of classification." SCI NDA ¶ 1. Like the Classified Information NDA, Paragraph 3 of the SCI NDA sets forth two different conditions or "triggers" that determine whether government review of a contemplated disclosure is required: one that applies when an employee wishes to publish information that *he knows is classified as SCI*, and another that applies when he wishes to confirm that information he wishes to publish *is not classified as SCI*. SCI NDA ¶ 3; *see* Def.'s MTD Br. 6–7.

The criteria used by the Executive Branch to determine whether information is classified is found in Executive Order No. 13526, 75 Fed. Reg. 707, 708 (Dec. 29, 2009). *See Shaffer v. Defense Intelligence Agency*, 102 F. Supp. 3d 1, 8 (D.D.C. 2015). As pertinent here, Section 1.7(a) of the Order warns that "[i]n no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to," *inter alia*:

- "conceal violations of law,"

- "prevent embarrassment to a person, organization, or agency," or

- "prevent or delay the release of information that does not require protection in the interest of the national security."

*Id.* at 710.

As discussed at greater length below, in the accompanying declaration, and in our motion to dismiss papers, Ambassador Bolton produced the book in question following his service as National Security Advisor to President Trump. Between December 30, 2019 and April 27, 2020, he engaged in a comprehensive, painstaking, four-month review process with Ellen J. Knight, the senior NSC official in charge of prepublication review. The Government admits that following this intensive process, Ms. Knight reached "the judgment that the manuscript did not contain classified information." Amended Complaint ¶ 46 (June 19, 2020), Doc.18 ("Am. Compl."). Shortly after being informed of Ms. Knight's judgment, Ambassador Bolton authorized his publisher, Simon & Schuster, to proceed with publishing the book.

On June 8, following press reports that Ambassador Bolton intended to publish his book on June 23, John Eisenberg, Deputy White House Counsel and the NSC's counsel, wrote to Ambassador Bolton's counsel claiming that the manuscript still contained classified information. Letter from John Eisenberg to Charles J. Cooper (Jun. 8, 2020), attached as Exhibit O to the Complaint, Doc. 1-15. As the Government's Amended Complaint explains, on May 2, NSC Senior Director for Intelligence Michael Ellis (a political appointee in the NSC) had "commenced an additional review of the manuscript" at the request of the Assistant to the President for National Security Affairs (another political appointee—in fact, Ambassador Bolton's successor). Am. Compl. ¶ 51. On June 16, Mr. Ellis delivered to Ambassador Bolton a copy of the book with new redactions based on Mr. Ellis's additional round of review. Am. Compl. ¶ 57. Mr. Ellis's redactions were extensive and sweeping, apparently eliminating passages describing or recounting a

significant majority of the President's conversations with his advisors and with foreign leaders. Declaration of John R. Bolton ¶ 23 (June 18, 2020), Doc. 9-1 ("Bolton Decl.")  The Government also deleted numerous passages portraying President Trump in an unflattering light. *Id.* In a cover letter to Ambassador Bolton, Mr. Ellis claimed that "[t]he manuscript still contains classified information." Letter from Michael J. Ellis, Deputy Assistant to the President, to John R. Bolton (Jun. 16, 2020), Doc. 40-2. Mr. Ellis did not suggest, however, that the book contained any SCI or any description of activities related to or derived from SCI.

The Government filed this lawsuit hours later, and it moved for a temporary restraining order or preliminary injunction on June 17. In its June 17 motion for a TRO or preliminary injunction, the Government asserted—for the first time ever—that the manuscript contained not only classified information but "information classified at the . . . Top Secret/SCI levels." Emergency App. for TRO and Mot. for Prelim. Inj. at 12 (June 17, 2020), Doc. 3. Defendant opposed the Government's motion for emergency injunctive relief and cross-moved to dismiss the Complaint. On June 19, in an effort to insulate the Complaint from Defendant's motion to dismiss, the Government amended its Complaint to add the allegation that Ambassador Bolton's book contains information classified at the "Top Secret/SCI level[ ]." Am. Compl. ¶ 59.

The Government's theory of the case is that Ambassador Bolton's book contains classified information, which required him, it argues, to undergo prepublication review and obtain written authorization to publish the book pursuant to the Classified Information NDA, and that it also contains SCI, or descriptions of activities related to or derived from SCI, which it maintains required him to undergo prepublication review and obtain written authorization to publish the book pursuant to the SCI NDA. The Government supported its preliminary injunction motion with five unclassified declarations, but only three of them actually speak to the presence of classified

information or SCI within the manuscript: (1) Michael Ellis's declaration, which asserts that the book contains classified information, including information "classified at the SECRET, TOP SECRET, or TOP SECRET/SCI level," *see* Ellis Decl. ¶¶ 14, 19; (2) Paul Nakasone's declaration, which asserts that a portion of the book contains "classified information" and that "a portion of the manuscript implicates sensitive information at the TOP SECRET/Sensitive and Compartmented Information (SCI) level," Nakasone Decl. ¶¶ 8, 9; and (3) John Ratcliffe's declaration, which "concur[s] that [certain] passages contain classified national security information," Ratcliffe Decl. ¶ 6. None of these declarations includes any support for, or meaningful explanation of, the conclusory assertions that there is classified information or SCI in the manuscript. However, the Government also simultaneously filed under seal an *ex parte* declaration by Michael Ellis which purportedly describes "six examples of passages in the manuscript" that are classified. *See* Ellis Decl. ¶ 15. To date, Ambassador Bolton and his counsel have not been permitted to review this *ex parte* declaration.

On June 20, the Court denied the Government's motion for a TRO or preliminary injunction. Memorandum Order (June 20, 2020), Doc. 27. On July 16, Ambassador Bolton moved to dismiss the Government's Amended Complaint. The Government responded on July 30 with a cross-motion for partial summary judgment as to liability. Defendant's motion to dismiss has been fully briefed and is ripe for oral argument and resolution. Ambassador Bolton now moves the Court, pursuant to FED. R. CIV. P. 56(d), to defer consideration of the government's summary judgment cross-motion pending completion of discovery, or, in the alternative, to deny the motion without prejudice to the Government refiling it at a later date once discovery has concluded.

**ARGUMENT**

"[S]ummary judgment is premature unless all parties have 'had a full opportunity to conduct discovery.'" *Convertino v. United States Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, (1986)). Accordingly, when one party files a premature motion for summary judgment before the opposing party of has had this opportunity, Rule 56 provides that if the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," the Court may defer the summary judgment motion, deny it, or take other appropriate action restoring the non-moving party's full opportunity to take discovery. FED. R. CIV. P. 56(d). "A Rule 56(f)[1] motion requesting time for additional discovery should be granted 'almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence.'" *Convertino*, 684 F.3d at 99 (quoting *Berkeley v. Home Ins. Co.,* 68 F.3d 1409, 1414 (D.C. Cir. 1995)). To be entitled to relief under Rule 56(d), the summary-judgment opponent must include an affidavit or declaration satisfying three criteria:

> (1) It must outline the particular facts the non-movant intends to discover and describe why those facts are necessary to the litigation; (2) it must explain why the non-movant could not produce the facts in opposition to the motion for summary judgment; and (3) it must show the information is in fact discoverable.

*United States ex rel. Folliard v. Government Acquisitions, Inc.*, 764 F.3d 19, 26 (D.C. Cir. 2014) (brackets, quotation marks, and citations omitted).

---

[1] In 2010, Rule 56(f) was renumbered as 56(d); the amendment "carrie[d] forward without substantial change the provisions of former subdivision (f)." *United States ex rel. Folliard v. Government Acquisitions, Inc.*, 764 F.3d 19, 26 n.3 (D.C. Cir. 2014).

As summarized below, the Declaration of Charles J. Cooper, filed contemporaneously herewith, meets all three criteria, and the Government's premature motion for summary judgment accordingly must be deferred or denied.

## I.   Defendant Has Outlined Particular Facts Necessary to the Litigation that He Intends to Discover.

Mr. Cooper's declaration describes in detail two different sets of facts that Defendant expects to uncover through discovery—both of which are independently sufficient to defeat the Government's claims in this case (and, therefore, sufficient to postpone resolution of the Government's summary judgment motion until discovery has taken place).

A.    Ambassador Bolton intends to establish, through discovery, that his book *does not contain* any properly classified information, SCI, or description of activities related to or derived from SCI. Even if it did, that would not, for the reasons explained in our pending motion to dismiss, state a claim for breach of the relevant NDAs, since those agreements do not impose strict liability, as the Government claims. Rather, the NDAs require—and the Government has not alleged (and cannot allege)—*scienter* on the part of Ambassador Bolton concerning the presence of such information in his book. Def.'s MTD Br. 19–22, 26–28, 30–35. The Government's inability to show the necessary *scienter* alone requires the denial of its summary judgment motion—indeed, it requires the dismissal of its claims altogether. *See id.* But setting that dispositive objection aside for purposes of the present motion, *even on the Government*'s (mistaken) interpretation of the two NDAs, it plainly has no claim if the manuscript *does not contain* any classified information, SCI, or material related to SCI. Indeed, the allegations that Ambassador Bolton's book contains such information are the critical lynchpins of all of the Government's claims. *See, e.g.*, Am. Compl. ¶¶ 59, 69, 79, 80, 82.

Moreover, as also explained in our motion to dismiss papers, under the SCI NDA's express temporal limitation, that NDA only applies to those writings that contain information, or material related to or derived from information, that was "classified or . . . in process of a classification determination" *at the time the writing was disclosed*. SCI NDA ¶ 1; *see* Def.'s MTD Br. 29–30. If an employee's writing *does not contain*, and *is not derived from or related to* information that, at the time of disclosure, "is classified or is in process of a classification determination" as SCI, then the SCI NDA *simply does not apply*. An interpretation that allowed the Government to *retroactively* classify some information in (or related to) a book as SCI—even *years after the book was published*—would be contrary to the NDA's plain text, absurd, and palpably unconstitutional under both the Due Process and Free Speech Clauses. Def.'s Reply in Supp. of his Mot. to Dismiss at 4–6 (Aug. 14, 2020), Doc. 48. The Amended Complaint does not allege that Ambassador Bolton's book contains any SCI that meets this temporal requirement. But to the extent it changes course, or the Court concludes that the Government has sufficient allegations on this point, Ambassador Bolton obviously must be allowed to take discovery into the timing of any decision to classify information in, or related to, the book as SCI.

Accordingly, each of the following facts, which Ambassador Bolton intends to establish through discovery, would indisputably require judgment in his favor and is thus necessary to the resolution of this litigation:

1.  Ambassador Bolton's book contains no classified information;

2.  His book contains no SCI;

3.  His book contains no description of activities related to or derived from SCI;

4.  If the book does contain SCI or a description of activities related to or derived from SCI, the SCI in question was not classified as such, or in process of a classification determination, at the time when Ambassador Bolton authorized the book's publication;

5.   If the book does contain classified information, SCI, or a description of activities related to or derived from SCI, Ambassador Bolton lacked the scienter required under the NDAs to trigger any prepublication review requirement.

*See* Cooper Decl. ¶ 10.

B.   Ambassador Bolton also intends to establish, through discovery, that the Government's actions in undertaking and conducting Mr. Ellis's "additional review" of the manuscript were in bad faith, as part of a deliberate effort to suppress the publication of his book or delay it until after the November election, for purely political purposes and at the direction of President Trump himself and/or White House officials acting on his behalf. Establishing this bad faith on the part of the Government is also, independently, necessary to adjudicate the Government's claims, for two independent reasons.

*First*, the Government's bad-faith, political conduct shows that if there *is* any information in Ambassador Bolton's book that has been classified (and as described above, Ambassador Bolton disputes that there is), that information was not *properly* classified, under the standards set forth in Executive Order 13526. That Executive Order, as set forth above, expressly provides that it is unlawful to classify information in order to "prevent embarrassment to a person" (such as the President) or "prevent or delay the release of information that does not require protection in the interest of the national security." 75 Fed. Reg. at 710. And it is well settled that one of this Court's functions, when determining whether a former employee may publish a book purportedly governed by a NDA or secrecy agreement, is to ensure that any information in the book that the Government asserts may not be disclosed was "properly classified." *McGehee v. Casey*, 718 F.2d 1137, 1147 (D.C. Cir. 1983); *see also Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003) ("If . . . the information was not classified properly, then Stillman may publish the manuscript."). Indeed, the Government cites the availability of such judicial review as the "safety valve" that ameliorates any First Amendment problem with its prepublication review requirement. Combined Mem. in Supp.

11

of Pl.'s Mot. for Summ. J. & in Opp'n to Def.'s Mot. to Dismiss at 35 (July 30, 2020), Doc. 44 ("Govt. Br."). Accordingly, if Ambassador Bolton is right that the Government undertook or conducted the review of his book in bad faith, or that information in his book was classified unlawfully, for the base political purpose of suppressing the publication of a book critical of the President, then the Government's claims necessarily must fail under settled law.

*Second*, the bad-faith, politically-motivated conduct engaged in by the Government also establishes an affirmative defense foreclosing any liability on the Government's claims: that the Government's own prior breach of its implied duty of good faith and fair dealing, in undertaking or conducting Mr. Ellis's prepublication review process, excuses, discharges, and waives any further duties Ambassador Bolton may have had to engage with the pre-publication review process. As discussed below, because of the very preliminary posture of this case, Defendant has not yet had an opportunity to plead any affirmative defenses. *See supra*, Part II. But if his motion to dismiss were to be denied and he is required to answer the Government's complaint, Ambassador Bolton intends to plead this prior breach of the duty of good faith as an affirmative defense to all of the Government's claims. And he therefore must be allowed to take the discovery necessary to establish his affirmative defense.

It is black-letter law that one party's material breach of a contractual duty excuses or discharges the other party from performing related duties he would otherwise owe under the contract. *See* RESTATEMENT (SECOND) OF CONTRACTS § 237 (Am. Law Inst. 1981). It is equally well established that a duty of good faith and fair dealing is implied in every contract, *see id.* at § 205, including every contract with the United States, *see Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014). While briefing and argument on his forthcoming affirmative defense are obviously premature at this nascent stage of the case, if the Government's claims were

to survive his motion to dismiss, Ambassador Bolton will allege—and ultimately establish—that under both of the NDAs at issue, the Government's implied obligation to undertake and conduct the prepublication review process fairly and in good faith was materially related to, and a condition of, Ambassador Bolton's own duties under those agreements to continue to engage with the prepublication review process. Accordingly, if the Government materially breached that implied duty of good faith in undertaking or conducting Mr. Ellis's review, that breach discharged, under settled contract law, any remaining duty of Ambassador Bolton to await written authorization. Ambassador Bolton will allege—and with the information developed through discovery ultimately establish—that Mr. Ellis's further prepublication review of the manuscript was undertaken in bad faith and for the purely political purpose of suppressing, or at least delaying until after the 2020 election, the publication of a book that reported facts portraying President Trump in an unfavorable and embarrassing light. The Government's bad-faith, politically motivated use of the prepublication review process as a pretext for suppressing his speech for political ends plainly violated the Government's implied duty of good faith and fair dealing. This conduct, had it succeeded, would have transformed prepublication review into an impermissible prior restraint.

Accordingly, each of the following facts, which Ambassador Bolton intends to establish through discovery, is also necessary to the resolution of this litigation:

1.  Ms. Knight did not provide Ambassador Bolton with the pro-forma written letter memorializing her conclusion that the manuscript, as revised, contained no classified information because she was instructed not to do so by President Trump or White House assistants acting at his direction and/or on his behalf;

2.  Ms. Knight was instructed not to provide the pro-forma letter for purely political reasons related to President Trump's desire to suppress, or at least delay until after the 2020 election, the publication of a book that reported facts portraying him in an unfavorable and embarrassing light;

3.  When Ms. Knight conveyed to Ambassador Bolton on April 27 that she was working through "delicate" "internal process considerations," Bolton Decl. ¶ 17, she was referring to political pressure by President Trump, or White House assistants acting

at his direction and/or on his behalf, who were seeking to suppress the publication of the book, or at least delay publication until after the 2020 election, because it reported facts portraying him in an unfavorable and embarrassing light;

4.  National Security Advisor Robert C. O'Brien conducted a further review of the manuscript, after Ms. Knight had completed her review. He was instructed to do so by President Trump or White House assistants acting at his direction and/or on his behalf. His review was undertaken to suppress, or at least delay until after the 2020 election, the publication of a book that reported facts portraying President Trump in an unfavorable and embarrassing light;

5.  Mr. O'Brien conducted his further review in bad faith for the purely political reason of finding a pretext to suppress, or at least delay until after the 2020 election, the publication of a book that reported facts portraying President Trump in an unfavorable and embarrassing light;

6.  It is unprecedented for the President's National Security Advisor to become personally involved in the prepublication review process of a former NSC employee;

7.  Mr. O'Brien instructed Michael Ellis to conduct a further review of the manuscript in bad faith and in furtherance of this same, purely political purpose;

8.  Mr. Ellis undertook and conducted his further review of the manuscript in bad faith for the purely political reason of finding a pretext to suppress, or at least delay until after the 2020 election, the publication of a book that reported facts portraying President Trump in an unfavorable and embarrassing light;

9.  Mr. O'Brien and others deliberately waited until Ms. Knight completed her review to commence their unprecedented second round of review—rather than reviewing the manuscript concurrently with Ms. Knight—so as to delay the conclusion of the review process until after the election;

10.  Any classified information that is contained in the book was classified after Ms. Knight's April 27 confirmation that the manuscript did not contain classified information;

11.  Any information that is contained in the book that was classified after Ms. Knight's April 27 confirmation that the manuscript did not contain classified information was so classified in bad faith, or was maintained as classified in bad faith contrary to the established standards for prepublication review at the NSC and other government agencies, for the deliberate, illegitimate purpose of suppressing, or at least delaying until after the 2020 election, the publication of a book that reported facts portraying President Trump in an unfavorable and embarrassing light, in violation of Executive Order 13526;

12.  Any SCI that is contained in the book, or that generated or is related to an activity described in the book, was classified as SCI after Ms. Knight's April 27 confirmation that the manuscript did not contain classified information;

13. Any information that is contained in the book, or that generated or is related to an activity described in the book, that was classified as SCI after Ms. Knight's April 27 confirmation that the manuscript did not contain classified information was so classified in bad faith for the deliberate, illegitimate purpose of suppressing, or at least delaying until after the 2020 election, the publication of a book that reported facts portraying President Trump in an unfavorable and embarrassing light in violation of Executive Order 13526.

*See* Cooper Decl. ¶ 13.

Ambassador Bolton's motion for relief under Rule 56(d) is thus not based on a "conclusory demand for discovery," *Service Emps. Int'l Union Nat'l Indus. Pension Fund v. Castle Hill Health Care Providers, LLC*, 312 F.R.D. 678, 685 (D.D.C. 2015), or the "vague" assertion that "discovery would be invaluable in this case," *Strang v. United States Arms Control & Disarmament Agency*, 864 F.2d 859, 861 (D.C. Cir. 1989) (quotation marks omitted). No, Defendant's allegations are based on information that is in the public domain, he has set forth, through Mr. Cooper's declaration, numerous definite and specific facts that he "intends to discover," and he has explained in detail "[w]hy those facts are necessary to the litigation." *Convertino*, 684 F.3d at 99. The first *Convertino* factor is plainly satisfied here.

## II. Defendant Cannot Currently Present the Facts at Issue Because Discovery Has Not Yet Begun.

There can also be no serious dispute that the second factor is satisfied. It is no mystery why Ambassador Bolton is unable, at present, to come forward with evidence of the above facts: that evidence is held exclusively by *the Government*, and Ambassador Bolton has *not yet had the opportunity to take any discovery whatsoever*. The parties have not yet even held the Rule 26(f) conference, and FED. R. CIV. P. 26(d)(1) expressly bars a party from serving any discovery requests until that time. Indeed, the parties have not yet even exchanged their initial disclosures.

Moreover, far from having obtained *discovery* in support of the affirmative defense described above, Ambassador Bolton has *not yet had the opportunity to even allege it*. Defendant

has not filed an Answer—he elected instead to move for dismissal, as allowed by Rule 12, because the Government's claims are all foreclosed as a matter of law. The briefing on that motion to dismiss was only completed less than a week ago. If the Court grants the motion, discovery will of course be unnecessary. But if the Court ultimately denies the motion, Ambassador Bolton's Answer will not be due until 14 days after the denial. FED. R. CIV. P. 12(a)(4)(A). Only at that point will the time come for Ambassador Bolton to plead his affirmative defenses—and then begin discovery supporting them.

### III.     Defendant Has Shown that Discovery Will Likely Uncover the Facts at Issue.

Finally, Mr. Cooper's Declaration also establishes that the discovery Ambassador Bolton intends to take "will produce the evidence required." *Convertino*, 684 F.3d at 100. The D.C. Circuit has held that a court must take a "generous approach" in determining whether discovery is reasonably likely to yield the facts sought. *Id.* at 102.  That generous approach is plainly satisfied here. Rule 56(d) does not require a party to reproduce its written discovery requests as part of its motion, but Mr. Cooper's Declaration includes a detailed summary of the interrogatories, requests for production, and depositions we intend to propound at the appropriate time. And those requests are likely to result in the discovery of the information described above, because (A) the facts that are publicly available and already in the public record overwhelmingly indicate that the Government possesses evidence establishing the specific facts described in Part I above; and (B) any objection that this information is not "discoverable" lacks merit.

A.     The accompanying declaration of counsel describes in detail the record facts supporting Ambassador Bolton's belief that he will obtain evidence establishing the particular necessary facts described above, and much of that information has been placed before the Court in prior briefing. Here we only summarize the highlights.

The undisputed facts before the Court and in the public record strongly support Ambassador Bolton's belief that his book does not contain any classified information, SCI, or description of activities derived from or related to SCI. It is undisputed that Ms. Knight—again, the senior NSC official in charge of prepublication review—concluded after an exhaustive, four-month review that Ambassador Bolton's manuscript, as revised, contained no classified information, let alone SCI. Indeed, no one *ever* suggested that the manuscript contained SCI or information related to SCI—not Ms. Knight, not Mr. Eisenburg, not Mr. Ellis, and not even the Government's initial Complaint in this litigation—until the filing of the Government's preliminary injunction motion (and its hasty amendment of its Complaint to add the naked allegation). The belated and convenient discovery of SCI by the Government strongly supports Ambassador Bolton's conclusion that any determination classifying material in the book as SCI did not take place until *after* he had authorized the publication of the book.

The only evidence the Government has come forward with supporting its assertions that the book contains classified information and SCI is comprised of: (1) three conclusory and ambiguous declarations, and (2) an *ex parte* filing and proceeding that excluded Ambassador Bolton and thus was not subjected to the adversarial process. To be sure, based on its *in camera* review of these materials and the Government's *ex parte* advocacy, the Court concluded, at the preliminary stage of deciding the Government's motion for a preliminary injunction, that Ambassador Bolton "likely" disclosed "classified information." Memorandum Order at 6 (June 20, 2020), Doc. 27. But that preliminary conclusion obviously does not entitle the Government to *pretermit any further dispute of the matter*, especially where, as here, Ambassador Bolton has not even seen the evidence the Court relied upon, let alone had an opportunity to contest it or subject

17

it to adversarial testing. As discussed below, *see infra*, pp. 20–23, that result would be contrary to due process.

The facts already in the record also overwhelmingly suggest that the Government's politicized conduct of the prepublication review process violated its duty of good faith and fair dealing. In sum: (1) the President announced publicly, near the beginning of the process, that Ambassador Bolton's book was "All Classified National Security"—even though the Government represented that no one outside of NSC staff had been given access to the manuscript—and he expressly linked that assertion to his view that the book's contents were "nasty & untrue," Cooper Decl. ¶¶ 51–53; (2) by mid-February the President had "directly weighed in on the White House [prepublication] review" of the manuscript and had told "his staff that he views John Bolton as 'a traitor,' that everything he uttered to the departed aide about national security is classified and that he will seek to block the book's publication," *id.* ¶ 55; (3) around the same time, the President openly stated to a group of television news anchors that "we're going to try and block the publication of [Ambassador Bolton's] book. After I leave office, he can do this," *id.* ¶ 56; and (4) days before the filing of this lawsuit, President Trump explained that he had "told . . . the attorney general" that "I will consider every conversation with me as president highly classified. So that would mean that if he wrote a book, and if the book gets out, he's broken the law," *id.* ¶ 61.

Evidence of the President's pattern and practice of using his executive power in an attempt to block *other* unfavorable publications confirms the likelihood that the evidence will establish the abuse of the prepublication review process of Ambassador Bolton's manuscript for political ends. On July 9, 2020, for example, the Government revoked the house-arrest of the President's former personal lawyer, Michael D. Cohen, in what a federal judge later found was unconstitutional retaliation for drafting a preparing to publish yet another book critical of the President. *See id.*

¶ 64. Mr. Cohen announced via Twitter that he was "close to completion of my book" on July 2, and a week later, he was abruptly re-arrested and remanded back to federal prison, after he resisted the Government's demand that he agree to an extraordinary and unprecedented condition of home confinement: that he refrain from "engagement of any kind with the media, including print, tv, film, books, or any other form of media/news." *Id.* ¶¶ 66–69. Mr. Cohen petitioned for a writ of habeas corpus, and the federal judge overseeing the case found that the Government's imprisonment of Mr. Cohen was "retaliatory," for the deliberate purpose of "stop[ping] exercise of First Amendment rights." *Id.* ¶ 70.

Defendant has shown a strong likelihood that the evidence in the Government's possession will show that the further prepublication review of his book undertaken and conducted after Ms. Knight confirmed on April 27 that it did not contain any classified information was motivated by, and conducted in, bad faith.

B.     This information is also "discoverable." *Convertino*, 684 F.3d at 100. Once again, the bar here is not high, and the Court need not resolve every discovery objection that the Government may decide to interpose to Ambassador Bolton's requests. In *Convertino*, for example, the D.C. Circuit found that the plaintiff had satisfied this criterion even though a district court had *denied* his motion to compel discovery of the information in question as privileged (the identity of a reporter's sources), because the plaintiff had presented sufficient "evidence to suggest" that the court "may revisit" its decision and "may decide to compel discovery" of the information, or failing that, that the denial of discovery might be reversed on appeal. 684 F.3d at 100–01. The evidence that the facts sought by Ambassador Bolton are "in fact discoverable" is easily as compelling here as in *Convertino*. *Id.* at 100.

The Government has made clear its view that the information concerning the presence of classified information and SCI in the book is not discoverable because of the Government's policy not to allow those without a "need to know" to see classified materials, and its determination that Ambassador Bolton and his counsel do not "need to know" this information. But as explained in Defendant's (still pending) motion for access to the Government's classified evidence on this point, Doc. 25, that contention makes no sense. Ambassador Bolton *knows* the information in his book; and Mr. Cooper and Mr. Kirk were both previously granted clearance by the Government to access the classified information described in the book relating to Ukraine as part of their representation of Ambassador Bolton during the recent impeachment proceedings. But even if the Government's position regarding access by Ambassador Bolton and his counsel made sense *before* publication of the book, it obviously makes no sense now. The book has been published containing the information that the Government, in bad faith, claims is classified, and the book has sold almost one million copies. As the Court put it at the preliminary injunction hearing, the "horse is out of the barn."

More fundamentally, barring Ambassador Bolton and his counsel from reviewing the only evidence supporting a critical element of the Government's claim against him would also plainly violate fundamental fairness and principles of due process. In the criminal context, the Supreme Court has made clear that a "criminal action must be dismissed when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence," information relevant to the accused's defense. *Jencks v. United States*, 353 U.S. 657, 672 (1957). Any other result would be an "unconscionable" violation of due process. *United States v. Reynolds*, 345 U.S. 1, 12 (1953). And it is equally well settled that due process protects "civil litigants," as well as those who have been charged with crimes. *Logan v.*

*Zimmerman Brush Co.*, 455 U.S. 422, 429 (1982). Specifically, the Supreme Court has long recognized that even in civil cases due process requires that there be " 'an opportunity to present every available defense.' " *Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007) (quoting *Lindsey v. Normet*, 405 U.S. 56, 66 (1972)); *accord American Sur. Co. v. Baldwin*, 287 U.S. 156, 168 (1932); *cf. Nelson v. Adams USA, Inc.*, 529 U.S. 460, 466 (2000) (due process requires "an adequate opportunity to defend against the imposition of liability").

To be sure, in *Reynolds*, the Court stated in dicta that these due process principles do not apply in the same way "in a civil forum where the Government is not the moving party, but is a defendant only on terms to which it has consented." *Reynolds*, 345 U.S. at 12. That dicta has no application here, where the Government is not a "defendant . . . on terms to which it has consented," but rather the *plaintiff* in a contract breach action seeking to impose a multi-million-dollar damages judgment on Ambassador Bolton. The Supreme Court has expressly repudiated *Reynolds*'s dicta in a similar context, unanimously holding that where a party's liability to the Government "depends upon" a defense that cannot be fully litigated without "the disclosure of state secrets," under settled principles of contract law and fundamental fairness, "[s]uit on the contract  . . . will not lie, and the parties will be left where they are." *General Dynamics Corp. v. United States*, 563 U.S. 478, 486, 488 (2011). Indeed, the Court stated that it would be "the height of injustice to deny the defense because of the Government's invocation of state-secret protection, but to maintain jurisdiction over the Government's claim and award it judgment." *Id.* at 487. So too here. Ambassador Bolton cannot meaningfully defend against the Government's claims of breach of contract without accessing the evidence that the contents of his book purportedly breached his duties under the NDAs. And it would thus be "the height of injustice," *id.*, to allow the Government to come into the courthouse claiming breach of contract, to invoke the classified

status of both the evidence supposedly supporting its claim and the evidence that will support Ambassador Bolton's defense based on the Government's breach of its duty of good faith and fair dealing to prevent Defendant from even viewing it, and to then *obtain judgment on its claim anyway*. No, under the common law and the constitutional requirements of due process, "the traditional course is to leave the parties where they stood when they knocked on the courthouse door." *Id.* That is, if the Government refuses to permit disclosure of the information it claims is classified, *the Government's claims must be dismissed*.

To be sure, the D.C. Circuit permitted limited *ex parte* review of classified information in *Stillman*, but that decision pre-dated the Supreme Court's unanimous ruling in *General Dynamics*. In any case, the *Stillman* Court did not meaningfully address the constitutional difficulties with that procedure, but it did make clear that, where a district court cannot "resolve the classification issue without the assistance of plaintiff's counsel," it "should consider whether its need for such assistance outweighs the concomitant intrusion upon the Government's interest in national security." 319 F.3d at 549. Indeed, in *McGehee* (also decided before *General Dynamics*), the D.C. Circuit stated that "[c]ourts should therefore strive to benefit from criticism and illumination by [the] party with the actual interest in forcing disclosure," and it specifically approved of the District Court's order allowing the author's attorney access to classified information submitted by the Government. 718 F.2d at 1149. Moreover, this Court is fully capable of ensuring during the judicial process that any classified information that must be disclosed is fully protected. The Government, in light of the basic norms and fundamental requirements of due process, is accordingly unlikely to prevail in its effort to prevent Ambassador Bolton and his counsel (to whom the Government has granted security clearances) from accessing and reviewing the sole evidence supporting a

necessary element of his alleged liability, particularly given that he already "know[s] the nature of the information in question." *Id.*

Finally, even if the Government were to succeed in preventing Ambassador Bolton from taking discovery into the *first* set of facts identified in Part I, relief under Rule 56(d) would still be warranted by the *second* set of facts, relating to Ambassador Bolton's defense concerning the Government's breach of its duty of good faith and fair dealing. The Government of course can be counted on to object to that line of discovery as well. But it cannot seriously be maintained that it is likely to succeed in preventing *all* discovery on this second issue—that it will successfully object to any interrogatory Defendant might frame, that every document relevant to the politicization of the review process will be held privileged, and that it will succeed in blocking every deposition Ambassador Bolton notices.

Accordingly, it is clear that "the discovery sought will produce the evidence required"— particularly given the "generous approach" to this showing commanded by binding precedent. *Convertino*, 684 F.3d at 100, 102.

## CONCLUSION

For the foregoing reasons, the Court should defer consideration of the Government's motion for summary judgment until the conclusion of discovery or, in the alternative, deny it without prejudice.

August 20, 2020

Respectfully submitted,

/s/ Charles J. Cooper
Charles J. Cooper, Bar No. 248070
Michael W. Kirk, Bar No. 424648
John D. Ohlendorf, Bar No. 1024544

COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
Email: ccooper@cooperkirk.com

*Counsel for Defendant John R. Bolton*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE UNITED STATES OF AMERICA,

                    Plaintiff,

v.

JOHN R. BOLTON,

                    Defendant.

Civil Action No. 20-1580-RCL

**DECLARATION OF CHARLES J. COOPER**

Pursuant to 28 U.S.C. § 1746, I, Charles J. Cooper, hereby declare as follows:

1.      I am counsel for Defendant John R. Bolton in the above-captioned matter.

2.      I make this declaration pursuant to FED. R. CIV. P. 56(d) for the purpose of showing that Defendant Bolton is currently unable to present facts essential to fully support his opposition to Plaintiff's July 30, 2020 Motion for Summary Judgment. I discuss, in turn, (I) the particular facts Ambassador Bolton hopes to show and why those facts are necessary to oppose Plaintiff's summary judgment motion; (II) why Ambassador Bolton is not currently able to produce those facts; and (III) why Ambassador Bolton believes it is likely that these facts would be obtained through discovery.

**I.      The Particular Facts Defendant Seeks To Show.**

      **A.      No Classified Information, SCI, Or Information Related to SCI, Is Present in the Manuscript.**

3.      As demonstrated in our Motion To Dismiss the Amended Complaint, the mere presence in Ambassador Bolton's book of classified information or sensitive compartmentalized information ("SCI") (or a description of activities related to or derived from SCI) is not sufficient to trigger any prepublication review requirement under the NDAs Ambassador Bolton signed,

because those NDAs instead require review only if Ambassador Bolton had knowledge, uncertainty, or at least some reason to be aware of the presence of such information.

4.      Even if the Court disagrees, however, and concludes that the presence in the book of properly classified information, or SCI, or a description of activities related to or derived from SCI, required Ambassador Bolton to engage in the prepublication review process, and await written authorization before publishing the book, Ambassador Bolton must be allowed to test, through discovery, the Government's allegation that such information is present within the book.

5.      The Government has alleged, in a conclusory fashion, that Ambassador Bolton's book contains classified information, including information classified at the Top Secret/SCI level. Am. Compl. ¶ 59 (though the allegation as to SCI was not added until its Amended Complaint, *see* Compl. ¶ 58).

6.      The Government has also filed: (1) a declaration by Michael Ellis conclusorily asserting, without support or meaningful explanation, that the book contains classified information, *see* Ellis Decl. ¶ 14, including information "classified at the SECRET, TOP SECRET, or TOP SECRET/SCI level," *id.* ¶ 19;[1] (2) a declaration by Paul Nakasone, which asserts, also without support or meaningful explanation, that a portion of the book contains "classified information" that "could result in the permanent loss of a valuable [Signals Intelligence] source" and that "a portion of the manuscript implicates sensitive information at the TOP SECRET/Sensitive and Compartmented Information (SCI) level," Nakasone Decl. ¶¶ 8, 9; and (3) a declaration by John Ratcliffe stating, also without support or meaningful explanation, that he

---

[1] It is ambiguous, given Mr. Ellis's use of the conjunction "or," whether he asserts that all three of these levels of information (and in particular, the TOP SECRET/SCI level) are present within the book.

"concur[s] that [certain] passages contain classified national security information," Ratcliffe Decl. ¶ 6.

7.      Finally, the Government has also filed an *ex parte* sealed declaration by Michael Ellis which purportedly describes "six examples of passages in the manuscript" that are classified, *see* Ellis Decl. ¶ 15. Ambassador Bolton has not been permitted to review this *ex parte* declaration.

8.      In order to adequately defend against the Government's claims, Ambassador Bolton must be allowed to test, through discovery, the Government's assertions that his book contains these types of information. Currently, although Ambassador Bolton was provided with a copy of the book from which Mr. Ellis claimed to have redacted classified information, Ambassador Bolton does not know (1) which specific passages of his book the Government currently maintains contain classified information, (2) which passages allegedly contain SCI, or (3) which passages allegedly contain descriptions of activities related to or derived from SCI.

9.      Further, as also explained in our Motion to Dismiss papers, the SCI NDA signed by Ambassador Bolton includes an express temporal limit on the types of information capable of triggering prepublication review under that agreement: review is required only if the underlying SCI that is purportedly contained in the book, or that is related to or generated the activities purportedly described in the book, was "classified or . . . in process of a classification determination" *at the time disclosure was authorized* by the employee. SCI NDA ¶ 1; *see* Def.'s Mem. in Supp. of his Mot. to Dismiss the Am. Compl. at 29–30 (July 16, 2020). Doc. 40-1. As described at greater length below and in our Motion to Dismiss, the notion that the book contains SCI was not surfaced until this litigation was already underway—several weeks after Ambassador Bolton authorized its publication—and indeed, the Government admits that the senior NSC official in charge of prepublication review, Ellen J. Knight, concluded after an exhaustive four-month

review that the manuscript, as revised under her direction, *did not* contain any classified information, let alone SCI.

10.     Accordingly, Ambassador Bolton believes that discovery will reveal the following specific facts:

a.  His book contains no classified information;

b.  His book contains no SCI;

c.  His book contains no description of activities related to or derived from SCI;

d.  If the book does contain SCI or a description of activities related to or derived from SCI, the SCI in question was not classified as such, or in process of a classification determination, at the time when Ambassador Bolton authorized the book's publication;

e.  If the book does contain classified information, SCI, or a description of activities related to or derived from SCI, Ambassador Bolton lacked the scienter required under the NDAs to trigger any prepublication review requirement.

11.     On the Government's own theory of the case and interpretation of the NDAs that Ambassador Bolton signed, the presence of either classified information or SCI (or a description of activities related to or derived from SCI) is absolutely critical to its claims that Defendant breached his obligations related to prepublication review. Accordingly, he must be given the opportunity to develop, through discovery, the above particular factual information rebutting the Government's assertion that such information is present in the book. Given the early posture of this case and the lack of any discovery, the Government's suggestion that there is "no material dispute" that the book contains these types of information, Pl.'s Mot. for Summ. J. at 12–13, 18 (July 30, 2020), Doc. 44, is at best premature and almost certainly incorrect.

**B.      The Government Acted in Bad Faith.**

12.      Ambassador Bolton also must be allowed discovery so that he may obtain and present information showing that the Government's actions in reviewing his manuscript were undertaken in bad faith, as part of a deliberate effort to suppress the publication of his book for purely political purposes.

13.      In particular, Ambassador Bolton believes that discovery will reveal the following specific facts:

      a.  Ms. Knight did not provide Ambassador Bolton with the pro-forma written letter memorializing her conclusion that the manuscript, as revised, contained no classified information because she was instructed not to do so by President Trump or White House assistants acting at his direction and/or on his behalf;

      b.  Ms. Knight was instructed not to provide the pro-forma letter for purely political reasons related to President Trump's desire to suppress, or at least delay until after the 2020 election, the publication of a book that reported facts portraying him in an unfavorable and embarrassing light;

      c.  When Ms. Knight conveyed to Ambassador Bolton on April 27 that she was working through "delicate" "internal process considerations," Bolton Decl. ¶ 17, she was referring to political pressure by President Trump, or White House assistants acting at his direction and/or on his behalf, who were seeking to suppress the publication of the book, or at least delay publication until after the 2020 election, because it reported facts portraying him in an unfavorable and embarrassing light;

      d.  National Security Advisor Robert C. O'Brien conducted a further review of the manuscript, after Ms. Knight had completed her review. He was instructed to do so

by President Trump or White House assistants acting at his direction and/or on his behalf. His review was undertaken to suppress, or at least delay until after the 2020 election, the publication of a book that reported facts portraying President Trump in an unfavorable and embarrassing light;

e.  Mr. O'Brien conducted his further review in bad faith for the purely political reason of finding a pretext to suppress, or at least delay until after the 2020 election, the publication of a book that reported facts portraying President Trump in an unfavorable and embarrassing light;

f.  It is unprecedented for the President's National Security Advisor to become personally involved in the prepublication review process of a former NSC employee;

g.  Mr. O'Brien instructed Michael Ellis to conduct a further review of the manuscript in bad faith and in furtherance of this same, purely political purpose;

h.  Mr. Ellis undertook and conducted his further review of the manuscript in bad faith for the purely political reason of finding a pretext to suppress, or at least delay until after the 2020 election, the publication of a book that reported facts portraying President Trump in an unfavorable and embarrassing light;

i.  Mr. O'Brien and others deliberately waited until Ms. Knight completed her review to commence their unprecedented second round of review—rather than reviewing the manuscript concurrently with Ms. Knight—so as to delay the conclusion of the review process until after the election;

6

j.  Any classified information that is contained in the book was classified after Ms. Knight's April 27 confirmation that the manuscript did not contain classified information;

k.  Any information that is contained in the book that was classified after Ms. Knight's April 27 confirmation that the manuscript did not contain classified information was so classified in bad faith, or was maintained as classified in bad faith contrary to the established standards for prepublication review at the NSC and other government agencies, for the deliberate, illegitimate purpose of suppressing, or at least delaying until after the 2020 election, the publication of a book that reported facts portraying President Trump in an unfavorable and embarrassing light, in violation of Executive Order 13526;

l.  Any SCI that is contained in the book, or that generated or is related to an activity described in the book, was classified as SCI after Ms. Knight's April 27 confirmation that the manuscript did not contain classified information;

m.  Any information that is contained in the book, or that generated or is related to an activity described in the book, that was classified as SCI after Ms. Knight's April 27 confirmation that the manuscript did not contain classified information was so classified in bad faith for the deliberate, illegitimate purpose of suppressing, or at least delaying until after the 2020 election, the publication of a book that reported facts portraying President Trump in an unfavorable and embarrassing light in violation of Executive Order 13526.

14.  These facts are material and necessary for Ambassador Bolton's defense for two reasons.

15.     *First*, these facts show that if there is any information in Ambassador Bolton's book that has been classified, it was not *properly* classified, under the standards set forth in Executive Order 13526. It is well settled that one of this Court's functions, when determining whether a former employee may publish a book purportedly governed by a NDA or secrecy agreement, is to ensure that any information in the book that the Government asserts may not be disclosed was "properly classified." *McGehee v. Casey*, 718 F.2d 1137, 1147 (D.C. Cir. 1983). If the above facts, as declarant believes, are true, the Government's claims fail. Accordingly, Ambassador Bolton must be allowed the opportunity to discovery them.

16.     *Second*, these facts are necessary to establish the affirmative defense Ambassador Bolton intends to plead. As discussed in more detail below in Part II, Ambassador Bolton has not yet had an opportunity to plead any affirmative defenses, because his motion to dismiss (which was fully briefed less than a week ago) is still pending and he has not filed an Answer. Although the Government's complaint should be dismissed for failing to state a claim, if it is not, Ambassador Bolton intends to allege that even if one of the NDAs he signed imposed a duty to submit his book for prepublication review and await written authorization before publishing it, his failure to do so did not constitute breach of contract because the Government's own prior breach of the implied duty of good faith and fair dealing waived, excused, and discharged Ambassador Bolton from any contractual duty to await written authorization while a further prepublication review of the manuscript was being undertaken in bad faith and for the purely political purpose of suppressing, or at least delaying until after the 2020 election, the publication of a book that reported facts portraying President Trump in an unfavorable and embarrassing light.

17.     It is well established that one party's material breach of a contractual duty excuses or discharges the other party from performing related duties he would otherwise owe under the contract. *See* RESTATEMENT (SECOND) OF CONTRACTS § 237 (Am. Law Inst. 1981).

18.     It is also well established that a duty of good faith and fair dealing is implied in every contract, *see id.* at § 205, including every contract with the United States, *see Metcalf Constr. Co., Inc. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014).

19.     Accordingly, should the case move past the motion-to-dismiss stage, Ambassador Bolton will plead and establish that the NDAs he signed imposed on the United States an implied obligation to perform its duties under the contract fairly, in good faith, and free from political bias or distortions.

20.     Ambassador Bolton will further plead and establish that this implied duty required the United States to carry out the prepublication review of his manuscript fairly, in good faith, in a timely fashion, and free from political bias or distortions, and that Ambassador Bolton's own duties related to prepublication review of the manuscript were materially related to, and contingent upon, the Government's performance of this implied duty.

21.     Finally, Ambassador Bolton will plead and establish that the above facts constitute a material breach by the Government of these requirements of good faith and fair dealing. Following Ms. Knight's April 27 confirmation that the book contained no classified information, *all* of the Government's actions with respect to the book were undertaken in bad faith and as part of a purely political effort to suppress the publication of the book, or at least delay publication until after the 2020 election, because it reported facts portraying President Trump in an unfavorable and embarrassing light. Ambassador Bolton will plead and establish that this material breach waived,

excused, and discharged any further duties he had under the NDA's related to the prepublication review of his manuscript.

## II.      Why Defendant Cannot Currently Present the Facts at Issue.

22.     Ambassador Bolton cannot currently present any of the above facts because this case is in its infancy, and *Defendant has not yet had an opportunity to take any discovery whatsoever*.

23.     Defendant moved to dismiss the Amended Complaint (rather than filing an Answer, as specifically allowed by FED. R. CIV. P. 12) on July 16—a little over a month ago. Briefing was completed on that motion only last week, and the Court has obviously not yet held argument or adjudicated the motion.

24.     If the Court denies the pending motion to dismiss, under FED. R. CIV. P. 12(a)(4)(A) Defendant's Answer will not be due until 14 days after the entry of the denial. Under FED. R. CIV. P. 12(b), the affirmative defense described in Part I.B above will not be ripe for presentation until that point.

25.     Moreover, the Parties have not yet held the Rule 26(f) conference, and under FED. R. CIV. P. 26(d)(1), no discovery requests may issue until that time. Indeed, because the 26(f) conference has not yet taken place, the parties have not yet even exchanged initial disclosures under Rule 26(a)(1)(C).

26.     Ambassador Bolton thus has not yet had an opportunity, under the rules, to obtain any discovery whatsoever concerning the above facts (or any others).

## III.     Why Defendant Believes Discovery of the Facts at Issue Is Reasonably Likely.

27.     Ambassador Bolton believes that if he is afforded the opportunity to take discovery, he will be able to discover evidence establishing each of the particular facts enumerated above.

28.     We anticipate discovery in the case would include at least the following:

a. Interrogatories inquiring about: (1) the identity of the specific passages of the book the Government claims set forth classified information, SCI, or any description of activities related to or derived from SCI; (2) the timing of the classification determinations regarding any such information alleged to be classified or SCI; (3) the timing and purpose of Mr. O'Brien's and Mr. Ellis's (and any other individuals') interposition into the review process; and (4) the identity and role of all individuals involved in reviewing the manuscript or making decisions or providing advice relating to the review, both within the U.S. Government and outside;

b. Requests for the production of all communications relating to the prepublication review process by those individuals involved in the process, including but not limited to Ms. Knight and the member of her staff who assisted her in the review process, Mr. O'Brien, Mr. Ellis, Mr. Evanina, Mr. Mitman, Gen. Nakasone, and Mr. Ratcliffe;

c. Depositions of the individuals discovered to have been involved in the review process, including Ms. Knight and the member of her staff who assisted her in the review process, Mr. O'Brien, Mr. Ellis, Mr. Evanina, Mr. Mitman, Gen. Nakasone, and Mr. Ratcliffe—all of whom have filed declarations supporting the Government, with the significant exception of Ms. Knight, who, as the Court noted at the June 20 preliminary injunction hearing, has not filed any declaration in this action.

29.    Based on the information already in the public record, Defendant believes this discovery is very likely to disclose evidence establishing some or all of the facts described above,

in Part I, pertaining to (A) the absence of classified information or SCI from the manuscript and (B) the bad-faith abuse of the prepublication review process for political ends. We discuss each point in turn.

### A. Extant Facts Supporting the Conclusion that No Classified Information, SCI, Or Information Related to SCI, Is Present in the Manuscript.

30.     As discussed at length in our motion to dismiss, it is undisputed that Ms. Knight— again, the senior NSC official in charge of prepublication review—concluded after an exhaustive, four-month review that Ambassador Bolton's manuscript, as revised, contained no classified information, let alone SCI. We recount the details of Ms. Knight's review again in some detail, as it strongly supports Ambassador Bolton's belief that further discovery will demonstrate that there is no classified information or SCI in the manuscript—or at the very least, that any such information was classified as such *after* Ms. Knight's review ended and Ambassador Bolton authorized the book's publication—and that the Government's claims must therefore fail.

31.     Given his extensive government career in matters relating to national security and foreign policy, Ambassador Bolton was and is an expert on what constitutes classified information and the proper handling of such information.[2] He therefore took care in writing the manuscript of his book to ensure that it did not contain or reveal classified information or SCI.[3] Nonetheless, so that there could be no question of his compliance with his obligations, Ambassador Bolton directed me, as his counsel, to submit the manuscript to the NSC for prepublication review "out of an abundance of caution.[4] I submitted the manuscript to Ms. Knight on December 30, 2019.

---

[2] Bolton Decl. ¶ 2.

[3] *Id.* ¶ 3.

[4] *See* Letter from Charles J. Cooper to Ellen Knight, Senior Director for Records, Access, and Information Security Management, National Security Council at 1(Dec. 30, 2019), Doc. 9-6.

32.    On January 23, at 3:33 p.m., Ms. Knight emailed me a letter stating that "[b]ased on our preliminary review, the manuscript appears to contain significant amounts of classified information," including information classified "at the TOP SECRET level."[5] Ms. Knight did not assert that the manuscript contained any information classified as SCI, or derived from or related to SCI.[6] On February 7, Ms. Knight sent me another letter asserting that the manuscript contained classified information and offering to meet with Ambassador Bolton "to review each instance of classified information in detail."[7] Once again, while Ms. Knight's letter asserted that the manuscript included "classified information"—and, indeed, quotes Executive Order 12526's definition of "classified information"—it contains no suggestion that the manuscript included SCI.[8]

33.    Ambassador Bolton's first meeting with Ms. Knight took place on February 21.[9] In the meeting, which lasted four hours, Ms. Knight, as she described it, "reviewed the preliminary results of three chapters in the draft manuscript in detail with" Ambassador Bolton.[10] Ambassador

---

[5] Letter from Ellen Knight, Senior Director for Records, Access, and Information Security Management, National Security Council, to Charles J. Cooper (Jan. 23, 2020), Doc. 9-8; *see* Am. Compl. ¶ 33.

[6] *Id.*

[7] Letter from Ellen Knight, Senior Director for Records, Access, and Information Security Management, National Security Council, to Charles J. Cooper at 1 (Feb. 7, 2020), Doc. 9-9; *see* Am. Compl. ¶ 40.

[8] *Id.* at 1–2.

[9] *See* Letter from Ellen Knight, Senior Director for Records, Access, and Information Security Management, National Security Council, to Charles J. Cooper at 1 (Feb. 24, 2020), Doc. 9-10.

[10] *Id.*; *see* Am. Compl. ¶ 41.

Bolton took five pages of handwritten notes, as he and Ms. Knight discussed her specific concerns page by page, line by line, and sometimes word by word.[11]

34.     Three days later, on February 24, Ms. Knight wrote that the meeting had been "most productive," and she suggested that "it would be most helpful to the process if we hold one or more follow-on meetings . . . to discuss the remaining portions of the draft manuscript."[12] Ms. Knight's letter does not indicate—and the Government has not alleged—that there was any suggestion during this intensive four-hour meeting that the manuscript contained SCI.[13]

35.     Ambassador Bolton met with Ms. Knight three more times, on March 2 (approximately four hours), March 3 (over four hours), and March 4 (approximately three hours).[14] In these meetings, Ambassador Bolton and Ms. Knight reviewed in meticulous detail each of her concerns in the remaining 11 chapters. Ambassador Bolton produced 34 pages of handwritten notes reflecting the details of their discussions.[15]

36.     Following his notes and the guidance provided by Ms. Knight, Ambassador Bolton revised his manuscript, and by March 9 had resubmitted all 14 chapters to begin the second round of the iterative review process.[16] On March 27, Ms. Knight wrote:

> I appreciate your efforts to address the classification concerns in the latest draft version you submitted. Many of the changes are satisfactory. However, additional edits are required to ensure the protection of national security information. To assist

---

[11] Bolton Decl. ¶ 10.

[12] *See* Doc. 9-10 at 1; Am. Compl. ¶ 41.

[13] *Id.*

[14] *See* Bolton Decl. ¶ 12; Am. Compl. ¶ 42.

[15] Bolton Decl. ¶ 12.

[16] *Id.*

in making the additional required changes, I will provide a list of required edits and language substitutions to guide you in this next stage of revising the draft.[17]

37.     Her list amounted to 17 typed, single-spaced pages of comments, questions, suggestions of specific alternative language, and citations to publicly available source material.[18] Once again, Ms. Knight's email contained no reference to SCI, and no suggestion that the manuscript then contained, or ever had contained, SCI.[19] Working through the weekend, Ambassador Bolton responded to all 17 pages on Monday, March 30, accepting the vast majority of Ms. Knight's suggestions and proposing alternative solutions to others.[20]

38.     In a telephone conversation on April 13, Ms. Knight provided Ambassador Bolton her much shorter list of remaining concerns after reviewing his March 30 revisions.[21] Their conversation resulted in entirely agreed-upon language changes, which Ambassador Bolton delivered to Ms. Knight the next day, April 14.[22] During the April 13 call, Ms. Knight also said she would review the entire manuscript one more time, to recheck the issues previously resolved and ensure that she had not overlooked any.[23]

---

[17] *See* Email from Ellen Knight, Senior Director for Records, Access, and Information Security Management, National Security Council, to John Bolton, Former National Security Advisor, National Security Council (Mar. 27, 2020, 3:52 PM), Doc. 9-11; Am. Compl. ¶ 44.

[18] *See* Prepublication Review for NSC Access Case 190762 List of Required Edits Prepared for Ambassador John R. Bolton (Mar. 27, 2020), Doc. 9-16; Am. Compl. ¶ 44.

[19] Doc. 9-11.

[20] Bolton Decl. ¶¶ 13–14; Am. Compl. ¶¶ 44–45.

[21] Bolton Decl. ¶ 15; Am. Compl. ¶ 45.

[22] Bolton Decl. ¶ 15; Am. Compl. ¶ 45.

[23] Bolton Decl. ¶ 15.

39.     That final review resulted in two further telephone calls, on April 21 and 24, in which Ms. Knight conveyed her final round of edits and some additional citations to publicly available sources.[24]

40.     Ambassador Bolton promptly responded with the requested revisions, and on April 27, Ms. Knight, after clarifying one previously discussed edit, confirmed "that's the last edit I really have to provide for you."[25]

41.     Accordingly, over the course of four months, Ambassador Bolton and Ms. Knight made a total of four passes through the manuscript, and at the end of this painstaking process, Ms. Knight confirmed that the revised manuscript contained no classified information. As the Government alleges, after her review was completed, Ms. Knight "was of the judgment that the manuscript draft did not contain classified information."[26]

42.     Given Ms. Knight's judgment, after completing this exhaustive four-month review process, that the manuscript, as revised, contained no classified information, Ambassador Bolton has strong reasons for doubting the Government's assertions—unsupported by any meaningful evidence that Ambassador Bolton has been afforded the opportunity to review—that it has *now* concluded that the book *does* contain classified information, including SCI.

43.     This conclusion is fortified by the belated timing of the Government's assertion that the book contains SCI. As discussed, when Ambassador Bolton submitted his manuscript for prepublication review on December 30, 2019, his counsel stated Ambassador Bolton's considered

---

[24] *Id.* ¶ 16; *see* Am. Compl. ¶ 45.

[25] Bolton Decl. ¶ 16; Am. Compl. ¶ 46.

[26] Am. Compl. ¶ 46.

view that the manuscript *did not* contain "any discussion . . . of sensitive compartmented information ('SCI')."[27]

44.    Over the next four months, he (or his counsel) and Ms. Knight exchanged more than a dozen emails and letters, participated in numerous phone calls, consuming many hours, and sat through more than fifteen hours of face-to-face meetings, painstakingly reviewing Ambassador Bolton's manuscript chapter-by-chapter, page-by-page, and in some cases word-by-word. Yet, in all that time, Ms. Knight never asserted—or even hinted—that the manuscript contained SCI or any description of activities related to SCI, even as she asserted that earlier drafts contained other sorts of classified information. After conducting an exhaustive process in which she reviewed the manuscript through *at least four waves of changes*, Ms. Knight concluded that it contains no classified information—let alone *SCI*—as the Government itself admits.

45.    Nor did Mr. Eisenberg assert in either his June 8 or June 11 letters that the manuscript contains SCI or any description of activities related to SCI.[28] Nor did Mr. Ellis assert in his June 16 letter that the manuscript contains SCI or any description of activities related to SCI.[29]

46.    Indeed, *not even the Government's initial complaint* asserted that the manuscript contains SCI or any description of activities related to SCI, even as it specifically alleged that it contains "Confidential, Secret, and Top Secret" information.[30] While the Government has since

---

[27] Doc. 9-6 at 1.

[28] *See* Letter from John Eisenberg, Legal Advisor, National Security Council, to Charles J. Cooper (Jun. 8, 2020), Doc. 1-15; Letter from John Eisenberg, Legal Advisor, National Security Council, to Charles J. Cooper (Jun. 11, 2020), Doc. 1-17.

[29] *See* Letter from Michael J. Ellis, Deputy Assistant to the President, to John R. Bolton (Jun. 16, 2020), Doc. 40-2.

[30] Compl. ¶ 58.

amended its Complaint to include the allegation that the book contains SCI, and while Plaintiff's counsel stated at the June 20 Preliminary Injunction hearing that this SCI was classified before Mr. Ellis began his review, the belated timing of these assertions strongly supports Ambassador Bolton's conclusion that any such classification determination did not take place until *after* he had authorized the publication of the book.

47.     At the very least, the facts enumerated above (which are essentially undisputed) obviously cast enough doubt on the Government's assertions to entitle Ambassador Bolton to discovery into the matter.

**B.     Extant Facts Supporting the Conclusion that the Government Acted in Bad Faith.**

48.     The facts already in the public record also overwhelmingly support Ambassador Bolton's belief that the prepublication review process of his manuscript was perverted for the purely political end of suppressing or at least delaying the publication of his manuscript, due to the content and nature of its descriptions of the President, in an unlawful abuse of the prepublication review and classification processes and in violation of the Government's implied duty of good faith and fair dealing. These facts strongly indicate that following Ms. Knight's April 27 confirmation that the book, as revised, contained no classified material, the additional review process was undertaken and conducted by Mr. Ellis entirely in bad faith, as part of a purely political effort to suppress the publication of the book, or at least delay publication until after the 2020 election, because it reported facts portraying President Trump in an unfavorable and embarrassing light. The Government's conclusion that the book contains classified material was thus reached in bad faith, and without serious effort to understand the contrary decisions of Ms. Knight, the long-time career professional supervising the regular prepublication review process. Once again, many of these facts have already been presented to the Court, in connection with Defendant's opposition

to the Government's preliminary injunction motion, but I set them forth again here, lest there be any doubt about the necessity of allowing Ambassador Bolton discovery into this issue.

### 1. President Trump's Statements Concerning the Review of Ambassador Bolton's Book.

49.　On January 26—less than a month after Ambassador Bolton initially delivered his manuscript to the Government for review—the *New York Times* published an article purporting to describe passages from the manuscript that bore on the then-ongoing impeachment trial.

50.　Three days later, on January 29, Senator Martin Heinrich of New Mexico asked the following question of the President's lawyers during the impeachment trial:

> When did the President's Counsel first learn that the Bolton manuscript had been submitted to the White House for review, and has the President's counsel or anyone else in the White House attempted in any way to prohibit, block, disapprove, or discourage John Bolton, or his publisher, from publishing his book?

166 Cong. Rec. S645-02, S660 (daily ed. Jan. 29, 2020) (statement of Sen. Heinrich).

51.　In response, Patrick F. Philbin, Deputy Counsel to the President and one of the President's defense lawyers during the impeachment trial, read into the Senate record Ms. Knight's January 23 letter to Mr. Cooper. *Id.* at S660–61 (statement of Mr. Counsel Philbin). Mr. Philbin also stated that, sometime after Ambassador Bolton's manuscript was submitted to the NSC, "[t]he White House Counsel's Office was notified that it was there. The NSC has released a statement explaining that it has not been reviewed by anyone outside NSC staff." *Id.* at S660.

52.　Later that day, however, the President asserted on Twitter that after he fired Ambassador Bolton, he had "go[ne] out and IMMEDIATELY writ[ten] a nasty & untrue book. All Classified National Security."[31] Of course, the President could not have offered this assessment

---

[31]　Donald J. Trump (@realDonaldTrump), Twitter (Jan. 29, 2020, 7:28 AM), https://bit.ly/30QPvWW.

of the content of the Ambassador's book unless he had either *read* the manuscript or been *briefed on its contents*.

53.    Equally troubling, the President's tweet expressly linked his assertion that "All" the material in the manuscript is "Classified National Security" with his personal hostility toward Ambassador Bolton and the content of the Ambassador's book. That demonstrates that a campaign of political pressure designed to prevent or stall the publication of Ambassador Bolton's book—a campaign emanating from the President himself—had already begun.

54.    On February 3, *Vanity Fair* reported that "the president is out for revenge against his adversaries."[32] The article stated that the President "has an enemies list," "Bolton is at the top of the list," and the "campaign against Bolton" included Ms. Knight's January 23 letter asserting that the manuscript contained classified information.[33] It also reported that the President "wants Bolton to be criminally investigated."[34]

55.    On February 21, the *Washington Post* reported that

President Trump has directly weighed in on the White House [prepublication] review of a forthcoming book by his former national security adviser, telling his staff that he views John Bolton as 'a traitor,' that everything he uttered to the departed aide about national security is classified and that he will seek to block the book's publication.[35]

56.    The story also reported that the President vowed to a group of television news anchors that "we're going to try and block the publication of [his] book. After I leave office, he

---

[32] *See* Gabriel Sherman, *"It's Payback Time": With Acquittal Certain, Trump Plots Revenge on Bolton, Impeachment Enemies*, VANITY FAIR (Feb. 3, 2020), https://bit.ly/2C2irkp.

[33] *Id.*

[34] *Id.*

[35] *See* Josh Dawsey, Tom Hamburger, and Carol D. Leonnig, *Trump wants to block Bolton's book, claiming most conversations are classified*, WASH. POST (Feb. 21, 2020), https://wapo.st/2AuWEBs.

can do this."[36] Accordingly, as early as the end of February, the President had *expressly and publicly confirmed* that he was directing an effort to use the prepublication review process as a pretext for suppressing the publication of Ambassador Bolton's book—and the public reporting confirmed that one of the purposes of this effort was the President's own desire for "revenge" against one of his political "enemies." At the same time, the President's insouciance about publication of the book after he leaves office strongly supports the inference that national security concerns did not drive his animus against the book.

57.     As Ms. Knight's review process drew to a close, the White House's increasing political interference in the process also became evident from Ambassador Bolton's interactions with her. When Ambassador Bolton asked on April 27—after Ms. Knight provided him with her "last edit"—when he could expect to receive the pro-forma closing letter memorializing her verbal confirmation that the revised book contained no classified information, Ms. Knight cryptically replied that her "interaction" with unnamed others in the White House about the book had "been very delicate," and that there were "some internal process considerations to work through."[37]

58.     Ambassador Bolton's subsequent inquiries of Ms. Knight as to when he would receive the pro-forma letter clearing the book for publication were answered with uncharacteristically stiff and formal replies that the "process was ongoing" and that she had nothing new to report.[38] By this point it had become obvious that the prepublication review process was now being conducted entirely in bad faith, and that ranking White House officials had no intention of permitting Ms. Knight to issue the customary, pro-forma clearance letter, but instead

---

[36] *Id.*

[37] Bolton Decl ¶ 17.

[38] *Id.* ¶ 18.

were attempting to run out the clock before the election by simply refusing to respond to Ambassador Bolton's requests and otherwise prolonging "the process."

59.     According to the Government, on May 2, Mr. Ellis had in fact begun "an additional review of the manuscript," at the direction of Ambassador Bolton's successor, Mr. O'Brien.[39] The Government concedes that such an "additional" round of review by a political appointee is unusual and extraordinary,[40] and indeed, the Government's counsel stated at the preliminary injunction hearing that he was "not aware" of such a "higher level of review" ever having occurred before.[41]

60.     Mr. Ellis's review is all the more extraordinary because: (1) he only commenced his role as Senior Director for Intelligence Programs at the National Security Council two months before undertaking the review; (2) he does not appear to have ever participated in any prepublication review before; and (3) in fact, he only completed his mandatory "training in proper classification," Executive Order 13526 § 1.3(d), 75 Fed. Reg. 707 (Dec. 29, 2009), *after* he had finished reviewing the manuscript (though the Government assures us that he "reviewed his work" at that point and concluded that his training "did not alter" his conclusions).[42]

61.     On June 15, in response to a question about why his administration was planning to file this lawsuit seeking to enjoin publication of the book, the President openly admitted that his classification decisions are not based on specific national-security concerns but instead encompass *anything* he says while in office: "I told that to the attorney general before; *I will consider every conversation with me as president highly classified*. So that would mean that if he wrote a book,

---

[39] Am. Compl. ¶ 51.

[40] *Id.* ¶ 27 (admitting that the prepublication review process ordinarily involves review only by the Records Access and Information Security Management Directorate's staff and senior employees).

[41] Transcript of Videoteleconference Hearing at 17:5–7 (June 20, 2020).

[42] Am. Compl. ¶ 51.

and if the book gets out, he's broken the law."[43] This view, of course, is preposterous, and the Government has not advanced it.

62.     The President reiterated: "Any conversation with me is classified."[44] The President added that "a lot of people are very angry with [Bolton] for writing a book" and that he "hope[d]" that Ambassador Bolton "would have criminal problems" for publishing the book.[45]

### 2.     The Government's Retaliatory Imprisonment of Michael Cohen.

63.     Far from an isolated incident, the President's effort to suppress Mr. Bolton's book, because of its content, is of a piece with similar abuses of Executive power designed to prevent the publication of other books that also portray him in an unflattering light.

64.     A federal judge in the Southern District of New York recently found, for example, that the Government revoked the house-arrest of the President's former personal lawyer, Michael D. Cohen, in retaliation for drafting and preparing to publish a book that describes the President's conduct in an unfavorable manner.[46]

65.     As detailed in the filings in that case, Mr. Cohen was released on furlough (and then home confinement) on May 21, 2020, because he suffers from health conditions that place him at high risk of severe injury or death if he contracts COVID-19 in prison.[47]

---

[43] Press Conference, President Donald J. Trump at 0:54–1:05, (Jun. 15, 2020) (emphasis added), https://politi.co/2Y2Vo1i.

[44] *Id.* at 4:18–21.

[45] *Id.* at 1:05–08, 1:30–36.

[46] Hearing Transcript at 11:10-12, *Cohen v. Barr*, No. 20-cv-5614 (S.D.N.Y. July 23, 2020).

[47] Verified Petition for Writ of Habeas Corpus at ¶¶ 28, 32, *Cohen*, No. 20-cv-5614 (S.D.N.Y. July 20, 2020), Doc. 1.

66.     Mr. Cohen announced his plans to publish a book concerning Mr. Trump in several tweets posted during his furlough. On June 26, for example, he posted a tweet with the hashtag "#WillSpeakSoon," and again on July 2, he tweeted: "I am close to completion of my book . . . anticipated release date will be late September."[48]

67.     On July 9, one week after this tweet, Mr. Cohen reported to federal officials to discuss the conditions governing his home confinement. At this meeting, Mr. Cohen was presented with a proposed condition of probation that he have "[n]o engagement of any kind with the media" during his home confinement, "including print, tv, film, books, or any other form of media/news," and that he be "prohibit[ed] from all social media platforms."[49] The federal judge overseeing the case had never before encountered such a condition "in 21 years of being a judge."[50]

68.     When Mr. Cohen and his attorney objected to this condition, the federal officials they were negotiating with asked to table the issue, so that they could run the objection "up the chain of command" while they settled on the other conditions.[51]

69.     Shortly thereafter, the meeting was abruptly cut short by the arrival of three U.S. Marshals who placed Mr. Cohen in handcuffs and shackles and escorted him back to federal prison.[52] When Mr. Cohen's attorney protested that they "had not failed to agree to the terms"

---

[48] *Id.* ¶¶ 38–39. As described by Mr. Cohen, the book, provisionally titled *Disloyal: The True Story of Michael Cohen, Former Personal Attorney to President Donald J. Trump*, will describe "how he had lost his moral compass over his years working for Mr. Trump," will "provide[ ] graphic details about the President's behavior behind closed doors," including making "anti-Semitic remarks against prominent Jewish people and virulently racist remarks against such Black leaders as President Barack Obama and Nelson Mandela," and will be "supported by documentary evidence." *Id.* ¶¶ 18–19.

[49] *Id.* at ¶ 41.

[50] Hearing Transcript, *Cohen*, *supra*, at 8:20–21.

[51] Verified Petition, *Cohen*, *supra*, at ¶¶ 46, 50.

[52] *Id.* ¶ 52.

proposed by the Government and "had not yet finished the meeting," the federal probation officers "did not deny this, but instead said it was 'out of [their] hands.' "[53]

70.     Mr. Cohen petitioned for a writ of habeas corpus. The federal judge overseeing the case, Judge Alvin K. Hellerstein, granted the petition, finding that the Government's imprisonment of Mr. Cohen, in response to his objection to the extraordinary and unprecedented condition restraining his free speech, was "retaliatory," for the deliberate purpose of "stop[ping] exercise of First Amendment rights."[54]

71.     In sum, based on the foregoing, there is a strong likelihood that discovery in this case will produce evidence concerning the specific facts identified in Part I.B above demonstrating interference with the prepublication review of Ambassador Bolton's memoir and the bad-faith abuse of the review process by President Trump and White House officials for the purely political purpose of suppressing the publication of the book or at least delaying its publication until after the 2020 election.

---

[53] *Id.* ¶ 54.

[54] Hearing Transcript, *Cohen*, *supra*, at 9:8–9, 11:10–12.

I declare under penalty of perjury under the laws of the United States of America that the foregoing Declaration is true and correct to the best of my knowledge.

Executed on the 20th day of August, 2020

Charles J. Cooper

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | |
| Plaintiff, | Civil Action No. 20-1580-RCL |
| v. | |
| JOHN R. BOLTON, | |
| Defendant. | |

## [PROPOSED] ORDER

Pending before the Court are Plaintiff's July 30, 2020 motion for summary judgment and Defendant's August 20 motion to defer consideration of that motion, pursuant to FED. R. CIV. P. 56(d). Upon consideration of the motions, the briefing in support and opposition, and all other parts of the record, Defendant's FED. R. CIV. P. 56(d) motion is **GRANTED.** All proceedings on and consideration of Plaintiff's motion for summary judgment are hereby **DEFERRED** until the close of discovery in this matter.

**SO ORDERED.**

Dated:_____

_____
HONORABLE ROYCE C. LAMBERTH
United States District Court Judge