**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br>v.<br><br>JOHN R. BOLTON,<br><br>                    Defendant. | Civil Action No. 20-1580-RCL |

**DECLARATION OF CHARLES J. COOPER**

Pursuant to 28 U.S.C. § 1746, I, Charles J. Cooper, hereby declare as follows:

1.      I am counsel for Defendant John R. Bolton in the above-captioned matter.

2.      I make this declaration pursuant to FED. R. CIV. P. 56(d) for the purpose of showing that Defendant Bolton is currently unable to present facts essential to fully support his opposition to Plaintiff's July 30, 2020 Motion for Summary Judgment. I discuss, in turn, (I) the particular facts Ambassador Bolton hopes to show and why those facts are necessary to oppose Plaintiff's summary judgment motion; (II) why Ambassador Bolton is not currently able to produce those facts; and (III) why Ambassador Bolton believes it is likely that these facts would be obtained through discovery.

**I.      The Particular Facts Defendant Seeks To Show.**

      **A.      No Classified Information, SCI, Or Information Related to SCI, Is Present in the Manuscript.**

3.      As demonstrated in our Motion To Dismiss the Amended Complaint, the mere presence in Ambassador Bolton's book of classified information or sensitive compartmentalized information ("SCI") (or a description of activities related to or derived from SCI) is not sufficient to trigger any prepublication review requirement under the NDAs Ambassador Bolton signed,

because those NDAs instead require review only if Ambassador Bolton had knowledge, uncertainty, or at least some reason to be aware of the presence of such information.

4.      Even if the Court disagrees, however, and concludes that the presence in the book of properly classified information, or SCI, or a description of activities related to or derived from SCI, required Ambassador Bolton to engage in the prepublication review process, and await written authorization before publishing the book, Ambassador Bolton must be allowed to test, through discovery, the Government's allegation that such information is present within the book.

5.      The Government has alleged, in a conclusory fashion, that Ambassador Bolton's book contains classified information, including information classified at the Top Secret/SCI level. Am. Compl. ¶ 59 (though the allegation as to SCI was not added until its Amended Complaint, *see* Compl. ¶ 58).

6.      The Government has also filed: (1) a declaration by Michael Ellis conclusorily asserting, without support or meaningful explanation, that the book contains classified information, *see* Ellis Decl. ¶ 14, including information "classified at the SECRET, TOP SECRET, or TOP SECRET/SCI level," *id.* ¶ 19;[1] (2) a declaration by Paul Nakasone, which asserts, also without support or meaningful explanation, that a portion of the book contains "classified information" that "could result in the permanent loss of a valuable [Signals Intelligence] source" and that "a portion of the manuscript implicates sensitive information at the TOP SECRET/Sensitive and Compartmented Information (SCI) level," Nakasone Decl. ¶¶ 8, 9; and (3) a declaration by John Ratcliffe stating, also without support or meaningful explanation, that he

---

[1] It is ambiguous, given Mr. Ellis's use of the conjunction "or," whether he asserts that all three of these levels of information (and in particular, the TOP SECRET/SCI level) are present within the book.

"concur[s] that [certain] passages contain classified national security information," Ratcliffe Decl. ¶ 6.

7.     Finally, the Government has also filed an *ex parte* sealed declaration by Michael Ellis which purportedly describes "six examples of passages in the manuscript" that are classified, *see* Ellis Decl. ¶ 15. Ambassador Bolton has not been permitted to review this *ex parte* declaration.

8.     In order to adequately defend against the Government's claims, Ambassador Bolton must be allowed to test, through discovery, the Government's assertions that his book contains these types of information. Currently, although Ambassador Bolton was provided with a copy of the book from which Mr. Ellis claimed to have redacted classified information, Ambassador Bolton does not know (1) which specific passages of his book the Government currently maintains contain classified information, (2) which passages allegedly contain SCI, or (3) which passages allegedly contain descriptions of activities related to or derived from SCI.

9.     Further, as also explained in our Motion to Dismiss papers, the SCI NDA signed by Ambassador Bolton includes an express temporal limit on the types of information capable of triggering prepublication review under that agreement: review is required only if the underlying SCI that is purportedly contained in the book, or that is related to or generated the activities purportedly described in the book, was "classified or . . . in process of a classification determination" *at the time disclosure was authorized* by the employee. SCI NDA ¶ 1; *see* Def.'s Mem. in Supp. of his Mot. to Dismiss the Am. Compl. at 29–30 (July 16, 2020). Doc. 40-1. As described at greater length below and in our Motion to Dismiss, the notion that the book contains SCI was not surfaced until this litigation was already underway—several weeks after Ambassador Bolton authorized its publication—and indeed, the Government admits that the senior NSC official in charge of prepublication review, Ellen J. Knight, concluded after an exhaustive four-month

review that the manuscript, as revised under her direction, *did not* contain any classified information, let alone SCI.

10.     Accordingly, Ambassador Bolton believes that discovery will reveal the following specific facts:

> a.  His book contains no classified information;
>
> b.  His book contains no SCI;
>
> c.  His book contains no description of activities related to or derived from SCI;
>
> d.  If the book does contain SCI or a description of activities related to or derived from SCI, the SCI in question was not classified as such, or in process of a classification determination, at the time when Ambassador Bolton authorized the book's publication;
>
> e.  If the book does contain classified information, SCI, or a description of activities related to or derived from SCI, Ambassador Bolton lacked the scienter required under the NDAs to trigger any prepublication review requirement.

11.     On the Government's own theory of the case and interpretation of the NDAs that Ambassador Bolton signed, the presence of either classified information or SCI (or a description of activities related to or derived from SCI) is absolutely critical to its claims that Defendant breached his obligations related to prepublication review. Accordingly, he must be given the opportunity to develop, through discovery, the above particular factual information rebutting the Government's assertion that such information is present in the book. Given the early posture of this case and the lack of any discovery, the Government's suggestion that there is "no material dispute" that the book contains these types of information, Pl.'s Mot. for Summ. J. at 12–13, 18 (July 30, 2020), Doc. 44, is at best premature and almost certainly incorrect.

4

**B.      The Government Acted in Bad Faith.**

12.      Ambassador Bolton also must be allowed discovery so that he may obtain and present information showing that the Government's actions in reviewing his manuscript were undertaken in bad faith, as part of a deliberate effort to suppress the publication of his book for purely political purposes.

13.      In particular, Ambassador Bolton believes that discovery will reveal the following specific facts:

  a.  Ms. Knight did not provide Ambassador Bolton with the pro-forma written letter memorializing her conclusion that the manuscript, as revised, contained no classified information because she was instructed not to do so by President Trump or White House assistants acting at his direction and/or on his behalf;

  b.  Ms. Knight was instructed not to provide the pro-forma letter for purely political reasons related to President Trump's desire to suppress, or at least delay until after the 2020 election, the publication of a book that reported facts portraying him in an unfavorable and embarrassing light;

  c.  When Ms. Knight conveyed to Ambassador Bolton on April 27 that she was working through "delicate" "internal process considerations," Bolton Decl. ¶ 17, she was referring to political pressure by President Trump, or White House assistants acting at his direction and/or on his behalf, who were seeking to suppress the publication of the book, or at least delay publication until after the 2020 election, because it reported facts portraying him in an unfavorable and embarrassing light;

  d.  National Security Advisor Robert C. O'Brien conducted a further review of the manuscript, after Ms. Knight had completed her review. He was instructed to do so

5

by President Trump or White House assistants acting at his direction and/or on his behalf. His review was undertaken to suppress, or at least delay until after the 2020 election, the publication of a book that reported facts portraying President Trump in an unfavorable and embarrassing light;

e.  Mr. O'Brien conducted his further review in bad faith for the purely political reason of finding a pretext to suppress, or at least delay until after the 2020 election, the publication of a book that reported facts portraying President Trump in an unfavorable and embarrassing light;

f.  It is unprecedented for the President's National Security Advisor to become personally involved in the prepublication review process of a former NSC employee;

g.  Mr. O'Brien instructed Michael Ellis to conduct a further review of the manuscript in bad faith and in furtherance of this same, purely political purpose;

h.  Mr. Ellis undertook and conducted his further review of the manuscript in bad faith for the purely political reason of finding a pretext to suppress, or at least delay until after the 2020 election, the publication of a book that reported facts portraying President Trump in an unfavorable and embarrassing light;

i.  Mr. O'Brien and others deliberately waited until Ms. Knight completed her review to commence their unprecedented second round of review—rather than reviewing the manuscript concurrently with Ms. Knight—so as to delay the conclusion of the review process until after the election;

j.  Any classified information that is contained in the book was classified after Ms. Knight's April 27 confirmation that the manuscript did not contain classified information;

k.  Any information that is contained in the book that was classified after Ms. Knight's April 27 confirmation that the manuscript did not contain classified information was so classified in bad faith, or was maintained as classified in bad faith contrary to the established standards for prepublication review at the NSC and other government agencies, for the deliberate, illegitimate purpose of suppressing, or at least delaying until after the 2020 election, the publication of a book that reported facts portraying President Trump in an unfavorable and embarrassing light, in violation of Executive Order 13526;

l.  Any SCI that is contained in the book, or that generated or is related to an activity described in the book, was classified as SCI after Ms. Knight's April 27 confirmation that the manuscript did not contain classified information;

m.  Any information that is contained in the book, or that generated or is related to an activity described in the book, that was classified as SCI after Ms. Knight's April 27 confirmation that the manuscript did not contain classified information was so classified in bad faith for the deliberate, illegitimate purpose of suppressing, or at least delaying until after the 2020 election, the publication of a book that reported facts portraying President Trump in an unfavorable and embarrassing light in violation of Executive Order 13526.

14.  These facts are material and necessary for Ambassador Bolton's defense for two reasons.

15.     *First*, these facts show that if there is any information in Ambassador Bolton's book that has been classified, it was not *properly* classified, under the standards set forth in Executive Order 13526. It is well settled that one of this Court's functions, when determining whether a former employee may publish a book purportedly governed by a NDA or secrecy agreement, is to ensure that any information in the book that the Government asserts may not be disclosed was "properly classified." *McGehee v. Casey*, 718 F.2d 1137, 1147 (D.C. Cir. 1983). If the above facts, as declarant believes, are true, the Government's claims fail. Accordingly, Ambassador Bolton must be allowed the opportunity to discovery them.

16.     *Second*, these facts are necessary to establish the affirmative defense Ambassador Bolton intends to plead. As discussed in more detail below in Part II, Ambassador Bolton has not yet had an opportunity to plead any affirmative defenses, because his motion to dismiss (which was fully briefed less than a week ago) is still pending and he has not filed an Answer. Although the Government's complaint should be dismissed for failing to state a claim, if it is not, Ambassador Bolton intends to allege that even if one of the NDAs he signed imposed a duty to submit his book for prepublication review and await written authorization before publishing it, his failure to do so did not constitute breach of contract because the Government's own prior breach of the implied duty of good faith and fair dealing waived, excused, and discharged Ambassador Bolton from any contractual duty to await written authorization while a further prepublication review of the manuscript was being undertaken in bad faith and for the purely political purpose of suppressing, or at least delaying until after the 2020 election, the publication of a book that reported facts portraying President Trump in an unfavorable and embarrassing light.

17.     It is well established that one party's material breach of a contractual duty excuses or discharges the other party from performing related duties he would otherwise owe under the contract. *See* RESTATEMENT (SECOND) OF CONTRACTS § 237 (Am. Law Inst. 1981).

18.     It is also well established that a duty of good faith and fair dealing is implied in every contract, *see id.* at § 205, including every contract with the United States, *see Metcalf Constr. Co., Inc. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014).

19.     Accordingly, should the case move past the motion-to-dismiss stage, Ambassador Bolton will plead and establish that the NDAs he signed imposed on the United States an implied obligation to perform its duties under the contract fairly, in good faith, and free from political bias or distortions.

20.     Ambassador Bolton will further plead and establish that this implied duty required the United States to carry out the prepublication review of his manuscript fairly, in good faith, in a timely fashion, and free from political bias or distortions, and that Ambassador Bolton's own duties related to prepublication review of the manuscript were materially related to, and contingent upon, the Government's performance of this implied duty.

21.     Finally, Ambassador Bolton will plead and establish that the above facts constitute a material breach by the Government of these requirements of good faith and fair dealing. Following Ms. Knight's April 27 confirmation that the book contained no classified information, *all* of the Government's actions with respect to the book were undertaken in bad faith and as part of a purely political effort to suppress the publication of the book, or at least delay publication until after the 2020 election, because it reported facts portraying President Trump in an unfavorable and embarrassing light. Ambassador Bolton will plead and establish that this material breach waived,

excused, and discharged any further duties he had under the NDA's related to the prepublication review of his manuscript.

## II.    Why Defendant Cannot Currently Present the Facts at Issue.

22.    Ambassador Bolton cannot currently present any of the above facts because this case is in its infancy, and *Defendant has not yet had an opportunity to take any discovery whatsoever*.

23.    Defendant moved to dismiss the Amended Complaint (rather than filing an Answer, as specifically allowed by FED. R. CIV. P. 12) on July 16—a little over a month ago. Briefing was completed on that motion only last week, and the Court has obviously not yet held argument or adjudicated the motion.

24.    If the Court denies the pending motion to dismiss, under FED. R. CIV. P. 12(a)(4)(A) Defendant's Answer will not be due until 14 days after the entry of the denial. Under FED. R. CIV. P. 12(b), the affirmative defense described in Part I.B above will not be ripe for presentation until that point.

25.    Moreover, the Parties have not yet held the Rule 26(f) conference, and under FED. R. CIV. P. 26(d)(1), no discovery requests may issue until that time. Indeed, because the 26(f) conference has not yet taken place, the parties have not yet even exchanged initial disclosures under Rule 26(a)(1)(C).

26.    Ambassador Bolton thus has not yet had an opportunity, under the rules, to obtain any discovery whatsoever concerning the above facts (or any others).

## III.   Why Defendant Believes Discovery of the Facts at Issue Is Reasonably Likely.

27.    Ambassador Bolton believes that if he is afforded the opportunity to take discovery, he will be able to discover evidence establishing each of the particular facts enumerated above.

28.    We anticipate discovery in the case would include at least the following:

a.  Interrogatories inquiring about: (1) the identity of the specific passages of the book the Government claims set forth classified information, SCI, or any description of activities related to or derived from SCI; (2) the timing of the classification determinations regarding any such information alleged to be classified or SCI; (3) the timing and purpose of Mr. O'Brien's and Mr. Ellis's (and any other individuals') interposition into the review process; and (4) the identity and role of all individuals involved in reviewing the manuscript or making decisions or providing advice relating to the review, both within the U.S. Government and outside;

b.  Requests for the production of all communications relating to the prepublication review process by those individuals involved in the process, including but not limited to Ms. Knight and the member of her staff who assisted her in the review process, Mr. O'Brien, Mr. Ellis, Mr. Evanina, Mr. Mitman, Gen. Nakasone, and Mr. Ratcliffe;

c.  Depositions of the individuals discovered to have been involved in the review process, including Ms. Knight and the member of her staff who assisted her in the review process, Mr. O'Brien, Mr. Ellis, Mr. Evanina, Mr. Mitman, Gen. Nakasone, and Mr. Ratcliffe—all of whom have filed declarations supporting the Government, with the significant exception of Ms. Knight, who, as the Court noted at the June 20 preliminary injunction hearing, has not filed any declaration in this action.

29.  Based on the information already in the public record, Defendant believes this discovery is very likely to disclose evidence establishing some or all of the facts described above,

in Part I, pertaining to (A) the absence of classified information or SCI from the manuscript and (B) the bad-faith abuse of the prepublication review process for political ends. We discuss each point in turn.

###### A.  Extant Facts Supporting the Conclusion that No Classified Information, SCI, Or Information Related to SCI, Is Present in the Manuscript.

30.     As discussed at length in our motion to dismiss, it is undisputed that Ms. Knight—again, the senior NSC official in charge of prepublication review—concluded after an exhaustive, four-month review that Ambassador Bolton's manuscript, as revised, contained no classified information, let alone SCI. We recount the details of Ms. Knight's review again in some detail, as it strongly supports Ambassador Bolton's belief that further discovery will demonstrate that there is no classified information or SCI in the manuscript—or at the very least, that any such information was classified as such *after* Ms. Knight's review ended and Ambassador Bolton authorized the book's publication—and that the Government's claims must therefore fail.

31.     Given his extensive government career in matters relating to national security and foreign policy, Ambassador Bolton was and is an expert on what constitutes classified information and the proper handling of such information.[2] He therefore took care in writing the manuscript of his book to ensure that it did not contain or reveal classified information or SCI.[3] Nonetheless, so that there could be no question of his compliance with his obligations, Ambassador Bolton directed me, as his counsel, to submit the manuscript to the NSC for prepublication review "out of an abundance of caution.[4] I submitted the manuscript to Ms. Knight on December 30, 2019.

---

[2] Bolton Decl. ¶ 2.

[3] *Id.* ¶ 3.

[4] *See* Letter from Charles J. Cooper to Ellen Knight, Senior Director for Records, Access, and Information Security Management, National Security Council at 1(Dec. 30, 2019), Doc. 9-6.

32.     On January 23, at 3:33 p.m., Ms. Knight emailed me a letter stating that "[b]ased on our preliminary review, the manuscript appears to contain significant amounts of classified information," including information classified "at the TOP SECRET level."[5] Ms. Knight did not assert that the manuscript contained any information classified as SCI, or derived from or related to SCI.[6] On February 7, Ms. Knight sent me another letter asserting that the manuscript contained classified information and offering to meet with Ambassador Bolton "to review each instance of classified information in detail."[7] Once again, while Ms. Knight's letter asserted that the manuscript included "classified information"—and, indeed, quotes Executive Order 12526's definition of "classified information"—it contains no suggestion that the manuscript included SCI.[8]

33.     Ambassador Bolton's first meeting with Ms. Knight took place on February 21.[9] In the meeting, which lasted four hours, Ms. Knight, as she described it, "reviewed the preliminary results of three chapters in the draft manuscript in detail with" Ambassador Bolton.[10] Ambassador

---

[5] Letter from Ellen Knight, Senior Director for Records, Access, and Information Security Management, National Security Council, to Charles J. Cooper (Jan. 23, 2020), Doc. 9-8; *see* Am. Compl. ¶ 33.

[6] *Id.*

[7] Letter from Ellen Knight, Senior Director for Records, Access, and Information Security Management, National Security Council, to Charles J. Cooper at 1 (Feb. 7, 2020), Doc. 9-9; *see* Am. Compl. ¶ 40.

[8] *Id.* at 1–2.

[9] *See* Letter from Ellen Knight, Senior Director for Records, Access, and Information Security Management, National Security Council, to Charles J. Cooper at 1 (Feb. 24, 2020), Doc. 9-10.

[10] *Id.*; *see* Am. Compl. ¶ 41.

Bolton took five pages of handwritten notes, as he and Ms. Knight discussed her specific concerns page by page, line by line, and sometimes word by word.[11]

34.     Three days later, on February 24, Ms. Knight wrote that the meeting had been "most productive," and she suggested that "it would be most helpful to the process if we hold one or more follow-on meetings . . . to discuss the remaining portions of the draft manuscript."[12] Ms. Knight's letter does not indicate—and the Government has not alleged—that there was any suggestion during this intensive four-hour meeting that the manuscript contained SCI.[13]

35.     Ambassador Bolton met with Ms. Knight three more times, on March 2 (approximately four hours), March 3 (over four hours), and March 4 (approximately three hours).[14] In these meetings, Ambassador Bolton and Ms. Knight reviewed in meticulous detail each of her concerns in the remaining 11 chapters. Ambassador Bolton produced 34 pages of handwritten notes reflecting the details of their discussions.[15]

36.     Following his notes and the guidance provided by Ms. Knight, Ambassador Bolton revised his manuscript, and by March 9 had resubmitted all 14 chapters to begin the second round of the iterative review process.[16] On March 27, Ms. Knight wrote:

> I appreciate your efforts to address the classification concerns in the latest draft version you submitted. Many of the changes are satisfactory. However, additional edits are required to ensure the protection of national security information. To assist

---

[11] Bolton Decl. ¶ 10.

[12] *See* Doc. 9-10 at 1; Am. Compl. ¶ 41.

[13] *Id.*

[14] *See* Bolton Decl. ¶ 12; Am. Compl. ¶ 42.

[15] Bolton Decl. ¶ 12.

[16] *Id.*

in making the additional required changes, I will provide a list of required edits and language substitutions to guide you in this next stage of revising the draft.[17]

37.     Her list amounted to 17 typed, single-spaced pages of comments, questions, suggestions of specific alternative language, and citations to publicly available source material.[18] Once again, Ms. Knight's email contained no reference to SCI, and no suggestion that the manuscript then contained, or ever had contained, SCI.[19] Working through the weekend, Ambassador Bolton responded to all 17 pages on Monday, March 30, accepting the vast majority of Ms. Knight's suggestions and proposing alternative solutions to others.[20]

38.     In a telephone conversation on April 13, Ms. Knight provided Ambassador Bolton her much shorter list of remaining concerns after reviewing his March 30 revisions.[21] Their conversation resulted in entirely agreed-upon language changes, which Ambassador Bolton delivered to Ms. Knight the next day, April 14.[22] During the April 13 call, Ms. Knight also said she would review the entire manuscript one more time, to recheck the issues previously resolved and ensure that she had not overlooked any.[23]

---

[17] *See* Email from Ellen Knight, Senior Director for Records, Access, and Information Security Management, National Security Council, to John Bolton, Former National Security Advisor, National Security Council (Mar. 27, 2020, 3:52 PM), Doc. 9-11; Am. Compl. ¶ 44.

[18] *See* Prepublication Review for NSC Access Case 190762 List of Required Edits Prepared for Ambassador John R. Bolton (Mar. 27, 2020), Doc. 9-16; Am. Compl. ¶ 44.

[19] Doc. 9-11.

[20] Bolton Decl. ¶¶ 13–14; Am. Compl. ¶¶ 44–45.

[21] Bolton Decl. ¶ 15; Am. Compl. ¶ 45.

[22] Bolton Decl. ¶ 15; Am. Compl. ¶ 45.

[23] Bolton Decl. ¶ 15.

39.     That final review resulted in two further telephone calls, on April 21 and 24, in which Ms. Knight conveyed her final round of edits and some additional citations to publicly available sources.[24]

40.     Ambassador Bolton promptly responded with the requested revisions, and on April 27, Ms. Knight, after clarifying one previously discussed edit, confirmed "that's the last edit I really have to provide for you."[25]

41.     Accordingly, over the course of four months, Ambassador Bolton and Ms. Knight made a total of four passes through the manuscript, and at the end of this painstaking process, Ms. Knight confirmed that the revised manuscript contained no classified information. As the Government alleges, after her review was completed, Ms. Knight "was of the judgment that the manuscript draft did not contain classified information."[26]

42.     Given Ms. Knight's judgment, after completing this exhaustive four-month review process, that the manuscript, as revised, contained no classified information, Ambassador Bolton has strong reasons for doubting the Government's assertions—unsupported by any meaningful evidence that Ambassador Bolton has been afforded the opportunity to review—that it has *now* concluded that the book *does* contain classified information, including SCI.

43.     This conclusion is fortified by the belated timing of the Government's assertion that the book contains SCI. As discussed, when Ambassador Bolton submitted his manuscript for prepublication review on December 30, 2019, his counsel stated Ambassador Bolton's considered

---

[24] *Id.* ¶ 16; *see* Am. Compl. ¶ 45.

[25] Bolton Decl. ¶ 16; Am. Compl. ¶ 46.

[26] Am. Compl. ¶ 46.

view that the manuscript *did not* contain "any discussion . . . of sensitive compartmented information ('SCI')."[27]

44.     Over the next four months, he (or his counsel) and Ms. Knight exchanged more than a dozen emails and letters, participated in numerous phone calls, consuming many hours, and sat through more than fifteen hours of face-to-face meetings, painstakingly reviewing Ambassador Bolton's manuscript chapter-by-chapter, page-by-page, and in some cases word-by-word. Yet, in all that time, Ms. Knight never asserted—or even hinted—that the manuscript contained SCI or any description of activities related to SCI, even as she asserted that earlier drafts contained other sorts of classified information. After conducting an exhaustive process in which she reviewed the manuscript through *at least four waves of changes*, Ms. Knight concluded that it contains no classified information—let alone *SCI*—as the Government itself admits.

45.     Nor did Mr. Eisenberg assert in either his June 8 or June 11 letters that the manuscript contains SCI or any description of activities related to SCI.[28] Nor did Mr. Ellis assert in his June 16 letter that the manuscript contains SCI or any description of activities related to SCI.[29]

46.     Indeed, *not even the Government's initial complaint* asserted that the manuscript contains SCI or any description of activities related to SCI, even as it specifically alleged that it contains "Confidential, Secret, and Top Secret" information.[30] While the Government has since

---

[27] Doc. 9-6 at 1.

[28] *See* Letter from John Eisenberg, Legal Advisor, National Security Council, to Charles J. Cooper (Jun. 8, 2020), Doc. 1-15; Letter from John Eisenberg, Legal Advisor, National Security Council, to Charles J. Cooper (Jun. 11, 2020), Doc. 1-17.

[29] *See* Letter from Michael J. Ellis, Deputy Assistant to the President, to John R. Bolton (Jun. 16, 2020), Doc. 40-2.

[30] Compl. ¶ 58.

amended its Complaint to include the allegation that the book contains SCI, and while Plaintiff's counsel stated at the June 20 Preliminary Injunction hearing that this SCI was classified before Mr. Ellis began his review, the belated timing of these assertions strongly supports Ambassador Bolton's conclusion that any such classification determination did not take place until *after* he had authorized the publication of the book.

47.     At the very least, the facts enumerated above (which are essentially undisputed) obviously cast enough doubt on the Government's assertions to entitle Ambassador Bolton to discovery into the matter.

**B.     Extant Facts Supporting the Conclusion that the Government Acted in Bad Faith.**

48.     The facts already in the public record also overwhelmingly support Ambassador Bolton's belief that the prepublication review process of his manuscript was perverted for the purely political end of suppressing or at least delaying the publication of his manuscript, due to the content and nature of its descriptions of the President, in an unlawful abuse of the prepublication review and classification processes and in violation of the Government's implied duty of good faith and fair dealing. These facts strongly indicate that following Ms. Knight's April 27 confirmation that the book, as revised, contained no classified material, the additional review process was undertaken and conducted by Mr. Ellis entirely in bad faith, as part of a purely political effort to suppress the publication of the book, or at least delay publication until after the 2020 election, because it reported facts portraying President Trump in an unfavorable and embarrassing light. The Government's conclusion that the book contains classified material was thus reached in bad faith, and without serious effort to understand the contrary decisions of Ms. Knight, the long-time career professional supervising the regular prepublication review process. Once again, many of these facts have already been presented to the Court, in connection with Defendant's opposition

to the Government's preliminary injunction motion, but I set them forth again here, lest there be any doubt about the necessity of allowing Ambassador Bolton discovery into this issue.

> ### 1. President Trump's Statements Concerning the Review of Ambassador Bolton's Book.

49.     On January 26—less than a month after Ambassador Bolton initially delivered his manuscript to the Government for review—the *New York Times* published an article purporting to describe passages from the manuscript that bore on the then-ongoing impeachment trial.

50.     Three days later, on January 29, Senator Martin Heinrich of New Mexico asked the following question of the President's lawyers during the impeachment trial:

> When did the President's Counsel first learn that the Bolton manuscript had been submitted to the White House for review, and has the President's counsel or anyone else in the White House attempted in any way to prohibit, block, disapprove, or discourage John Bolton, or his publisher, from publishing his book?

166 Cong. Rec. S645-02, S660 (daily ed. Jan. 29, 2020) (statement of Sen. Heinrich).

51.     In response, Patrick F. Philbin, Deputy Counsel to the President and one of the President's defense lawyers during the impeachment trial, read into the Senate record Ms. Knight's January 23 letter to Mr. Cooper. *Id.* at S660–61 (statement of Mr. Counsel Philbin). Mr. Philbin also stated that, sometime after Ambassador Bolton's manuscript was submitted to the NSC, "[t]he White House Counsel's Office was notified that it was there. The NSC has released a statement explaining that it has not been reviewed by anyone outside NSC staff." *Id.* at S660.

52.     Later that day, however, the President asserted on Twitter that after he fired Ambassador Bolton, he had "go[ne] out and IMMEDIATELY writ[ten] a nasty & untrue book. All Classified National Security."[31] Of course, the President could not have offered this assessment

---

[31]   Donald J. Trump (@realDonaldTrump), TWITTER (Jan. 29, 2020, 7:28 AM), https://bit.ly/30QPvWW.

of the content of the Ambassador's book unless he had either *read* the manuscript or been *briefed on its contents*.

53.     Equally troubling, the President's tweet expressly linked his assertion that "All" the material in the manuscript is "Classified National Security" with his personal hostility toward Ambassador Bolton and the content of the Ambassador's book. That demonstrates that a campaign of political pressure designed to prevent or stall the publication of Ambassador Bolton's book—a campaign emanating from the President himself—had already begun.

54.     On February 3, *Vanity Fair* reported that "the president is out for revenge against his adversaries."[32] The article stated that the President "has an enemies list," "Bolton is at the top of the list," and the "campaign against Bolton" included Ms. Knight's January 23 letter asserting that the manuscript contained classified information.[33] It also reported that the President "wants Bolton to be criminally investigated."[34]

55.     On February 21, the *Washington Post* reported that

President Trump has directly weighed in on the White House [prepublication] review of a forthcoming book by his former national security adviser, telling his staff that he views John Bolton as 'a traitor,' that everything he uttered to the departed aide about national security is classified and that he will seek to block the book's publication.[35]

56.     The story also reported that the President vowed to a group of television news anchors that "we're going to try and block the publication of [his] book. After I leave office, he

---

[32] *See* Gabriel Sherman, *"It's Payback Time": With Acquittal Certain, Trump Plots Revenge on Bolton, Impeachment Enemies*, VANITY FAIR (Feb. 3, 2020), https://bit.ly/2C2irkp.

[33] *Id.*

[34] *Id.*

[35] *See* Josh Dawsey, Tom Hamburger, and Carol D. Leonnig, *Trump wants to block Bolton's book, claiming most conversations are classified*, WASH. POST (Feb. 21, 2020), https://wapo.st/2AuWEBs.

can do this."[36] Accordingly, as early as the end of February, the President had *expressly and publicly confirmed* that he was directing an effort to use the prepublication review process as a pretext for suppressing the publication of Ambassador Bolton's book—and the public reporting confirmed that one of the purposes of this effort was the President's own desire for "revenge" against one of his political "enemies." At the same time, the President's insouciance about publication of the book after he leaves office strongly supports the inference that national security concerns did not drive his animus against the book.

57.     As Ms. Knight's review process drew to a close, the White House's increasing political interference in the process also became evident from Ambassador Bolton's interactions with her. When Ambassador Bolton asked on April 27—after Ms. Knight provided him with her "last edit"—when he could expect to receive the pro-forma closing letter memorializing her verbal confirmation that the revised book contained no classified information, Ms. Knight cryptically replied that her "interaction" with unnamed others in the White House about the book had "been very delicate," and that there were "some internal process considerations to work through."[37]

58.     Ambassador Bolton's subsequent inquiries of Ms. Knight as to when he would receive the pro-forma letter clearing the book for publication were answered with uncharacteristically stiff and formal replies that the "process was ongoing" and that she had nothing new to report.[38] By this point it had become obvious that the prepublication review process was now being conducted entirely in bad faith, and that ranking White House officials had no intention of permitting Ms. Knight to issue the customary, pro-forma clearance letter, but instead

---

[36] *Id.*

[37] Bolton Decl ¶ 17.

[38] *Id.* ¶ 18.

were attempting to run out the clock before the election by simply refusing to respond to Ambassador Bolton's requests and otherwise prolonging "the process."

59.     According to the Government, on May 2, Mr. Ellis had in fact begun "an additional review of the manuscript," at the direction of Ambassador Bolton's successor, Mr. O'Brien.[39] The Government concedes that such an "additional" round of review by a political appointee is unusual and extraordinary,[40] and indeed, the Government's counsel stated at the preliminary injunction hearing that he was "not aware" of such a "higher level of review" ever having occurred before.[41]

60.     Mr. Ellis's review is all the more extraordinary because: (1) he only commenced his role as Senior Director for Intelligence Programs at the National Security Council two months before undertaking the review; (2) he does not appear to have ever participated in any prepublication review before; and (3) in fact, he only completed his mandatory "training in proper classification," Executive Order 13526 § 1.3(d), 75 Fed. Reg. 707 (Dec. 29, 2009), *after* he had finished reviewing the manuscript (though the Government assures us that he "reviewed his work" at that point and concluded that his training "did not alter" his conclusions).[42]

61.     On June 15, in response to a question about why his administration was planning to file this lawsuit seeking to enjoin publication of the book, the President openly admitted that his classification decisions are not based on specific national-security concerns but instead encompass *anything* he says while in office: "I told that to the attorney general before; *I will consider every conversation with me as president highly classified*. So that would mean that if he wrote a book,

---

[39] Am. Compl. ¶ 51.

[40] *Id.* ¶ 27 (admitting that the prepublication review process ordinarily involves review only by the Records Access and Information Security Management Directorate's staff and senior employees).

[41] Transcript of Videoteleconference Hearing at 17:5–7 (June 20, 2020).

[42] Am. Compl. ¶ 51.

and if the book gets out, he's broken the law."[43] This view, of course, is preposterous, and the Government has not advanced it.

62.     The President reiterated: "Any conversation with me is classified."[44] The President added that "a lot of people are very angry with [Bolton] for writing a book" and that he "hope[d]" that Ambassador Bolton "would have criminal problems" for publishing the book.[45]

## 2.     The Government's Retaliatory Imprisonment of Michael Cohen.

63.     Far from an isolated incident, the President's effort to suppress Mr. Bolton's book, because of its content, is of a piece with similar abuses of Executive power designed to prevent the publication of other books that also portray him in an unflattering light.

64.     A federal judge in the Southern District of New York recently found, for example, that the Government revoked the house-arrest of the President's former personal lawyer, Michael D. Cohen, in retaliation for drafting and preparing to publish a book that describes the President's conduct in an unfavorable manner.[46]

65.     As detailed in the filings in that case, Mr. Cohen was released on furlough (and then home confinement) on May 21, 2020, because he suffers from health conditions that place him at high risk of severe injury or death if he contracts COVID-19 in prison.[47]

---

[43] Press Conference, President Donald J. Trump at 0:54–1:05, (Jun. 15, 2020) (emphasis added), https://politi.co/2Y2Vo1i.

[44] *Id.* at 4:18–21.

[45] *Id.* at 1:05–08, 1:30–36.

[46] Hearing Transcript at 11:10-12, *Cohen v. Barr*, No. 20-cv-5614 (S.D.N.Y. July 23, 2020).

[47] Verified Petition for Writ of Habeas Corpus at ¶¶ 28, 32, *Cohen*, No. 20-cv-5614 (S.D.N.Y. July 20, 2020), Doc. 1.

66.     Mr. Cohen announced his plans to publish a book concerning Mr. Trump in several tweets posted during his furlough. On June 26, for example, he posted a tweet with the hashtag "#WillSpeakSoon," and again on July 2, he tweeted: "I am close to completion of my book . . . anticipated release date will be late September."[48]

67.     On July 9, one week after this tweet, Mr. Cohen reported to federal officials to discuss the conditions governing his home confinement. At this meeting, Mr. Cohen was presented with a proposed condition of probation that he have "[n]o engagement of any kind with the media" during his home confinement, "including print, tv, film, books, or any other form of media/news," and that he be "prohibit[ed] from all social media platforms."[49] The federal judge overseeing the case had never before encountered such a condition "in 21 years of being a judge."[50]

68.     When Mr. Cohen and his attorney objected to this condition, the federal officials they were negotiating with asked to table the issue, so that they could run the objection "up the chain of command" while they settled on the other conditions.[51]

69.     Shortly thereafter, the meeting was abruptly cut short by the arrival of three U.S. Marshals who placed Mr. Cohen in handcuffs and shackles and escorted him back to federal prison.[52] When Mr. Cohen's attorney protested that they "had not failed to agree to the terms"

---

[48] *Id.* ¶¶ 38–39. As described by Mr. Cohen, the book, provisionally titled *Disloyal: The True Story of Michael Cohen, Former Personal Attorney to President Donald J. Trump*, will describe "how he had lost his moral compass over his years working for Mr. Trump," will "provide[ ] graphic details about the President's behavior behind closed doors," including making "anti-Semitic remarks against prominent Jewish people and virulently racist remarks against such Black leaders as President Barack Obama and Nelson Mandela," and will be "supported by documentary evidence." *Id.* ¶¶ 18–19.

[49] *Id.* at ¶ 41.

[50] Hearing Transcript, *Cohen*, *supra*, at 8:20–21.

[51] Verified Petition, *Cohen*, *supra*, at ¶¶ 46, 50.

[52] *Id.* ¶ 52.

proposed by the Government and "had not yet finished the meeting," the federal probation officers "did not deny this, but instead said it was 'out of [their] hands.' "[53]

70.     Mr. Cohen petitioned for a writ of habeas corpus. The federal judge overseeing the case, Judge Alvin K. Hellerstein, granted the petition, finding that the Government's imprisonment of Mr. Cohen, in response to his objection to the extraordinary and unprecedented condition restraining his free speech, was "retaliatory," for the deliberate purpose of "stop[ping] exercise of First Amendment rights."[54]

71.     In sum, based on the foregoing, there is a strong likelihood that discovery in this case will produce evidence concerning the specific facts identified in Part I.B above demonstrating interference with the prepublication review of Ambassador Bolton's memoir and the bad-faith abuse of the review process by President Trump and White House officials for the purely political purpose of suppressing the publication of the book or at least delaying its publication until after the 2020 election.

---

[53] *Id.* ¶ 54.

[54] Hearing Transcript, *Cohen*, *supra*, at 9:8–9, 11:10–12.

I declare under penalty of perjury under the laws of the United States of America that the foregoing Declaration is true and correct to the best of my knowledge.

Executed on the 20th day of August, 2020

Charles J. Cooper