# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE UNITED STATES OF AMERICA,

                      Plaintiff,

v.

JOHN R. BOLTON,

                      Defendant.

Civil Action No. 20-1580-RCL

## DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION TO DEFER CONSIDERATION OF PLAINTIFF'S MOTION FOR <u>SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(d)</u>

September 10, 2020

Charles J. Cooper, Bar No. 248070
Michael W. Kirk, Bar No. 424648
John D. Ohlendorf, Bar No. 1024544

COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC  20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
Email: ccooper@cooperkirk.com

*Counsel for Defendant John R. Bolton*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................. 6

I.     Defendant Needs Discovery To Determine Whether His Book Contains any
Properly Classified Information, SCI, or Description of Activities Related to
or Derived from SCI. ........................................................................................... 6

       A.     The Government Fails To Rebut Defendant's Need for Discovery into the
Claim that His Book Contains a Description of Activities Related to or
Derived from SCI. ............................................................................... 6

       B.     The Government's Attempts To Shore Up its Interpretation of the SCI NDA
Are Unpersuasive. ............................................................................. 10

       C.     The Government also Fails To Persuasively Defend Its Interpretation of
the Classified Information NDA. .......................................................... 15

II.    Defendant Needs Discovery To Obtain Facts Supporting His Contemplated
Affirmative Defense Based on the Government's Breach of the Duty of Good Faith
and Fair Dealing. ............................................................................................... 20

CONCLUSION ......................................................................................................... 25

i

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page**

\* *Convertino v. United States Dep't of Justice*, 684 F.3d 93 (D.C. Cir. 2012) ............................1, 4

 *Snepp v. United States*, 444 U.S. 507 (1980).......................................................................18, 22

\* *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548 (Fed. Cir. 1992)............................5, 21

 *United States v. Marchetti*, 466 F.2d 1309 (4th Cir. 1972) ....................................................23, 24

 *United States v. Snepp*, 897 F.2d 138 (4th Cir. 1990) .................................................................24

**Other Authorities**

 Restatement (Second) of Contracts (Am. Law Inst. 1981)...................................................22

## INTRODUCTION

Under FED. R. CIV. P. 56(d), when one party moves for summary judgment before any discovery has taken place, the motion must be deferred if the non-moving party files a declaration establishing that there are particular facts, relevant to the summary judgment motion, that he cannot currently present; that his inability to present those facts is reasonable; and that he likely would be able to obtain evidence of those facts if allowed to take discovery. *See Convertino v. United States Dep't of Justice*, 684 F.3d 93, 99–100 (D.C. Cir. 2012). The Rule 56(d) declaration filed by Ambassador Bolton identifies two separate sets of facts that are relevant to the summary judgment motion and that he must be allowed an opportunity to pursue through discovery: (1) facts bearing on whether Ambassador Bolton's book in fact contains properly classified information, SCI, or any description of activities related to or derived from SCI; and (2) evidence supporting Ambassador Bolton's (forthcoming, if necessary) affirmative defense that any contractual duties he owed relating to the prepublication review of his book were excused and released because the unprecedented second prepublication review of the book by Mr. Ellis was conducted unfairly and in bad faith, constituting a prior material breach by the Government.

The Government *does not dispute* that Ambassador Bolton's Rule 56(d) papers satisfy the second and third *Convertino* factors: that is, the Government *effectively concedes* (as it must) that Ambassador Bolton's explanation for his present inability to present evidence of the facts at issue is reasonable and satisfactory, and it further *effectively concedes* (as it must) that we have adequately shown that discovery would likely yield that evidence. Instead of disputing these factors, the Government places all of its chips behind an attempt to show that neither of the sets of facts we have identified "justifies postponing the Government's summary-judgment motion, because neither of those topics is legally relevant." Pl.'s Opp'n to Def.'s Mot. To Defer

Consideration of Pl.'s Mot. for Summ. J. at 2 (Sept. 3, 2020), Doc. 50 ("Govt.'s Rule 56(d) Br."). The attempt fails as to both topics (and a failure as to either one alone would require deferral under Rule 56(d)).

It cannot be maintained with a straight face that discovery by Defendant into whether his book *actually contains* the information alleged to have triggered the *very contractual duties* he supposedly breached is not "legally relevant" to the litigation. *Id.* Indeed, the Government's primary argument on this score—that the dispositive question is whether the book contains "a description of activities that produce or relate to SCI," and that Ambassador Bolton "does not dispute or seek discovery on *that* point," *id.* at 6—is simply and flatly false. Ambassador Bolton unequivocally *does* dispute that the book contains any such material, he repeatedly *did* request discovery on that very issue, and that request is more than justified by the Government's complete failure, *even in its latest brief, after we pointed the failure out*, to identify even a *single passage* in the book that it thinks qualifies as a description of activities that produce or relate to SCI.

Much of the rest of the Government's brief is in the nature of a sur-reply opposing the merits of our pending Motion To Dismiss. None of its arguments are new and thus none improve its position. The Government has still failed even to address the express language set forth in Paragraph 1 of the SCI NDA, which limits the NDA's application to information containing or related to SCI *that was classified as SCI at the time the employee disclosed it*. There is no allegation in the Amended Complaint satisfying that temporal requirement, a fatal defect that the Government simply ignores.

The Government has also still failed to show why the Court should interpret the NDAs signed by Ambassador Bolton as legally equivalent to the Secrecy Agreements at issue in *Snepp*, *Marchetti*, and the other cases that it repeatedly invokes. To be sure, had Ambassador Bolton

signed one of *those agreements*, this case would be controlled by those precedents. But he did not, and the obligations created by the plain text of the agreements he did sign differs in dispositive ways from the language of the NDAs in the cases the Government relies upon. The Government cannot explain those critical textual differences, so it simply pretends they do not exist.

And the Government has still failed to explain why either NDA should be interpreted as imposing strict liability on an employee who publishes a work that he reasonably believes does not contain any classified information or related material, where that interpretation (1) is not supported by any language in the contract imposing strict liability, and (2) in fact is contrary to, and would read *out* of the contract, multiple passages indicating that *some level of scienter is required*. The Government could easily have written an NDA imposing the strict-liability requirement it now advocates. All it need have done is require prepublication review of any book "containing classified information, SCI, or a description of activities that produce, relate to, or are derived from SCI, whether or not the employee knows or has reason to know that the book contains such material." *Neither* of Ambassador Bolton's contracts *say that*. And what they *do* say *cannot* reasonably be read to *say that*.

At the end of the day, the Government does not dispute that Ambassador Bolton must prevail if his book does not contain either (1) classified information, (2) SCI, or (3) a description of activities that produce, relate to, or are derived from SCI. The only evidence proffered by the Government for the proposition that the book contains either of the first two of these things—at least, the only evidence that Ambassador Bolton has been permitted to see—are three vague, conclusory declarations. And the Government has not offered *any evidence whatsoever* that the book contains the third class of material, preferring instead to rest its case on the naked assertion that a nearly 600-page book by a former National Security Advisor simply *must* contain such

material. The notion that any of these necessary factual propositions is not disputed, or reasonably subject to dispute, is fatuous.[1]

That is enough to require relief under Rule 56(d), but it is not all. For if Ambassador Bolton's Motion To Dismiss is denied, he is also and independently entitled to defer the Government's summary judgment motion until after he pleads and takes discovery into his affirmative defense of prior material breach. The Government does not dispute that it had an implied duty to conduct the prepublication review of Ambassador Bolton's book fairly and in good faith. It does not dispute that if it breached that duty, under bedrock contract law that breach would excuse Ambassador Bolton from further performance of any related contractual duties—including any duty to continue to engage in a sham prepublication review process. And most astonishingly of all, the Government *does not dispute*, for purposes of our Rule 56(d) motion, that discovery *would reveal* that it breached that duty by layering on an additional and unprecedent stage of review that was conceived and conducted for the nakedly political and bad-faith aim of suppressing or delaying the publication of the book for no other or better reason than that it relates unflattering details about President Trump's conduct. In deciding our Rule 56(d) motion, the Court must thus proceed on the assumption that *all of these facts are true and would be conclusively proven* through discovery.

---

[1] As the Government notes (at footnote 1 on page 2), Ambassador Bolton "did not file an opposition to the Government's summary judgment motion in conjunction with his Rule 56(d) motion, and he has not contested any of the undisputed record facts the Government set forth as grounds for its motion." That does not mean, as the Government intimates, that Ambassador Bolton has *conceded* any of the supposedly "undisputed record facts" set forth by the Government in its summary judgment papers. Instead, given the nascent stage of the litigation and as Rule 56 explicitly allows, we explained in our Rule 56(d) motion and declaration that we "*cannot* present facts essential to justify . . . opposition" to those purportedly "undisputed" facts at this point in time, given that the Government moved for summary judgment before any discovery could occur, and "summary judgment is premature unless all parties have had a full opportunity to conduct discovery." *Convertino*, 684 F.3d at 99 (citations and quotation marks omitted).

The Government's only justification for eliminating Ambassador Bolton's right to obtain the evidence showing these facts is the notion that he somehow abandoned, for all time, any right to object to the Government's bad-faith conduct when he chose not to affirmatively seek judicial relief for the Government's breach of its duty of good faith. Indeed, on the Government's view, there is *no* breach of Ambassador Bolton's contracts so blatant, open, and material that it would justify his decision to abandon further performance. That argument is flatly contrary to the bedrock rule of contract law that "[u]pon material breach of a contract the non-breaching party has the right to discontinue performance of the contract." *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1550 (Fed. Cir. 1992). And the Government cites no authority whatsoever—no language in Ambassador Bolton's contracts, and no case dealing with a material Government breach in the prepublication-review context—justifying a different rule here.

So Ambassador Bolton's affirmative defense is likely to succeed, should the litigation develop to the point where it becomes necessary and appropriate for him to raise and then prove it. But for present purposes, the critical point is that the Government obviously cannot show that the Court should effectively *adjudicate and deny* Ambassador Bolton's good-faith-and-fair-dealing defense on the merits *now*—in the absence of any discovery whatsoever and based on nothing more than a two-and-a-half-page section tucked at the end of the Government's latest brief—*before he has even had a chance to plead it.*

The Government's premature motion for summary judgment must be denied or deferred until after the completion of discovery.

# ARGUMENT

**I.    Defendant Needs Discovery To Determine Whether His Book Contains any Properly Classified Information, SCI, or Description of Activities Related to or Derived from SCI.**

**A.    The Government Fails To Rebut Defendant's Need for Discovery into the Claim that His Book Contains a Description of Activities Related to or Derived from SCI.**

The Government has alleged and argued that Ambassador Bolton was required to submit his manuscript for prepublication review, under the two form NDAs he signed, because it contains three types of information, any one of which, according to the Government, requires review: (1) classified information, (2) "sensitive compartmented information" ("SCI"), and (3) a description of activities that produced, are related to, or are derived from SCI. *See, e.g.*, Am. Compl. ¶¶ 59, 69, 79, 80, 82. As we explained in our Motion To Dismiss papers, and as we further demonstrate below, the Government's understanding of the duties imposed by the NDAs is incorrect, and the bare presence of one of these types of information is *not sufficient* to trigger prepublication review. (Which is why the Government's complaint fails to even state a claim and must be dismissed). But even accepting for the sake of argument that the presence of any one of these classes of information *does* suffice for the Government to make out its claims, relief under Rule 56(d) would *still* be necessary, because Ambassador Bolton has had *no opportunity to test* the Government's naked allegations that his book contains information of any of these kinds—and in fact, Defendant has not seen *even a single scrap* of meaningful evidence supporting the Government's say-so that it does. Indeed, the Government refuses even to identify what information in the book it contends is classified, SCI, or a description of activities derived from or related to SCI. The Government asks the Court to take it on faith that book "must" contain such information.

The Government does not even try to argue that the Court could find, based on the scant record before it, that any information of the first two types is contained within the book's four

corners—that is, it *does not contend* that summary judgment is appropriate at this juncture on its claim that the book *actually contains* properly classified information or SCI. Instead, it rests its weight on the notion that review is required under the SCI NDA *regardless* of "the presence of any classified information in his manuscript," because the book supposedly "indisputably contains a 'description of activities that produce or relate to SCI.' " Govt.'s Rule 56(d) Br. 5, 6. That reed is too slender to bear the burden.

The allegation that Ambassador Bolton's book "contains a 'description of activities that produce or relate to SCI' " *simply is not* "indisputabl[e]." *Id.* at 6. As explained in the Reply in support of our Motion To Dismiss, this phrase cannot plausibly be read as encompassing *everything* written by a former National Security Advisor that touches on his former government role. *See* Def.'s Reply in Supp. of His Mot. To Dismiss the Am. Compl. at 8–11, 15–16 (Aug. 14, 2020), Doc. 48 ("Def.'s MTD Reply"). Indeed, the Government's brief effectively concedes this. Govt.'s Rule 56(d) Br. 10. The Government responds that "Defendant does not advance a reading of this term that would exclude the entirety of his 592-page tome," *id.*, but that is not true. We *did* offer a narrower, more sensible reading of the key phrase, as "requiring that the information bears some *genuine and direct* relationship to SCI," Def.'s MTD Reply 16, which the Government utterly fails to address or even acknowledge. And in any event, *Ambassador Bolton is not the one asking for summary judgment*. Instead, because the "relate to" phrase cannot be read in an all-embracing way, it is *the Government's burden*, if it thinks it is entitled to summary judgment on this basis, to come forward and: (a) identify *what*, exactly, the book contains that it believes is related to or derived from SCI, and (b) give *some* explanation as to why the specific, identified material qualifies as a description of activities related to or derived from SCI, on the proper (limited) understanding of those terms. And even if it did so, Ambassador Bolton would still be

entitled to take discovery if there is reason to believe that such discovery may give rise to a genuine issue of material fact on this point.

To meet these burdens, the Government offers: *nothing*. As explained in our Motion To Dismiss Reply, the Government has *never identified a single passage* that it contends actually counts as an impermissible description of an activity related to or derived from SCI. Def.'s MTD Reply 15–16. It does nothing to fill that glaring hole in its latest brief. Instead, it merely regurgitates its conclusory speculation that because Ambassador Bolton's "duties as National Security Advisor necessarily included activities that produce or related to SCI," any book he writes touching on "his experiences in that role" *must* "obviously" include *something* that fits the bill. Govt.'s Rule 56(d) Br. 5, 6. We have explained why this is simply untrue, Def.'s MTD Reply 15–16, and the Government tenders no response whatsoever. Such vacuous generalities, unsupported by any evidence or argument, are plainly not enough to entitle the Government to summary judgment on this critical point—particularly before Defendant has had any opportunity to test them through the adversarial discovery process.

Indeed, as outlined in detail in our Rule 56(d) papers, Ambassador Bolton has offered strong evidence—even *without* the benefit of any discovery—in support of his assertion that his book *does not* contain any impermissible description of activities related to or derived from SCI. *See id.* at 16–18; Declaration of Charles J. Cooper ¶¶ 30–47 (Aug. 20, 2020), Doc. 49-2 ("Cooper Decl."). We will not burden the Court by setting forth the entirety of this evidence yet again; suffice it to say that the Government's assertions on this score are difficult indeed to square with (a) Ellen Knight's conclusion, after an intensive, four-month review process, that "the manuscript draft did not contain classified information," let alone SCI, Am. Compl. ¶ 46, and (b) the fact that until the Government's June 17 preliminary injunction motion, *not a single person on earth* had ever

suggested that Ambassador Bolton's book contained a description of activities related to or derived from SCI—not Ms. Knight, in any of her numerous communications; not Mr. Eisenberg, in either his June 8 or June 11 letters; not Mr. Ellis, in his June 16 letter; and not even the Government's lawyers in this case, in the original complaint.

Accordingly, Ambassador Bolton is entitled to discovery into the allegation—very much disputed and very much necessary to this litigation (only if the Court denies our pending Motion To Dismiss, that is)—that his book contains a description of activities related to or derived from SCI. The Government's only response is to incorrectly claim that "Defendant does not dispute or seek discovery on that point." Govt.'s Rule 56(d) Br. 6. It apparently somehow missed:

- The paragraph of Mr. Cooper's Declaration explicitly stating that "Ambassador Bolton believes that discovery will reveal . . . [that] [h]is book contains no description of activities related to or derived from SCI." Cooper Dec. ¶ 10(c).

- The repeated statements in the declaration that Ambassador Bolton needs discovery into this very issue. *See, e.g.*, *id.* at ¶¶ 4, 8, 11, 28(a), 32, 44, 45, 46.

- The explicit statement in our supporting brief that "Ambassador Bolton intends to establish, through discovery, that his book does not contain any . . . description of activities related to or derived from SCI"—a statement that, inexplicably, *the Government itself quotes* only *two pages before* claiming that we *do not* seek discovery on that very issue. *See* Govt.'s Rule 56(d) Br. 3–4; Def.'s Mem in Supp. of his Mot. To Defer Consideration of Pl.'s Mot for Summ. J. Pursuant to FED. R. CIV. P. 56(d) at 9 (Aug. 20, 2020), Doc. 49-1 ("Def.'s Rule 56(d) Br.").

- The multiple passages in our brief explaining why we need discovery into this issue. *See, e.g.*, Def.'s Rule 56(d) Br. 1, 10, 6, 17.

The short of the matter is this. The principal basis offered by the Government for disputing that Ambassador Bolton is entitled to discovery into the Government's claim for breach of the SCI NDA is its *obviously mistaken* assertion that Ambassador Bolton "does not dispute or seek discovery" concerning the alleged presence in the book of a description of activities related to or derived from SCI. Govt.'s Rule 56(d) Br. 6.

**B.      The Government's Attempts To Shore Up its Interpretation of the SCI NDA Are Unpersuasive.**

The Government spends most of the rest of its brief attempting to rehabilitate its merits arguments opposing our Motion To Dismiss. The result is no more successful than its previous merits brief.

1.      As explained in our Motion To Dismiss papers, the Government has failed to state a claim for breach of the SCI NDA for the dispositive threshold reason that Paragraph 1 of the NDA by its terms limits the prepublication review requirement to situations where a book supposedly sets forth SCI (or supposedly describes an activity that is related to or derived from SCI) *that was classified as SCI before the disclosure took place*. The Government's amended complaint completely fails to allege that this temporal requirement is met, and its latest brief once again says nothing to fill this gap. Instead, it continues to argue that this temporal requirement *does not exist*—such that the SCI NDA requires prepublication review, according to the Government, even if a book *does not contain any information in the same galaxy as SCI* when it is published, so long as the Government *later* (*after publication*) classifies as SCI some information in or related to activities described in the book. That interpretation is nonsensical, and so are the Government's attempts to defend it.

The Government's principal response on this temporal point is aimed at defeating an argument that we have not made—and that we *explicitly explained we are not making* (which renders the Government's suggestion that *our* interpretation "creates and tears down a strawman," *id.* at 7, deeply ironic to say the least). The Government insists that Paragraph 1's temporal requirement must be ignored because "the prepublication review process is designed precisely" to "provide the Government the opportunity to identify information that could contain SCI or be

otherwise classified and therefore can harm national security if disclosed, and to take appropriate action." *Id.* at 7–8. But that is irrelevant even if true, because as we explained:

> No such power is at issue here at all. What the Government seeks here is *not* the authority to stop the disclosure of classifiable information that is belatedly identified; what it seeks is the right to penalize the employee for a publication *that has already taken place*.

Def.'s MTD Reply 6 (quotation marks omitted). Accordingly, we are *assuredly not* "claiming that the Government cannot identify information that is SCI during the prepublication review." Govt.'s Rule 56(d) Br. 7. That renders the Government's suggestion that it somehow "did not have the opportunity to review for, identify, and make a determination as to the classification status of information" in Ambassador Bolton's book completely irrelevant, *id.*—not to mention farcical, given Ms. Knight's intensive, four-round, four-month review of the book.  Instead, what Paragraph 1 provides is that, *whether or not* the Government classifies some information relating to the book *during the prepublication review process*, what it *may not* do (or at least may not do and then use as a pretext for seizing the book's profits) is claim that prepublication review was required due to the presence of some material that sets forth, or relates to, information that was classified as SCI *after publication has already been authorized*.  It is *that* limitation on "retroactive" classification— the very thing the Government mistakenly says is "not at issue here," *id.* at 8—that Paragraph 1 imposes and that the Government's allegations fail to satisfy. (And it accordingly follows that the Government's response to our "due process and First Amendment claims," *id.*, collapses like the paper roof on a falling house of cards.)

The Government's only other response to Paragraph 1's temporal requirement is to once again invoke the "related to or derived from" language from Paragraph 4. "The contractual prepublication requirement," it says, "also covers material that contains descriptions of activities that produce or relate to SCI or that the author has reason to believe are derived from SCI," and if

Paragraph 1 really imposed a temporal limitation on retroactive, post-publication classification, "it would be pointless for the contract to have provisions that allow the Government to review the material more broadly to find material *related to or derived from* SCI." *Id.* at 6–7, 8 (brackets and quotation marks omitted). No, it would not be pointless, for as we have repeatedly explained, Paragraph 1's temporal requirement *also* applies to any SCI that is purportedly *related to* (or that purportedly generated) information in the book. Yet again, the Government offers no response, apparently preferring to simply pretend as though we had not made the argument.

To put the point as plainly as possible: if the only SCI that a book contains, or that is related to, generated by, or derived from an activity the book describes, is SCI *that was not classified as such until after the employee authorized publication*, then under the plain text of the SCI NDA *there has been no unauthorized disclosure of SCI*, as that term is clearly defined in Paragraph 1. The Government has once again failed to offer any persuasive response to this plain-text interpretation of the NDA—and its amended complaint alleges no facts satisfying this temporal requirement.

2.      The Government also does not succeed in showing that the SCI NDA should be read as saddling employees with strict liability for publishing books that they reasonably believed did not contain any SCI or description of activities related to or derived from SCI. The Government cites the principle that whether a party has committed breach of contract does not "depend on the breaching party's mental state." *Id.* at 9. That may be true in general as to many contractual duties: a renter who agrees to pay $2,000 monthly and who fails to make rent, for instance, is likely liable for breach even if he simply forgot to mail the check. But whether scienter must be shown obviously depends on *the substance of the duty at issue*—that is why the Government's cases say that scienter need not be shown "[i]n general," *see id.* (quoting *DeHart v. Moore*, 424 F. Supp. 55,

57 (S.D. Fla. 1976)). After all, even the Government concedes that it *must* show scienter to establish a breach under the SC NDA's "reason to believe" trigger, where it applies. *Id.*

Whether a contract requires scienter is, in other words, a matter of contractual interpretation. And as we explained in our prior briefing, numerous principles of contractual interpretation unite here in rejecting the Government's strict-liability reading. The arguments back and forth on this point are by this stage well-trodden, but in brief:

- If Paragraph 4's "produce or relate to" trigger is unlimited by any scienter requirement, it effectively requires prepublication review of *every* writing by a former employee that so much as mentions his government service, an interpretation the Government previously recognized would be "absurd." Def.'s MTD Reply at 9. The Government's latest brief offers no justification for reading the SCI NDA in this absurd way.

- The SCI NDA is suffused with language explicitly or implicitly requiring a showing of scienter. Paragraph 1's definition of SCI to include information "in process of a classification determination" plainly assumes *awareness* by the employee of the information's classification status. Paragraph 2's requirement of "a security indoctrination concerning the nature and protection of SCI" makes no sense if the employee's awareness of the existence of SCI is irrelevant to his duty not to disclose it. And most directly pertinent, Paragraph 3's discussion of the prepublication review requirement makes clear beyond all doubt that its application depends on the level of the employee's scienter—ranging from information "I know to be SCI" to information "I have reason to believe might be, or related to or derived from SCI." The Government's latest brief wholly fails to explain why Paragraph 4 of the SCI NDA should be read in isolation from, and in tension with, the rest of the contract's provisions.

- The Government's strict liability interpretation of Paragraph 4's first two triggers— writings that (1) contain SCI itself, or (2) contain a "description of activities that produce or relate to SCI"—renders the *third* trigger—"any . . . description of activities . . . that I have reason to believe are derived from SCI"—completely superfluous. *See* Def.'s MTD Reply 8–9. The Government's latest brief effectively *concedes* that its reading creates this superfluity, Govt.'s Rule 56(d) Br. 9, but apart from a conclusory assertion that "some redundancy is not fatal," *id.*, it offers no justification for adopting such a senselessly redundant interpretation of the NDA.

If the Government had really wanted to impose the expansive liability it now advocates when it drafted the SCI NDA, it could easily have done so, in either of two ways. First, it could have rendered the issue of scienter effectively irrelevant by requiring prepublication review for any

work related to the employee's government service, like the CIA's NDA at issue in *Snepp* and other cases. Second, it could have *foreclosed* any scienter requirement by replacing Paragraph 3 and 4's complicated scheme of triggers with the simple requirement that an employee must submit a manuscript for prepublication review when it "contains SCI, or a description of activities that produce, relate to, or are derived from SCI, whether or not the employee knows or has reason to know that the manuscript contains such material." The Government has failed to explain why the contractual language it *actually* wrote—containing numerous different triggers, some of which expressly require a showing of scienter and the remainder of which make no sense without it— should be read *as if* it had written the above language instead (particularly given the First Amendment difficulties with such a reading and the rule of *contra proferentem*, *see infra*, Part I.B.3).

Finally, the Government argues that it can prevail even under Paragraph 4's third "reason to believe" trigger because "it is not objectively reasonable for Defendant to maintain that he had no 'reason to believe' his book about his experiences as National Security Advisor contained not a shred of information derived from SCI." Govt.'s Rule 56(d) Br. 9. For the reasons explained above, *see supra*, pp. 8–9, that is simply not so. To the contrary, Ms. Knight's conduct—and even the communications from Mr. Eisenberg and Mr. Ellis and *the Government's own unamended complaint in this case*—gave Ambassador Bolton *every reason* to believe that his book did not contain any information describing activities derived from SCI, when that phrase is understood, as it must be, in a properly limited way. No, not even a shred.

3.      Finally, the Government repeats its attempt to wave away the obvious First Amendment violation created by its interpretation of the SCI NDA, as well as its arguments against the traditional *contra proferentem* rule (which applies with special force here, given the NDAs'

status as contracts of adhesion). *See* Govt.'s Rule 56(d) Br. 10–11. But we have already explained in our Motion To Dismiss Reply why its arguments lack any merit: (a) none of the cases holding that prepublication review does not violate the First Amendment in principle contains *any suggestion* that the same result would follow even if review was required on an all-encompassing strict-liability basis, much less if review could be triggered in the retroactive way defended by the Government; (b) the rule that contracts must be construed against the drafter, particularly when the contract is one of adhesion, simply does not depend on the signing party's level of sophistication, or whether he received adequate consideration in return; and (c) *Snepp* does not stand for the proposition that prepublication-review contracts are magically exempt from these ordinary rules of contract law. *See* Def.'s MTD Reply 6, 10–11. Once again, the Government simply ignores all of these arguments rather than trying to respond to them.

### C. The Government also Fails To Persuasively Defend Its Interpretation of the Classified Information NDA.

The Government's attempt to shore up its claim for breach of the Classified Information NDA is equally unavailing. As explained in our prior briefing, the Classified Information NDA sets forth two distinct types of review. In the first, the employee agrees to "never divulge classified information to anyone unless: (a) I have officially verified that the recipient has been properly authorized by the United States Government to receive it; or (b) I have been given prior written notice of authorization . . . that such disclosure is permitted." Classified Information NDA ¶ 3. In the second, the employee agrees that "if I am uncertain about the classification status of information, I am required to confirm from an authorized official that the information is unclassified before I may disclose it, except to a person as provided in (a) or (b) above." *Id.* As also previously explained, Ambassador Bolton's actions were entirely consistent with this NDA for two reasons: (i) the first type of review never applied at all, given that the Amended Complaint

fails to allege that Ambassador Bolton knew that his book contained classified information; and (ii) even if the second type of review *did* apply, it was *completely satisfied* by Ms. Knight's confirmation that the manuscript, as revised, contained no classified information. The Government's latest offerings do not call either of these propositions into doubt.

1.       The Government again argues that under the "plain text" of the Classified Information NDA, Paragraph 3's first category of review should be interpreted as applying "to information that is classified, regardless of an individual's subjective understanding of the status of the information." Govt.'s Rule 56(d) Br. 13. We have already rehearsed the problems with this interpretation at length, *see* Def.'s MTD Reply 17–21—most significantly, it obviously *nullifies* the *second* type of review set forth in Paragraph 3, for if the bare presence of classified information in a manuscript is sufficient to require review under the first part of the paragraph *whether the employee knows it or not*, the employee will effectively be forced to submit for review everything he writes that has even the barest chance of containing classified information.

The Government insists that there is no redundancy because the second type of review independently kicks in "if there is doubt about the status of [classified information]." Govt.'s Rule 56(d) Br. 15. But what it fails to recognize is that if an employee ever harbors any such "doubt," the Government's interpretation of the first type of review—as imposing strict liability, regardless of the employee's reasonable belief that no classified information is present—necessarily would force him to submit the manuscript for review *wholly apart* from the second half of the paragraph. On the Government's strained interpretation, then, the two types of review are necessarily redundant—and *both* types of review will lead to the exact same "three answers," because *both* types of review will apply to the exact same manuscripts: those containing information the employee either knows to be classified or is uncertain about. *Id.* 15 (emphasis omitted).

16

Reading the first type of review required by Paragraph 3 as applying in a strict liability manner also makes no sense on its own terms. The requirement that an employee "officially verif[y] that the recipient of [classified information] has been properly authorized . . . to receive it," or that he first obtain "prior written notice of authorization" before disclosure, simply *makes no sense* absent *some* awareness by the employee that he is *dealing with information that is classified*.

The Government next attempts to contrive tension between Ambassador Bolton's interpretation of the two types of review set forth by Paragraph 3. It notes that we acknowledge that the second type of review (which is triggered by an employee's *uncertainty*) "cannot be read to free an individual to unilaterally disclose information no matter how *unreasonable* his uncertainty may be," but suggests that our reading of the first type of review (which is triggered by his *knowledge*) "would appear to authorize precisely that." *Id.* at 14. Accordingly, it concludes that our reading "is nonsensical" because it "argues that [an employee] need not seek review [under the first half of the paragraph] if he is subjectively certain that information is unclassified, even though he agrees he must seek review [under the second half] if there is objective doubt." *Id.* at 15–16. There is nothing to this, for the simple reason that Paragraph 3's two triggers are self-evidently *separate and independent*. Therefore, while an employee who subjectively does not know that his manuscript contains classified information is not required to submit it for review under the *first* half of Paragraph 3, if his lack of knowledge is unreasonable, he *is* required to submit it under the *second* half. Far from creating some kind of "loophole," this distinction between the scope of the two paragraphs is precisely why our interpretation, unlike the Government's, *preserves Paragraph 3 as a whole from redundancy*.

Once again, the Government's argument is based on the pretense that it wrote a different contract than the one actually at issue. The Government could easily have ensured the outcome it now desires by simply copying the language from the CIA's NDA, at issue in *Snepp* and the other cases, requiring prepublication review of any book relating to Ambassador Bolton's government service—a requirement so broad that the employee's scienter is virtually irrelevant. And it likewise could have worded the NDA in a way that made clear no scienter was required—mandating prepublication review, for example, before the disclosure of any writing "that contains classified information, whether or not the employee knows or reasonably should have known that it contains such information." While either alternative would have been simpler and more expansive, that is not the contract it wrote. In effect, the Government's interpretation proceeds as though *the only things* contained in Paragraph 3 were the bar on "divulge[ing] classified information to anyone" and the language about "prior written notice of authorization." But the other language in Paragraph 3 *is* there, and it simply cannot be squared with the Government's strict liability interpretation.

The Government's citations to *Snepp v. United States*, 444 U.S. 507 (1980), repeated *ad nauseum* throughout its brief, thus fail to support its interpretation. As just noted, and explained at length in our prior briefing, the language of the contract at issue in *Snepp* (and the contracts at issue in the other cases cited by the Government) was dispositively different from the NDAs signed by Ambassador Bolton. The *Snepp* contract, for example, mandated prepublication review of every book containing "any information or material relating to the Agency, its activities or intelligence activities generally." *Id.* at 508; *see also* Def.'s MTD Reply 19–20. That all-encompassing language *simply does not appear* in anything signed by Ambassador Bolton. If it did, we admit that publication of Ambassador Bolton's book would have required written authorization (assuming the Government's good faith in withholding such written authorization). But the

Government completely fails to rebut, or even address, the dispositive textual differences between the contracts at issue. Instead, it simply carries on citing *Snepp* and these other cases, without explanation or justification, as though these textual differences *simply did not exist*.

2.    Accordingly, the only part of the Classified Information NDA that even conceivably applied to Ambassador Bolton was Paragraph 3's *second* type of review—covering manuscripts containing information that an employee is "uncertain about"—and his conduct complied with that provision to the letter. For he did not proceed with publication *until he had received* "confirm[ation] from an authorized official"—Ms. Knight—"that the information [in the book] is unclassified." Classified Information NDA ¶ 3. And contrary to the Government's atextual reading, this confirmation *did not* have to be "in writing." Govt.'s Rule 56(d) Br. 17. If the Government *had* wanted to require this confirmation to be in writing when it drafted the Classified Information NDA, it could have said so. Indeed, it *did* say so in many *other* NDAs penned by the Government—including, again, the contracts at issue in *Snepp* and the other cases it relies upon. And it *also* did say so *in the immediately preceding sentence* of the Classified Information NDA. The Government's latest brief offers no response to these dispositive points.[2]

The Government continues to think it can prevail even if oral authorization *does* suffice because it was supposedly "clear that the conversation with Ms. Knight did not give [Ambassador Bolton] permission to proceed with publication." Govt.'s Rule 56(d) Br. 18. But what the relevant portion of the Classified Information NDA requires is *not* "permission to proceed with

---

[2] The Government does make the novel claim that the second type of review "incorporates by reference the review provision in the preceding sentence, which explicitly requires written approval." Govt.'s Rule 56(d) Br. 17. But while the second half of Paragraph 3 does indeed refer to the first, noting that an employee need not go through the second type of review if he has already gone through the first type, that reference hardly "incorporates" the "preceding sentence"—and it *certainly* does not "incorporate" the first sentence's "written approval" requirement. *Id.*

publication," *id.*, but rather "confirm[ation] from an authorized official that the information [in the book] is unclassified." Classified Information NDA ¶ 3.  That is precisely what Ms. Knight gave. As we explained in our reply, it was clear beyond any doubt that the only item outstanding, after Ms. Knight's oral confirmation "that the manuscript draft did not contain classified information," Am. Compl. ¶ 46, was the *pro forma* letter memorializing that confirmation in writing. There was *no suggestion whatsoever* from Ms. Knight that her "confirm[ation] that the information [in the book] is unclassified" was anything other than final and complete. Classified Information NDA ¶ 3. The Government asserts that "no such judgment was given," Govt.'s Rule 56(d) Br. 18, but that is palpably false. Its own amended complaint *specifically admits* that Ms. Knight reached "the judgment that the manuscript draft did not contain classified information." Am. Compl. ¶ 46. (And there is no dispute that she confirmed that Judgment to Ambassador Bolton. *See* Def.'s MTD Reply 2 n.1; Declaration of John R. Bolton at ¶ 16 (June 18, 2020), Doc. 9-1.)

## II.  Defendant Needs Discovery To Obtain Facts Supporting His Contemplated Affirmative Defense Based on the Government's Breach of the Duty of Good Faith and Fair Dealing.

Even if the record before the Court was sufficient to foreclose any genuine dispute about whether Ambassador Bolton breached the SCI or Classified Information NDAs, our Rule 56(d) motion would *still* need to be granted, because Ambassador Bolton must be allowed to take discovery supporting his contemplated affirmative defense.[3]

The Government does not dispute that both NDAs implicitly required it carry out the prepublication review process fairly and in good faith. And the Government also *does not dispute*

---

[3] The Government cryptically asserts, without explanation, that this second necessary topic of discovery "collapses into an argument that the information contained in his manuscript is not classified," Govt.'s Rule 56(d) Br. 20, but that is not so. The presence of classified information (or SCI) and the contemplated bad faith affirmative defense are two entirely separate areas of necessary discovery, either of which is sufficient to require relief under Rule 56(d), and we have made that clear from the beginning. *See, e.g.*, Cooper Decl. ¶ 12; Def.'s Rule 56(d) Br. 9, 11.

Defendant's assertion that if he is allowed discovery, he is likely to obtain evidence demonstrating that it breached that duty because "Mr. Ellis's further prepublication review of the manuscript was undertaken in bad faith and for the purely political purpose of suppressing, or at least delaying until after the 2020 election, the publication of a book that reported facts portraying President Trump in an unfavorable and embarrassing light." Def.'s Rule 56(d) Br. 13. The *only* reason offered by the Government for denying Ambassador Bolton's request to obtain this discovery is the startling proposition that such a bad-faith course of conduct is not "legally relevant." Govt.'s Rule 56(d) Br. 2.

In other words, the Government *concedes*, for the propose of our Rule 56(d) motion, that discovery will demonstrate a purely political, bad-faith perversion of the prepublication review process, directed by President Trump himself for nakedly partisan ends, that violated the duty of good faith and fair dealing. Indeed, on the Government's view, even if Ms. Knight had expressly and truthfully told Ambassador Bolton that the only reason she could not give him the *pro forma* clearance letter was because President Trump had told her he did not like the book's unflattering contents and had therefore instructed her to delay publication until after the November election, that would not be "legally relevant." That surely cannot be correct.

The Government's principal attempt to preemptively defeat Ambassador Bolton's (yet-to-be asserted) good faith and fair dealing defense is its contention that "to the extent that Defendant wished to raise a bad faith defense . . . , the opportunity to do so was in the context of a lawsuit challenging the Government's conduct." Govt.'s Rule 56(d) Br. 21. That response fails under both the plain language of the NDAs and black-letter contract law. It is settled law that "[u]pon material breach of a contract the non-breaching party has the right to discontinue performance of the contract." *Stone Forest*, 973 F.2d at 1550. The law does not place the burden on the non-breaching

party to bring suit before discontinuing performance in the face of a material breach. The Government repeatedly disparages this as "self-help," Govt.'s Rule 56(d) Br. 11, but it is an ordinary right that non-breaching parties *routinely* exercise, upon a material breach, and that courts routinely uphold. *See* RESTATEMENT (SECOND) OF CONTRACTS § 237 (Am. Law Inst. 1981).

The Government's contention that Ambassador Bolton was required to seek judicial review of the Government's violation of the duty of good faith and fair dealing before discontinuing performance—and that his decision not to do so is a basis for stripping him now of any such defense—can thus only be correct if the NDAs Ambassador Bolton signed *override* the ordinary contract-law rule by imposing such an affirmative requirement. They do not. No clause in either the SCI NDA or the Classified Information NDA puts the onus on Ambassador Bolton to bring suit, before publication, if the Government is breaching its contractual duties by conducting a bad-faith, politicized review process. Indeed, the *only* contractual provisions referencing judicial review place the burden on *the Government* (1) to bring an "action . . . in any of the several appropriate United States District Courts," SCI NDA ¶ 7, and (2) to "seek any remedy available to it to enforce this Agreement" or obtain "a court order prohibiting disclosure of information," Classified Information NDA ¶ 6.

The Government once again returns to the *Snepp* well, but to the extent *Snepp* speaks at all to who has the burden of going to Court, it says that, "[a]bsent agreement" that publication may go forward, "*the Agency* would have borne the burden of seeking an injunction against publication." 444 U.S. at 513 n.8 (emphasis added). The Government's insistence that its view "follows directly from *Snepp*," Govt.'s Rule 56(d) Br. 19, is accordingly difficult to comprehend. The Government retorts that the viability of a bad faith affirmative defense will make the constructive-trust remedy less "swift and sure." *Id* at 20. But the same thing is true about the

availability of *any* affirmative defense, and nothing in this dicta from *Snepp* suggests that the Court meant to insulate a constructive-trust claim, in this context, from every affirmative defense that would ordinarily be available to a civil defendant.

The Government also repeatedly emphasizes the statement from *United States v. Marchetti*, 466 F.2d 1309, 1317 (4th Cir. 1972), that "the burden of obtaining judicial review . . . ought to be on [the employee]." That statement has no application here for three independent reasons. First, even if the statement could be understood as applying to Ambassador Bolton's vastly different contracts, it is completely irrelevant to his prior-material-breach affirmative defense (and thus to the question of whether he is entitled to obtain discovery supporting it). *Marchetti*'s statement simply governed the right-of-action—implied by the Fourth Circuit under the First Amendment— for judicial review of a dispute between the Government and the employee over the *outcome* of the prepublication review process, where prepublication review is required. Ambassador Bolton has not brought, and does not seek to bring, such an action; and there is nothing whatsoever in *Marchetti* that speaks to the completely distinct question of what the parties' rights and obligations are when the Government commits a material breach of its own contractual duties. Accordingly, nothing in *Marchetti* could even conceivably override the bedrock rule of contract law that, in such a context, a material breach excuses the non-breaching party from further performance, with or without judicial intervention.[4]

---

[4] *Marchetti*'s language about the burden of bringing suit also does not affect Ambassador Bolton's right to discovery on the first issue, discussed in Part I, concerning whether his book contains classified information, SCI, or a description of activities derived from or relating to SCI. For unlike Marchetti's contract, neither of the NDAs signed by Ambassador Bolton broadly imposes a duty to submit for prepublication review any book "relating to the national defense and security." 466 F.2d at 1312 n.2. So again, unlike the situation at issue in *Marchetti*, Ambassador Bolton is not challenging the outcome of a prepublication review process that concededly applied; he is arguing that neither the Classified Information or SCI NDAs *required prepublication review*

Second, *Marchetti*'s statement about the burden of seeking judicial review cannot apply to Ambassador Bolton's NDAs at all, given their lack of any language creating such a burden. While *Marchetti* concluded that the burden "ought to be on [the employee]" in the context of the contract at issue there, 466 F.2d at 1317, it is unclear whether this statement was offered as an interpretation of Marchetti's contract (in which case it was dicta) or merely as a justification for the burden imposed by the injunction crafted by the district court in that case (in which case it is obviously irrelevant here), *see id.* at 1312 (discussing the injunction); *see also United States v. Snepp*, 897 F.2d 138, 141–42 (4th Cir. 1990) (affirming, based on *Marchetti*, similar injunction requiring former employee to "initiate a judicial action" if he "disagrees with the Agency over the propriety of its decision to withhold approval"). And either way, nothing in the opinion holds or even suggests that *every Government NDA* must be read as imposing an affirmative duty on former employees to seek judicial review, even where (a) there is *no contractual language whatsoever* creating such a duty, and (b) the *only* contract terms discussing judicial review are those setting forth *the Government*'s right to seek review. To the extent *Marchetti* does direct such a result, it is contrary to basic principles of contract interpretation, and the Court should ignore it.

Third, neither *Marchetti*, *Snepp,* nor any of the Government's other favored precedents involved any evidence or allegation of bad faith on the part of the Government. Indeed, we are aware of no case suggesting that an employee bears the burden of seeking judicial review, before publication, where (1) the Government has used the prepublication process, in bad faith, as a pretext for suppressing or at least delaying, until after the next election, the publication of a manuscript for purely political purposes, and (2) requiring the employee to seek judicial review

---

*in the first place*. *Marchetti* does not treat with that type of claim at all, much less place the burden on the employee to bring it to court before publication or forever lose it.

would *itself extend and perpetuate* that delay, converting the courts themselves into another instrument of the Government's bad-faith campaign.

That also suffices to dispose of the Government's invocation, yet again, of "the purposes of prepublication review." Govt.'s Rule 56(d) Br. 20. The Government argues that one purpose of such review is to give it "a reasonable opportunity to determine whether the [writing] sets forth any SCI" or classified information. *See* SCI NDA ¶ 5. But the bad faith perversion of the prepublication review process for nakedly political and unconstitutional ends is patently *un*reasonable, and it cannot plausibly be maintained that requiring an employee to undergo such a process furthers "the purposes of prepublication review." Govt.'s Rule 56(d) Br. 20.

Finally, the Government invokes the standard of proof, arguing that a defense of bad faith "requires that the proof must be almost irrefragable." Govt.'s Rule 56(d) Br. 21 (quoting *Information Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1323 n.2 (Fed. Cir. 2003)). But *whatever* the correct standard of proof is, the only relevant point here and now is that Ambassador Bolton *must be allowed an opportunity to obtain evidence meeting it*. He has not yet had that opportunity, and the Government's suggestion that his affirmative defense should be pretermitted for failing to meet the standard of proof *before the discovery process has even begun* comes with poor grace.

## CONCLUSION

For the foregoing reasons, and those given in our opening brief and supporting declaration, the Court should grant Defendant's FED. R. CIV. P. 56(d) motion to defer consideration of the Government's summary judgment motion.

September 10, 2020

Respectfully submitted,

/s/ Charles J. Cooper
Charles J. Cooper, Bar No. 248070
Michael W. Kirk, Bar No. 424648
John D. Ohlendorf, Bar No. 1024544

COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
Email: ccooper@cooperkirk.com

*Counsel for Defendant John R. Bolton*