# EXHIBIT A

No. 20-1580-RCL

New York     Paris
Northern California     Madrid
Washington DC     Hong Kong
São Paulo     Beijing
London     Tokyo

# Davis Polk

**Kenneth L. Wainstein**

Davis Polk & Wardwell LLP  
901 15th Street, NW  
Washington, DC 20005

202 962 7141 tel  
ken.wainstein@davispolk.com

September 22, 2020

Re:    United States v. John Bolton

Jennifer B. Dickey  
Deputy Associate Attorney General  
U.S. Department of Justice  
950 Pennsylvania Avenue NW  
Washington, D.C. 20530  
 E-mail: Jennifer.B.Dickey@usdoj.gov

Daniel F. Van Horn  
Assistant United States Attorney  
555 Fourth Street N.W., Room E4226  
Washington, D.C. 20530  
Email: daniel.vanhorn@usdoj.gov

Michael J. Gerardi  
Trial Attorney United States Department  
of Justice Civil Division, Federal  
Programs Branch  
1100 L Street NW, Room 11514  
Washington, D.C. 20005  
 E-mail: michael.j.gerardi@usdoj.gov

Charles J. Cooper  
Copper & Kirk, PLLC  
1523 New Hampshire Avenue, NW  
Washington, DC 20036  
Email: ccooper@cooperkirk.com

Michael W. Kirk  
Cooper & Kirk, PLLC 1523  
New Hampshire Avenue, N.W.  
Washington, D.C. 20036  
Email: mkirk@cooperkirk.com

John D. Ohlendorf  
Cooper & Kirk, PLLC  
1523 New Hampshire Avenue, N.W.  
Washington, D.C. 20036  
Email: johlendorf@cooperkirk.com

Dear Counsel:

We represent Ms. Ellen Knight, the former Senior Director for Records Access and Information Security Management at the National Security Council (NSC) who conducted the prepublication review of Ambassador John Bolton's book with her staff at the White House. We submit this letter at the request of Ms. Knight, who wishes to offer her assistance

September 22, 2020

to these proceedings and to detail how that assistance may shed light on the relevant facts of this case.[1]

A central question in this litigation is the soundness and thoroughness of the prepublication review of Ambassador Bolton's book and whether it overlooked passages that contained classified information whose disclosure would jeopardize our national security. Given Judge Lamberth's deep experience with classified information and national security matters, we know that he is very well equipped to make the national security assessment necessary to answer that central question.[2]

Ms. Knight feels nonetheless compelled to submit this letter for the following reasons. First, Ms. Knight recognizes that her management of the prepublication review and her interaction with the Legal Office of the NSC ("NSC Legal") position her as a central actor in this matter. She noted the Court's observation at the TRO hearing as to the absence of a declaration from her as well as the comments by Ambassador Bolton's attorney, Charles Cooper, about her important role in the litigation.

Second, Ms. Knight feels it important that she be heard, as this litigation revolves around the government's contention that the prepublication review conducted by her and her staff left substantial amounts of classified national security information in the Bolton manuscript. That contention directly challenges the quality of her team's work, and therefore calls for a response from Ms. Knight.

Third, as a career professional in the field of classified information management, Ms. Knight is very concerned about the politicization – or even the perceived politicization – of the prepublication review process. Once authors start perceiving that manuscripts are being reviewed for political considerations, they will lose confidence in the integrity of the process and find ways to publish or release their works without submitting them for review. This could result in unchecked disclosures of sensitive information and the potential for serious damage to our national security.

Finally and most importantly, Ms. Knight is concerned about the ongoing litigation over Ambassador Bolton's motion for discovery, especially as it relates to his request to explore whether the White House acted in good or bad faith in its handling of the prepublication review. She is specifically concerned that the government is positioning the litigation in a

---

[1] We have not coordinated or communicated in any way with either party – the government or Ambassador Bolton's legal team – about the litigation or the substance of this letter.

[2] We also understand that the Court has already conducted an in camera review of the passages cited by the government in its Motion for a Temporary Restraining Order (TRO). In that context, the Court was largely limited to reviewing those selected passages and the unchallenged declarations of NSC official Michael Ellis and four presidentially-appointed intelligence officials who reviewed passages of the manuscript in isolation and opined that they contained classified information, without any insight into the multi-layered analysis and context that led Ms. Knight and her staff to determine that they did not.

September 22, 2020

3

way that will prevent disclosure of information that might be at odds with the narrative it has propounded since the initiation of this litigation. In its opposition to Ambassador Bolton's motion, the government contends that it is legally irrelevant whether the White House dealt with Ambassador Bolton in good or bad faith, and that there should therefore be no exploration of that issue in discovery or in the litigation. If the government prevails with that discovery argument, the Court and, ultimately the public, will be denied a full understanding of how the prepublication review of Ambassador Bolton's book was conducted.[3]

Ms. Knight recognizes that it is up to the Court to assess what is or is not legally relevant and up to the judicial process to assess whether White House personnel operated in good or bad faith. However, she wants to ensure that the parties are aware of her knowledge of what took place throughout this prepublication review.

For these reasons, Ms. Knight has asked us to submit this letter, which will summarize the relevant information that Ms. Knight can share.[4] It will do so in four sections. The first section will introduce Ms. Knight and her experience in information security management. The second will explain the process of prepublication review and how that process differs from a classification review. The third will describe how she and her team of career officials conducted the prepublication review of the Bolton manuscript. And, the final section will lay out the extraordinary actions taken by NSC Legal and the Office of the White House Counsel after Ms. Knight notified them that her staff's review was complete and that the manuscript was ready for clearance.

    I.       <u>Ms. Knight's Professional Background</u>

Ms. Knight has devoted her career to the field of classified information management, and she is an expert in government classification policy and practice as provided in Executive Order 13526 and its implementing regulations. She holds a Master's degree in Library Science from the University of Maryland School of Information Studies, one of the top universities in the nation for this field. After starting her career at the National Security Agency, she was hired by the National Archives and Records Administration (NARA) as a declassification review archivist at the Nixon Presidential Materials Project, where she was responsible for

---

[3] According to this argument, the only relevant issue in the litigation is whether Bolton breached his contractual obligation to wait for and receive a formal clearance letter from the White House before sending his manuscript off for publication. Once that breach is demonstrated, the government argues, it is automatically entitled to Ambassador Bolton's book royalties, no matter whether the White House demonstrated bad faith in the exercise of its prepublication responsibilities.

[4] This letter proffers facts that Ms. Knight would be expected to provide on issues of potential relevance to this matter and is not intended to waive, and does not constitute a waiver of, any applicable privileges or rights of Ms. Knight, including, but not limited to, the attorney-client privilege or the protections of the work product doctrine.

reviewing President Nixon's secretly-taped conversations and conducting research to determine which portions could be declassified.

In 2010, Ms. Knight was hired as a Program Analyst by the Information Security Oversight Office (ISOO), which is also located within NARA, and was later promoted to a Senior Program Analyst in the Classification Management Directorate, where she supported the Interagency Security Classification Appeals Panel (ISCAP) and the Public Interest Declassification Board,[5] and participated in an oversight program to evaluate agency declassification decisions.

Ms. Knight has held a Top Secret security clearance, with access to Sensitive Compartmented Information and Q clearance Restricted Data information, since 2006. At the NSC, she was designated an original classification authority (OCA) and one of six officials with declassification authority, and exercised her OCA and declassification authority throughout the duration of her detail at the NSC. Throughout her career, she has reviewed thousands of records for classification, declassification, and prepublication review.[6]

Between August 2018 and August 2020, Ms. Knight served on detail from NARA to the National Security Council at the White House. Ms. Knight first served as Director for Access Management, the unit that provides classification management expertise to the NSC and the Executive Office of the President more broadly. Among her duties as Director was supervising a group of five staff members specifically responsible for conducting prepublication reviews submitted to the NSC. In December 2019, National Security Advisor Robert O'Brien promoted her to the position of Senior Director for Records Access and Information Security Management, in which she supervised 14 records and access professionals and continued to manage the prepublication process. Over the course of her time at the NSC, her staff completed more than 135 prepublication review requests, totaling over 10,000 pages of reviewed manuscripts.[7]

---

[5] Ms. Knight served as the Senior Staff Member for the Public Interest Declassification Board (PIDB), which is a statutorily-created panel of national security experts appointed by the President and Congress with the mandate to maximize public access to the documentary record of significant U.S. national security decisions and activities. Undersigned counsel (Ken Wainstein) has been a member of the PIDB and has worked with Ms. Knight in that capacity since 2013.

[6] Ms. Knight has consistently performed at the Outstanding review rating while at NARA and the NSC. She has been recognized for her leadership in various capacities, including for her work on the Interagency Security Classification Appeals Panel. In 2020, she was recognized by the Office of the Director of National Intelligence's Office of Civil Liberties, Privacy, and Transparency for her outstanding work and is a recent recipient of the Archivist's Achievement Award. She is currently pursuing a second graduate degree at the University of Maryland School of Public Policy, where she is close to completing a Master's degree in Public Management.

[7] Ms. Knight also chaired the Records Access and Information Policy Coordinating Committee, an interagency policymaking body that coordinates all federal security policy issues concerning records management, security classification, declassification, information handling and safeguarding, and national security clearance

## II.     The Prepublication Review Process

As a government classification expert, Ms. Knight is deeply experienced in the use of classification in government agencies and in the prepublication review process by which the government reviews the written work of private citizens writing about sensitive matters from their time serving in national security positions in the U.S. government. The significant differences between a prepublication review and an ordinary government classification review are important to understand when considering the actions taken by Ms. Knight and her team and those taken by other White House officials in the review of the Bolton manuscript.

A classification review is simple and straightforward, and is part of the everyday routine in government agencies that produce classified documents.[8] Its purpose is solely to identify and protect sensitive information in documents written by government employees and contractors working for the government. It entails reviewing a government employee's written work, identifying potentially sensitive topics or facts in the substance of that work, determining if that information is specified in a classification guide, applying the appropriate markings – i.e. Confidential, Secret and Top Secret –and then imposing the appropriate control, handling and dissemination limitations on that information. It is the expectation of an official conducting a classification review that the result will likely be a classified document, access to which will be restricted by the rules of the government's security classification system.

A prepublication review, by contrast, involves reviewing the written work of a private U. S. citizen.[9] Its purpose is two-fold -- to ensure the protection of government information whose

---

suitability, as well as policy matters involving application of the Executive Orders relating to classified information.

[8] The standards for identifying classified information in government records follow those found in Section 1 of Executive Order 13526, "Classified National Security Information." Section 1.1 of the Order provides standards for classifying national security information. The following conditions must be met for information to be originally classified:

1. An Original Classification Authority is classifying the information,

2. The information is owned by, produced by or for, or is under the control of the United States Government,

3. The information falls within one or more of the categories of information listed in section 1.4 of the Order (such as military plans, weapon systems, or operations; intelligence activities (including covert action), foreign relations or foreign government information, etc.), and

4. The Original Classification Authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, and the Original Classification Authority is able to identify or describe the expected damage.

[9] The NSC Prepublication review process is laid out in the internal guidance document "NSC Access Procedures: Prepublication Review," which explains the purpose of the review process, details who must submit materials for review and what materials must be submitted, and describes how NSC Access Management staff should conduct a prepublication review. For example, it explains that, "unlike the declassification review of U.S. Government records in which documents can be declassified in full, in part, or not at all, pre-publication review involves making recommendations to the author for changes to the text to ensure that classified

disclosure would damage national security while at the same time supporting that citizen's right to publish all First Amendment-protected information. It is therefore designed not to limit the transmission of information, but rather to facilitate the private citizen's ability to transmit his thoughts in a way that does not disclose government secrets. It is the expectation of an official conducting a prepublication review that the result will be the public release of a document free of any information that could damage national security.

The prepublication review process is, therefore, much more complex and time-consuming than a classification review. It entails reading the draft text to identify information that may be sensitive and then carefully researching the press and public record for any government releases, statements, reports, testimony or presidential tweets that may have officially disclosed that information, thereby meaning that it is no longer sensitive or classified in the context of prepublication review. It often happens that a prepublication reviewer flags what was at one time highly-protected sensitive information, only to learn that that information has been otherwise released through official channels and is now a matter of public knowledge.[10] Once that research is completed and any remaining sensitive information is identified, the reviewer then works closely with the author to remove, sanitize, or otherwise obscure enough details or specifics that the author can discuss that information in a way that will not damage national security.

---

information is not released. This may be done by suggesting that the author cite as a source of information a news article or other open source either in an in-text citation or footnote in place of a potentially classified source. In other cases, NSC Access may require that entire sentences or topics be removed."

The NSC, as a component of the Executive Office of the President, does not have a federal regulation specific to its NSC prepublication review process like those that govern other agencies and departments. However, the NSC has traditionally based its practice, in part, on the guidance provided in the other agencies' regulations, such as 28 CFR 17.18, Prepublication review for the Department of Justice, Department of Defense Instruction sections 5230.09 and 5230.29, and the prepublication review regulations that apply to the agencies of the Intelligence Community. Those regulations lay out the principles upon which prepublication review is conducted across the government, including by the NSC Access Management staff (e.g. "Material submitted for prepublication review will be reviewed solely for the purpose of identifying and preventing the disclosure of Sensitive Compartmented Information and other classified information. This review will be conducted in an impartial manner without regard to whether the material is critical of or favorable to the Department. No effort will be made to delete embarrassing or critical statements that are unclassified," 28 CFR 17.18). Like the NSC guidance discussed above, these regulations similarly emphasize the need to work with the author to sanitize or obscure sufficient details to allow him or her to discuss a topic without disclosing specific secrets that will compromise national security (see, e.g., DoD 5230.29, which authorizes the reviewer to condition clearance of a manuscript on recommended corrections, deletions or additions that the reviewer feels are necessary to sufficiently obscure sensitive information).

[10] The fact of that official release completely changes the equation for the prepublication review. Not only does it render the information unclassified, but the fact that there is a different public source for that information can help to obscure and thereby protect the intelligence processes (i.e. sources or methods) by which the author may have learned that information.

The above-described NSC prepublication review process is typically performed entirely within the NSC Access Management directorate, and the authority to issue a clearance letter approving publication of a reviewed manuscript lies with the Director for Access Management or the Senior Director for Records Access and Information Security Management.  This was the case for every prepublication review in Ms. Knight's experience, with the exception of the Bolton manuscript.

### III. The Prepublication Review of the Bolton Manuscript

Ms. Knight can describe in detail how she and her staff conducted the prepublication review and explain the decisions they made as to every part of Ambassador Bolton's book that raised potential classification concerns.  They noted classification concerns with literally hundreds of the passages in the book, and for each passage, they went through the above process with Ambassador Bolton and his attorney, maintaining thorough notes and records of their analysis.

The review started with Ambassador Bolton's submission of the manuscript on December 30, 2019.  Upon the first reading, it was apparent to Ms. Knight that the manuscript contained voluminous amounts of classified information and that it would take a significant effort to put it into publishable shape. The ensuing review ultimately became the most intensive prepublication review process in recent memory at the NSC.

Commitment of Staff Effort and Attention: This review process involved a very significant investment of time and effort, with Ms. Knight and her colleague, the First Reviewer (a classified information expert with four years of experience as a reviewer for the NSC), spending hundreds of hours over the course of four months reviewing and researching information found in the over 500-page manuscript.  They each spent weeks reading the first iteration of the manuscript, meticulously identifying information they deemed to be classified, meeting to consolidate their findings, and then conducting countless hours of research to determine what information was already publicly available.  Besides re-reading every chapter numerous times with each round of edits, Ms. Knight and her colleague each read through the entirety of the manuscript a total of four times.  As a last step in the process, Ms. Knight gave the manuscript to the Acting Director for Access Management, a 20+year classified information expert with Original Classification Authority who to that point had not been involved in the Bolton review.  He carefully read the manuscript to confirm – and he did confirm – that it no longer contained any sensitive or classified information.

Interaction with Ambassador Bolton and his Attorney:  This review also involved much more extensive interaction with the author than prepublication reviews typically require.  Despite Mr. Cooper's assurance in his submittal letter that "Ambassador Bolton has carefully sought to avoid any discussion in the manuscript of sensitive compartmented information ("SCI") and other classified information," it quickly became apparent that the manuscript was replete

with concerning information, leading to a four-month process of regular, intensive and occasionally spirited consultation between Ambassador Bolton and Ms. Knight's team.

In the course of this process, Ms. Knight provided Ambassador Bolton with extensive guidance and best practices for writing around classified information, held four in-person meetings with Ambassador Bolton lasting a total of 14 hours, and spoke with him in ten telephone conversations, two of which were hours-long conversations to discuss edits and changes. Ms. Knight also held three lengthy telephone calls with Mr. Cooper, and had extensive email correspondence with the author, his attorney, and his assistant throughout this process.

Ms. Knight and the First Reviewer came to the end of their review process on April 27 when they received Ambassador Bolton's response to their last set of necessary changes, most of which at this point in the revision simply entailed providing citations. At that point, Ms. Knight determined that all classification concerns had been addressed and that publication of the manuscript, as heavily revised, would disclose no information that would cause harm to our national security – which conclusion was confirmed by the final read-through of the manuscript by the Acting Director for Access Management. Ms. Knight then informed Ambassador Bolton that she had no more proposed changes, but that the process was still ongoing and that she would reach out to him as soon as she had more information about the issuance of a clearance letter.

Ms. Knight contacted NSC Legal on April 28, 2020 to convey her findings and coordinate the finalizing of the prepublication review process, which, as discussed above, was an unusual step for NSC prepublication reviews, which normally do not involve other NSC officials in the approval process. Given their level of interest in this particular review, Ms. Knight felt it necessary to advise NSC Legal that she was prepared to clear the manuscript. When she did so, the Deputy Legal Advisor Sue Bai instructed her to stand by and to take no further action.

Over the next nine days, Ambassador Bolton reached out approximately six times seeking an update on the anticipated clearance letter. On each occasion, Ms. Knight conferred with the Deputy Legal Advisor, only to be instructed that they were dealing with other issues and that she should tell Ambassador Bolton that the process was "ongoing." On May 7, she responded to Ambassador Bolton's last inquiry about the clearance letter by stating that "the process was ongoing," per the direction from NSC Legal. She never heard from Ambassador Bolton or his attorney again after that date.

Interaction with NSC Legal: This review entailed an unprecedented amount of interaction between the political appointees in the NSC Legal staff and the career prepublication review staff. Unlike every other prepublication review, this review had Ms. Knight in regular – often daily – contact with the NSC Legal staff.

Ms. Knight first learned that Ambassador Bolton would be submitting a manuscript for review from the then-Deputy Legal Advisor, Michael Ellis. Soon thereafter, Mr. Cooper sent her the manuscript along with a letter describing his understanding of the process and asserting that his client did not believe the manuscript contained any classified information and that he was only submitting it for prepublication review out of an "abundance of caution." After a cursory look at the manuscript, Ms. Knight contacted NSC Legal to inform Mr. Ellis about the outreach from Ambassador Bolton's counsel and to relay her concerns about the amount of classified information she found in the manuscript.[11]

NSC Legal requested a copy of the manuscript and the working case file on January 6, 2020, and then immediately started playing what was, in her experience, an outsize role in the review process, specifically by overseeing the correspondence with Mr. Cooper and Ambassador Bolton and dictating the timing of that correspondence. For example, on one occasion when Mr. Cooper requested that Ms. Knight's staff prioritize the Ukraine chapter in the manuscript for prepublication review to make it publicly available during the impeachment trial, the then-Deputy NSC Legal Advisor Ellis instructed her to temporarily withhold any response.

Ms. Knight was also regularly instructed by Mr. Ellis and, later, by Deputy Legal Advisor Bai not to use email in her communications with NSC Legal about her interactions with Mr. Cooper and Ambassador Bolton and instead to use the telephone. On several occasions, the political appointees in NSC Legal asked her to read draft correspondence over the telephone rather than sending the drafts over email for their evaluation. On another occasion, the then-Deputy NSC Legal Advisor Ellis expressed NSC Legal's concern that others might be able to read the Bolton manuscript on the records management system and possibly leak its content, and he had her ascertain with the information technology staff whether they could monitor and identify anyone who accessed and printed the manuscript.

These interactions with NSC Legal in the course of a prepublication review were unprecedented in her experience. She had never previously been asked to take the above-described measures, and she has never heard that predecessors in her position ever received such instructions in the course of their prepublication reviews.

    IV.    <u>The White House Reaction to Ms. Knight's Approval of the Manuscript</u>

Ms. Knight's extraordinary interaction with NSC Legal continued after she notified Deputy NSC Legal Advisor Bai on April 28, 2020 that she and her team had completed their review

---

[11] She also passed on to NSC Legal her concern about the description of the process in Mr. Cooper's letter and her observation that the manuscript was likely derived at least in part from notes Ambassador Bolton had in his possession. If correct, these notes would be considered classified Presidential records which belong to the U.S. government, and should have been returned to the NSC upon Ambassador Bolton's departure in 2019. Ambassador Bolton later publicly asserted that he destroyed his notes.

and that the manuscript was ready for clearance.  That notification set off a chain of events that led to the filing of the instant litigation.

<u>NSC Legal's Unwillingness to Admit the Real Reason for the Clearance Letter Delay</u>:  Soon after Ms. Knight notified NSC Legal that the review was complete, Ms. Bai called to request a copy of the reviewed manuscript, which Ms. Knight furnished to her.  Over the following nine days, Ms. Knight received numerous requests from Ambassador Bolton for the clearance letter.  Each time, Ms. Knight passed the request along to the NSC Legal staff, reminding them that the publication date for Ambassador Bolton's book was June 23 and warning them that Ambassador Bolton and Mr. Cooper may be planning toward that publication date.  When Ms. Knight asked why there was a delay in NSC Legal issuing a clearance letter, Ms. Bai attributed the delay to their focus on the COVID pandemic crisis.  At no time was Ms. Knight ever advised that the delay was due to any further review that was being conducted on the Bolton manuscript.

<u>NSC Legal's Warning Letter to Ambassador Bolton and Mr. Cooper</u>:  On June 8, 2020 – six weeks after Ms. Knight had advised NSC Legal that the manuscript was ready for clearance – the NSC Legal Advisor, John Eisenberg, called Ms. Knight to his office in the West Wing and asked her to review a letter that he had drafted to Mr. Cooper.  The letter noted recent press reports indicating that Ambassador Bolton intended to publish his manuscript without final written NSC authorization, and pointed out that the review process was still ongoing.  The letter then asserted that "the current draft manuscript still contains classified material."

That last assertion caught Ms. Knight by surprise, as nobody had ever said so much as one word about any remaining classification concerns since her April 28 request that NSC Legal authorize her to clear the manuscript.  She told Mr. Eisenberg that she and her team were confident that the manuscript no longer contained classified information, and that she would say the same thing to anyone who asked her about that assertion in the draft letter.  She then recommended that he amend that sentence.  Mr. Eisenberg responded that her recommendation was "noted" and ended the meeting without any further explanation.

<u>Classification Training for Michael Ellis</u>:  On June 9, Deputy NSC Legal Advisor Bai called Ms. Knight with an unexpected request — to arrange for Michael Ellis (by this point serving as NSC Senior Director for Intelligence Programs and no longer NSC Deputy Legal Advisor) to receive Original Classifying Authority (OCA) training, which is required for those serving in a position that is authorized to originally classify information.  Ms. Bai gave no explanation for the training request.  The Acting Director for Access Management provided that training to Mr. Ellis on June 10.[12]

---

[12] It is worth noting that this training took place *after* Ellis had already finished the classification review that Ms. Knight later learned he conducted between May 2 and June 9, 2020.  In its amended complaint, the government conceded that sequencing – i.e. that Ellis had actually done his review before receiving the training on how to do

September 22, 2020

11

Meetings with Justice Department Attorneys: On the evening of June 10, Deputy NSC Legal Advisor Bai called Ms. Knight and directed her to come into work to attend a meeting in the White House Situation Room. When Ms. Knight arrived at 5:30 p.m., she was greeted by Ms. Bai and four attorneys from the Justice Department. The group then presented her with a letter from Mr. Cooper, which was Mr. Cooper's response to Mr. Eisenberg's June 8 letter asserting that the manuscript still contained classified information and warning Ambassador Bolton and Mr. Cooper not to move forward with publication. In his response letter, Mr. Cooper claimed that Ms. Knight had de facto cleared the manuscript on April 27 when she indicated that there were only "some internal process considerations to work through" before issuance of the clearance letter. The attorneys from the Justice Department directed Ms. Knight to that language and instructed her to explain it to them.

Despite being caught off balance, Ms. Knight read Mr. Cooper's letter and calmly explained that she had never told Ambassador Bolton or Mr. Cooper that the prepublication process was over and that she had carefully followed NSC Legal's instructions to tell them that "the process was ongoing" whenever they asked for the clearance letter. Although she had discussed with Ambassador Bolton that a formal letter would be forthcoming at the conclusion of the process, she provided him no assurance as to the specific timing of its issuance.

The attorneys then asked Ms. Knight a series of questions which clearly indicated they were preparing for litigation. For example, they asked her how she had communicated with the political appointees in NSC Legal throughout the prepublication process, as they wanted to understand whether communications had been in person or by telephone, per NSC Legal's previous instructions.

They also asked questions suggesting that Ambassador Bolton had acted in bad faith during the prepublication review. To those questions, Ms. Knight explained that Ambassador Bolton had seemingly conducted himself in good faith overall and that she had never seen any indication during their work together that he was trying to circumvent the process. He had been gruff and demanding and expressed frustration at times during the process,[13] but Ms. Knight always felt his intention was to cooperate with and complete the review.

Finally, they asked what Ambassador Bolton and Mr. Cooper knew about the reason for the delay in granting the clearance of the manuscript. This is the moment at which Ms. Knight first learned that the delay was not due to competing priorities brought about by the COVID crisis – which is the explanation she had been given whenever she asked NSC Legal about

---

the review – but suggested that it was immaterial because "[a]fter completing the training, Mr. Ellis reviewed his work and concluded that the information he received in training did not alter his decisions."

[13] In addition, at the outset of the review process, his attorney made a number of public statements suggesting that Ms. Knight's team and their review were subject to political influence, which suggestions were completely unfounded.

September 22, 2020

12

the timing of finalizing the process.  In the course of their conversation, the then-Assistant Attorney General of the Civil Division at the Justice Department – who made an effort throughout their meetings to treat Ms. Knight in a collegial and forthcoming manner – asked her whether Ambassador Bolton and Mr. Cooper knew that Michael Ellis had been conducting his own prepublication review of the manuscript.  Surprised at that news, Ms. Knight responded that she very much doubted that they knew about that second review, especially given that she – the Senior Director for Records Access and Information Security Management at the NSC – knew nothing about it until that very moment.

She later learned how that second review came about.  In reviewing the government's filings in this litigation, she learned that National Security Advisor Robert O'Brien had reviewed the manuscript that Ms. Knight and her team determined was publishable on April 28 and concluded that that determination was wrong.  He then instructed Michael Ellis, an NSC political appointee with no previous classification authority experience,[14] to conduct another review.  Between May 2 and June 9, Mr. Ellis reviewed the manuscript and flagged hundreds of passages that, in his opinion, were still classified.  It was presumably that opinion that underlay the NSC Legal Advisor's assertion in his June 8 letter to Ambassador Bolton that "the current draft manuscript still contains classified material."

It is important to note that between April 28 and June 10, none of these political appointees – not Ambassador O'Brien, not Mr. Ellis and not Mr. Eisenberg – ever raised these classification concerns with Ms. Knight and her team or sought to learn about their analysis of the concerning passages.  Had their concern been to produce a publishable manuscript without classified information, they presumably would have asked the experts who had devoted hundreds of person-hours to a painstaking review of every page of the manuscript.

At a subsequent meeting, the DOJ attorneys showed Ms. Knight the manuscript with Mr. Ellis's hundreds of marked passages and asked her whether it was possible that she and her team had simply "missed this much classified information."  She firmly responded that that was not possible, and she proceeded to explain how Mr. Ellis's re-review of the manuscript was fundamentally flawed.

The fundamental flaw was that Mr. Ellis had done a "classification review" rather than a "prepublication review."  Based on her review of the markings, she could tell that Mr. Ellis had simply looked for passages that may have been classifiable under the broad categories laid out in the relevant Executive Order (EO 13526) and deemed those passages classified

---

[14] Michael Ellis had served as a staffer on the Permanent Select Committee on Intelligence in the House of Representatives under then-Chairman Devin Nunes.  In 2017, he took a politically-appointed position in the NSC Legal Office, where he served as Deputy Legal Advisor and Associate White House Council until March 2020, when he was appointed the NSC Senior Director for Intelligence Programs, replacing an incumbent who, like those who had traditionally served in that position, was a career official detailed from the Intelligence Community.

September 22, 2020

13

and unpublishable, as though he were doing a classification review of a government record. However, this manuscript was not a government record; it was the First-Amendment protected writings of a private citizen.

It appeared that Mr. Ellis nonetheless never went beyond this basic classification analysis to do an actual prepublication review.  For example, he flagged text involving conversations with foreign heads of state without making any attempt to do what Ms. Knight and her team had spent months doing – carefully ensuring that any sensitive details were deleted or sufficiently obscured to permit the account of those conversations to be published without compromising national security.  He also flagged passages that are clearly Ambassador Bolton's analysis and/or opinion about his personal recollections of events he witnessed, violating the basic tenet of prepublication review that a private author is entitled to his or her perspective of an event, even if that perspective is slanted or factually incorrect.

Finally, it appeared that Mr. Ellis failed to analyze whether the information he marked as classified was still, in fact, classified and subject to redaction.  In determining the publishability of information in the manuscript, Mr. Ellis apparently focused on whether that same information could be found in classified government records.  If he saw information in the manuscript that was also reflected in a classified government record, he appeared to have automatically deemed that information classified.  Ms. Knight and her team, by contrast, did what is required in a prepublication review and meticulously researched every potentially sensitive data point in the manuscript to determine whether the government had already put that data point into the public domain, thereby rendering it publishable regardless of its presence in a classified government document.[15]  With the benefit of this research and with careful efforts to obscure the sourcing and details in sensitive passages, Ms. Knight's team was able to clear substantial amounts of text that Mr. Ellis later deemed unpublishable.  In sum, Ms. Knight explained to the attorneys, Mr. Ellis had seemingly taken a flawed approach

---

[15] This can best be illustrated by a hypothetical example of a presidential meeting with a foreign leader.  The details of such meetings are typically recorded by staff and reduced to meeting memoranda, which are routinely classified at the Top Secret level.  It is routine for such memoranda to recite both the general topics of discussion between the two leaders as well as the specifics of those discussions.  It is also routine for the President's press secretary to describe the general discussion topics of such meetings – but not the specifics – when he or she briefs the press about the President's daily activities.  Under the rules of prepublication review, as dutifully applied by Ms. Knight's team, those general topics would be considered unclassified and publishable once they were disclosed by the press secretary, despite the fact that they may also be recited in a classified meeting memorandum.  Of course, the specific details that were not publicly disclosed would only be publishable if they satisfy the standard prepublication analytical criteria (e.g. they do not reveal government secrets, are details that have already been officially disclosed, can be plausibly denied or otherwise obscured in the drafting, etc.).  Under Mr. Ellis's approach, by contrast, the classification level of the meeting memorandum would dictate that both the specific details and the general topics would remain classified and their disclosure a felony offense, regardless of any previous disclosure by the press secretary.

September 22, 2020

14

to his re-review, and it was that flawed approach – and not the failings of her team's work – that accounted for the different results of their respective reviews.[16]

Meeting with the Deputy White House Counsel:  On Saturday, June 13, Ms. Knight was called into work for a meeting in the West Wing.  When she arrived at the NSC Legal office, she was greeted by Mr. Eisenberg, Ms. Bai and Patrick Philbin, the Deputy Counsel to the President from the White House Counsel's Office.  Over the following four hours, Mr. Philbin questioned Ms. Knight about a series of issues.  For the first hour or so, he walked her through the many passages that were marked during Ellis's re-review and asked her to explain how she and her team could have cleared each passage.  It was clear to Ms. Knight that they were trying to get her to admit that she and her team had missed something or made a mistake, which mistake could then be used to support their argument to block publication.  To their consternation, Ms. Knight was able to explain the clear and objective reasoning behind her team's decision-making as to each of the challenged passages.

Having failed to find fault in her team's specific determinations, they pivoted to an attempt to have her concede that the whole prepublication process is simply a matter of opinion – i.e. that prepublication determinations are unmoored from objective criteria and that the classified nature of information is simply in the eye of the beholder.  With that theory, they suggested that the differences between her team's determination that the manuscript was publishable and Mr. Ellis's determination that it was still full of classified information could be chalked up to a simple difference of opinion.  Ms. Knight responded that this was not a difference of opinion, but was rather a difference between a prepublication review process conducted with the goal of producing a publishable manuscript and a classification review process conducted with the goal of blocking publication.

Effort to Force Ms. Knight to Sign a Declaration:  Having failed to secure Ms. Knight's concession that this could all be chalked up to a difference between opinions, they changed tack and tried to persuade her to sign a declaration that purported to explain her role in the process.

Over the course of five days and a total of 18 hours of meetings, a rotating cast of Justice Department and White House attorneys tried to persuade Ms. Knight to sign a declaration they wanted to file with their lawsuit against Ambassador Bolton.  They made their case for the declaration, while Ms. Knight voiced her reservations about it.  Her reservations were primarily with the following points in the draft declaration:

---

[16] In explaining the deficiency of his re-review process, we do not deny that Ellis brought a new perspective to the manuscript review and may well have detected certain concerns with the text that warranted further analysis. However, this possibility could not explain the claim that hundreds of passages still contained classified information.  Nor could it explain the extended delay in clearance of the manuscript, as any such concerns could have been addressed – probably in a matter of hours – with a simple call or meeting with Ms. Knight and a possible revision of the manuscript.  No such call or meeting ever took place.

September 22, 2020

15

- The contention that this was simply a disagreement between experts, when, as discussed above, Ms. Knight saw this as a contrast between an appropriate prepublication review and an inappropriate classification review of a private citizen's work;

- The suggestion -- without factual basis – that her team's work was subpar, which is a necessary inference of the government's allegation that she and her team had failed to identify and redact substantial amounts of sensitive information that would irreparably harm the national security;

- The narrative in the declaration that glossed over the irregular aspects of the prepublication review – i.e. the secretive secondary re-review that (1) was initiated without the knowledge of or participation of the career staff, (2) was assigned to a political appointee with little or no relevant classification experience or training, (3) was not disclosed to Ms. Knight when NSC Legal attributed the clearance delay to the demands of the COVID-19 crisis, and (4) was ultimately used to justify the White House effort to block publication of the book;

- And finally, the ultimate conclusion that the manuscript was unpublishable, notwithstanding that Ms. Knight had addressed the classification concerns that the attorneys raised with her.

In addition to her substantive concerns with the draft declaration, Ms. Knight also voiced her concerns about the fairness and objectivity of the process being followed by the White House and Justice Department attorneys. She was particularly concerned about the following:

- Ms. Knight repeatedly asked the attorneys to explain their litigation strategy and how they intended to use her declaration. They refused to give her such information, and instead urged her to simply trust them and their assurances that they would not throw her and her team "under the bus."

- Ms. Knight also repeatedly asked to see Mr. Ellis's declaration and the government's draft complaint to learn which specific passages Mr. Ellis and the government attorneys would argue were still classified. They refused to show her Mr. Ellis's declaration, indicating to her that they had less interest in resolving the concerns cited in those documents and more interest in using them as a basis for blocking publication.[17]

---

[17] It is worth noting that Ms. Knight was never informed of the government's intent to secure the declarations of four presidentially-appointed intelligence officials for use in the TRO hearing. Ms. Knight learned of the existence of those declarations only when the Justice Department attorneys filed them with the TRO and used

- Ms. Knight asked the attorneys how it could be appropriate that a designedly apolitical process had been commandeered by political appointees for a seemingly political purpose.  She asked them to explain why they were so insistent on pursuing litigation rather than resolving the potential national security issues through engagement with Ambassador Bolton and her team.  The attorneys had no answer for her challenges, aside from a rote recitation of the government's legal position that Ambassador Bolton had violated his contractual obligations by failing to wait for written clearance.  However, when Ms. Knight speculated that this litigation was happening "because the most powerful man in the world said that it needed to happen," several registered their agreement with that diagnosis of the situation.

- Ms. Knight asked permission to call the NARA supervisor to whom she reported and have him join and support her throughout these meetings, most of which involved Ms. Knight being questioned by three to six White House and Justice Department attorneys at a time in a West Wing conference room.  An official at the Information Security Oversight Office, her supervisor is a recognized expert in classification, declassification, and prepublication review, and had actually worked in that capacity in the NSC in the recent past.  Despite these credentials, the NSC lawyers refused her request to have him attend the meeting and ordered her not to share any information with him.

After five days of meetings, in which the attorneys remained unwilling to address her concerns about the draft declaration and the process, Ms. Knight informed the NSC Legal Advisor that she would not sign the declaration.  He and his Justice Department colleagues then proceeded with the litigation without any declaration from her.  That was the last time Ms. Knight ever spoke with any member of the NSC Legal staff about the Bolton manuscript or litigation.

Ms. Knight's Departure from her NSC Position:  As explained above, Ms. Knight is a 16-year career federal employee who was detailed from NARA to the NSC staff in August 2018 for a two-year detail, and was promoted in December 2019 to the position of Senior Director for Records Access and Information Security Management.  Prior to Ms. Knight's promotion to Senior Director while detailed to NSC, it had been long-standing practice for that Senior Director to be a direct-hire career NSC employee who remained in place through transitions between presidential administrations to ensure continuity of operations among the White House, the NSC and NARA on all matters concerning information management.

---

them to support their argument that the manuscript still contained classified information.  Since the declarations were filed under seal, Ms. Knight has had no opportunity to review them.

September 22, 2020

After her promotion to Senior Director, Ms. Knight was given assurances from all of her relevant NSC supervisors that she would have the option to transition into that direct-hire position at the end of her two-year detail in August 2020.  Both the NSC Executive Secretary and the Senior Director for Resource Management told her that they supported her transition to the direct-hire position at the conclusion of her detail.  The NSC Legal Advisor gave her the same assurance, and promised to advocate for this transition with the NSC Chief of Staff, who had separately expressed strong support for her direct-hire and even assured her as recently as May 22 that he was working to "muscle some money around" to ensure her transition to the NSC permanent staff.

Following her refusal on June 16 to sign a declaration concerning the Bolton litigation, Ms. Knight's interaction with her leadership and NSC Legal all but ceased until June 22, when she received an automated email advising her that her detail would end in 60 days.  When she then asked the NSC Executive Secretary about the prospect of a direct hire he consulted with the NSC Chief of Staff and the NSC Legal Advisor, who informed him that that was no longer a possibility, and that "there is no path forward for [Ms. Knight] at the NSC."  The Executive Secretary expressed his sympathy and also his surprise at the decision in light of his strong impression of Ms. Knight as a "professional [who] did everything by the book." However, he said, the decision was "not [his] to make," and had already been made by others.  On August 20, Ms. Knight's detail expired and she returned to NARA.

**************

Ms. Knight has spent her career avoiding the spotlight and has no interest in the public attention that has accompanied this litigation.  Given that reticence, she was initially happy to remain on the sidelines of the litigation. With the government's recent effort to prevent any discovery – which would have the effect of precluding scrutiny of the government's conduct and motives in the Bolton prepublication review process – she now feels an obligation to tell her account of that process and to help fill in the gaps that have been left in the public narrative to date.  The foregoing provides a general summary of that account.

To be clear, Ms. Knight is not taking sides in the litigation.  She does not take issue with all the actions of the government attorneys with whom she interacted; a number of them conducted themselves with absolute professionalism, were understanding of her concerns as a career public servant, and were obviously trying their best to operate under very challenging circumstances.  In fact, it appeared to Ms. Knight that most, if not, all of them were being directed to implement a strategy with which they were not entirely comfortable.  Nor does she align herself with Ambassador Bolton and his decision to write and publish such a book, aside from supporting his constitutional right to do so in accordance with the prepublication rules.

September 22, 2020

18

Her interest in this litigation is simply to set the record straight and to help ensure that the important process of prepublication review is not tainted by political concerns. To that end, she stands ready to provide her account of the Bolton prepublication review and to be of assistance to you and the Court in this important matter.

Sincerely,

Kenneth L. Wainstein