# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| *Plaintiff,* | |
| **v.** | **Case No. 1:20-cv-1580-RCL** |
| **JOHN R. BOLTON,** | |
| *Defendant.* | |

## MEMORANDUM OPINION

As a condition of becoming National Security Advisor to President Trump, John Bolton signed three nondisclosure agreements with the United States. Those agreements guard classified information, including classified information about intelligence sources and methods known as sensitive compartmented information (SCI). The United States alleges that Bolton breached both his fiduciary obligations to the government and his contractual duties by (a) publishing his memoir before completing prepublication review and (b) by disclosing classified information. To succeed on those claims, the government must show that Bolton was either obligated to complete prepublication review or to not disclose classified information. Because the agreements imposed both obligations and because the government plausibly pleads that Bolton breached those obligations, the Court will deny Bolton's pending motion [40] to dismiss.

## I.   BACKGROUND

### A.   Classified Information and the Agreements

The federal government classifies information at three levels. Information is classified as confidential, secret, or top secret if its unauthorized release could cause, respectively, damage, serious damage, or exceptionally grave damage to the national security. Exec. Order No. 13,526 at § 1.2(a), 75 Fed. Reg. 707, 707 (Dec. 29, 2009). Information may not be classified to conceal

unlawful behavior, prevent embarrassment, or delay the release of otherwise unprotected information. *Id.* at § 1.7(a), 75 Fed. Reg. at 710. When classified information concerns or derives from intelligence sources and methods, the government designates it as SCI. All SCI is classified as confidential, secret, or top secret.

Before accessing classified information, a person must sign a nondisclosure agreement. *Id.* at § 4.1(a)(2), 75 Fed. Reg. at 720. The government's nondisclosure agreement for classified information is referred to as a Standard Form 312. For SCI, the agreement is called Form 4414.

### 1. SCI Nondisclosure Agreement (Form 4414)

The SCI nondisclosure agreement imposes lifelong obligations on persons granted access to SCI. The agreement defines SCI as information that "involves or derives from intelligence sources or methods and is classified or is in process of a classification determination." Ex. A at 4, ¶ 1.[1] Before signing the agreement, a recipient of SCI must receive a security indoctrination "concerning the nature and protection of SCI, including the procedures to be followed in ascertaining whether other persons to whom [he] contemplate[s] disclosing [SCI] have been approved for access to it." *Id.* at 4, ¶ 2.

The agreement imposes the following obligations. First, a recipient agrees to "never divulge" any marked or known SCI without written authorization. *Id.* at 4, ¶ 3. The recipient also agrees to submit for prepublication security review any writings that meet one of several SCI-based triggering conditions, *id.* at 4, ¶ 4, in order to "give the United States a reasonable opportunity to determine whether the [writing] sets forth any SCI," *id.* at 4, ¶ 5. Third, the recipient

---

[1] All references to exhibits refer to the exhibits to the original complaint, ECF No. 1. The United States did not refile the exhibits attached to the original complaint when it filed the first amended complaint, but the first amended complaint refers to the exhibits as if they were attached. *See He Depu v. Yahoo! Inc.*, 950 F.3d 897, 901 (D.C. Cir. 2020) ("In deciding a motion to dismiss, a court may . . . consider documents 'attached to or incorporated in the complaint.'").

agrees to "not disclose the contents of [a writing submitted for review] with, or show it to, anyone who is not authorized to have access to SCI until" he receives written permission from the government. *Id.* at 4, ¶ 4. Fourth, the agreement provides that SCI remains property of the United States. *Id.* at 4, ¶ 8. Finally, upon an unauthorized disclosure of SCI, a recipient assigns to the government "all rights, title and interest, and all royalties, remunerations, and emoluments that have resulted, will result, or may result" from the disclosure. *Id.* at 5, ¶ 12.

### 2.  Classified Information Nondisclosure Agreement (SF 312)

The classified information agreement imposes similar obligations on parties granted access to classified information. The agreement defines classified information as "marked or unmarked classified information . . . and unclassified information that meets the standards for classification and is in the process of a classification determination." *Id.* at 2, ¶ 1. As with a recipient of SCI, a recipient of classified information must be trained in how to protect classified information and in the procedures for "ascertaining whether other persons to whom [he] contemplate[s] disclosing [classified] information have been approved for access to it." *Id.* at 2, ¶ 2. Under the agreement, a recipient of classified information agrees to "never divulge" any classified information except (a) to an authorized recipient or (b) with written authorization. *Id.* at 2, ¶ 3. He also agrees to consult with the government before disclosing any information if he is uncertain about its classification status. *Id.* As with SCI, classified information remains the property of the United States. *Id.* at 2, ¶ 7. And as with SCI, a recipient of classified information assigns to the government "all royalties, remunerations, and emoluments that have resulted, will result or may result from any [unauthorized] disclosure." *Id.* at 2, ¶ 5.

**B. Factual Allegations[2]**

Bolton served as President Trump's National Security Advisor from April 2018 to September 2019. First Am. Compl. ¶ 9, ECF No. 18. In that role, he led the National Security Council (NSC) in advising the President on national security and foreign policy questions and in facilitating interagency coordination on those topics. *Id.* at ¶¶ 7–8; *see generally* National Presidential Security Memorandum 4, 82 Fed. Reg. 16,681 (Apr. 6, 2017). The National Security Advisor regularly deals with some of the most sensitive information the government possesses. First Am. Comp. ¶ 7.

When he became National Security Advisor, Bolton signed three nondisclosure agreements with the United States. He signed two SCI nondisclosure agreements (Form 4414) to access SCI.[3] Ex. A at 4–7. He also signed a classified information nondisclosure agreement (SF 312) to access classified information. *Id.* at 2–3.

In the months after Bolton left the White House, he and publisher Simon & Schuster agreed to produce a memoir of Bolton's time as National Security Advisor. First Am. Compl. ¶ 23. Bolton titled his memoir *The Room Where It Happened.*

Bolton then began a prepublication review process. At the end of 2019, Bolton's attorney contacted Ellen Knight, the NSC's senior director for records access and information security management, to submit his manuscript for review. *Id.* at ¶ 31; Ex. D. In a letter to Knight, Bolton's attorney asserted that "Bolton has carefully sought to avoid any discussion in the manuscript of [SCI] or other classified information, and we accordingly do not believe that prepublication review

---

[2]As the Court must accept as true all well-pleaded facts in a complaint when resolving a motion to dismiss, *see Sissel v. U.S. Dep't of Health & Hum. Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014), the facts in this section are drawn from the first amended complaint.

[3] Bolton signed two copies of Form 4414 because each allowed him to access different Special Access Programs, which provide compartmented security for SCI. The terms of the two agreements are identical, except that the agreements list different Special Access Programs.

is required." Ex. D.  He described the decision to submit the manuscript as taken "out of an abundance of caution, as contemplated by the nondisclosure agreements that [Bolton] entered." *Id.*  Knight and her staff conducted a preliminary review of the manuscript and informed Bolton that it contained "significant amounts of classified information," some of which was classified as top secret.  First Am. Compl. ¶ 33; Ex. E; *see also* Ex. H.  Through in-person meetings, phone calls, and written comments, Knight and Bolton worked through an iterative series of changes to his manuscript to excise classified information.  First Am. Compl. ¶¶ 41–45.  On April 28, 2020, Knight completed her prepublication review and believed that the manuscript did not contain classified information.  *Id.* at ¶ 46.  But despite Bolton's requests for a letter confirming that he had permission to publish his manuscript, Knight declined to provide a letter and told him that the review was ongoing.  *Id.* at ¶¶ 47, 49.

After Knight completed her initial review, Michael Ellis, the NSC's senior director for intelligence programs, began a second review.  *Id.* at ¶ 51.  Ellis possessed delegated authority to classify information, *id.*, *see also* Exec. Order No. 13,526 at § 1.3(a)(3), 75 Fed. Reg. at 708, and had regular access to more "extremely sensitive intelligence reports" than Knight, First Am. Compl. ¶ 52.  Ellis determined that the manuscript contained classified information, including SCI. *Id.* at ¶¶ 57, 59.  Accordingly, on June 8, 2020, the NSC's legal advisor sent Bolton's attorney a letter explaining that the manuscript contained classified information and that publication could not occur until the government confirmed that the prepublication review process was complete. *Id.* at ¶ 54.

Nevertheless, Bolton authorized Simon & Schuster to publish his book, *id.* at ¶¶ 53–55, Ex. P, and Simon & Schuster forged ahead with publication, *id.*. ¶ 64, Ex. P.  By June 10, 2020,

Simon & Schuster had printed the memoir and distributed it to retailers and reviewers.  First Am. Compl. ¶¶ 64, Ex. P.

### C.  Procedural History

On June 16, 2020, one week before the memoir's official release date, the government commenced this action.  It sought (a) a declaration that Bolton had acted unlawfully, (b) an injunction to prevent Bolton from publishing the book, and (c) a constructive trust over Bolton's royalties.  *See* Compl.  In its original complaint, the government alleged only that the manuscript contains classified information.  *See id.* at ¶ 58.  Three days later, the government amended its complaint to allege that Bolton's memoir contains SCI.  First Am. Comp. ¶ 59.

In the amended complaint, the government raises three claims.  First, it alleges that Bolton breached the SCI agreements, the classified information agreement, and his fiduciary duties by sharing his manuscript before he completed prepublication review.  *Id.* at ¶¶ 68–76.  Second, the government alleges that Bolton breached the SCI agreements, the classified information agreement, and his fiduciary duties by disclosing classified information without authorization.  *Id.* at ¶¶ 77–80.  Third, it alleges that Bolton unjustly enriched himself by breaching both the agreements and his fiduciary duties.  *Id.* at ¶¶ 81–86.  And by breaching the agreements, the government claims, Bolton assigned all his royalties to the United States.  *Id.*

The government also sought a temporary restraining order and a preliminary injunction to prevent the memoir's publication.  *See* Emergency Appl., ECF No. 3.  After holding a hearing on the motion and reviewing *ex parte* the government's classified declarations, the Court denied the motion.  *See* Mem. Order 6, 10 (June 20, 2020), ECF No. 27.  Though the Court determined that "Bolton likely jeopardized national security by disclosing classified information in violation of his nondisclosure agreement[s]," *id.* at 6, it also concluded that the government would not suffer

irreparable harm in the absence of an injunction, because Simon & Schuster had already distributed thousands of copies of the memoir, *id.* at 8–9.

Bolton now seeks to dismiss the complaint for failure to state a claim upon which relief may be granted.[4] *See* Fed. R. Civ. P. 12(b)(6).

## II.   LEGAL STANDARDS

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (citation omitted). In resolving a motion under Rule 12(b)(6), "[t]he [C]ourt assumes the truth of all well-pleaded factual allegations in the complaint and construes reasonable inferences from those allegations in the plaintiff's favor[] but is not required to accept the plaintiff's legal conclusions as correct." *Sissel*, 760 F.3d at 4. The Court may also consider documents attached to or incorporated by reference in the complaint. *He Depu*, 950 F.3d at 901.

In interpreting contracts between private parties and the United States, courts apply federal common law. *NRM Corp. v. Hercules, Inc.*, 758 F.2d 676, 681 (D.C. Cir. 1985); *see also* Compl. Ex. A at 5, ¶ 15 (choice of law provision). The federal common law of contracts "dovetails . . . with general principles of contract law," *NRM Corp.*, 758 F.2d at 681, including those set out in the *Restatement (Second) of the Law of Contracts*, *see Bowden v. United States*, 106 F.3d 433, 439 (D.C. Cir. 1997).

---

[4] In addition to its response, the government moved for summary judgment, ECF No. 44, and Bolton, in turn, sought to delay consideration of the summary judgment motion under Rule 56(d), ECF No. 49. Those motions remain pending.

Contract interpretation begins with the plain meaning of the text. *Bode & Grenier, LLP v. Knight*, 808 F.3d 852, 862 (D.C. Cir. 2015). When the parties' intent "can be determined from the face of the agreement," the Court's analysis also ends with the text. *CITGO Asphalt Refin. Co. v. Frescati Shipping Co., Ltd.*, 140 S. Ct. 1081, 1088 (2020) (quoting 11 *Williston on Contracts* § 30:6 (4th ed. 2012)). "[A] contract is unambiguous if it can be given a definite or certain meaning as a matter of law." 11 *Williston on Contracts* § 30:4 (4th ed. 2020 update)).

## III.   ANALYSIS

The government alleges that Bolton breached his fiduciary duties and contractual obligations by failing to complete prepublication review and by disclosing classified information. Accordingly, to prevail on his motion to dismiss, Bolton must show either that he did not have those obligations or, even if he had them, that he did not breach them.

The Court first analyzes Bolton's prepublication review obligations under the SCI agreements and the classified information agreement. *See infra* Section III.A. Next, the Court analyzes Bolton's nondisclosure obligations under both agreements. *See infra* Section III.B. Finally, the Court need not, and accordingly does not, address whether Bolton owed the government fiduciary duties to complete prepublication review and to refrain from disclosing classified information. *See infra* Section III.C.

### A. Prepublication Review Requirement (Count 1)

The government argues that (1) the SCI agreements and (2) the classified information agreement require Bolton to complete prepublication review. The Court holds that the SCI agreements require Bolton to complete full prepublication review and that the classified information agreement requires Bolton merely to receive authorization before disclosure.

### 1. SCI Agreements

Paragraph three of the SCI agreements requires predisclosure consultation under certain circumstances. A recipient of SCI agrees that he:

> understand[s] that it is [his] responsibility to consult with appropriate management authorities in the Department or Agency that last authorized [his] access to SCI, whether or not [he is] still employed by or associated with that Department or Agency or a contractor thereof, in order to ensure that [he] know[s] whether information or material within [his] knowledge or control that [he has] reason to believe might be, or related to or derived from SCI, is considered by such Department or Agency to be SCI.

Ex. A at 4, ¶ 3. Accordingly, the provision conditionally requires consultation—but not review—when a recipient has "reason to believe [that information] might be [SCI], or related to or derived from SCI." *Id.* at 4, ¶ 3. In that case, he must consult with the agency that cleared him to verify whether the information is in fact SCI. *Id.* The government does not expressly allege that Bolton had reason to believe his manuscript contained information that "might be, or related to or derived from SCI" before he disclosed it. Therefore, Bolton was not required to engage in predisclosure consultation with the government. But this is not the end of the analysis.

To "give the United States a reasonable opportunity to determine whether" a draft publication contains SCI, *id.* at 4, ¶ 5, paragraph four of the agreements imposes an easily triggered prepublication review requirement. The provision provides that a recipient:

> agree[s] to submit for security review by the Department or Agency that last authorized [his] access to such information or material, any writing or other preparation in any form, including a work of fiction, *that contains or purports to contain any SCI or description of activities that produce or relate to SCI or that [he has] reason to believe are derived from SCI*, that [he] contemplate[s] disclosing to any person not authorized to have access to SCI or that [he has] prepared for public disclosure. [He] understand[s] and agree[s] that [his] obligation to submit such preparations for review applies during the course of [his] access to SCI and thereafter, and [he] agree[s] to make any required submissions prior to discussing the

> preparation with, or showing it to, anyone who is not authorized to
> have access to SCI.

*Id.* at 4, ¶ 4 (emphasis added).

By those terms, the SCI agreements require prepublication review when a recipient of SCI produces a writing that both meets a disclosure threshold and has a specified nexus to SCI.  To potentially trigger prepublication a recipient must prepare a writing either (1) "that [he] contemplate[s] disclosing to any person not authorized to have access to SCI" or (2) "for public disclosure." *Id.*  When one of those two thresholds is met and one of three nexuses between the writing and SCI exists, the SCI agreements require review.  A writing bears the requisite nexus to SCI if it (a) actually contains "any SCI or description of activities that produce or relate to SCI," (b) purports to contain "any SCI or description of activities that produce or relate to SCI," or (c) contains materials that its author has "reason to believe are derived from SCI." *Id.*  An author must submit a writing to prepublication review when it meets both a disclosure threshold and has an SCI nexus.

The government sufficiently alleges that Bolton's manuscript met both a disclosure threshold and an SCI nexus.  No one disputes that Bolton prepared his manuscript for public disclosure: he signed a contract to publish it as a book.  And though the complaint does not allege that the manuscript (b) purported to contain SCI or (c) contained materials that Bolton had had "reason to believe are derived from SCI," it does allege that the manuscript (a) describes activities related to SCI,[5] First Am. Compl. ¶ 59, Under the plain terms of the agreement, that fact, if proven, would provide an SCI nexus and would have required Bolton to not publish the manuscript until he "received written authorization" from the government.  Ex. A at 4, ¶ 4.

---

[5] It also alleges that the manuscript contained SCI but fails to allege that the material was classified as SCI or was in the process of being classified as SCI at the time Bolton disclosed it. *See infra* p. 16 & n.7.

Not only did the SCI agreements prohibit publication before written authorization, but they also obligated Bolton not to *share* the contents of the manuscript with anyone until he received written clearance.  *Id.*  The agreements provide that a recipient of SCI:

> further agree[s] that [he] will not disclose the contents of such preparation with, or show it to, anyone who is not authorized to have access to SCI until [he has] received written authorization from the Department or Agency that last authorized [his] access to SCI that such disclosure is permitted.

*Id.* at 4, ¶4.  The government alleges that Bolton shared his manuscript with Simon & Schuster, First Amp. Compl. ¶ 50, and Bolton never received written authorization to share his book. Accordingly, the complaint sufficiently alleges that Bolton violated his prepublication review obligation by sharing his manuscript before the review ended.

Bolton raises four arguments to the contrary.  None are convincing.

First, Bolton argues that every SCI nexus requires scienter.  He says that because the agreements twice refer to "contemplate[d]" disclosure of SCI, the Court should interpret the nexuses as applying only when a recipient of SCI knows or should know that he is disclosing SCI. But two isolated references in a compact yet detailed agreement cannot overcome the agreements' express text.   The first reference appears in a provision acknowledging indoctrination in procedures for "contemplate[d]" disclosure of SCI. Ex. A at 4, ¶ 2. That Bolton was trained in how to disclose SCI does not change his other obligations under the agreements—though that training may belie his assertion that he had no reason to believe he must submit his manuscript for prepublication review.  Nor does the provision's reference to contemplated disclosure change the meaning of the word disclosure when it appears unmodified elsewhere in the agreements.  The agreements also reference contemplated disclosure in describing one of the two disclosure thresholds to trigger prepublication review. To restate, the SCI agreements' prepublication review requirement requires a recipient to:

> submit for security review . . . any writing or other preparation in
> any form, including a work of fiction, that contains or purports to
> contain any SCI or description of activities that produce or relate to
> SCI or that [he] ha[s] reason to believe are derived from SCI, that
> [he] contemplate[s] disclosing to any person not authorized to have
> access to SCI or that [he has] prepared for public disclosure.

The disclosure thresholds—"that [he] contemplate[s] disclosing to any person not authorized to
have access to SCI" and "that [he has] prepared for public disclosure"—appear in parallel
adjectival phrases modifying "writing" and "preparation." And the SCI nexuses appear in another
adjectival phrase also modifying "writing" and "preparation." Syntactically, an adjectival phrase
containing a disclosure threshold cannot modify either the adjectival phrase containing the other
disclosure threshold or a third adjectival phrase containing the SCI nexuses. Rather, all three
phrases modify the nouns "writing" and "preparation." The SCI nexuses are an independent
requirement, and do not require scienter except as expressly provided for material that a recipient
"ha[s] reason to believe" is derived from SCI. The SCI nexuses do not require Bolton to have
contemplated disclosing SCI or material related to or describing SCI; they simply require that he
prepare for public disclosure a manuscript meeting an SCI nexus.

The other two nexuses are, by their terms, strict liability. And that makes sense.
Contractual requirements impose strict liability by default. *See Restatement (Second) of the Law
of Contracts*, ch. 11, introductory note (1981) ("Contract liability is strict liability. . . . The obligor
is therefore liable in damages for breach of contract even if he is without fault . . . ."). Here, only
one of the SCI nexuses requires that the recipient act with a specific state of mind, because only
that nexus references a state of mind. *See Legal Aid Soc'y of N.Y. v. United States*, 92 Fed. Cl.
285, 299 (2010) ("Under the doctrine of *expressio unius est exclusio alterius*, it is well-settled that
'[w]here certain things are specified in detail in a contract, other things of the same general
character relating to the same matter are generally held to be excluded by implication.'" (quoting

Grover C. Grismore, *Principles of the Law of Contracts* § 105, at 164 (1947))).  And Bolton cannot overcome the default presumption, because strict liability serves the agreements' overriding purpose.  By holding a recipient who shirks his prepublication review requirements strictly liable, the agreements incentivize recipients of SCI to undergo prepublication review.  And in so doing, the agreements protect SCI.

Second, Bolton claims that the First Amendment prohibits the government from requiring him to submit writings for prepublication review when he neither believes nor has reason to believe that the writings contain SCI.  Bolton roots his argument in the idea that prepublication review requirements must be reasonably necessary to protect the government's interest in protecting the material under review.  And, claims Bolton, the SCI agreements require prepublication review of everything he writes "from Op-Eds and blog posts to cookbooks."  Def.'s Br. 32.  Thus, he argues, the SCI agreements unreasonably require prepublication review.  But the contracts do no such thing: they require review when materials are, relate to, or purport to be SCI or describe activities that produce or relate to SCI.  *See* Ex. A at 4, ¶ 4.  While the National Security Advisor's role may require many of his writings to be submitted for prepublication review, the nexuses apply only to information related to intelligence sources and methods.  Bolton may freely publish a cookbook, unless he intends to edit a set of recipes from CIA operatives and sources.  And even then, he might be in the clear.  *Cf.* Letter from Michael Pompeo, Director, CIA, to Benjamin Wittes, Editor-in-Chief, *Lawfare* (Dec. 29, 2017), https://www.lawfareblog.com/letter-michael-pompeo (disclosing Pompeo family fudge recipe).  Additionally, prepublication review does not allow the government to permanently restrain a former employee from publishing unclassified information.  Many authors complete review and publish their writings, even when those writings criticize the administration reviewing them.  *See, e.g.*, Robert M. Gates, *Duty: Memoirs of a Secretary at War*

(2015) (former Defense Secretary's critical assessment of his time in Bush and Obama administrations). Indeed, the SCI agreements require swift action: the government must make an initial response to a submission within thirty working days. Ex. A at 4, ¶ 5. Here, for example, Knight provided an initial response twenty-four calendar days after Bolton submitted his manuscript. First Am. Compl. ¶¶ 31, 33; Ex. D; Ex. E. Prepublication review slows, but does not prevent, former officials' speech. And this fact curtails the process's First Amendment implications.

Further, controlling law forecloses Bolton's argument. In *Snepp v. United States*, the Supreme Court rejected a First Amendment challenge to a stricter prepublication review requirement found in a former CIA agent's nondisclosure agreement. 444 U.S. 507, 509 n.3 (1980). Snepp, the CIA agent, signed an agreement promising to "not . . . publish . . . any information or material *relating to the Agency*, its activities or intelligence activities generally, either during or after the term of [his] employment . . . without specific prior approval by the Agency." *Id.* at 508 (alterations and omissions in original) (emphasis added). The Supreme Court held that because "[t]he Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service," *id.* at 509 n.3, Snepp's agreement "[was] a reasonable means for protecting this vital interest," *id; see also Wilson v. C.I.A.*, 586 F.3d 171, 183–84 (2d Cir. 2009); *McGehee v. Casey*, 718 F.2d 1137, 1140 (D.C. Cir. 1983); *United States v. Marchetti*, 466 F.2d 1309, 1317 (4th Cir. 1972). Snepp's agreement thus subjected far more to prepublication review than Bolton's. In fact, Bolton admits as much. Hr'g Tr. 4:6–17 (Sept. 24, 2020) ("[T]he scope of Snepp's prepublication review and approval obligation could not have been broader. . . . [I]f Ambassador Bolton had signed an agreement like Snepp's we wouldn't

be here today . . . ."), ECF No. 55.  While Bolton's SCI agreements required prepublication review only for writings that meet an SCI nexus, Snepp's agreement covered anything *related* to the CIA and to intelligence more broadly.  *Compare* 444 U.S. at 508, *with* Ex. A at 4, ¶ 4.  As the government could constitutionally require Snepp to submit for review *any* writings related to intelligence activities, so too can the government require Bolton to submit for review writings related to the narrower category of intelligence sources and methods.  Therefore, enforcing the plain meaning of the agreement does not offend the First Amendment.

Bolton also argues that the government would violate the First Amendment if it required prepublication review of "harmless" material—material which he had no reason to know related to SCI.  That argument fails for two reasons.  First, and most importantly, the agreement in *Snepp* did precisely that.  It imposed a blanket prepublication review requirement for any writings related to a signatory's CIA employment regardless of whether they contained classified information.  And the Supreme Court upheld it.  Second, as the Court explains below, the government has a compelling interest in reviewing information related to SCI prior to its disclosure.  *See infra* p. 18; *cf. CIA v. Sims*, 471 U.S. 159, 178 (1985) (approving of the withholding of seemingly innocuous information to protect intelligence sources in context of FOIA); *Marchetti*, 466 F.2d at 1318 ("The significance of one item of information may frequently depend upon knowledge of many other items of information.  What may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context.").  The government has the power to prevent harm to the national security.  While the government may not prevent Bolton from publishing unclassified materials, it may require him to undergo a reasonable prepublication review process.  *See Wilson*, 586 F.3d at 184–86; *Marchetti*, 466 F.2d at 1317.  The SCI agreements are thus consistent with the First Amendment.

Next, Bolton argues that the government failed to allege that the material in his manuscript was classified as SCI when he disclosed it.[6]  The complaint does not explicitly allege when the government classified the material as SCI.[7]  But it need not.  The relevant SCI nexus requires only that the writing describe activities related to SCI.  And the complaint adequately alleges that Bolton's manuscript, as prepared for publication, had that nexus to SCI and thus triggered prepublication review.  *See* First Am. Compl. ¶¶ 7, 21.  Bolton wrote a memoir of his time serving as National Security Advisor—a role pervaded with SCI.  *See id.*  Accordingly, writing a book about the work of the National Security Advisor alone triggers prepublication review, because any detailed description of the National Security Advisor's work relates to SCI.

Fourth, Bolton argues that the contract should be construed against the government.

To start, Bolton argues that the agreements are contracts of adhesion and thus should be construed against their drafter.  The SCI agreements are, notwithstanding the government's protestations, contracts of adhesion, because Bolton—no matter how sophisticated a lawyer he may be—had no opportunity to negotiate their terms.[8]  *See City of Gettysburg v. United States*, 64 Fed. Cl. 429, 451 (2005) ("An adhesion contract is a form of contract unilaterally drafted by one party and presented to the other party on a "take-it-or-leave-it" basis."), *aff'd*, 173 F. App'x 827

---

[6] Bolton also argues that the complaint does not detail what SCI he disclosed.  Yet the complaint puts Bolton on notice as to the theory under which the government is proceeding.  The government is not required to publicly divulge classified information to meet notice-pleading requirements.  *Cf. Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003) (instructing courts to handle *ex parte* classified materials unless further disclosure is unavoidable).

[7] The record might support such an allegation, *see, e.g.*, Hr'g Tr. 10:9–24 (June 20, 2020) ("Three of the examples, including the example relating to TS/SCI were classified before Mr. Ellis's review."), ECF No. 28, but in the context of a Rule 12(b)(6) motion, the Court may consider only the complaint.

[8] Contracts of adhesion, however, paradigmatically create public policy difficulties when they bind unsophisticated consumers.  *See generally* Todd D. Rakoff, *Contracts of Adhesion: An Essay in Reconstruction*, 96 Harv. L. Rev. 1173 (1983); Friedrich Kessler, *Contracts of Adhesion—Some Thoughts about Freedom of Contract*, 43 Colum. L. Rev. 629 (1943).  The doctrine has far less bite in the context of professional employment contracts.  *See* Allison E. McClure, Note, *The Professional Presumption: Do Professional Employees Really Have Equal Bargaining Power When They Enter Into Employment-Related Adhesion Contracts?*, 74 U. Cin. L. Rev. 1497, 1509–15 (2006) (collecting cases).  And here, Bolton voluntarily accepted the job of National Security Advisor knowing that it would require him to take steps to safeguard classified information.

(Fed. Cir. 2006); *see also* 11 *Williston on Contracts* § 32:12.  But a contract of adhesion is still a valid contract.  If, after exhausting its interpretive toolbox, the Court still found genuine ambiguity in the contracts, it might construe ambiguous provisions in favor of Bolton.  *See Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1352 (Fed. Cir. 2006) ("[C]ontra proferentem is a 'rule of last resort.'"); *see also* 11 *Williston on Contracts* § 32:12.  Here, however, the Court holds that the contracts unambiguously set out Bolton's duties.  Without intractable ambiguity in the agreements, *contra proferentem* offers Bolton no help.

Next, Bolton argues that the agreements cannot require prepublication review when a recipient has no reason to know that his writing contains SCI.  Bolton contends that such an interpretation would be absurd and would render superfluous the consultation requirement in paragraph three and the nondisclosure requirement in paragraph four.  He further claims that if the mere presence of SCI triggered prepublication review, there would be no need for the purported-SCI or reason-to-believe nexuses.

Bolton fails to recognize that each of the SCI nexuses is broader than a simple presence-of-SCI trigger and that the nondisclosure and consultation requirements provide additional protections for SCI.  Take the SCI nexuses.  Each provision offers a distinct nexus which, when combined with a disclosure threshold, obliges a recipient to submit material for prepublication review.  That principle is easiest to understand in the context of non-SCI information that purports to be SCI.  If a national security official intends to publish information that he claims he derived from intelligence sources and methods, his employer may well want to know about those plans regardless of whether the information is actually SCI.  At the very least, his employer could want to ensure that the information is properly unclassified.  That desire to safeguard intelligence sources and methods is hardly absurd.  Indeed, because disclosing SCI may endanger lives, *cf.*

*Fitzgibbon v. CIA*, 911 F.2d 755, 763–64 (D.C. Cir. 1990), the only reasonable construction of the agreements is one that allows the government to secure SCI.  Similarly, take the requirement not to disclose information known to be or marked as SCI.  Information that bore an SCI paragraph marker and which had subsequently been declassified would not require prepublication review under Bolton's interpretation of the contract.  But the government would not act absurdly if it reviewed that material out of an abundance of caution, especially because items of intelligence may be harmless individually yet critically sensitive when combined.  *Halkin v. Helms*, 598 F.2d 1, 8–9 (D.C. Cir. 1978) (citing *Marchetti*, 466 F.2d at 1318).  The Court prefers to give meaning to all parts of a contract, *United Int'l Investigative Servs. v. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997), but its reading does not create superfluity.

Moreover, in the context of a contract that protects the nation's most sensitive intelligence information, the Court acknowledges that the government may have drafted broadly out of a sense of caution.  In such a case, the rule against surplusage carries less weight.  *Cf.* Ethan J. Leib & James J. Brudney, *The Belt-and-Suspenders Canon*, 105 Iowa L. Rev. 735, 750 (2020) (discussing caution as a motive in repetitive statutory drafting).

Paragraphs three and four of the agreement impose a number of similar but distinct requirements; their potential for redundancy, however, does not render any of them superfluous.

Last, Bolton argues that the Court must interpret the agreement to avoid unresolved First Amendment questions.  To be sure, when interpreting statutes, courts must try to avoid constructions that create serious doubt as to constitutionality.  *See NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 500 (1979).  At least in some circumstances, the courts also avoid tough constitutional questions in interpreting contracts.  *See, e.g.*, *United States v. Winstar Corp.*, 518 U.S. 839, 875 (1996).  But *Snepp* controls and resolves Bolton's First Amendment arguments.

And when binding precedent answers a question, "there are no constitutional rulings to be avoided." *Ali v. Trump*, 959 F.3d 364, 373 (D.C. Cir. 2020).  To invoke the constitutional doubt canon a litigant must show both ambiguity and an unanswered constitutional question.  Bolton fails to do either.

Because all four of Bolton's arguments for why the Court should make presumptions in his favor fail, the Court rests its analysis on the contracts' plain meaning.

The SCI agreements required Bolton to complete prepublication review.

### 2.  Classified Information Agreement

The Government also argues that the classified information agreement imposes a prepublication review requirement.  The classified information agreement provides that a recipient of classified information:

> agree[s] that [he] will never divulge classified information to anyone unless: (a) [he has] officially verified that the recipient has been properly authorized by the United States Government to receive it; or (b) [he has] been given prior written notice of authorization . . . that such disclosure is permitted.  [He] understand[s] that if [he is] uncertain about the classification status of information, [he is] required to confirm from an authorized official that the information is unclassified before [he] may disclose it, except to a person as provided in (a) or (b), above.

Ex. A at 2, ¶ 3.

Unlike the SCI agreements, the classified information agreement does not require prepublication *review*.  It simply requires predisclosure *authorization*.  Paragraph three requires a recipient to ensure that anyone he shares that information with is authorized to receive it.[9]  And it requires that a recipient who is uncertain whether information is classified verify its status prior to

---

[9] "A person may have access to classified information provided that: (1) a favorable determination of eligibility for access has been made by an agency head . . . ; (2) the person has signed an approved nondisclosure agreement; and (3) the person has a need-to-know the information."  *See* Exec. Order 13,526 at § 4.1(a), 75 Fed. Reg. at 720.

disclosure.  The agreement does not refer to a "security review" or anything like it.  It does not presume that the recipient has written anything capable of review.  And, unlike the CIA agreement at issue in *Marchetti,* it does not refer to publication.  *See* 466 F.2d at 1312 n.1 ("I do solemnly swear that I will never divulge, *publish* or reveal . . .  any classified information . . . ." (emphasis added)).  Rather, the provision simply functions as a precautionary check.  While a person bound by the classified information agreement may freely share unclassified information, he may share classified information only (a) to those authorized to receive it or (b) with written permission.  And if a person bound by the classified information agreement is not certain whether the information he wants to share is classified, he must verify the information's status.

The government sufficiently alleges that Bolton disclosed information without confirming that the information was unclassified.  First, in alleging that Bolton submitted his manuscript for review and that the material Bolton submitted actually contained classified information, the government alleges sufficient facts to allow a factfinder to conclude that Bolton was uncertain as to the status of the information.[10]  First Am. Compl. ¶¶ 31–33, 44–45.  Even if Bolton operated out of an abundance of caution in submitting his manuscript for review, the very existence of his caution leads to a fair inference that Bolton was less than certain as to the status of the manuscript.  And the allegation that classified material was actually present in the manuscript makes it more likely that Bolton harbored doubts as to whether everything in his manuscript was unclassified. *Cf. United States v. James*, 169 F.3d 1210, 1214 (9th Cir. 1999).  Certainty, after all, is a high bar

---

[10] The government argues that the classified information agreement should be read to impose an objective standard for predisclosure consultation.  If the agreement required consultation when a recipient *should be* uncertain about the classified status of information, the government would be correct.  But the agreement does not contain that critical language.  Instead, the requirement to consult turns on whether the recipient was in fact uncertain.  To be sure, courts construe contracts objectively.  But the objective theory of contracts means only that courts look to the parties' objective manifestations of intent in forming a contract.  *See* 11 *Williston on Contracts* § 31:4.  It does not prevent contracts from basing obligations on a party's subjective understanding of facts.

to clear[11]—an iota of doubt would render Bolton uncertain.   Second, in alleging that Bolton disclosed the manuscript both during and after Knight's review, the government alleges sufficient facts to allow a factfinder to conclude that Bolton disclosed the information prior to receiving confirmation that the material was unclassified.  First Am. Compl. ¶¶ 35, 37–38, 46–47, 49–50, 53.   If proven, those allegations would demonstrate that Bolton breached his predisclosure consultation requirement.

In response, Bolton contends that he did not believe the manuscript contained classified information and that Knight confirmed that the manuscript did not contain classified information. If Bolton can prove either of those claims, he would demonstrate that he complied with the predisclosure consultation requirement.  In ruling on a motion to dismiss, however, the Court may look only to the face of the complaint and must draw all reasonable inferences in favor of the plaintiff.  The complaint does not allege that Knight told Bolton his manuscript was cleared.[12]  *See id.* at ¶¶ 46–48, 49–50 (alleging only that Knight told the NSC legal staff that she believed the manuscript did not contain classified information and that Knight told Bolton the review was ongoing).  And the complaint does not contain enough material to defeat the inference that Bolton doubted whether the information in his manuscript was classified.  Because at this stage the Court cannot consider Bolton's contradictory arguments, it must permit the government's claim for breach of the predisclosure consultation requirement to proceed.

* * *

---

[11] A person is certain when he is "[f]ully confident upon the ground of knowledge, or other evidence believed to be infallible; having no doubt; assured; sure."  Certain, II *The Oxford English Dictionary* 1051 (2d ed. 1989).  But "[c]ertitude is not the test of certainty.  We have been cock-sure of many things that were not so."  Oliver Wendall Holmes, *Collected Legal Papers* 311 (1920).

[12] Thus, whether such a communication would have to be in writing—as Bolton maintains—is immaterial.

In sum, the government sufficiently alleges that Bolton breached his prepublication review and predisclosure consultation obligations.

## B. Nondisclosure Requirement (Count 2)

The government argues that (1) the SCI agreements and (2) the classified information agreement prohibit Bolton from disclosing classified information. The Court holds that the classified information agreement—but not the SCI agreements—prohibits conduct in which the government alleges Bolton engaged.

### 1. SCI Agreements

The SCI agreements provide that a recipient of SCI may "never divulge anything marked as SCI or that [he] know[s] to be SCI to anyone who is not authorized to receive it without prior written authorization." Ex. A at 4, ¶ 3. The agreement thus expressly prohibits unauthorized disclosure of marked or known SCI. It does not prohibit unknowing disclosure of unmarked SCI.

The complaint does not allege that Bolton knowingly disclosed SCI or that he disclosed marked SCI. The complaint thus does not state a claim for breach of the SCI agreements' nondisclosure provision.

### 2. Classified Information Agreement

The classified information agreement provides that a recipient of classified information may "never divulge classified information to anyone unless: (a) [he has] officially verified that the recipient has been properly authorized by the United States Government to receive it; or (b) [he has] been given prior written notice of authorization." *Id.* at 2, ¶ 3. The agreement thus prohibits unauthorized disclosure of classified information; that is, of marked or unmarked information that is classified or in the classification process. *Id.* at 2, ¶ 1.

The complaint alleges that Bolton disclosed classified information without prior written authorization. *See* First Am. Compl. ¶¶ 59, 61.  Accordingly, the government has stated a prima facie claim for breach of the classified information agreement's nondisclosure requirement.

Bolton attempts to read a scienter requirement into the classified information agreement. He argues that requiring him to consult with his agency in cases of uncertainty would be pointless if he were strictly liable for disclosing classified information.  From this, he draws the conclusion that he is only liable for knowing disclosures.  That argument fails to take account of the agreement's text, subject matter, and structure.

First, unlike parts of the SCI agreements, the classified information agreement is silent on the recipient's state of mind when he discloses classified information.  The government knows how to prohibit only knowing disclosures.  It did so in the SCI agreement. *See* Ex. A at 4, ¶ 3 ("I hereby agree that I will never divulge anything marked as SCI or that I know to be SCI . . . .").  But it did not so limit the prohibition on disclosing classified information.  And when a contract is silent on state of mind, the parties are strictly held to their obligations to perform. *See Restatement (Second) of the Law of Contracts*, ch. 11, introductory note.  Therefore, the contract's plain meaning defeats Bolton's argument.

Second, Bolton's superfluity argument does not make sense in the context of safeguarding classified information.  Here, the belt-and-suspenders combination of predisclosure consultation and postdisclosure liability makes sense.  If money damages—or even a constructive trust—would adequately remedy unauthorized disclosure, the government would be indifferent between compliance and damages. *See* Robert L. Birmingham, *Breach of Contract, Damage Measures, and Economic Efficiency*, 24 Rutgers L. Rev. 273, 284 (1970); *cf.* Oliver Wendell Holmes *The Path of the Law*, 10 Harv. L. Rev. 457, 462 (1897).  But the government classifies information

because its release would damage national security. Exec. Order No. 13,526 at § 1.2, 75 Fed. Reg. at 707. Once information is released, it cannot be resecured. *See, e.g.*, Mem. Order 4, ECF No. 27. Damages are not equivalent to performance when classified information is at risk. In this context, the predisclosure consultation requirement protects classified information from inadvertent disclosure, while the nondisclosure requirement guards against disclosure of all kinds. When classified information is on the line, overlapping precautions are not superfluous.

Third, the classified information agreement's structure indicates that a recipient is strictly liable for disclosing classified information. The nondisclosure and predisclosure provisions must be read together. And reading those provisions of both the SCI agreement and the confidential information agreement together illustrates two different frameworks for protecting classified information: one relying more on *ex ante* measures and the other on *ex post*. The SCI agreements impose a stricter predisclosure regime: a full security review. But they also impose a less stringent nondisclosure obligation: a person bound by the SCI agreements may not share marked or known SCI. In short, they heavily burden a recipient's ability to disclose information prior to prepublication review but give the government less recourse to sue a recipient for disclosing SCI after review. In contrast, the classified information agreement imposes a laxer predisclosure regime: mere predisclosure authorization. But it also prohibits any disclosure of classified information. In short, it imposes minimal upfront burdens but strictly prohibits disclosure of classified information and provides the government broad ability to sue for unauthorized disclosures.

Bolton also argues that the complaint fails to allege that the information he disclosed was classified at the time he disclosed it. *See* Hr'g Tr. 7:17–8:9 (Sept. 24, 2020). Unlike with SCI, however, the complaint alleges that the manuscript contained classified information before Bolton

and Knight revised it, First Am. Compl., ¶¶ 33, 39–40, 44, and that Bolton disclosed the manuscript without authorization, *id.* at ¶¶ 37–38. So the government has satisfied the classified information agreement's temporal requirement.

The classified information agreement obligates Bolton not to disclose classified information without prior written authorization. As the government alleges that Bolton did just that, it has stated a prima facie claim for breach of the classified information agreement.

Bolton additionally argues that imposing a constructive trust on his royalties would violate the First Amendment's prohibition on punishing a speaker for the content of his speech. That argument misapprehends both the nature of a constructive trust and the protections attached to disseminating classified information.

Though the result might feel like a punishment to Bolton, a constructive trust is an equitable remedy. And equity does not punish. *See Liu v. SEC*, 140 S. Ct. 1936, 1941 (2020); *see generally* Samuel L. Bray, *Fiduciary Remedies*, in *The Oxford Handbook of Fiduciary Law* 449 (Evan J. Criddle, et al., eds., 2018). Rather, equity protects rights while avoiding injustice. *See* Bray, *supra* at 450. A constructive trust arises by operation of law when one person holds property (the government's classified information) or its traceable proceeds (the royalties) that properly belong to another. *See Beatty v. Guggenheim Expl. Co.*, 122 N.E. 378 (N.Y. 1919) (Cardozo, J.); *see also* Caryl A. Yzenbaard, et al., *Bogert's The Law of Trusts and Trustees* § 471 (June 2020 update). In short, a constructive trust is appropriate when the trust *res* never properly belonged to the defendant. In such cases, a constructive trust prevents the defendant's unjust enrichment at the plaintiff's expense. Here, the government theorizes that the royalties Bolton earns from the memoir are the government's property because they are proceeds of the government's misappropriated classified information. Indeed, under the agreements, Bolton acknowledged that

SCI and classified information were government property, Ex. A at 2, ¶ 7; 4, ¶ 8, and assigned his royalties to the government upon breach. *Id.* at 2, ¶ 5; 5, ¶ 12. If the government proves its theory, it will regain its rightful property. A constructive trust would no more punish Bolton than replevin punishes a converter.

Nor does the First Amendment prohibit punishing those who unlawfully disclose classified information. *See New York Times Co. v. United States*, 403 U.S. 713, 735 (1971) (White, J., concurring). "If the Government classified the information properly, then [a recipient] simply has no [F]irst [A]mendment right to publish it." *Stillman*, 319 F.3d at 548; *accord Wilson*, 586 F.3d at 183; *see also McGehee*, 718 F.2d at 1147. Thus, even if the remedy the government sought *did* punish Bolton, the First Amendment would offer him no refuge.

The classified information agreement lawfully prohibits Bolton from disclosing classified information without authorization.

* * *

In sum, the government sufficiently alleges that Bolton breached his nondisclosure obligations.

### C. Fiduciary Duty

The government also argues that Bolton owed a fiduciary duty to complete prepublication review and to refrain from disclosing classified information.

The Court will follow *Snepp* in declining to reach those issues. In *Snepp*, the Supreme Court reasoned that "since this case involves the breach of a trust agreement that specifically required . . . prepublication review . . . we need not look to the common law to determine the scope of Snepp's fiduciary obligation." 444 U.S. at 515 n.11. Here, where the agreements clearly

delineate prepublication review and nondisclosure requirements, the Court will look to the agreements to define Bolton's duties.

## IV.   CONCLUSION

Count One in the government's complaint alleges that Bolton breached his prepublication review obligations.  Having found that the government alleges sufficient facts to support its claim that Bolton violated these obligations in the SCI agreements and classified information agreement, the Court will not dismiss Count One.

Count Two in the government's complaint alleges that Bolton breached his nondisclosure obligations.  Having found that the government alleges sufficient facts to support its claim that Bolton violated these obligations in the classified information agreement, the Court will not dismiss Count Two.

Count Three in the government's complaint alleges that the government is entitled to a constructive trust over Bolton's royalties as a result of the conduct that underlies Counts One and Two.  Having declined to dismiss the substantive claims in Counts One and Two, the Court will not dismiss the remedial claim in Count Three.

Therefore, the Court will deny the motion to dismiss by separate order.

Date: ____10/1/20____

Royce C. Lamberth
United States District Judge