**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| *Plaintiff,* | |
| **v.** | Case No. 1:20-cv-1580-RCL |
| **JOHN R. BOLTON**, | |
| *Defendant.* | |

**MEMORANDUM OPINION**

As a condition of becoming President Trump's National Security Advisor, defendant John Bolton signed three nondisclosure agreements with the government. The agreements guard classified information, including classified information about intelligence sources and methods known as sensitive compartmented information (SCI). They require recipients of classified information to submit certain writings for security review prior to publication. The government alleges that Bolton violated the agreements when he released his memoir, *The Room Where It Happened*, before completing prepublication review. So the government sued Bolton, seeking a constructive trust over all profits from the book as well as injunctive and declaratory relief.

The government now moves for summary judgment. Mot. Summ. J., ECF No. 44. Bolton, in turn, asks the Court to delay consideration of that motion under Rule 56(d) until he has had the opportunity to conduct discovery in two discrete areas. Mot. Defer, ECF No. 49; *see* Fed. R. Civ. P. 56(d). Bolton has not been able to conduct any discovery so far.

Bolton's motion to defer requires the Court to determine whether two types of evidence would be material to Bolton's opposition to summary judgment: (1) evidence of whether the President or senior White House officials acted in bad faith by delaying prepublication review and

attempting to unduly influence classification decisions and (2) additional evidence of whether the book contains properly classified information.[1]  The Court holds that evidence of bad faith would be material to summary judgment because it could support an unclean hands defense.  The Court also holds that additional evidence about whether the book contains properly classified material is not material to summary judgment.

Therefore, the Court will **GRANT** Bolton's Rule 56(d) motion [49] and will **DENY WITHOUT PREJUDICE** the government's motion [44] for summary judgment.

## I.   BACKGROUND

The Court draws its discussion of the factual background of this case from its opinion denying Bolton's motion to dismiss.  Mem. Op. (Oct. 1, 2020), ECF No. 57.

### A.  Classified Information and the Agreements

> The federal government classifies information at three levels. Information is classified as confidential, secret, or top secret if its unauthorized release could cause, respectively, damage, serious damage, or exceptionally grave damage to the national security. Exec. Order No. 13,526 at § 1.2(a), 75 Fed. Reg. 707, 707 (Dec. 29, 2009).  Information may not be classified to conceal unlawful behavior, prevent embarrassment, or delay the release of otherwise unprotected information.  *Id.* at § 1.7(a), 75 Fed. Reg. at 710.  When classified information concerns or derives from intelligence sources and methods, the government designates it as SCI.  All SCI is classified as confidential, secret, or top secret.

> Before accessing classified information, a person must sign a nondisclosure agreement.  *Id.* at § 4.1(a)(2), 75 Fed. Reg. at 720. The government's nondisclosure agreement for classified information is referred to as a Standard Form 312.  For SCI, the agreement is called Form 4414.

---

[1] When the Court discusses whether material has been "properly classified," it looks to the relevant executive order and any applicable agency classification procedures.  *See McGehee v. Casey*, 718 F.2d 1137, 1143–47 (D.C. Cir. 1983) (evaluating classification scheme based on then-applicable executive order); *see also* Exec. Order No. 13,526 75 Fed. Reg. 707 (Dec. 29, 2009).  It does not consider acts exogenous to the ordinary classification process.  Rather, any such acts—such as Bolton's allegations of improper political influence—come into play when the Court evaluates bad faith.

*Id.* at 1–2.

### 1.   SCI Nondisclosure Agreement (Form 4414)

The SCI nondisclosure agreement imposes lifelong obligations on persons granted access to SCI. The agreement defines SCI as information that "involves or derives from intelligence sources or methods and is classified or is in process of a classification determination." Ex. A at 4, ¶ 1.[2] Before signing the agreement, a recipient of SCI must receive a security indoctrination "concerning the nature and protection of SCI, including the procedures to be followed in ascertaining whether other persons to whom [he] contemplate[s] disclosing [SCI] have been approved for access to it." *Id.* at 4, ¶ 2.

The agreement imposes the following obligations. First, a recipient agrees to "never divulge" any marked or known SCI without written authorization. *Id.* at 4, ¶ 3. The recipient also agrees to submit for prepublication security review any writings that meet one of several SCI-based triggering conditions, *id.* at 4, ¶ 4, in order to "give the United States a reasonable opportunity to determine whether the [writing] sets forth any SCI," *id.* at 4, ¶ 5. Third, the recipient agrees to "not disclose the contents of [a writing submitted for review] with, or show it to, anyone who is not authorized to have access to SCI until" he receives written permission from the government. *Id.* at 4, ¶ 4. Fourth, the agreement provides that SCI remains property of the United States. *Id.* at 4, ¶ 8. Finally, upon an unauthorized disclosure of SCI, a recipient assigns to the government "all rights, title and interest, and all royalties, remunerations, and emoluments that have resulted, will result, or may result" from the disclosure. *Id.* at 5, ¶ 12.

*Id.* at 2–3.

### 2.   Classified Information Nondisclosure Agreement (SF 312)

The classified information agreement imposes similar obligations on parties granted access to classified information. The agreement defines classified information as "marked or unmarked classified information . . . and unclassified information that meets the standards for classification and is in the process of a classification

---

[2] "All references to exhibits refer to the exhibits to the original complaint, ECF No. 1. The United States did not refile the exhibits attached to the original complaint when it filed the first amended complaint, but the first amended complaint refers to the exhibits as if they were attached. *See He Depu v. Yahoo! Inc.*, 950 F.3d 897, 901 (D.C. Cir. 2020) ('In deciding a motion to dismiss, a court may . . . consider documents attached to or incorporated in the complaint.')." Mem. Op. 2 n.1 (internal quotation marks omitted).

determination." [Ex. A] at 2, ¶ 1. As with a recipient of SCI, a recipient of classified information must be trained in how to protect classified information and in the procedures for "ascertaining whether other persons to whom [he] contemplate[s] disclosing [classified] information have been approved for access to it." *Id.* at 2, ¶ 2. Under the agreement, a recipient of classified information agrees to "never divulge" any classified information except (a) to an authorized recipient or (b) with written authorization. *Id.* at 2, ¶ 3. He also agrees to consult with the government before disclosing any information if he is uncertain about its classification status. *Id.* As with SCI, classified information remains the property of the United States. *Id.* at 2, ¶ 7. And as with SCI, a recipient of classified information assigns to the government "all royalties, remunerations, and emoluments that have resulted, will result or may result from any [unauthorized] disclosure." *Id.* at 2, ¶ 5.

*Id.* at 3.

## B. Factual History

Bolton served as President Trump's National Security Advisor from April 2018 to September 2019. First Am. Compl. ¶ 9, ECF No. 18. In that role, he led the National Security Council (NSC) in advising the President on national security and foreign policy questions and in facilitating interagency coordination on those topics. *Id.* at ¶¶ 7–8; *see generally* National Presidential Security Memorandum 4, 82 Fed. Reg. 16,681 (Apr. 6, 2017). The National Security Advisor regularly deals with some of the most sensitive information the government possesses. First Am. Comp. ¶ 7.

When he became National Security Advisor, Bolton signed three nondisclosure agreements with the United States. He signed two SCI nondisclosure agreements (Form 4414) to access SCI.[3] Ex. A at 4–7. He also signed a classified information nondisclosure agreement (SF 312) to access classified information. *Id.* at 2–3.

In the months after Bolton left the White House, he and publisher Simon & Schuster agreed to produce a memoir of Bolton's time as National Security Advisor. First Am. Compl. ¶ 23. Bolton titled his memoir *The Room Where It Happened*.

Bolton then began a prepublication review process. At the end of 2019, Bolton's attorney contacted Ellen Knight, the NSC's senior

---

[3] "Bolton signed two copies of Form 4414 because each allowed him to access different Special Access Programs, which provide compartmented security for SCI. The terms of the two agreements are identical, except that the agreements list different Special Access Programs." Mem. Op. 4 n.3.

director for records access and information security management, to submit his manuscript for review.  *Id.* at ¶ 31; Ex. D.  In a letter to Knight, Bolton's attorney asserted that "Bolton has carefully sought to avoid any discussion in the manuscript of [SCI] or other classified information, and we accordingly do not believe that prepublication review is required."  Ex. D.  He described the decision to submit the manuscript as taken "out of an abundance of caution, as contemplated by the nondisclosure agreements that [Bolton] entered."  *Id.*  Knight and her staff conducted a preliminary review of the manuscript and informed Bolton that it contained "significant amounts of classified information," some of which was classified as top secret.  First Am. Compl. ¶ 33; Ex. E; *see also* Ex. H.  Through in-person meetings, phone calls, and written comments, Knight and Bolton worked through an iterative series of changes to his manuscript to excise classified information.  First Am. Compl. ¶¶ 41–45.  On April 28, 2020, Knight completed her prepublication review and believed that the manuscript did not contain classified information.  *Id.* at ¶ 46.  But despite Bolton's requests for a letter confirming that he had permission to publish his manuscript, Knight declined to provide a letter and told him that the review was ongoing.  *Id.* at ¶¶ 47, 49.

After Knight completed her initial review, Michael Ellis, the NSC's senior director for intelligence programs, began a second review.  *Id.* at ¶ 51.  Ellis possessed delegated authority to classify information, *id.*, *see also* Exec. Order No. 13,526 at § 1.3(a)(3), 75 Fed. Reg. at 708, and had regular access to more "extremely sensitive intelligence reports" than Knight, First Am. Compl. ¶ 52.  Ellis determined that the manuscript contained classified information, including SCI.  *Id.* at ¶¶ 57, 59.  Accordingly, on June 8, 2020, the NSC's legal advisor sent Bolton's attorney a letter explaining that the manuscript contained classified information and that publication could not occur until the government confirmed that the prepublication review process was complete.  *Id.* at ¶ 54.

Nevertheless, Bolton authorized Simon & Schuster to publish his book, *id.* at ¶¶ 53–55, Ex. P, and Simon & Schuster forged ahead with publication, *id.*. ¶ 64, Ex. P.  By June 10, 2020, Simon & Schuster had printed the memoir and distributed it to retailers and reviewers.  First Am. Compl. ¶¶ 64, Ex. P.

*Id.* at 4–6.

## C.  Procedural History

On June 16, 2020, one week before the memoir's official release date, the government commenced this action.  It sought (a) a

> declaration that Bolton had acted unlawfully, (b) an injunction to prevent Bolton from publishing the book, and (c) a constructive trust over Bolton's royalties.  *See* Compl.  In its original complaint, the government alleged only that the manuscript contains classified information.  *See id.* at ¶ 58.  Three days later, the government amended its complaint to allege that Bolton's memoir contains SCI. First Am. Comp. ¶ 59.

*Id.* at 6.

In the amended complaint, the government alleges that Bolton breached the SCI agreements, the classified information agreement, and his fiduciary duties.  First. Am. Compl. ¶¶ 68–86.  It seeks a constructive trust over Bolton's profits from his memoir and injunctive and declaratory relief.  *Id.* at pp. 25–26.

The government sought, and the Court denied, a temporary restraining order and a preliminary injunction to prevent the memoir's publication.  *See* Mem. Order 6, 10 (June 20, 2020), ECF No. 27.

After the memoir was published, Bolton moved to dismiss the complaint.  The government opposed the motion and moved for summary judgment.  Bolton, in turn, asked the court to delay consideration of the motion for summary judgment until he is able to conduct discovery.

The Court denied Bolton's motion to dismiss the complaint, but directed the parties not to hold a discovery conference until further order.  *See* Order (Oct 1, 2020), ECF No. 56.  Bolton answered the complaint, raising numerous affirmative defenses including prior material breach of the agreements and unclean hands.  Answer ¶¶ 90, 95, ECF No. 58; *see also id.* at ¶¶ 87–89, 91– 94, 96–97.

Bolton's motion to deny or delay consideration of the motion for summary judgment and the government's motion for summary judgment are now before the Court.  The Court has benefitted from extensive briefing on both motions.  Bolton supported his Rule 56(d) motion with the requisite affidavit, Cooper Decl., ECF No. 49-2, and the parties have fully briefed the

motion.  ECF Nos. 49-1, 50, 51. The government filed a brief in support of its summary judgment motion, ECF No. 44, but Bolton did not file a brief in opposition.  Additionally, the Court heard argument on the motions.  Hr'g Tr. (Sept. 24, 2020), ECF No. 55.

## II.   LEGAL STANDARDS

"[S]ummary judgment is premature unless all parties have 'had a full opportunity to conduct discovery.'" *Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)). When the party opposing a summary judgment motion shows that it "cannot present facts essential to justify its opposition," a court may (a) defer consideration of or deny the motion, (b) allow time for discovery, or (c) grant any other appropriate relief.  Fed. R. Civ. P. 56(d).  The Circuit directs trial courts to grant Rule 56(d) motions "as a matter of course."  *Convertino*, 684 F.3d at 99 (D.C. Cir. 2012).

A Rule 56(d) motion requires (1) a specific affidavit about why additional discovery is necessary, (2) an explanation of why the evidence could not be obtained before the motion for summary judgment, and (3) a showing that the information sought can be obtained through additional discovery.  *Convertino*, 684 F.3d at 99–100.  Discovery is not required when "all the facts required to decide the summary judgment issue are already in the record."  *Curtin v. United Airlines, Inc.*, 275 F.3d 88, 91 (D.C. Cir. 2001).  If the evidence the responding party seeks through discovery cannot not "cure[] the fatal flaws" in the party's legal theory, then the trial court has discretion to deny the motion.  *Trudel v. SunTrust Bank*, 924 F.3d 1281, 1287 (D.C. Cir. 2019).  Put another way, if the court's deposition of the motion would not change even if the responding party successfully discovered all the information it sought in its Rule 56(d) affidavit, then the party has not shown why additional discovery is necessary.

While the Court must construe Rule 56(d) motions "generously," *Convertino*, 684 F.3d at 99 (quoting *Resolution Trust Corp. v. N. Bridge Assocs.*, 22 F.3d 1198, 1203 (1st Cir. 1994)), filing

a Rule 56(d) motion does not automatically entitle a party to more time, *see United States ex rel. Folliard v. Gov't Acquisitions, Inc*., 764 F.3d 19, 26–27 (D.C. Cir. 2014).

## III.   ANALYSIS

Bolton seeks discovery in two areas.  First, he asks to conduct discovery into his allegations that President Trump or other White House officials acted in bad faith by delaying prepublication review and attempting to unduly influence classification decisions.  Second, he asks to conduct discovery into his allegations that the manuscript does not contain information properly classified under the applicable executive order and agency procedures.

In his Rule 54(d) affidavit, Bolton explains that this information could not be obtained earlier because discovery has not begun.  Cooper Decl.  at ¶¶ 22–26.  And the affidavit meets Bolton's minimal burden to show that discovery can produce information about the truth or falsity of the facts he seeks to establish.  *Id.* at ¶¶ 27–29; *see also id.* at ¶¶ 30–71; *Convertino*, 684 F.3d at 99–100.  Indeed, the government does not contest that Bolton has met *Convertino*'s second and third requirements: previous unavailability and present availability of the information sought.

The only issue, then, is whether Bolton has met the *Convertino*'s first requirement: materiality.  In this context, information is material—or necessary—when it could change the outcome of the government's motion for summary judgment.  For reasons explained below, evidence about bad faith conduct could faith could change the outcome of the motion for summary judgment, but evidence about improper classification could not.  Because the court concludes that evidence of bad faith is material, it proceeds to define the scope of the discovery it will permit Bolton to conduct.

### A.  Discovery Regarding Bad Faith Conduct

Bolton argues that he is entitled to discovery to establish thirteen necessary facts related to alleged bad faith on the part of President Trump or other White House officials.  To summarize,

he alleges that discovery will show that they intentionally delayed prepublication review and attempted to unduly influence classification decisions. *See* Cooper Decl. ¶ 13. He argues that this evidence will support an affirmative defense: prior material breach of the implied covenant of good faith and fair dealing. *Id.* at 15. Additionally, in his answer, Bolton asserts a similar affirmative defense: unclean hands.[4] Answer ¶ 95. To establish unclean hands, Bolton must only show bad faith conduct, *see Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945), while to establish a material breach Bolton must prevail in a complex five-balancing test. *See Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1312 (Fed. Cir. 2004) (citing *Restatement (Second) of the Law of Contracts* § 241). Bolton's unclean hands defense is thus much easier to establish. And Bolton would be entitled to the same discovery to support either defense. Therefore, the Court need only analyze whether discovery is necessary to support the equitable defense.

If bad faith could be material to deciding the government's motion for summary judgment, Bolton is entitled to discovery to prove or disprove his unclean hands defense.

The government asks this Court to employ its equitable powers to impose a constructive trust over Bolton's book profits. But "he who comes into equity must come with clean hands." *Precision Instrument*, 324 U.S. at 814. That doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Id.*

---

[4] While Bolton does not expressly ask for discovery to support this affirmative defense, the Court properly considers it for two reasons. First, the Court must construe Rule 56(d) motions generously. *Convertino*, 684 F.3d at 99. The court should be particularly generous where, as here, the defendant had not filed an answer—and thus not could not plead affirmative defenses—*before* the plaintiff moved for summary judgment. And evidence of bad faith would support both affirmative defenses. Second, now that Bolton has asserted an unclean hands affirmative defense, the Court cannot grant summary judgment to the government unless that defense fails as a matter of law. Nor could the Court treat Bolton's unclean hands defense as forfeited. *See Daingerfield Island Protective Soc. v. Babbitt*, 40 F.3d 442, 445 (D.C. Cir. 1994). Thus, the Court properly considers whether the unclean hands defense could affect the outcome of the government's summary judgment motion.

Because the government seeks an equitable remedy, Bolton may assert unclean hands against the government's claim for a constructive trust unless the government can show that the defense is unavailable. The government cannot.

*First*, Bolton did not forfeit his ability to raise affirmative defenses by deciding not to sue the government before he published his memoir.

The government argues that the Supreme Court's promise of a "swift and sure remedy" in *Snepp v. United States* cannot be reconciled with "an amorphous concept of 'bad faith.'" Gov't Br. 20 (citing 444 U.S. 507, 516 (1980)). The government reads too much into that phase. "Swift and sure" does not mean automatic. *See, e.g.*, *Air Line Pilots Ass'n v. Miller*, 523 U.S. 866, 878–79 (1998) (describing arbitration as a "swift and sure" process). Indeed, the doublet arose in law to describe "swift and sure" criminal punishments.[5] *See, e.g.*, *Morgan v. State*, 31 Ind. 193, 195 (1869). Compared to damages for breach of contract, a constructive trust provides a relatively swift remedy because a court imposes it without a jury trial. *See Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570 (1990). And a constructive trust provides a relatively sure remedy because the amount the plaintiff will recover if it obtains its remedy is certain. *See Restatement (Third) of Restitution and Unjust Enrichment* § 55 (2011). But nothing in *Snepp* precludes a defendant from asserting affirmative defenses in an action for a constructive trust.

The government also argues that *United States v. Marchetti* limits Bolton to asserting bad faith in a prepublication suit for a declaratory judgment. Gov't Br. 19 (citing 466 F.2d 1309, 1317 (4th Cir. 1972)). *Marchetti* certainly says that when the government and a recipient of classified

---

[5] Shakespeare may have coined the phrase in another context. *See* William Shakespeare, *Macbeth* act 3, sc. 1, l. 37 ("I wish your horses swift, and sure of foot.").

10

information disagree about whether material can be published, the recipient has the burden of suing the government:

> [S]ince First Amendment rights are involved, we think Marchetti *would be entitled to judicial review* of any action by the CIA disapproving publication of the material. Some such review would seem essential to the enforcement of the prior restraint imposed upon Marchetti and other former employees. Because of the sensitivity of the area and confidentiality of the relationship in which the information was obtained, however, we find no reason to impose the burden of obtaining judicial review upon the CIA. It ought to be on Marchetti.

*Marchetti*, 466 F.2d at 1317 (emphasis added) (citation omitted). But *Marchetti* only discusses the recipient's burden to raise First Amendment challenges to prior restraint; in that situation, it relieves the government of the onus of seeking an injunction to prevent publication. It says nothing about waiving affirmative defenses. And indeed, in affirming the lower court's ruling, the *Marchetti* court also remanded for "such further proceedings as may be necessary if Marchetti contends that the CIA wrongfully withheld approval of the publication of any information under the standards we have laid down." *Id.* at 1318. Such a remand would not be necessary if Marchetti's failure to sue prevented him from litigating the merits of his claims. The government's interpretation of *Marchetti* is not sound.

Furthermore, precedent in this Circuit supports the conclusion that a defendant may raise an affirmative defense when he alleges that the government seeks to use a secrecy agreement improperly. In *Agee v. CIA*, the government (as counterclaimant) sought a constructive trust over the proceeds from former CIA clandestine officer Philip Agee's books, arguing that he violated his secrecy agreement with the agency. 500 F. Supp. 506, 507–08 & n.1 (D.D.C. 1980). Agee raised two affirmative defenses in opposition to the government's motion for summary judgment: politically biased enforcement and unclean hands. Despite Agee's campaign to reveal the identities of hundreds of CIA officers and agents, *see Haig v. Agee*, 453 U.S. 280, 284–85 (1981),

11

Judge Gesell took Agee's claims of political bias seriously, *see Agee*, 500 F. Supp. at 508–09.  He declined to impose a constructive trust because Agee had raised "unsettled factual issues that can only come clear through time-consuming discovery."  *Id.* at 509.  In addition to accepting Agee's politically motivated-enforcement defense, Judge Gesell rejected Agee's unclean hands defense on the merits.  *See id.* at 508 ("In invoking the 'dirty hands' doctrine, it is necessary that the wrongs complained of have a close nexus to the cause of action.  There is no such nexus here.").  In reaching the merits of the claim, Judge Gesell implicitly accepted that an unclean hands defense could be available in a government suit to enforce a secrecy agreement.  If the government could not secure a constructive trust against Agee—whose blatant conduct endangered hundreds of lives—without litigating the merits of his affirmative defenses, it cannot secure one against Bolton until the Court satisfies itself that the government comes into court with clean hands. [6]  For these reasons, Bolton has not forfeited his affirmative defenses.

 *Second*, equitable defenses are available against the government in contracts cases.  To be sure, when the government calls upon equity to enforce laws on behalf of its citizens, a defendant may not rely on equitable defenses in the same manner as it could against an ordinary litigant.  *Bartko v. SEC*, 845 F.3d 1217, 1227 (D.C. Cir. 2017); *see also Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 60–61 (1984); *United States v. Philip Morris Inc.*, 300 F. Supp. 2d 61, 75 (D.D.C. 2004) (collecting cases).  But when the government seeks to enforce its own contractual rights, a defendant may call upon equitable defenses when it can show "affirmative

---

[6] A trio of cases from the Eastern District of Virginia offer some support for the government's position, but the Court finds them unpersuasive. *See United States v. Snowden*, No. 1:19-cv-1197-LO, slip op. at 10 (E.D. Va. Dec. 17, 2019); Hr'g Tr. 24–25, *United States v. Scherck*, No. 1:12-cv-754-CMH (E.D. Va. Apr. 18, 2013) (ruling from bench); Hr'g Tr. 19–20, *United States v. Jones*, No. 1:10-cv-765-GBL (E.D. Va. June 15, 2011) (ruling from bench).  Each of the cases overreads *Snepp* and *Marchetti* in the same way as the government does here, holding that a recipient's failure to sue before publishing effectively waives his affirmative defenses.  The Court rejects that conclusion for the same reason it rejects the government's arguments.

misconduct." *See Rumsfeld v. United Techs. Corp.*, 315 F.3d 1361, 1377 (Fed. Cir. 2003); *Travelers Indem. Co. v. United States*, 16 Cl. Ct. 142, 156 (1988).[7]  As Bolton alleges that the government engaged in affirmative misconduct, he may assert his unclean hands defense against the government's efforts to enforce its contractual rights.

*Third*, strong public policy concerns favor allowing an unclean hands defense in actions to enforce secrecy agreements.  To hold otherwise would create tremendous moral hazard, because otherwise the government would face effectively no consequences for conducting prepublication reviews in bad faith.  Nor does the potential for judicial review solve that moral hazard.  While a recipient of classified information could seek declaratory relief in some cases, unripeness may prevent courts from weighing in until the relevant agency completes its review.  *See generally Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 632 (D.C. Cir. 2017); *cf. Shaffer v. Def. Intelligence Agency*, 601 F. Supp. 2d 16, 24–25 (D.D.C. 2009) (holding unripe a complaint for declaratory judgment to permit plaintiff to discuss classified information with his attorney to prepare for potential Congressional hearing).  The Court does not countenance any individual's decision to short-circuit prepublication review and publicly disseminate potentially classified information.  But nor does it wish to free the government from all consequences for potential misconduct.  And those consequences are reasonable because the defense only bars equitable remedies; if a defendant proves unclean hands, the government may still proceed with legal remedies against him.

As Bolton may assert an unclean hands defense against the government's claim for a constructive trust, evidence of bad faith is material to his opposition to summary judgment. Accordingly, Bolton must be allowed to conduct discovery into his allegations of bad faith.

---

[7] Indeed, the government concedes that a bad faith defense is available in at least some contracts cases against the government.  *See* Gov't Br. 21.

**B.  Discovery Regarding Improper Classification**

Bolton also argues that he is entitled to discovery to establish necessary facts related to improper classification.  He alleges that discovery will show that (1) his book contained no classified information or SCI, (2) his book contained no description of activities related to or derived from SCI, that (3) any SCI or description of activities related to or derived from SCI in his book "was not classified as such, or in process of a classification determination" when he authorized publication, and (4) he lacked scienter.  Cooper Decl. ¶ 10.  Bolton argues that these facts will establish he did not breach the agreements.  Def's. Br. 9.

If establishing these facts could be material to deciding the government's motion for summary judgment, Bolton is entitled to discovery to prove or disprove his theory.  None of these four sets of facts, however, is material.

*First*, additional evidence establishing whether Bolton's book contained classified information or SCI is not material because the Court must rely first on *ex parte* evidence in evaluating whether information has been properly classified.  And if that *ex parte* evidence is sufficient, the court must rely solely on *ex parte* evidence.

In the context of disputed nondisclosure agreements, courts generally review classified affidavits *ex parte*.  *See Stillman v. CIA*, 319 F.3d 546, 549 (D.C. Cir. 2003) (directing the district court to attempt to determine whether information is properly classified without assistance from plaintiff's counsel); *McGehee v. Casey*, 718 F.2d 1137, 1149 (D.C. Cir. 1983) ("We anticipate that *in camera* review of affidavits, followed *if necessary* by further judicial inquiry, will be the norm." (emphasis added)).  The government lodged classified declarations to show that Bolton's manuscript contained classified information and SCI.  Notice of Lodging (June 17, 2020), ECF

No. 4; *see* Hr'g Tr. 9:19–11:9, 11:22–12:2, 16:1–16:6, 18:2–6 (June 20, 2020) (generally describing content of declarations in open hearing), ECF No. 28.

Based on those declarations, the Court finds that Bolton's manuscript contained SCI and classified information, that the government classified some of the SCI and classified information before Bolton authorized publication of his manuscript, and that the government classified the information properly under Executive Order 13,526 and the relevant agency procedures. *See also* Mem. Order 6. Under *Stillman*, those findings end the inquiry into whether the manuscript contains properly classified information. Accordingly, Bolton's access to the discovery would be immaterial to the Court's resolution of the case.

Nor, contrary to his arguments, does Bolton have a due process right to discovery on the question of improper classification. While due process normally demands fully adversarial proceedings, the Due Process Clause permits *ex parte* review of evidence in "extraordinary circumstances" when disclosure of the evidence would have "substantial adverse consequences." *See Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 967–68 (D.C. Cir. 2016). Evaluation of top secret information presents a paradigmatic extraordinary circumstance because disclosure of the evidence, by definition, would result in "exceptionally grave damage" to the national security. Exec. Order No. 13,526 at § 1.2(a). Bolton, thus, has no due process right to discover that evidence.

*Second*, evidence establishing whether Bolton's book contains descriptions of activities related to SCI would not be material because Bolton's manuscript contains SCI and classified information. That alone suffices to prove a breach of the SCI agreement.

*Third*, additional evidence establishing when the government classified information is not material because the Court finds that Bolton's manuscript contained classified information and

SCI and that the information was classified or designated as SCI before May 2, 2020.  *See* Hr'g Tr. 10:22–24 (June 20, 2020) (stating that declaration establishes that "[t]hree of the examples, including the example relating to TS/SCI were classified before Mr. Ellis's review.").  Bolton argues that he did not breach the agreements because the government classified information in his manuscript only after he authorized publication.  But the Court's findings, based on the *ex parte* declarations, foreclose that argument.  Thus, no additional evidence could be material to summary judgment.

*Fourth*, evidence establishing Bolton's state of mind is not material because the government does not need to establish scienter to prevail.  *See* Mem. Op. 11–13 (holding that except for violations related to "material that a recipient 'ha[s] reason to believe' is derived from SCI," the SCI agreements impose strict liability); *id.* at 23 (holding the classified information agreement imposes strict liability).

In sum, Bolton's access to additional evidence about the classified information and SCI in his manuscript or his own state of mind cannot materially affect the Court's resolution of the government's summary judgment motion.  Therefore, Bolton is not entitled to discovery on those topics.

### C. Permitted Discovery

While the Court will permit discovery, it is aware that discovery in this case is likely to implicate questions of executive privilege and national security.  It therefore has the power and the duty to control discovery to minimize potential constitutional issues.  *See Cheney v. U.S. Dist. Court*, 542 U.S. 367, 390 (2004).  Thus, the Court will not grant Bolton free rein to conduct the unbounded discovery he has proposed.  *See, e.g.*, Hr'g Tr. 73:25–76:2 (Sept. 24, 2020).  Rather, the Court will work to avoid a confrontation of constitutional dimensions by controlling the scope

of discovery and minimizing the need for formal invocations of executive privilege. *See Cheney*, 542 U.S. at 390 (citing with approval *United States v. Poindexter*, 727 F. Supp. 1501, 1503–04 (D.D.C. 1989)).

Bolton may conduct discovery only on his allegations that President Trump or senior White House officials acted in bad faith by intentionally delaying prepublication review and by attempting to attempting unduly influence classification decisions.

As detailed in the order accompanying this opinion, the Court will permit discovery in carefully controlled phases. The first phase shall consist of the least intrusive means of securing evidence about Bolton's bad faith allegations from the most junior officials who are likely to provide useful information. Each subsequent phase may include more senior officials or more intrusive means of discovery. Bolton may not commence discovery until the Court reviews his discovery plan, and Bolton must return to the Court to seek authorization to begin each phase of discovery. The Court will grant Bolton authorization to carry out, at most, one phase of discovery at a time.

Additionally, as detailed in the order accompanying this opinion, the Court will direct the parties to confer on a process for addressing privilege objections and will offer the government the opportunity to seek a protective order to govern the handling of discovery materials.

## IV.  CONCLUSION

Because Bolton argues that the government acted inequitably, the Court must be satisfied that the government has clean hands before it can impose a constructive trust. For Bolton to support that argument, he must be allowed limited discovery.

Therefore, by separate order the Court will **GRANT** Bolton's Rule 56(d) motion and **DENY WITHOUT PREJUDICE** the government's motion for summary judgment. The government may renew its motion after the conclusion of discovery.

/s/ Royce C. Lamberth

Date: January 14, 2021                    Royce C. Lamberth
                                          United States District Judge